In The Circuit Court of Jackson County, Missouri

Keith L. Carnes,                    )
                movant,            )
                                   )
        vs.                        )        0816-CV04757
                                   )        Division 5
State of Missouri,                 )
                respondent.        )

## Motion to Reopen Rule 75.01

Now comes Movant, Keith Carnes, pro se, and pursuant to Rule 75.01 requests this honorable Court to rule on the following claims that were not ruled on. Within the judgement on Motion for Post-Conviction Relief (pursuant to Rule 29.15) that were briefed on and attached to the back of Movant's 29.15 amended motion.

                    Claim #3(8(G)) (see attached)

Movant received ineffective assistance of Apellant counsel by counsel's failure to brief on appeal; the trial court erred and abused its discretion in overruling Appellant's Motion for Judgement of Acquital regarding the sufficiency of the evidence, in that the evidence, particularly the material and forensic evidence, was in such logical conflict in violation of his rights to Due Process of Law and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and by Article 1, sections 10 and 18(a) of the Missouri Constitution.

                    Claim #5(8(I)) (see attached)

Movant received ineffective assistance of Appellant counsel,

by counsel's failure to brief on appeal, the State failed to disclose and turn over all of the crime scene photographs to enable his forensic reconstructionist crime scene expert to reconstruct the crime scene, in violation of Movant's right to Due Process of Law and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article 1, sections 10 and 18(a) of the Missouri Constitution.

### Claim #6(8(J)) (see attached)

Movant received ineffective assistance of Appellate counsel by counsel's failure to represent Movant zealously and competently. Counsel was derelict in his duties owed to Movant by not referring to citation in the record to support the claim, thus denying Movant the effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and by Article 1, sections 10 and 18(a) or the Missouri Constitution.

Had these claims been ruled on in the Finding of Facts and Conclusion of Law there is a reasonable probability that the result of the proceeding would have been different.

### In Conclusion

Movant request that this honorable Court make a Finding of Fact and Conclusion of Law on the claims within this Motion.

Wherefore Movant request this honorable Court grant this request.

Respectfully submitted,

_Keith Carnes_

Keith Carnes, #161267
Crossroads Correctional Center
1115 East Pence Road
Cameron, Missouri  64429

Sworn to and signed before me this 11th day of August, 2010.

SEAL:

CHERYL R RICHEY
Notary Public - Notary Seal
STATE OF MISSOURI
DeKalb County
My Commission Expires: 10-26-2013
Commission # 09887036

_Cheryl R. Richey_
(Notary)

C/C Filed
Keith Carnes

_____

Attorney of Record
Susan Hogan

Appendix "B"

42

KEITH L CARNES

Plaintiff,

vs.                                    Case No: 0816-CV04757

                                       Division 5

STATE OF MISSOURI

Defendant.

## ORDER DENYING
## MOTION TO REOPEN RULE 75.01

UPON FULL CONSIDERATION, the Court, having reviewed Plaintiff's Motion

to Reopen Rule 75.01 filed on August 16, 2010, and the Court having reviewed all

evidence, pleadings and arguments of record related to said motion, and being fully

advised in the premises,

IT IS HEREBY ORDERED that said motion is DENIED.

Dated: SEPTEMBER 9, 2010

_____
W STEPHEN NIXON
Judge

**Certificate of Service**

This is to certify that a copy of
the foregoing was mailed postage
pre-paid or hand delivered to the
following on SEPTEMBER 9, 2010.

Copies to:

SUSAN LYNN HOGAN
920 MAIN ST STE 500
KANSAS CITY, MO 64105

# In the Missouri Court of Appeals

# Western District

STATE EX REL KEITH CARNES,    )
        RELATOR,           )
                                   )
vs.                                  )   WD74311
                                   )   0816-CV04757
HON. W. STEPHEN NIXON, JUDGE, DIV 5, )
16TH JUDICIAL CIRCUIT,           )
        RESPONDENT.      )

## ORDER

Relator having been granted leave to proceed in forma pauperis, pursuant to the provisions of the "Prisoner Litigation Reform Act" requiring offenders to pay the full Seventy ($70.00) filing fee when bringing a civil action; and

The Relator having paid the initial partial filing fee ordered by the Court;

IT IS ORDERED that balance of $ 22.85 be withdrawn from the Relator's correctional center account pursuant to the "Prisoner Litigation Reform Act" Section 506.372 RSMO (2000) and forwarded monthly to the Department of Revenue as provided by this Act.

Dated this 30th day of September, 2011.

**LISA WHITE HARDWICK**
**CHIEF JUDGE**

cc:   KEITH CARNES
      STEPHEN HAWKE
      RODNEY KUEFFER



## In the
## Missouri Court of Appeals
## Western District

IN RE: KEITH L. CARNES,  )
)
Relator,  )
)
v.  )   WD74311
)
STATE OF MISSOURI, et al.,  )
THE HONORABLE STEPHEN  )
NIXON, Judge, Division 5, 16th  )
Judicial Circuit,  )
)
Respondent.  )

### ORDER

Relator's Petition for Writ of Mandamus and Suggestions in Support thereof submitted on September 30, 2011, are taken up and considered. The Court, having considered the Petition hereby denies said Petition.

Dated this 3rd day of October, 2011.

*Cynthia L. Martin*

Cynthia L. Martin
Presiding Judge, Writ Division



# CLERK OF THE SUPREME COURT
## STATE OF MISSOURI
## POST OFFICE BOX 150
## JEFFERSON CITY, MISSOURI
### 65102

BILL L. THOMPSON
IMTERIM CLERK

TELEPHONE
(573) 751-4144

October 20, 2011

Mr. Keith Carnes - #161267
Crossroads Correctional Center
1115 East Pence Road
Cameron, Missouri          64429

**In re: State of Missouri vs. Keith Carnes**

Dear Mr. Carnes:

Please be advised that effective August 28, 1997, legislation became effective requiring all prisoners to the pay the entire filing fee of Seventy dollars ($70.00) when filing a civil action, such as a petition for writ, in the Supreme Court of Missouri. If you do not pay the entire filing fee at the time you seek to file your action, you must submit an actual request/motion to proceed without the prepayment of the entire fee along with evidence of your inability to pay the entire filing fee at the time of filing. Further, you must submit to the Court with your pleadings your **original** certified, stamped, and signed inmate account statement cover page dated within 30 days of the date preceding the submission of your pleadings along with the computer printout of your inmate account statement for the six (6) month period immediately preceding the submission of your documents for filing in the Supreme Court of Missouri. If you submit pleadings for filing without enclosing the **original** certified copy of your correctional center account statement for the six (6) month period immediately preceding your attempt to file the pleadings, the pleadings will be returned to you and will not be filed.

**Upon receipt of the necessary documentation**, the Court will calculate the partial filing fee required and notify you of the same. You must pay this amount within thirty (30) days of the date of the letter notifying you of the amount due or your case will be dismissed. **Further, by submitting the correctional center account statement, you agree to the deduction from your correctional center account sufficient funds to pay the remainder of the filing fee in monthly installments as set forth in the law. Moreover, the amount necessary to complete payment of the filing fee will be entered as a judgment against you.**

Page 2
October 20, 2011

The statute provides that the initial partial payment shall be calculated as follows:

Section 4. 1. The court shall order the offender to pay the full amount of the filing fee. If the offender is unable to pay the full amount, the court shall assess a partial payment of the filing fee which shall be twenty percent of the greater of the following:

(1) The average monthly deposits to the offender's account for the six-month period immediately preceding the filing of the complaint or notice of appeal requiring the payment of a fee; or

(2) The average monthly balance in the offender's account for the six-month period immediately preceding the filing of the complaint or notice of appeal requiring the payment of a fee.

Installment payments thereafter shall consist of 20% of the preceding month's deposits credited to your correctional center account.

The original only of your pleadings is required when filing a petition for writ in this Court. You must provide a completed Form 16 Writ Summary cover page which provides the underlying County and case number from the Circuit Court and the case number from the Court of Appeals on the last question/statement along with all other required information, your petition, suggestions in support thereof, an index or table of contents for any and all attachments/exhibits with said exhibit pages consecutively numbered and identified by letter or number on the actual exhibit document (refer to Rule 94.03 and 97.03), payment of the full filing fee or a motion to proceed in forma pauperis with your current **original** certified cover sheet with attached inmate account statement, any additional motions you wish to provide to the Court, and a certificate of service showing that you have sent a copy of all pleadings to the Respondent(s) or, in the alternative, the Office of the Missouri Attorney General. The certificate of service must provide the name and address for each party/respondent or their attorney(s).

Very truly yours,

*Bill L. Thompson*

Interim Clerk



NOTICE
THIS OPINION IS NOT FINAL UNTIL
ALL POST HANDDOWN MOTIONS HAVE
BEEN DISPOSED OF AND THE MANDATE
ISSUED AND RECEIVED.

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

KEITH L. CARNES, )
)
Appellant, )
)
vs. )  WD72916
)
STATE OF MISSOURI, )  Order filed: November 8, 2011
)
Respondent. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
### The Honorable W. Stephen Nixon, Judge

Before Division Two: Mark D. Pfeiffer, Presiding Judge, Victor C. Howard, Judge
and Cynthia L. Martin, Judge

## O R D E R

**PER CURIAM:**

Keith Carnes appeals the judgment of the motion court denying his Rule 29.15 motion for postconviction relief following an evidentiary hearing. Carnes sought to vacate his convictions for first-degree murder, section 565.020, RSMo 2000, and armed criminal action, section 571.015, RSMo 2000, and concurrent sentences of life imprisonment without probation or parole and life imprisonment, respectively. He claims that he received ineffective assistance of counsel when counsel failed to call a forensic or crime scene reconstructionist to testify at trial. Because a published opinion would have no precedential value, a memorandum has been provided to the parties. The judgment is affirmed. Rule 84.16(b).

# Missouri Court of Appeals
## WESTERN DISTRICT

December 20, 2011

## IMPORTANT NOTICE

To: All Attorneys of Record

Re: KEITH L CARNES #161267 (29.15), APPELLANT

vs.

STATE OF MISSOURI, RESPONDENT

WD72916

Please be advised that Appellant's motion for Rehearing is **OVERRULED** and motion for transfer to Supreme Court is **DENIED**. See Rule 83.04.

*Terence G. Lord*

Terence G. Lord
Clerk

cc: KEITH CARNES (000) 000-0000
SHAUN J MACKELPRANG (573) 751-5391



**CLERK OF THE SUPREME COURT**
**STATE OF MISSOURI**
**POST OFFICE BOX 150**
**JEFFERSON CITY, MISSOURI**
**65102**

BILL L. THOMPSON
INTERIM CLERK

TELEPHONE
(573) 751-4144

January 18, 2012

Mr. Keith L. Carnes  (via regular mail)
No 161267
Crossroads Correctional Center
1115 East Pence Road
Cameron, Missouri  64429

**In re:  Keith Carnes vs. State of Missouri**
**Western District No. WD72916**

Dear Mr. Carnes:

The enclosed application for transfer, received in this office on January 11, 2012, is not in compliance with the rules of this Court and it cannot be filed.  Pursuant to Rule 83.04, an application for transfer shall be filed in this Court within fifteen days of the date on which transfer was denied by the court of appeals.  It appears the application for transfer under Rule 83.02 (filed in court of appeals) was denied by the court of appeals on December, 20, 2011, making your application for transfer due to be filed in this Court on or before January 4, 2012.

Yours very truly,

Bill L. Thompson

Bill L. Thompson

Interim Clerk

Enclosures

cc: Mr. Shaun J. Mackelprang  (via e-mail)
    Clerk, Missouri Court of Appeals, Western District  (via e-mail)

# "Ground One"

## (NEWly Discovered Evidence)

"Report form Narrative"

"Two Letter from        "
Thaddeaus Wilson

"Affidavit from        "
Junius Morrow

Request
Evidentiary Hearing

"<u>Ground One</u>"

In order for merit to be given to the inferences of appellants Newly Discovered Evidence it is necessary to being by stating that this withheld exculpatory material was not disclosed by the first prosecutor Amy McGowan in appellants discovery request for his first trial that got dismissed November 16, 2004 and immediately refiled, because the prosecutor failed to produce its key-eyewitness Wendy L. Lockett (Direct appeal L.F. pg. 34) nor appellants second trial April 18, 2005 with prosecutor Dawn Parson, were appellant was found guilty by a jury trial and then granted a new trial because appellant was prejudice by the states 11th hour witness Wendy Lockett cause she was not properly deposed before trial, she also had to be apprehended through a court order for a body attachment to testify at trial (Direct appeal L.F. pgs. 83, 116-117 Line 3, 146) or appellants third trial November 7, 2005 with prosecutor Dawn Parson in which appellant was found guilty in a bench trial that also consisted of another court order for a body attachment on Wendy Lockett (Direct appeal L.F. pg. 195). Giglio v. U.S. 92 S.Ct. 763, 405 U.S. 150 (U.S 1972) Napue v. State of Illinois 79 S.Ct. 1173, 360 U.S. 264 (U.S. 1959) Harris v. Lafler 553 F.3d 1028, 1033 (6th Cir. 2009), Brady v. Maryland*

The Newly Discovered Evidence is a "report form narrative" written by P.O. Veron D. Huth #4755 and his partner P.O. Edward S. Begley taken a day after the crime (10-7-03) regarding their "female" confidential informant eyewitness; and two written letters from Thaddeaus Wilson." The report form narrative document didn't come into appellants possesion until 2008

through investigator Angelina Mc Millen who worked for appellants 29.15 post-conviction attorney Susan L. Hogan of the Western District, State Public Defenders Office.

Back in October of 2003 as appellant sat in the Jackson County Missouri jail on this charge, it was brought to his attention that Wendy Lockett was expected to testify against her nephew Thaddeaus Wilson for a murder, but appellant never got the oppurtunity to talk with Wilson because they were on different floors in the county jail. Once appellant was transferred to the Crossroad Correctional Center, Wendy Locketts son Greg Lockett/Kelly came to the facility and was moved right next door to appellant in the same module. After discovering that was her son they ended up talking and appellant told him about his actual innocence and that his mother testified falsely against him because of felonies she had pending at the time. Appellant also mentioned that he heard that she was going to testify on a person named Thaddeaus, he confirmed it was true and that Thaddeaus was his cousin, he also said that his mother has been on crack-cocaine since he was born and they aren't as close as they should be. Appellant asked Greg for Thaddeaus entire name and the address of what facility he was in so he could write him. The initial reason appellant wanted his information was to submit evidence in his appeal showing that she should be excluded because her trustwor-thiness was not reliable. To accomplish this, appellants plan was to produce a portion from Wendy Locketts deposition that was taken October 28, 2005 in which she stated

she has never made any deals with the police or prosecutor to testify or given any information about any crimes (Deposition pg. 62), but months before on February 10, 2005 she had given information about a crime of murder in a police statement report against Thaddeaus Wilson (Locketts police report). Appellant argued this at his 29.15 evidentiary hearing and insinuated that Wendy Lockett was the confidential informant mentioned in the report written by P.O. Huth (Evidentiary hearing transcript pgs. 119-125).

Thaddeaus Wilson first return letter received in 2007, also corroborated towards Wendy Lockett as being the confidential informant in the "report form narrative" dated a day after the crime, he states in his letter that one day after the crime the police rolled up on him and W. Lockett, found a few pieces of crack-cocaine and a crack pipe on her, then took her away in the police car, so he thought they were taking her to jail, but after about 20 minutes later they dropped her back off. He wrote that they were together when the shooting occurred on October 6, 2003 at a house on 28th and Park and that Lockett was not a eyewitness.

Worthiness of a statement against penal interest for the purpose of admissibility of the "confrontation clause" is whether the witness was in police custody when the statement was made, whether the witness had a motive to mitigate their own criminal liability and whether the witness made a response to a leading question. Witnesses often give statements to police that they later change, and in this instance W. Lockett official police report, that was given

to the defense, was taken 8 days after the crime on October 14, 2003 by Detective Avery Williamson #4723 after being transported to the police station by P.O. Huth and P.O. Begley, but the non-disclosure to the defense of the prior "report form narrative" taken by P.O. Huth and P.O. Begley on W. Lockett a day after the crime is what is of importance and would have affected the result of the trial.

When Wendy Lockett was ask in Trial 2 by prosecutor Dawn Parson, how did you come in contact with police after the crime and did this happen the next day or several days after the crime, W. Lockett's responds, about 2 days later. Maybe two days later (Trial 2, pg. 18 Line 15-17). (Lockett's response collaborates with the report form narrative take a day after the crime) Prior to being ask this question W. Lockett agrees that as the shooting occurred she's in the parking lot (Trial 2, pg. 17 Line 16-22) and then W. Lockett goes on to testify, I'm on my way back to the house," Like I said", I was standing on the lot. I was on my way back to the house. The police come out of nowhere and tell me they had a flag on me in the computer. Homicide wanted me (Trial 2, pg. 18 Line 8-14). Wendy Lockett's entire response to the prosecutors question is illogical and inconsistent with the actual date she was taken downtown for her official police report October 14, 2003. Wendy Lockett testified that she knew the two officers (Trial 2, pg. 19 Line 1-16) In W. Lockett's deposition which was taken after trial, she stated that P.O. Huth is the officer that rolled up on her a couple of days after the crime and told her that she was wanted for questioning, she said

okay, and got in the car but stated that he did not ask her any questions. W. Lockett claims that she doesn't remember the first officer she talked to about the shooting on the day she was picked up and made her statement. She was also ask if she knew if they videotaped the statement and her response was "They didn't videotape it, no". (Deposition pgs. 57-58). Wendy Lockett bold confidence in knowing that they didn't videotape the statement is obviously because she knows she was in the car with P.O. Hath and P.O. Begley when her statement was made, of the undisclosed report form narrative. Wendy Lockett had 2 pending felonies at the time that the shooting occurred, one was for possesion of a controlled substance (felony) case number 04CR204934-01 offense date 01-02-03 and Tampering with a motor vehicle (felony) case number 16CR03000016-01 offense date 11-10-2004. W. Lockett stated that she talked to the prosecutor about the shooting in questioning but not directly about what happened or with any of the investigators from the prosecutors office, she also said that the only person she's given a statement to is the police officer, the detective who questioned her (Deposition pg. 59) She was presently in the county jail at the time of the deposition on a probation violation and said that it's reinstated, when ask how she knew it was reinstated she said cause a hearing officer had her sign a paper saying that she had to report to her probation officer as soon as she was released. She stated that she had got put on probation on her case before she testified in court against appellant and that she had pled guilty on that case but hadn't been put on probation yet and she didn't

remember her public defenders name, but that no one from the prosecutor office or the police department made any agreements to assist her on her outstanding cases (Deposition, pgs. 60-62).

Wendy Lockett has 2 prior convictions for drug sales, one in 1996 and got 5 yrs. in the Department of Corrections and the other one in 1999 and got another 5 yrs. in D.O.C., then in 2003 she got convicted of possesion of the controlled substance case and got a 5 yr. sentence but ended up doing only 120 days, she pled guilty on that case, after the shooting received probation, violated that probation and got reinstated then violated it again then they gave her the 120 days after the warrant was served on 12-1-2003, then they released her from that probation in April of 2004, she still had the tampering (felony) pending, after a court ordered body attachment she testifies against appellant April of 2005 then 2 months later on June 20, 2005 arraignment is set on the tampering felony. Wendy Lockett already had four prior prison convictions then was rewarded probation on the tampering case shortly after testifying against appellant. Wendy Lockett testifies that she didnt cut any deal with the state. Prosecutor Dawn Parson ask W. Lockett did I promise you anything on your tampering case or did we ever talk about it, W. Lockett response was, no (Trial 3 pgs. 202-205, 236).

These conniving tactics used by the State and Lockett to achieve their personal objectives, eventually led the State to request another court ordered body attachment for Wendy Lockett to testify against appellant in his 3rd trial on November 7, 2005.

To put an end to this on-going debate that appellant has claimed from the beginning regarding the State and W. Lockett's trustworthiness, appellant decided to write a second letter to Thaddeaus Wilson around October of 2011 in hopes of his 2nd return letter to possibly help resolve this issue.

In appellants letter he basically informed T. Wilson that he was looking forward to getting his case overturned soon from a claim he was waiting for the court to rule on and was he still willing to come to court on appellant behalf like T. Wilson wrote in the first letter? Appellant ask T. Wilson if he knew the officers names that he wrote about that rolled up on him and W. Lockett after the crime or could he at least remember what they look like, cause this will help in court. When he wrote back his response was he doesn't know if he can remember what the officers look like because alot of time has past and people features change, but he knew for sure that one of the officers name was Beiley, but that the other cop had a really funny name and everybody called him Huff, for short and that the last time he was out there he became a detective.

All documents disclose of Wendy L. Lockett career criminal history, municipal included, plus the two pending felonies she had at the time give probative value to the reasonable probability that she gave the false statement in the undisclosed report form narrative to P.O. Huth and P.O. Begley, especially after they rolled up on her and found pieces of crack-cocaine and a crack pipe in her possesion.

Appellant prays that this court recognize this Newly Discovered Evidence as verification that was needed to establish the connection to the informant in the report form narrative as being Wendy Lockett, and not just a mere coincidence, because this Evidence contains more than an implication that the Government would reward the cooperation of W. Lockett, and hence to confirm rather than refute the existence of some understanding for leniecy. Furthermore the statement given by W. Lockett in the report form narrative compared to her deposition and two trial testimonies fail to fall with-in the realm of the "5" needed criteria conditions for the reliability of witness identification, therefore excluding W. Lockett permanently. Withholding to disclose statements police made to its key-eyewitness, including a promise of release if they implicated defendant, this was material under "Brady", witness was a key eyewitness who gave eyewitness accounts and the only Evidence that linked defendant as the gunman, SEE: Harris v. Lafler 553 F. 3d 1028, 1033 (6th Cir. 2009), Brady v. Maryland 373 U.S. 83 [83 S.Ct. 1194, 10 L. Ed 2d 215] (1963)

√20 ½    3-20-12

Respectfully Submitted

VINCENT NEGUS
Notary Public - Notary Seal
STATE OF MISSOURI
DeKalb County
My Commission Expires: 11-18-2013
Commission # 09898623

Keith Carnes

Appellant would also ask the court to reflect on the fact that numerous request were submitted before trial requesting the State to disclose all "Deals" given to eyewitness for their testimony (Direct Appeal L.F. pgs. 157, 165-166) 47-48. The prosecutor testified, "as a officer of this court, there was never a Deal (Trial 3 pg. 541). United States V. Agurs 427 U.S. at 112, 96, S.Ct. at 2401; Davis v. Alaska 415 U.S. 308, 318 94 S.Ct. 1105, 1111, 39 2d L. Ed (1974): Brady v. Maryland 373 U.S. 83 [83 S.Ct. 1194, 10 L. Ed 2d 215] (1963)
United States V. Bagley 473 U.S. 667, 105 S.Ct. 3375, 87 L. Ed 2d 481, 53 USLW 5084)

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

**STATE OF MISSOURI**

PLAINTIFF

vs.

Keith L. Carnes

DEFENDANT

NO. 16CR0300632l

DOCKET _____

DIVISION _____ 11

## DISMISSAL

Comes now _Amy A. McGown_ ,

Assistant Prosecuting Attorney for Jackson County, Missouri, and hereby dismisses the above entitled cause for the

reason: _____ (32) Fugitive
_____ (33) Not filed in proper territorial jurisdiction
_____ (37) Disposition of Detainer
___X___ (38) Case to be refiled
_____ (39) Restitution made to victim
_____ (40) Defendant plead guilty in another case
_____ (41) Current evidence not sufficient to prove guilty
_____ (43) State's witness(es) not available for trial
_____ (44) Defendant entered diversionary program
_____ (47) Defendant indicted by Grand Jury
_____ (48) Victim/witness refusal to cooperate
_____ (49) Other: _____

_____

November 16 , 20 04
DATE

PROSECUTING ATTORNEY
JACKSON COUNTY, MISSOURI

By _____
Assistant Prosecuting Attorney

Copy of the foregoing Dismissal mailed to,
Willis Toney

attorney for defendant, on
November 16 , 20 04

By _____
Assistant Prosecuting Attorney

## ORDER

As per dismissal filed, defendant is hereby discharged as to this cause of action and defendant's bond and surety, if any, are hereby released and discharged. Any warrant issued in this cause for the arrest of the above said defendant is hereby withdrawn.

11-16-04
DATE

34
ORIGINAL
(FILE IN COURT'S CASE FILE FOLDER)

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

STATE OF MISSOURI,              )
                                )
                    Plaintiff,  )          Division No. 70
                                )
        vs.                     )          Case No. 16CR03006321
                                )
KEITH CARNES,                   )
                                )
                                )
                    Defendant,  )

## ATTACHMENT FOR WITNESS

STATE OF MISSOURI       )
                        ) ss
COUNTY OF JACKSON       )

THE STATE OF MISSOURI TO ANY PEACE OFFICER IN THE STATE OF MISSOURI: YOU ARE COMMANDED TO ATTACH THE PERSON OF:

**Wendy Lockett**

**B/F, dob: 3/8/64**

AND TO BRING **WENDY LOCKETT** FORTHWITH BEFORE THE HONORABLE JUDGE WILLIAM F. MAUER OF THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, IN DIVISION 70 THEN AND THERE TO SHOW CAUSE WHY **WENDY LOCKETT** SHOULD NOT BE ADJUDGED IN CONTEMPT OF SAID COURT AND PUNISHED FOR FAILING TO APPEAR TO TESTIFY IN THE ABOVE ENTITLED CAUSE ON APRIL 18, 2005, AT 9:00 A.M., PURSUANT TO A SUBPOENA SERVED ON APRIL 7, 2005, AT 7:40 P.M., AND FURTHER INSTRUCTIONS REGARDING **WENDY LOCKETT'S** APPEARANCE PURSUANT TO THE SUBPOENA.

WITNESS MY HAND AND SEAL OF SAID COURT ON _4/18_ , 2005.

_Wm N Mauer_
_____
JUDGE

83

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY, MISSOURI

STATE OF MISSOURI

VS.

CR04-6321 — 02
DIVISION: 70

KEITH CARNES

## MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE JURY VERDICT OR IN THE ALTERNATIVE MOTION FOR NEW TRIAL AND REQUEST FOR ORAL ARGUMENT AND A HEARING ON THE MOTION

COMES NOW, Defendant Keith Carnes, by and through his attorney Willis L. Toney and hereby moves this Court to enter a finding of not guilty to all pending charges or in the alternative to grant the Defendant a new trial and in support thereof states as follows:

1. That on April 18 2005 the Defendant went to trial on the charges of Murder 1st Degree and Armed Criminal Action. That on April 20, 2005 the jury returned a verdict of guilty on both counts.

2. That the Defendant would submit to the Court that the verdict was against the weight of the evidence and that the verdict was not supported by the testimony of the witnesses.

3. That the Court erred in not sustaining the Defendants motion to exclude the testimony of Wendy Lockett. That the Defendant was prejudiced because he was not allowed sufficient time to investigate the testimony of Wendy Lockett prior to her in court testimony. That the testimony of Wendy Lockett was critical to the case and but for her testimony the Defendant would not have been convicted. It was clear error by the Court to allow her testimony over Defendant's objection. Further, the Court erred in only allowing the Defendant a short period of time on a recess to interview Ms. Lockett. {Ms. Lockett was in police custody and was brought to trial on the third day of trial}. This denied the Defendant the right to prepare an effective cross-examination. Additionally, the Defendant was not afforded adequate time to investigate the information that was given by Ms. Lockett. This is especially true since Ms. Lockett indicated that there were other people present during the alleged shooting. Once provided with these names defense counsel did not have adequate time to search for these witness to determine if their version of the events was different from Ms. Lockett's.

Additionally, Ms. Lockett testified that she ran behind the building after the shooting and crossed through a vacant lot. This would have been impossible, since there was a locked fence behind the

building. This fact was not discovered until after Ms. Lockett had given her testimony. This again contributed to the Defendant being denied the right to effectively confront and cross-examin a critical State witness.

Finally, the Defendant had requested the State to produce Ms. Lockett for interview/deposition for over 10 months. These request were made in writing and preserved in the record by the Defendant's pre-trial motion to exclude Ms. Lockett. The State located Ms. Lockett the night before trial (according to the Prosecutor). The State then interviewed her that night and prepared her for trial. However, the State did not notify the Defendant of her location until the morning that she was to testify and a few minutes prior to her actual testimony. The State should have contacted the Defendant's counsel immediately upon locating the witness   so that defense counsel would have had the same opportunity to interview her as the State. This action by the State of Missouri and by the  Court denied the Defendant due process of law.

    4. The Court erred and abused its discretion in now allowing the Defendant to inquire about statements made by another person regarding the ownership of the alleged murder weapon. The Court rule that such testimony would have been hearsay. The Defendant suggest that this statement (admission of ownership of the alleged murder weapon) was an exception to the hearsay rule, in that it would have been a statement by a coconspirator, **Fed R. Evid 11**. There was amble evidence that the person making the statement was also seen shooting at the victim. There was testimony that the maker of the statement was the owner or occupier of the apartment adjacent to where the weapon was found. Additionally, the declarant was unavailable because he is currently incarcerated in the Federal Bureau of Prisons.

    5. The verdict in this case was against the clear weight of the evidence. The evidence in this case clearly supported a finding of not guilty:
    A. The physical evidence did not support the finding of guilt by the jury, in that no clear evidence existed which showed beyond a reasonable doubt that the Defendant shot and killed the victim with pre-mediation and after cool deliberation as is required for a finding of guilty of Murder 1st Degree.
    B.  The medical evidence clearly indicated that the victim was not shot at point blank range as alleged by the witnesses in this matter. Therefore, the testimony of the State's witnesses was not credible.
    C. The clear physical evidence showed that all the shooting was done from one location. There were not any bullet casings or shells found at the location where the victims body was found and there were no shell casing or bullets found in the location where the witness, Wendy Lockett, testified that the Defendant was standing when he allegedly fired the first shots.
    D. The State failed to introduce any evidence that the Defendant was ever in possession of the murder weapon. In fact the clear evidence was that the murder weapon was in the possession of another person both before, during and after the shooting of the victim.

THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY

STATE OF MISSOURI,

CASE NO. 16CR03006321-01

PLAINTIFF,

DIVISION 70

VS.

KEITH L. CARNES,

DEFENDANT.

### ORDER RULING ON POST-TRIAL MOTIONS AND JUDGMENT

Now on this 2nd day of August, 2005, the State appears by Assistant Prosecuting Attorneys,

Dawn Parsons and Brady Twenter. Defendant appears in person, in custody, and by attorney, Willis

Toney. The Court hears testimony and oral argument on Defendant's Motion for Judgment of

Acquittal notwithstanding the Jury Verdict or in the Alternative Motion for New Trial, filed May 12,

2005.

Having heard the evidence presented and the arguments of counsel, and otherwise being

fully advised in the premises, the Court finds that Defendant's motion should be granted. The Court

finds that the Defendant was unfairly prejudiced at trial by the Court's failure to grant Defendant's

motion to exclude the testimony of Wendy Lockett. This prejudice resulted not from any fault of the

assistant prosecutor or Defendant's trial counsel, but as a result of the circumstances surrounding

the appearance of the witness late in the trial. The Court finds that such prejudice requires that the

Court set aside the jury's verdict and grant Defendant a new trial.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that the jury's verdict of guilty

is hereby set aside and Defendant's Motion for New Trial is SUSTAINED.

**IT IS HEREBY FURTHER ORDERED** that the above-styled cause is specially set for jury

trial to commence on Monday, September 26, 2005 at 9:30 A.M. in Division 70 before the Honorable

146

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff, | ) | Division No. 70 |
| | ) | |
| vs. | ) | Case No. 16CR03006321 |
| | ) | |
| KEITH CARNES, | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | |

## ATTACHMENT FOR WITNESS

| | |
|---|---|
| STATE OF MISSOURI | ) |
| | ) ss |
| COUNTY OF JACKSON | ) |

THE STATE OF MISSOURI TO ANY PEACE OFFICER IN THE STATE OF MISSOURI: YOU ARE COMMANDED TO ATTACH THE PERSON OF:

**Wendy Lockett**
**B/F, dob: 3/8/64**

AND TO BRING **WENDY LOCKETT** FORTHWITH BEFORE THE HONORABLE JUDGE WILLIAM F. MAUER OF THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, IN DIVISION 70 THEN AND THERE TO SHOW CAUSE WHY **WENDY LOCKETT** SHOULD NOT BE ADJUDGED IN CONTEMPT OF SAID COURT AND PUNISHED FOR FAILING TO APPEAR TO TESTIFY IN THE ABOVE ENTITLED CAUSE ON OCTOBER 11, 2005, AT 9:00 A.M., PURSUANT TO A SUBPOENA SERVED ON SEPTEMBER 26, 2005, AT 10:00 A.M., AND FURTHER INSTRUCTIONS REGARDING **WENDY LOCKETT'S** APPEARANCE PURSUANT TO THE SUBPOENA.

WITNESS MY HAND AND SEAL OF SAID COURT ON _____, 2005.

_____
JUDGE

195

65.

Oct. 28, 05
DEPO. pg. 62
W. Lockett testifies that she has
never given any information to about any crimes

KANSAS CITY, MISSOURI POLICE DEPARTMENT

**STATEMENT**

PAGE 1 OF 3 PAGES
SUPP. # 05-000408

STATEMENT OF Wendy LaShawn Lockett TAKEN AT THE OFFICES OF THE VIOLENT CRIMES DIVISION BY DETECTIVE Solomon ON THIS 10th DAY OF <u>February, 2005</u>, AT 0815 HOURS.

MY NAME IS Wendy LaShawn Lockett, I AM 40 YEARS OF AGE, HAVING BEEN BORN IN Kansas City, MO ON 3/8/64. I LIVE AT 515 Maple, PHONE NUMBER 816-206-5918.

Q. Can you tell me where you were living during the last two months of 2004?
A. 511 Maple, apartment 11.

Q. Who were you living there with?
A. Me and James Tindall.

Q. During the last part of November to the first part of December 2004, did something occur with the person you know by the name of Butch at 521 Maple?
A. Yes.

Q. In your own words can you tell me what information you have about the incident that occurred?
A. I just walked over to the house and he was unconscious. That's all I know. I know there were four or five other people in the house.

Q. Prior to you going over to 521 Maple and seeing Butch unconscious what took place?
A. Me, James and Fats were in my house talking. Fats was upset about Butch and Victoria. He left. Ten minutes later I walk over to Butch's and Butch was unconscious.

Q. Do you know Butch by any other name?
A. No.

Q. I am showing you a single photograph do you recognize the person in this picture?
A. Yes that's Butch.
Note: Ms. Lockett identified a photograph of Clarence Thomas, B/M, 2/3/57.

Q. Who is Fats?
A. Fats is my nephew.

Q. Do you know Fats by any other name?
A. Yes his name is Thaddeus Wilson.

Q. Why was Fats upset when he left your apartment?
A. Because he found out that Butch was sucking Victoria's pussy.

Q. When Fats left the apartment did he have anything with him?
A. No.

Q. Was anyone with Fats when he left the apartment?
A. Yes Billy, I don't know his last name.

66

Q. Is Billy a black or white male?
A. Black.

Q. You stated ten minutes after Thaddeus left your apartment you went over to 521 Maple and saw Butch unconscious, why did you go to 521 Maple?
A. Because Jennifer came over and told me that they were jumping on Butch.

Q. When you arrived at 521 Maple whose apartment did you enter?
A. Georgia's. I don't know Georgia's last name, she's Butch's girlfriend.

Q. Is Georgia a white or black female?
A. White.

Q. What apartment number were they in?
A. Twenty-four.

Q. When you entered 521 Maple, Apt. 24, besides Butch, Jennifer and Georgia who else was in the apartment?
A. Rick and Mello.

Q. Who is Rick?
A. Rick is a friend of theirs, black male, older guy.

Q. Who is Mello?
A. Mello is an associate of theirs who basically sold dope out of their house.

Q. Is Mello a white or black female?
A. Black female.

Q. When you entered 521 Maple, Apt. 24, did you see any injuries on Butch?
A. Yes he had a gash in the back of his head.

Q. What did you do after seeing the injury to the back of Butch's head?
A. I got the hell out of there.

Q. Do you know if he was ever taken to the hospital?
A. I don't know who took him, but somebody took him to the hospital. I think it was Chris, he works at Gates on 12th Street, I don't know his last name.

Q. Has anyone told you what happened to Butch?
A. Yes. James, my boyfriend's brother-in-law told me that Butch had died, but he didn't tell me how.

Q. Were you present when Butch was assaulted?
A. No.

tc/wl

Q.    Is there anything else that you wish to add to this statement?

A.    No.

Q.    Will you read and sign this statement?

A.    Yes, I have read the above statement which consists of 3 page(s).  I understand it and I am
signing it because it is the truth.

SIGNED _Wendy Lockett_          WITNESS _Dot Bunch_ 3133

                                WITNESS _____

1            IN THE MISSOURI COURT OF APPEALS
                    WESTERN DISTRICT
2
                                                □ COPY
  KEITH CARNES,                      )
3            Appellant,              )
             vs.                     )  WD No. 72916
4                                    )
  STATE OF MISSOURI,                 )
5            Respondent.             )

6     IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
          SIXTEENTH JUDICIAL CIRCUIT, DIVISION 5
7            Honorable W. Stephen Nixon, Judge

8  KEITH CARNES,                     )
             Movant,                 )
9            vs.                     )  Case No. 0816-CV04757
                                     )
10 STATE OF MISSOURI,                )
             Respondent.             )
11
                RECORD ON APPEAL - TRANSCRIPT
12                    APPEARANCES

13

14  For Movant/Appellant:

15  MS. SUSAN HOGAN
    MISSOURI STATE PUBLIC DEFENDER
16  920 Main Street, Ste. 500
    Kansas City, Missouri 64105
17
    For Respondent/Respondent:
18
    MS. DAWN PARSONS
19  PROSECUTING ATTORNEY'S OFFICE
    415 E. 12th Street
20  Kansas City, Missouri 64106

21

22

23       Gayle M. Wambolt, Certified Court Reporter
             Official Court Reporter, Division 5
24              Sixteenth Judicial Circuit
                Jackson County, Missouri
25
                        1

**Page 116**

1  A  Okay.

2  Q  Which is that Ms. Sanders did not argue that the

3     evidence was inconsistent with the guilt from a

4     forensic standpoint? Claim G

5  A  Yes. She just argued deliberation. I put a

6     claim on sufficiency of the evidence, a complete

7     claim where, you know, I wanted her to at least

8     attach it, and I showed her all the

9     inconsistencies.

10        She just argued deliberation and that's not

11    -- because it's two ways you can argue the

12    sufficiency, and she just argued the deliberation

13    part. I wanted her to argue the sufficiency of

14    the guilt part.

15 Q  Okay.

16 A  She didn't do that. I asked her ahead of time

17    and even sent her the whole claim already put

18    together.

19 Q  Okay.

20 A  And she chose the latter -- or the other one.

21 Q  Okay. And so all of the issues that you did --

22    that we included in the amended motion that were

23    claims of ineffective assistance of appellate

24    counsel, those are claims that you presented to

25    Ms. Sanders before the brief was filed?

**Page 117**

1  A  Yes.

2  Q  Now, the last one is what is listed as claim six

3     that I want to ask you about as far as

4     ineffective assistance of appellate counsel.

5     That is where you allege that the brief that

6     Ms. Sanders filed did not comply with Rule 84.04?

7  A  Exactly.

8  Q  Okay. And is that the portion where -- are you

9     arguing there that the court of appeals said that

10    none of the evidence supported your claim?

11 A  Because I pointed -- because there was nothing

12    pointing in the record to prove it. They said

13    that they don't have time to go through the

14    record trying to search for it. That was her

15    duty to make the argument and then point to it

16    and prove it in the transcript. She didn't.

17       But I ended up doing a rehearing after they

18    denied it when they had a rehearing that you can

19    do within 15 days or an alternative sentence with

20    the Supreme Court. In that motion I showed what

21    she didn't do as far as could they have proven

22    that the state did rely on that in closing

23    arguments and showing the judge agreed upon it

24    also.

25 Q  Okay. Let me just ask you, that appears in your

**Page 118**

1     pro se motion at page 18S through 18, I believe

2     it's V.

3  A  Okay.

4  Q  Would that be correct?

5  A  I'm sure you're right.

6  Q  Okay. And while you're looking -- here, I'll let

7     you see mine.

8  A  Okay.

9  Q  In the amended motion you actually, the pro se

10    claim that's raised in the amended motion, you

11    actually reference the trial transcript at page

12    452 and also at page 486?

13 A  Yes.

14 Q  And those are portions of the trial transcript

15    where the court or I believe -- yeah, the court

16    and possibly counsel for, I would imagine for the

17    state, referenced the evidence of other crimes

18    that was presented at the trial?

19 A  Prior bad acts.

20 Q  Or prior bad acts. However you want to claim --

21    however you want to characterize it, that's the

22    area of the transcript where that specific

23    evidence is referenced?

24 A  Yes.

25 Q  So it's -- your contention is even though the

**Page 119**

1     court of appeals found that the evidence did not

2     support that argument, that there were some

3     portions of the transcript where you felt that

4     Ms. Sanders did not adequately back up her claim?

5  A  That's why they didn't rule on it because she

6     didn't show, you know -- she made the argument,

7     but she didn't back it up with trial transcript

8     proof.

9  Q  Okay. And, now, I just want to ask you about one

10    other aspect of the case because I do believe

11    your testimony has covered -- your testimony and

12    Mr. Willis' testimony has covered most of the

13    issues.

14       But I know that you have indicated to me

15    your belief that Wendy Lockett was the

16    confidential informant that Police Officer Huth

17    had talked to?

18 A  Yes. Because the day after the -- I didn't get

19    this information. My family has paid $206 -- $60

20    to Kansas City Police Department to try to

21    get my whole master file. I've gotten two or

22    three different discoveries from two or three

23    different people, but never have I got this until

24    I think it was maybe last year sometime through

25    your private investigator, Angelina McMillin.

**[Page 120]**

1    When I got this document --

2 Q   Okay. I'm going to hand you what's been marked

3    as Petitioner's Exhibit 3, and is that one of the

4    documents that you received in the course of

5    getting the discovery from our office?

6 A   Yes.

7 Q   Okay. And had you seen that prior to receiving

8    it from our office in discovery?

9 A   No. It was never -- I never got this. I just

10    recently got it within, like, the last, I would

11    say, year.

12 Q   Okay. And is that a police report? It's by

13    officer -- it's actually printed out as I believe

14    Huth.

15 A   Huth, oh, okay.

16 Q   Is that what that purports to be?

17 A   Yes. And Wendy Lockett stated that --

18 Q   Let me just ask you a question.

19    And does this purport to be a police report

20    of a contact that the police officer had with a

21    confidential informant talking about the shooting

22    that took place at the -- around the area of 29th

23    and Prospect?

24 A   Yes.

25 Q   Okay. And it was on October 6th of 2003?

120

**[Page 121]**

1 A   The report was made the day after --

2 Q   Okay.

3 A   -- the crime, the 7th.

4 Q   Okay. So this police report that you received,

5    was that this witness, this confidential

6    informant, saw a black male running and being

7    pursued by two other black males who were firing

8    guns at him?

9 A   Uh-huh.

10 Q   Then he ran north in the alley and then east and

11    jumped a fence and ran eastbound beside 2846

12    Wabash?

13 A   Yes.

14 Q   What is it about this police report that

15    indicates to you that this confidential informant

16    must have been Wendy Lockett?

17 A   Well, for starters when my lawyer -- for starters

18    he says it's a she. I know that she had prior

19    felonies at the time that I was going through my

20    court proceedings for drugs and felony tampering

21    charges.

22 Q   You were or she was?

23 A   She was, Wendy Lockett.

24 Q   Wendy Lockett was?

25 A   Right. To tell you the truth, the streets know

121

**[Page 122]**

1    her to be a confidential informant. This is --

2    however you want to label it, but the streets

3    know --

4 Q   Was that, like, her reputation?

5 A   Her reputation for the streets.

6 Q   Okay.

7 A   So when I got this statement, I had already knew

8    she was lying on me, and then when I got this, I

9    said this is -- this is -- he's talking about

10    her. Okay. It's just a lot of lies she made. I

11    don't want to get off track.

12    But Theodus Wilson is supposed to be her

13    nephew. She was supposed to have taken the stand

14    on him on a murder -- or gave a statement on him

15    on a murder trial. I contacted him through

16    letters and people that I knew. He sent me her

17    document on giving that statement, her police

18    statement against him. But when my lawyer asked

19    her on page -- I want to say on two, but I want

20    to be for sure.

21 Q   Let's skip the page number then. What exactly --

22    I don't want to break up your thought process.

23 A   He asked her, "Have you ever given any

24    information on any crimes in the past or willing

25    to stand on any crimes?" She says, No, she's

122

**[Page 123]**

1    never given any information on any crimes. But

2    the -- Theodus Wilson, the statement she gave on

3    him was a couple of months before she just --

4 Q   Before her testimony?

5 A   Yeah. Before she answered that from my lawyer

6    saying she never gave them any information on any

7    crimes. Couple of months before I had a document

8    showing that she just did this.

9 Q   Okay. So your --

10 A   And I have that document.

11 Q   Yeah, I know. And actually what you have is a

12    police report on Theodus Williams or Theodus

13    Williams from 2005; is that correct?

14 A   Right.

15 Q   And it's right before your trial?

16 A   Right. It's her --

17 Q   And it's a statement of -- it's a police

18    statement of Wendy Lockett?

19 A   Right.

20 Q   Against Theodus Williams?

21 A   Right.

22 Q   Okay. So but what you're -- but essentially the

23    reason that you're concerned about this police

24    statement or this confidential informant

25    statement is because you're thinking that this is

123

**124**

```
 1    also Wendy Lockett who is involved in this --
 2  A  Right.
 3  Q  -- as the confidential informant?
 4  A  Yes.  And from the questions that my lawyer asked
 5     her when she took the stand, it almost seemed
 6     like she was about to go along with what this
 7     said, but she was talking too fast and, I guess,
 8     good cross-examination twisted her up where she
 9     said she ended up running north.  Because my
10     lawyer said, Well, you couldn't see what was
11     going on on 29th Street if you just told us that
12     you went north down Olive.
13  Q  Uh-huh.
14  A  So that makes her come at a whole different
15     testimony, which I would say is all the way
16     different from what this statement right here
17     that Huth has.
18  Q  Okay.
19  A  So I'd like to be able to collaborate that, you
20     know.
21  Q  All right.
22  A  Show that that's the same person, that she's not
23     credible, and --
24  Q  So you think this is something that should have
25     been investigated at the time of your trial?
```

**125**

```
 1  A  Yes.  I just got that.
 2          MS. HOGAN:  All right.  I don't
 3     believe I have any further questions, Your Honor.
 4          THE WITNESS:  I do as far as Wendy
 5     Lockett, as far as another lie that she told.
 6          MS. HOGAN:  Can I just consult
 7     with him for just a second?
 8     (A discussion was had off the record.)
 9          MS. HOGAN:  I just have one last
10     area if it's okay, Judge.
11  Q  (BY MS. HOGAN) Was there also some concern about
12     Wendy Lockett and her inconsistencies and what
13     you see as her being untruthful as concerns a
14     young man named Damon Rhodes?
15  A  Yes.
16  Q  Rhode or Rhodes?
17  A  Rhodes, R-h-o-d-e-s.
18  Q  Okay.
19  A  On her police statement she is saying that at the
20     time of the crime, that Damon Rhodes was there.
21     I have the police document where they check to
22     see if Damon Rhodes -- checked to see if Wendy
23     Lockett was telling the truth.
24     Detective Blehm did his investigation and
25     finds that Damon Rhodes was not there.  In fact,
```

**126**

```
 1     he was at the Bank of America cleaning a bank at
 2     the time of the crime.  So she just consistent
 3     with her lies.
 4  Q  Okay.  Yeah.  So that's yet another example of
 5     what you see as her untruthfulness?
 6  A  Yes.
 7  Q  And makes her less credible?
 8  A  Yes.
 9          MS. HOGAN:  Okay.  I have nothing
10     further.
11          THE COURT:  Cross-examination?
12          MS. PARSONS:  Just a couple
13     questions.
14  CROSS-EXAMINATION BY MS. PARSONS:
15  Q  So, Mr. Carnes, you just think Wendy Lockett is a
16     big liar?
17  A  I know she is.
18  Q  And you don't think that Mr. Toney highlighted
19     her, what you believe, are lies?
20  A  I'm sitting here, ain't I?
21  Q  The question is, the reason you're sitting here
22     is because you don't believe that Willis
23     highlighted what you believe are her lies
24     effectively?
25  A  That's why I'm here for ineffective assistance of
```

**127**

```
 1     counsel.
 2  Q  And you don't think Willis did a good enough job
 3     portraying Wendy as a liar?
 4  A  That's why I'm here for ineffective assistance of
 5     counsel.
 6  Q  And you also think that Wendy got a bunch of
 7     deals that we didn't tell you about?
 8  A  I'm not saying you personally, but I'm saying if
 9     you look at the leniency that she's had over the
10     years and all the cases that she's had over the
11     years, and I think if you dig deep into her
12     history, you would find it to be true.
13  Q  So you're guessing based on her history, that we
14     must have given her -- somebody must have been
15     giving her deals?
16  A  Yes.
17  Q  Okay.  And you're guessing based on Officer
18     Huth's report that we just talked about, that
19     you're guessing that confidential informant
20     is Wendy Lockett?
21  A  No.  I'm going off of questions that were asked
22     to her about her history and her felonies and all
23     the times she's been in the penitentiary and the
24     cases that she had pending and the street -- her
25     record -- her -- it was her forte on the streets.
```

Tra,

A man what up, how have you been doing? I hope everything is good. Yeah, Tra sorry for the delay, but I was in the hole plus I had to dig my papers out and get them copy, so here you go. Shit I don't know if you knew or not, but that bitch Wendy is my aunt, but fuck that bitch and that nigga Greg he a bitch to, cause all that shit he told you was some bullshit. The only reason he told you that shit was cause he was scared, cause that part in your letter when you said he wrote her that was a lie, shit he didn't know where she was at and now the bitch is in Lee's again, and another thing he don't even talk to his mom, but back to what I was saying, all that shit he told you, you might as well forget about it. A Tra on some real shit the day that shit happen I was with Wendy and she wasn't there we were both at that bitch Dolla's house on 28th park and she was there to, but the police pull up on me and Wendy one day and she had a couple pieces on her and a pipe and they put her in the car, so I thought she went to jail, but they bent the block in like 20 minutes and she got out of the car and after I seen they wasn't coming for me I really didn't trip on the shit, and I didn't hear about the shit again until I hit the county and the big hommie Dada said something about it, but if you need my help and need me to come to court for you just let me know, cause I remember that shit like it was yesterday. Well Tra I guess that about it for now, but get back at me and let me know something okay. Yeah, Tra a quick q do you have a lil brother name lil Tra? Cause →

When I had my spot on 37 and Wabash I use to look out for hem and he said you was his brother, but what I was saying I put hem up on some shit and he didn't take care of it, that all I can say, but yeah, I need you to do something for me. If you knew the big hommie Freaky Fred give hem my info and tell hem to get at me A.S.A.P alright. Yeah, man stay up and if you need anything just let me know

3300

SUPP Case #  03095392

| Title of Investigation | Subject of Report |
|---|---|
| HOMICIDE<br><br>V: LARRY E. WHITE, B/M, 04-17-79<br><br>OCC: 10-06-03, 2050 HOURS, 2831<br>       PROSPECT | INTERVIEW / RECOVERED PROPERTY<br><br>WENDY L. LOCKETT, B/F, 03-08-64<br>5707 E. 17TH KANSAS CITY, MO.<br>NO PHONE |

| Report By: *Aw*<br>DET. AVERY WILLIAMSON #4723 | Assignment:<br>HOMICIDE UNIT | Date:<br>10-15-03 | Page 1 of<br>1 Pages |
|---|---|---|---|

On 10-14-03 at approximately 0800 hours, P.O. Huth and P.O. Begley voluntarily transported the listed subject to Police Headquarters, 1125 Locust. The listed subject was placed in Interview Room #1.

The listed subject stated she was a witness to the above captioned incident. The listed subject provided a two page typewritten statement in regard to the incident. See statement for further information.

The photo line-up was recovered and placed in the Property Box located in the Violent Crimes Unit at no value.

Case 4:12-cv-00416-BP   Document 1-2   Filed 03/30/12   Page 36 of 41

75

NARRATIVE:

On 10-7-03 at 1155 hours, P.O. Begle, + I were contacted by a confidental informant in regard to information on a homicide that occurred on 10-6-03 at 28th and Wabash.

She stated that on 10-6-03 at approximatly 2030 hours, she observed a black male running from 29th and Olive (apartment buildings), being pursued by two other black males, who were firing guns at him. She stated that the black male ran north in the alley, just east of the above-mentioned apartments, jumped a fence and ran eastbound beside 2846 Wabash. The two black males continued pursing him while firing rounds from an unknown weapon.

On 10-7-03 at 1200 hours, P.O. Begle, and I conducted an area canvass in the area where the informant observed the incident and recovered the listed items from the northside of 2846 Wabash. Sgt. Niemier and Det. Morris of the Homocide Unit were at the scene at the time of recovery of the listed items. P.O. Begle, recovered the listed items at EPD and placed them in EPD property with a value of $2.00.

It should be noted the above-mentioned informant has in the past given us reliable information in regard to numerous crimes.

#4755

OFFICER: V. NUTZ



Trial Two
WENDY LOCKETT

# Transcript of the Testimony of

**Date:** April 20, 2005
**Volume:**

**Case:** STATE OF MISSOURI v. KEITH L. CARNES

Printed On: 7/26/2005

Patricia A. Manners
Phone: 816.881.3711
Fax:
Email: patmanners@comcast.net
Internet:

Case 4:12-cv-00416-BP   Document 1-2   Filed 03/30/12   Page 38 of 41

1     already collapsed at Fish Town.

2   Q.  What direction was Tre coming from?

3   A.  From this way here.

4   Q.  Did you see him cross the church parking lot or

5     cross Prospect?

6   A.  Cross Prospect.  I seen him cross Prospect.  I

7     didn't see him cross the church parking lot.

*DEPO 48*
*LINE 14-17*
*SEEN HIM Cross*
*Church parking lot*

8   Q.  Okay.  So you pick up the action when he crosses

9     Prospect.  Was anybody else with him?

10   A.  There was somebody behind him.  I couldn't tell you

11     who it was.

12   Q.  Okay.

13   A.  And this area here is lighted, is lit up, but I

14     still couldn't tell you who it was with him.  Like I

15     say, it was him because of the patch.

16   Q.  Okay.  So you're in the parking lot.  You see the

17     defendant and someone that you don't know come to

18     the parking lot.  The victim is on the ground.  What

19     do you see next?

20   A.  Tre raised the gun and shot him, says something to

21     the effect about, "You're going to die," something

22     like that, and shot him.  *OBJECT*

23   Q.  Okay.  What did you do?

24   A.  Well, I start running again.

25   Q.  Which way?

Case 4:12-cv-00416-BP   Document 1-2   Filed 03/30/12   Page 39 of 41

1    A.  Back, back this way, but I went up that way instead.

2    Q.  Where did Dollar Bill go?

3    A.  I really couldn't tell you.  At that point we kind

4        of separated.  She may have jumped in a car or

5        something.  I don't know.  She could have went--  I

6        don't know.  I was just on the go for myself at that

7        point.

8    Q.  Okay.  What did you do?  This happened.  How did you

9        come in contact with the police?

        *when?*

10   A.  I'm on my way back to the house.  Like I said, I was

11       standing on the lot.  I was on my way back to the

12       house.  The police come out of nowhere and tell me

13       they had a flag on me in the computer.  Homicide

14       wanted me.

        *when?? not that night*

15   Q.  Okay.  Did this happen the next day or several days

16       later?

17   A.  About two days later.  Maybe two days later.

18   Q.  Would you disagree with me if I told you it was

19       October 14th?

20   A.  Would I disagree?  No, I wouldn't disagree because I

21       mean it seemed like it was a couple days later.  It

22       could have been a week later.  I really don't know,

23       but, no, I wouldn't disagree with it.

24   Q.  Okay.  So the police come up.  Did you know the

25       officers who came up to you?

*inconsistent with original questioning. Date*

*Doped up?*

Case 4:12-cv-00416-BP   Document 1-2   Filed 03/30/12   Page 40 of 41   3be12df6-b5a2-4d6f-a4b7-e9f7ffb6fe01

1   A.  Yeah, I knew the two officers.

2   Q.  And did you go with them voluntarily?

3   A.  Yeah.

4   Q.  And when you went downtown, did you make a

5       statement?

6   A.  Yeah.  They asked me questions and, yeah, it was a

7       statement.

8   Q.  Did they do anything to get the statement from you?

9   A.  No.

10  Q.  After you made your statement, what did you do?

11      What happened after you were finished?

12  A.  They released me and I left.

13  Q.  Did you walk home?

14  A.  Yeah.

15  Q.  Where did you walk to?

16  A.  Back to Park.

17  Q.  All right.  You're familiar with the area of 29th

18      and Olive.  Are there any other black men out there

19      who wear an eye patch other than Tre?

20  A.  No.

21  Q.  Are there any other drug dealers that wear an eye

22      patch?

23  A.  No.

24  Q.  On that night did you see Tre with a gun?

25  A.  Yes.

Division 70, Sixteenth Judicial Circuit
Case 4:12-cv-00416-BP   Document 1-2   Filed 03/30/12   Page 41 of 41
13743beb-a9b2-4d6f-a4b7-e9f7ffb6fe01