1    IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
            AT KANSAS CITY
2
3    STATE OF MISSOURI,          )    **ORIGINAL**
                        )
              Plaintiff,    )
4                          )
                        )    Case No.
     -vs-                )    16CR03- 06321
5                          )
                        )
     KEITH CARNES,            )
6                          )
              Defendant.    )
7

8              DEPOSITION OF WENDY LOCKETT,

9    produced, sworn and examined on Friday, October 28,
     2005, at the Jackson County Prosecutor's Office,
10   415 East 12th Street, in Kansas City, Jackson
     County, Missouri, before:
11
              JENNY L. EASTABROOKS, CCR, for
12             CROSS REPORTING SERVICE, INC.

13   a Certified Court Reporter and Notary Public for the
     State of Missouri.
14
     Taken on behalf of Defendant.
15
                   APPEARANCES:
16
     For the Plaintiff:
17
         JACKSON COUNTY PROSECUTOR'S OFFICE
18       By:  Ms. Dawn M. Parsons, Chief Trial Assistant
         and Mr. Brady X. Twenter
19       415 E. 12th Street, 11th Floor
         Kansas City, Missouri  64106
20
     For the Defendant:
21
         MR. WILLIS TONEY
22       Attorney at Law
         1100 Main Street, Suite 1600
23       Kansas City, Missouri  64106
24   Also Present:
25       C.O. John

Case 4:12-cv-00416-BP   Document 1-3   Filed 03/30/12   Page 1 of 26

talked a little while longer and then the nephew asked where Junius was and then she called Junius to the phone. After the two cousins talked briefly he put appellant on the phone with Junius, appellant asked Junius what happened and he thought that his mother was going to tell the truth, Junius response was that its a back and forth situation with his mother and that appellant shouldn't give up hope cause he would still do all he could and that he believed that eventually his mother would do what was right. As weeks passed on appellant stayed in contact with Junius and then suddenly Junius got put in a situation that could send him back to jail and until he knew the out-come, his parole officer put him in the Honor Center. Junius told appellant to keep trying to call but that he wasn't allowed to have his cell phone in the Honor Center. Appellant talked to Junius a few more times after that and then one day when appellant called Junius, his mother Lorianne Morrow answered the phone, appellant was shocked and almost speechless when she ask, who is this? When appellant said Tra he thought she would get belligerent and hang-up the phone, but when she didn't, appellant started talking and told her that he knew that the police and prosecutors used her to get a conviction and that they knew that her statements and testimony didn't match the crime scene and still pushed and prepared her to testify. Appellant told her that he was actually innocent and the facts prove it, appellant goes on to tell Lorianne that he forgives her and that he is not mad at her; because he knew that the state used her weakness to crack-cocaine as leverage to use her like a pawn to obtain a tainted conviction.

To make a long story short, after appellant finish talking, Lorianne's first words were "they set you up, and you didnt do it etc...... She also slightly expressed that the first prosecutor (Amy McGowan) coerced/prepared her. Lorianne went on to say things to appellant that made him feel as if in some strange way she was trying to justify what she did by bringing up a conversation about one of her sons that got killed and that the person that killed him hardly got any jail time and then she told appellant that she had been raped and the person that did it hardly got any time even though D.N.A. was found etc...... She asked appellant how much time did he receive and he told her life with-out parole for something they know he didnt do, her response was "they (State) wrong and that aint right. She said to have his attorney call her and that she would tell the truth. I told my attorney (Susan Hogan) about the conversation and gave her Junius and Lorianne cell phone numbers, but she told appellant to have Lorianne call her. Appellant eventually talked to Junius and told him about the conversation and that appellant needed his mother to get the affidavit that he's sending notarized so that appellant can at least have that to submit to the court to get the process going that will get him out of prison one day. Appellant called Junius one day and he said that he had the affidavit and that he was just walking in the door of his mothers home, as Junius handed her his cell phone appellant heard her get the affidavit from her son and then she told appellant that she was going to take the affidavit and get it notarized at her bank, and send it to appellant. As weeks passed by the affidavit never got sent back to appellant, Junius ended up getting violated and sent

back to prison, so making contact with Lorianne seem to fade away. Appellant felt as if his only option was to purchase the phone transcript of Lorianne Morrows confession of appellants innocence so he could submit that to the courts. After numerous attempts through the staff here at the Crossroad Correctional Center to purchase them, appellant was denied that right. At that time appellant and his attorney were in conflict regarding another issue and now that appellants state post-conviction proceeding are over he doesn't have that attorney any more nor has a attorney been currently appointed to appellant at this stage of his proceedings that could possibly get the transcript, which put appellant at a stand-still.
(May 20, 2011 calls to Junius cellphone (816) 778-4714 at 6:40 pm. 7:11 pm and 7:21 p.m. verify Lorianne Morrows confession. Lorianne Morrow cell phone (816) 382-2749)

As faith would have it, the stand-still begins moving February of 2012 when Junis Morrow comes to Crossroad Correctional Center on his violation and is placed in the same module as appellant, where they meet for the first time. Junius tells appellant that his mother really needs help because she's been smoking crack-cocaine since he was a baby in her stomach and that he loves her dearly even though his father raised him because of her continuos drug addiction (Lorianne testifies that she doesn't use crack-cocaine (Trial 3 pg. 129 Line 6-7). Juncus told appellant that his mother told him the truth, that she was not a eyewitness to the shooting. He suggested that he write a affidavit and get it notarized because he would come to court and testify to what his mother confess to him. The last time appellant had a conversation with L. Morrow was in February of 2012 when Junius

asked appellant to call her for him about some money he needed, in that conversation she told appellant that she was still ready to take the necessary steps needed regarding appellants case

Appellant prays that this court agrees, that with the newly Discovered Evidence of Junius Morrows affidavit and the information that has been submitted, plus the phone conversation that the court has the authority to verify, warrants appellant relief or at least an evidentiary hearing.

3-20-12

VINCENT NEGUS
Notary Public - Notary Seal
STATE OF MISSOURI
DeKalb County
My Commission Expires: 11-18-2013
Commission # 09699623

Keith Carnes

State Of Missouri )ss
County of DeKalb,                              2/9/12

 AFFIDAVIT

I Junius Romone Morrow swear under oath that the folling is true!

My Mother Lorrianne Morrow told me she gave false testimony in the murder trials of Larry White, Against Keith Carnes. She said she was not a eye whitness to to the murder, But felt pressured to help the victims family. When the ~~Kansas~~ Kansas City Police Department questioned her, She ended up telling them she only heard shot and didn't actually see Keith Carnes shooting. She said that he was set up and mention that she was influenced by the prosecutor and prepared her for her testimony.

I swear under the penalty of perjury that the above is true

                                    Junius Romone Morrow

                                    Junius Morrow

                                    Junius Romone Morrow

CERTIFICATE OF NOTARY

Now on this _____ 9 day of February, 2012 before me appeared Junius Romone Morrow. To me known to be person who executed the foregoing and acknowledged that the statements contain herin are true and correct. Subscribed _____ forene this 9 day of February 2012 _____ expires 11-18-2013

NOTARY PUBLIC _____

My Commission Expires 11-18-2013
DeKalb County
Notary Public - Notary Seal
STATE OF MISSOURI

```
 1              MS. PARSON:  That's okay, we'll just
 2       keep on --
 3  Q.   (By Mr. Toney) When you got there did you have a
 4       conversation with your sister?
 5  A.   No.
 6  Q.   Did you have a conversation with anybody that
 7       night about what you saw?
 8  A.   No.
 9  Q.   When was the first time you told anybody about
10       what you saw that night?
11  A.   When the police rolled upon me.
12  Q.   When was that?
13  A.   A couple days later.
14  Q.   Do you remember the first police officer you
15       talked to?
16  A.   Yes.
17  Q.   Who was it?
18  A.   Huth.
19  Q.   Huth?
20  A.   Officer Huth.
21  Q.   And what did you tell him?
22  A.   He just told me I was wanted for questioning.  I
23       said, "Okay."
24  Q.   You went with him?
25  A.   Uh-huh.
```

Need His police report

CROSS REPORTING SERVICE, INC   (816) 252-8883

| | | |
|---|---|---|
| 1 | Q. | Did he ask you any questions -- |
| 2 | A. | No. |
| 3 | Q. | -- while you were in the car?  No? |
| 4 | A. | No. |
| 5 | Q. | Who was the first officer that you talked to about |
| 6 | | the shooting? |
| 7 | A. | I don't remember.  The first officer I spoke to I |
| 8 | | don't remember. |
| 9 | Q. | When was the first time you gave a statement? |
| 10 | A. | That day that I was picked up.  It was a -- |
| 11 | | Detective -- I don't remember his name. |
| 12 | Q. | Did he write it down? |
| 13 | A. | Yeah. |
| 14 | Q. | Did he have you sign the statement? |
| 15 | A. | Yeah. |
| 16 | Q. | Do you know if they videotaped your statement? |
| 17 | A. | They didn't videotape it, no. |
| 18 | Q. | What did you tell the officer that you saw? |
| 19 | A. | The same thing I just told you. |
| 20 | Q. | Have you told anybody else about what you saw? |
| 21 | A. | No. |
| 22 | Q. | So the only people you've told is a police |
| 23 | | officer, that's it? |
| 24 | A. | And -- yeah, you all. |
| 25 | Q. | You told Ms. Parsons, Dawn.  The lady next to you? |

CROSS REPORTING SERVICE,  INC   (816) 252-8883

Return
Date/Time:      06/15/2005 @ 02:12:26 PM

## REQUEST INFORMATION

Client Name:    MCS, INC
Req.#/Date:     2128302 / 06/14/2005 @ 08:00:00 AM
Request Type:   CFM / County Felony & Misdemeanor
St/Cnty/Seat:   MO / JACKSON / INDEPENDENCE

Subject Name:   WENDY L LOCKETT

*MO. Gov. WEb SitE*
*www. courts. MO. gov*

*nEEd Jackson County*
*16th Circuit Court WEb. SitE*
*GENEral*

## CRIMINAL HISTORY

Response:       RECORD FOUND
Dates Checked:  06/06/1998 - 06/06/2005
Court Name:     CIRCUIT
Juris Check:    FELONY & MISDEMEANOR
Casenumber:     16CR03000016-01
Casetype:       FELONY
Offense:        CT1: POSSESS OF CONTROLLED SUBSTANCE (FELONY)
Offense Date:   01/02/2003
Judgement:      WARRANT ISSUED
Disposition:    CT1: PLEA: NOT SPECIFIED; JUDGEMENT: WARRANT ISSUED; SENTENCED
                TO: ON 12/1/2003 WARRANT SERVED
Disp. Date:     NOT AVAILABLE        *Tampering 1st degree Felony 6/5/05 G.P    5 yr. SES 3 yr*
Verified By:    NAME ONLY                                                      *probation*
Name on File:   WENDY L LOCKETT                                                *pending  D.V.*
DOB on File:    03/08/1964

## CRIMINAL HISTORY

Response:       RECORD FOUND
Dates Checked:  06/06/1998 - 06/06/2005
Court Name:     CIRCUIT
Juris Check:    FELONY & MISDEMEANOR
Casenumber:     04CR204934-01
Casetype:       FELONY
Offense:        CT1: TAMPERING WITH MOTOR VEHICLE (FELONY)
Offense Date:   11/10/2004
Judgement:      SEE DISPOSITION INFORMATION
Disposition:    CT1: PLEA: NOT SPECIFIED; SENTENCED TO: ON 6/20/2005 ARRAIGNMENT
                SET
Disp. Date:     NOT AVAILABLE
Verified By:    NAME ONLY
Name on File:   WENDY L LOCKETT

https://webservices._____.com/clientresp/getoneresponse.gresp                06/15/2005

1    A.   Well, in questioning.

2    Q.   Have you not sat in her office and had a

3         conversation with her about what happened?

4    A.   About directly what happened?

5    Q.   Yes.        *Coached*

6    A.   No.

7    Q.   When she came to see you at Leeds before we had

8         the last trial did you talk to her about what

9         happened then?

10   A.   No, we talked about me going to court.

11   Q.   Did you ever talk to Mr. Twenter about what

12        happened?

13                  MS. PARSONS:   Him.

14   A.   No.

15   Q.   (By Mr. Toney) Did you ever talk with any

16        investigator from the prosecutor's office about

17        what happened?

18   A.   No.

19   Q.   So the only person that you have given a statement

20        to would be the police officer, the detective who

21        questioned you; is that correct?

22   A.   Uh-huh.

23   Q.   Is that a yes?

24   A.   Yes.

25   Q.   None of your friends, none of your homies, nobody

Case 4:12-cv-00416-BP   Document 1-3   Filed 03/30/12   Page 10 of 26

| | | |
|---|---|---|
| 1 | | that you hung out with have you ever had a |
| 2 | | discussion with? |
| 3 | A. | No. |
| 4 | Q. | You're presently in custody in the Jackson County |
| 5 | | Jail, correct? |
| 6 | A. | Correct. |
| 7 | Q. | And you have a pending case right now, correct? |
| 8 | | Do you have any pending cases? |
| 9 | A. | I'm there for probation violation, which is I'm |
| 10 | | just waiting to go to court, it's reinstated. |
| 11 | Q. | Your probation has been reinstated? |
| 12 | A. | Yeah. |
| 13 | Q. | How do you know that? |
| 14 | A. | Because I talked to the hearing officer. |
| 15 | Q. | You mean your probation officer? |
| 16 | A. | Yeah, they have hearing officers to come and see |
| 17 | | you and, you know, interview you why. |
| 18 | Q. | And they told you your probation was going to be |
| 19 | | reinstated? |
| 20 | A. | No, he had me sign a paper saying that I had to |
| 21 | | report to my probation officer as soon as I was |
| 22 | | released, that pretty much tells you. |
| 23 | Q. | When were you placed on probation? |
| 24 | A. | A couple months ago. |
| 25 | Q. | Was that after you testified in court in this |

Case 4:12-cv-00416-BP   Document 1-3   Filed 03/30/12   Page 11 of 26

```
 1          case?
 2    A.    No, but that case I was already placed on
 3          probation.
 4    Q.    Before you testified in court?
 5    A.    Uh-huh.
 6    Q.    Is that a yes?
 7    A.    Yes.
 8    Q.    Why were you at Leeds when the --
 9    A.    Oh, for not doing -- I had some city tickets, I
10          had five city tickets and I didn't pay the fines,
11          I didn't do the community service.
12    Q.    So you had pled guilty and were placed on
13          probation before you came to court and testified
14          last May?
15    A.    No.  I had pled guilty, I hadn't already had been
16          placed on it yet.
17    Q.    You pled guilty, who was your attorney then?
18    A.    I don't remember her name.
19    Q.    Was it a public defender? — Who?
20    A.    Yeah, it was a public defender.
21    Q.    Did you enter into any agreements with the
22          prosecutors -- did you have any agreements with
23          the prosecutor's office regarding your testimony?
24    A.    No.
25    Q.    Did they make you any promises to assist you on
```

CROSS REPORTING SERVICE, INC   (816) 252-8883

1          any of your outstanding cases?

2    A.    No.

3    Q.    Did the police department make you any agreements

4          to assist on your outstanding cases?

5    A.    No.

6    Q.    Have you ever testified in court against anybody

7          else?

8    A.    No.

9    Q.    Have you ever made any deals with the police or

10         prosecutor to testify or give information about

11         any crimes?

12   A.    No.

13   Q.    This is the only time you've ever agreed to

14         testify in court about a crime that you observed?

15   A.    Yes.

16   Q.    Were you aware that this case was set for trial

17         approximately two Mondays ago?

18   A.    What day would that be?

19   Q.    I don't have a calendar.

20              MS. PARSON:  October 10th or 11th.

21              MR. TWENTER:  October 11th.

22   Q.    (By Mr. Toney) October 11th.

23   A.    Was I aware?

24   Q.    Right.

25   A.    Yes, I was.



IN THE MISSOURI COURT OF APPEALS
WESTERN DISTRICT

STATE OF MISSOURI,                    )
                                      )        COPY
                Respondent,           )
                                      )
        vs.                           )    Appeal No. WD 67426
                                      )
KEITH L. CARNES,                      )
                                      )
                Appellant.            )


IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
SIXTEENTH JUDICIAL CIRCUIT
Honorable Gene R. Martin, Senior Judge


STATE OF MISSOURI,                    )
                                      )
                Plaintiff,            )
                                      )
        vs.                           )    Case No. 16CR03006321
                                      )
KEITH L. CARNES,                      )
                                      )
                Defendant.            )


TRANSCRIPT ON APPEAL
VOLUME I OF I
Pages 1 thru 572


FOR THE PLAINTIFF:              FOR THE DEFENDANT:

    Ms. Dawn M. Parsons and         Mr. Willis L. Toney
    Mr. Brady X. Twenter            Attorney at Law
    Asst. Prosecuting Attorneys     1100 Main Street
    Floor 7M                        Suite 1600
    Jackson County Courthouse       Kansas City, Missouri 64105
    415 East 12th Street
    Kansas City, Missouri 64106

(14)

JIM BOUCK, CCR, CSR, PSSC, CVR-CM-RVR
Official Reporter, Circuit Court of Jackson County, Missouri

Case 4:12-cv-00416-BP   Document 1-3   Filed 03/30/12   Page 14 of 26

**202**

1 A Exactly.
2 Q All right. Now, on at least two of those
3 occasions, you took an oath to tell the truth, is
4 that correct?
5 A Correct.
6 Q Well, no, three, because you took an oath today,
7 right?
8 A Correct.
9 Q And so when you took that oath, did you take it
10 seriously?
11 A Of course.
12 Q And that meant that you would tell the truth,
13 right?
14 A Yes.
15 Q And you wouldn't lie?
16 A Yes.
17 Q All right. You indicated that you had been
18 convicted of drug sales two times, is that  c/455 D
19 correct?
20 A Yes.
21 Q Once in 1999, when you got five years in the
22 Department of Corrections?
23 A Yes.
24 Q Once in 1996, when you got another five years in
25 the Department of Corrections?

**203**

1 A Yes.
2 Q And then in 2003, you got convicted for possession
3 and got a five-year sentence and did 120 days?
4 A Correct.
5 Q And you were on probation in 2003, correct?
6 A That's when I got the conviction.
7 Q Right. And then after you did your 120 days, they
8 put you on probation, correct?
9 A No, sir.
10 Q You didn't come out and go on probation?
11 A No, sir.
12 Q Okay. Well, did you do your five years?
13 A No, sir.
14 Q Well, why don't you tell me what happened. You
15 pled guilty and got 120 days. What happened?
16 A No, I pled guilty and I got probation. I was
17 placed on probation. Okay? I violated that
18 probation and they reinstated it. I violated it
19 again and they gave me 120 days and released me
20 from probation.
21 Q All right. When were you released from probation?
22 A Oh, when? April.
23 Q Of which year?
24 A 2004.
25 Q So that was after this shooting had occurred, is

**204**

1 that correct?
2 A Correct.
3 Q All right. And then you picked up a tampering
4 case?
5 A Yes. Well, I had been having the tampering; it
6 just hadn't been filed on yet.
7 Q And when you came to court in 2005 to testify, had
8 you been sentenced on that case?
9 A No, sir.
10 Q When did you get sentenced on the tampering case?
11 A Probably a couple of weeks or so after that.
12 Q After the trial?
13 A Yeah. I was supposed to have been in court, but
14 I missed court.
15 Q So after you came to court and testified for the
16 State -- you got sentenced after that, correct?
17 A Yes.
18 Q And you were charged with tampering in the first
19 degree, correct?
20 A Correct.
21 Q And do you remember whether that's a class C or a
22 class B felony?
23 A Class C.
24 Q Class C felony. All right. And you had one, two,
25 three, four prior convictions at that time,

**205**

1 correct?
2 A Correct.
3 Q And you've been in prison at least four times,
4 correct?
5 A Correct.
6 Q And after you testified for the State and then you
7 got sentenced, could you tell the Court what
8 sentence you got?
9 A I got probation.
10 Q You got probation. Okay. Four prior convictions,
11 down to the penitentiary four times, you testify
12 for the State and then you get probation, is that
13 right?
14 A Correct.
15 Q Okay. Did you cut a deal with the State?
16 A No, sir.
17 Q But you got probation anyway, right?
18 A Yes, sir.  Stop
19 Q Now, you've indicated that in October of 2003 you
20 were a drug dealer, correct?
21 A Correct.
22 Q And you indicated that you sold crack cocaine, is
23 that correct?
24 A Yes.
25 Q And you sold crack cocaine in the area of 28th and

234

1    long period of time, did you?
2  A  No, sir.
3  Q  Just real quick and then you took off, is that
4    correct?
5  A  Correct.
6  Q  Okay. And you're saying that you then ran from
7    there all the way down to Independence Avenue, is
8    that correct?
9  A  In between breaks, yes.
10  Q  The prosecutor may have asked you this. Do you
11    know a lady named Lorianne Morrow?
12  A  No, sir.
13  Q  Okay. So she wasn't running with you?
14  A  I don't know her.
15  Q  Okay. But you're saying there was no one running
16    with you?
17  A  There was no one running with me.
18  Q  And you didn't see anybody hiding on the side of
19    that church with you, correct?
20  A  I did not see anybody, no.
21  Q  Okay. And when you took off running away from
22    there, did you go north on Prospect?
23  A  I went down Prospect, which is headed north.
24  Q  Towards 27th Street?
25  A  Yes.

235

1  Q  Okay. Did you see another female running toward
2    27th Street at that time?
3  A  I seen people, but I couldn't tell you if they
4    was male or female.
5  Q  You indicated when the prosecutor was questioning
6    you that you heard two shots coming off the porch,
7    is that correct?
8  A  Yes.
9  Q  And that you didn't hear another shot until you
10    got up to the church parking lot, is that correct?
11  A  Correct.
12  Q  And you only heard one shot then?
13  A  At that time, yes.
14  Q  And Ms. Lockett, again, just to make sure I'm
15    correct on this, you had been up for at least all
16    day and all night that day, correct?
17  A  Somewhat correct.
18  Q  And you just admitted to me earlier that you had
19    been smoking drugs earlier that day?
20  A  In the wee hours of the morning of the 5th,
21    yes. Yes, I had.
22  Q  Crack cocaine, correct?
23  A  Correct.
24      MR. TONEY:  No other questions, Your
25  Honor.

236

1      THE COURT:  Redirect?
2      MS. PARSONS:  Yes, sir.
3      REDIRECT EXAMINATION
4  BY MS. PARSONS:
5  Q  Ms. Lockett, did I promise you anything on your
6    tampering case?
7  A  No.
8  Q  Did we ever talk about it?
9  A  No.
10  Q  And the times that you came to court to testify,
11    of the three times you came, how many times were
12    you in custody?
13  A  Once.
14  Q  Once for the first trial, right?
15  A  Right.
16  Q  And you showed up on the 26th of September?
17  A  Uh-huh.
18  Q  Is that a "yes"?
19  A  Yes.
20  Q  And then we had to arrest you for this trial date?
21  A  Exactly.
22  Q  So I haven't given you anything?
23  A  No.
24  Q  You had stated during Mr. Toney's questioning that
25    when you were looking across that the only way you

237

1    knew the person was by the patch. Who shot Larry
2    White?
3  A  Tre shot him.
4  Q  Are you confused at all? Was it just the patch,
5    or do you know Tre?
6  A  I mean, I've been knowing him for a couple of
7    years. I bought dope from him. I mean, just a
8    temporary flash and, still, I know it was Tre.
9      MS. PARSONS:  Okay. I don't believe I
10    have any further questions of you at this time.
11      THE COURT:  Any recross?
12      MR. TONEY:  Yes.
13      RECROSS-EXAMINATION
14  BY MR. TONEY:
15  Q  All right. You had been dealing drugs in that
16    area for a while, correct?
17  A  Correct.
18  Q  You knew all of the players in that area, correct?
19  A  Yes.
20      MS. PARSONS:  Objection, Your Honor. I
21    believe that's beyond the scope of redirect.
22      THE COURT:  I'll give some latitude.
23  Q  (By Mr. Toney)  And you knew the guys who hung
24    out at that apartment building, correct?
25  A  Some, not all of them.

( RECEIVED 2011 )
( ThaddEUS Wilson )

TRA,

Hey peep's what up? Yeah, I just got you letter the other day and that why I'm getting back at you now. Now about those names I know one of their names is Bailey for sure, but the other cop had a real funny name but everybody call him Huff for short. But the last time I was out he became a Det. But I think I still remember what they look like. But you know I've been gone for 7 years my damn self and people looks change. But holla at your lawyer and let him know I was with Wendy the night all this bullshit was suppost to happen that she lying about and I'll go to court and tell them the truth. Because this prison shit ain't where it at plus I don't like seeing niggas in here if their not good for it. So holla at your lawyer and if he needs to talk to me you know where I'm at I'll let him know everything. Well I'm gone. Yeah your lil'hommie is on the other side of the camp, but I shot word over there to him to get at you.

1 or peep's

Thad

IN The Circuit Court of Jackson County
State of Missouri

92

State of Missouri,
    Plaintiff
    v.
Keith Carnes,
    Defendant

CASE No. CR03-06321

Division No. 19

## Motion To Disclose All Deals Made With State's witnesses

Come Now the defendant, through Counsel, and hereby Moves this Court, pursuant to the Fifth, Sixth and Fourteenth amendments to the United States Constitution, Article I, Sections 2, 10 and 18(a) of the Missouri Constitution and Missouri Supreme Court Rule 25.04, to enter an order directing the prosecuting attorney to disclose to the defendant all deals, plea bargains, agreements, arrangements, understanding, consideration and any and all other types of inducements, including any threats, i.e., criminal and/or civil prosecutions, asset seizures or forfeitures, child custody actions or investigations, made with any witness or such witness Relatives, Friends, Spouse, loved ones or anyone impacting such witness, in this Case any Companion case or any other case. Wherefore, the defendant

1. A criminal defendant has the right to be tried only for the crime with which he or she has been charged. E.g., State v. Dittman, 731 S.W. 2d 43, 47 (Mo. App. 1987). Proof that the defendant committed a separate and distinct crime is generally not admissible. E.g., State v. Burr, 542 S.W. 2d 527, 530 (Mo. App. 1976).

2. When making an admissibility determination, the trial court must examine the relevance of evidence of other crimes with "Rigid Scrutiny", because of the unwarranted presumption of guilt such evidence inevitably raises in the minds of the jury. State v. Randolph, 698 S.W. 2d 535, 541 (Mo. App. 1985).

3. Even if the court should determine that the evidence is relevant with regard to one of the exceptions, if the evidence is to prejudicial it still should not be received. State v. Burr, Supra at 551. Futhermore, when ruling on the admissibility of other-crimes evidence, the trail court must resolve any doubt in favor of the accused. State v. Randolph, Supra at 542. Finally, the trial court should receive such evidence only if there is Necessity." State v. Collins, 69 S.W. 2d 933 (Mo. banc 1984).

(48)

4. Such Rules, which strongly support the exclusion

In The Circuit Court of Jackson County

State of Missouri

State of Missouri ) CASE No. CR03-06321
Plaintiff )
v. ) Division No. 6
Keith CARNES, )
Defendant )

FILED
2005 AUG 25 PM 1:35
CIRCUIT COURT
JACKSON CO. MD-KC
BY: ___

## Motion To Disclose All Deals Made With State's witnesses

Come now the defendant, through Counsel, and hereby Moves this Court, pursuant to the Fifth, Sixth and Fourteenth amendments to the United States Constitution, Article I, Sections 2, 10 and 18(a) of the Missouri Constitution and Missouri Supreme Court Rule 25.04, to enter an order directing the prosecuting attorney to disclose to the defendant all deals, plea bargains, agreements, arrangements, understanding, consideration and any and all other types of inducements, including any threats, i.e., criminal and/or civil prosecutions, asset seizures or forfeitures, child custody actions or investigations, made with any witness or such witness Relatives, Friends, Spouse, loved ones or anyone impacting

IN The Circuit Court of
Jackson County Kansas City, Missouri

State of Missouri
Plaintiff

VS.

KEITH Carnes
Defendant

Case no. CR03806632

Division 18

Senior Judge William Mauer

*Brady*

Alleged Defendant's Motion for Disclosure of Exculpatory Evidence and notice to the State of Missouri, county of Jackson on notice of the following requested exculpatory evidence and moves that the information requested be produced to the defense ninety (90) days prior to the trial. This request is for all evidence in the possession of the state which is material to the issues of this and which may be favorable to the alleged defendant. The request includes, but is not limited to the following:

1. Exculpatory materials in the form of books, records, documents, and correspondence of and reports of interviews with statements by, and testimony of any Kansas City Police Dept. Crime Lab Tech.

2. All tangible evidence in the prosecutor's possession, but not limited to the statements of witnesses, exhibits, and testimony which would exculpate, tend to exculpate, or in any way provide mitigating factors in connection with alleged defendant's alleged commission of the offenses charged.

3. Any evidence in the possession of the state, the existence of which is known, or by the exercise of due diligence may become known to the state, tending to show that any individuals who may be called as state witnesses have given conflicting or contradictory statement regarding their involvement of any alleged associate, accomplice, co-conspirator, or co-defendant.

4. Any evidence in the possession of the state that would tend to show that any of the alleged participants in the indictment were participants in separate conspiracies, organizations, enterprises, or activities, not charged in the indictment and not involving the alleged defendant.

5. The full record of any arrest, pending cases, and criminal convictions of any witnesses whom the state intends to call at trial, including any accomplices, witnesses, or unindicted co-conspirators.

6. Evidence or records of any suspected wrongdoing or ongoing investigations in this or any other jurisdiction (state or federal) of any witness whom the state intends to or contemplates calling at trial.

7. A full complete statement of all promises, considerations, rewards, or inducements made by the state, its prosecutor, agents, or agencies to induce or encourage any individual's testimony, cooperation or provision of information, wherein the state has agreed either with the individual, their counsel, agent or representative, to any of the following:

   (a) not to prosecute said person for any crime or crimes;

   (b) not to prosecute a third party for any crime or crimes where the reason for not prosecuting the third party is a consideration to the party;

   (c) to provide a formal grant of statutory immunity, or to provide an informal assurance that the person will not be prosecuted in connection with any testimony, cooperation, or information given;

   (d) to recommend leniency of particular sentence for any crime or crimes for which the person

165

11-7-05 granted element H. Martin

stand convicted or is expected to be convicted;

(e) to comply with and prior agreements although said witness may have previously violated a part of their agreement;

(f) to recommend or not oppose a reduction of the offense level of the person under the Missouri Sentence Guidelines for acceptance of responsibility;

(g) to recommend to the sentencing authority under Missouri Sentence Guidelines a downward departure from the guidelines if that person provides substantial assistance to the authorities;

(h) to recommend or not oppose any downward departures or offense level reduction for the person under the Missouri Sentencing Guidelines;

(i) to seal nay plea or plea agreement of that person;

(j) to provide favorable treatment or consideration, including but not limited to, money, expenses, subsistence of a job, a new location, a new start, etc. to the person or to friends or relatives of the person in return for the person's testimony, cooperation, or provision of information;

(k) to make any beneficial recommendation, regarding the person to any state or federal agency;

(l) to cooperate with any state law enforcement agency and that agency's agreement not to prosecute said person for any crime or crimes prohibited by state law;

(m) to make any other recommendation to benefit, or give any other consideration to the person or friends or relatives of said person;

(n) to provide a statement to, or speak with, any law enforcement agency, prosecution official, or court (state or federal) concerning the witness's assistance or cooperation.

8. Notice, including date, amount, and method (cash or check) and purpose of any monetary paid to any witness, operative, or informant of the stare in return for information, their services, or as a reward and/or for any purported obligation of any such witness or informant.

9. Any writing, canceled checks, receipts, vouchers, or other documents generated as a result of any promises, statements, agreements, understanding, or arrangements by which any of the matters listed in paragraphs 7 and 8 were provided to the person, or by which records were kept of such by the state.

10. Any evidence in the possession of the state that would tend to prove or contemplates calling at trial.

11. Any and all threats of prosecution of any statements regarding the magnitude of penal liability made to any witness that the state intends or contemplates calling at trial, or any witness called before a state or federal grand jury, by any agent or employee of the state or government or by any state law enforcement or prosecutorial agency working or cooperating with the state.

12. A list of all persons (and their counsel) who were asked by the state or its representatives whether they or their clients would and/or could implicate the defendant in any criminal wrongdoing.

13. Any evidence of past or present drug or alcohol ingestion or dependency of any witness whom the state intends or contemplates calling at trial. If any medical, hospital, or law enforcement records exists, which disclose such ingestion or dependency or the treatment thereof, it is requested that the source and location of such records be provided and/or disclosed. If no such records exist, but such ingestion or dependency has been witnessed by others, it is requested that the names and addresses of such persons be disclosed.

14. Any evidence of psychiatric hospitalization, psychiatric treatment, or mental disease or defect or physical disorder of any witness whom the state intends or contemplates calling at trial. If any medical or hospital records exists, it is requested that the source and location of such records be provided and/or disclosed. If no such records exist, but such disease, defect or

disorder has been observed by others, it is requested that the names and addresses of such persons be disclosed.

15. Any evidence of polygraph or "lie-detector" test administered to any witness whom the state intends or contemplates calling at trial, and the results of any such test, including any evidence regarding the refusal of such persons to take any requested polygraph or "lie-detector" test.

16. Any evidence that may be used to impeach a witness at the trial in this case, particularly but not limited to exclusively, inconsistent statement of a witness or between witnesses.

## Memorandum In Support

In Brady vs. Maryland, 373 U.S. 83 (1963), the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to the accused upon request where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. See Giglio vs. United States, 405 U.S. 150 (1972); United States vs. McCrane, 527 F. 2d 906 (3rd Cir. 1975), aff'd afted remand, 547 F. 2d 205 (1976). In United States vs. Bagley, 473 U.S. 667, 87 L. Ed. 2d 481, (1985), the court held that there is no difference between "specifically requested" and "non-requested or generally requested evidence." The prosecution must disclose all material and all favorable evidence, regardless of the request or lack thereof. Id, the court elaborated on Brady in Kyles vs. Whitley, 514 U.S. 419 (1995), holding that the prosecution has a duty to learn of any favorable evidence known to other government and state agents to gauge the cumulative effect of all exculpatory evidence in deciding whether to disclose. This duty is absolute and is not a good faith effort test. Id.

The Supreme Court has also emphasized that impeachment evidence, as well as exculpatory evidence, falls within the Brady rule. United States vs. Bagley, 473 U.S. 667, taken to put the case in a different light so as to undermine confidence in the outcome. Kyle vs. Whitley, 514 U.S. 419 (1995); Strickler vs. Green, 527 U.S. 263 (1999).

The Supreme Court has never precisely pinpointed the time at which the disclosure under Brady must be made. It is abundantly clear, however, that disclosure by the state must be made at such a time as to allow the defense to use favorable material effectively in the preparation and pre-trial disclosure. United States vs. Polluck, 534 F. 2d 964, 973 (D.C. 1976). Accord United States vs. Presser, 844 F. 2d 1275, 1283 (6th Cir. 1988).

Manifestly, a more lenient disclosure burden on the state would drain Brady of all vitality, United States vs. Elmore, 423 F. 2d 775, 779 (5th Cir. 1970).

Tenth Circuit recently held that evidence "need not conclusively exonerate a defendant in order to qualify as Brady material," but that evidence need only be favorable to the defense. Gonzales vs. McKune, 247 F. 3d 1066 (10th Cir. Kan. 2001).

The interests of justice require that material be made available to the defendant well in advance of trial so that the defendant may appropriately and adequately prepare his case. To make effective use of the information requested herein, it may be necessary to obtain records by way of subpoena, possible from other states. The defendant's request for this disclosure ninety (90) days in advance of the trial is quite reasonable, and such failure of the state to provide such information in a reasonable time before trial will deny defendant the opportunity to adequately prepare for this case, which constitutes a denial of due process and effective assistance of counsel.

WHEREFORE, defendant, therefore, respectfully submits that at least ninety (90) days will be required to investigate matters discloure or, if necessary, pursue subpoenas for the matter identified.

1  What they then did was turn around and refile an
2  information against him, but he was never granted
3  a preliminary hearing on that new information,
4  nor did they take it to a grand jury.
5      So the argument on that is that the
6  State violated the defendant's right to a
7  preliminary hearing in that matter because on the
8  charge which we proceeded on for this trial he
9  had not been granted a preliminary hearing, nor
10  had the case been taken to a grand jury, which
11  would be in direct violation of Missouri law,
12  because this was filed as an information. We
13  never waived a preliminary hearing on it. If
14  you'll look in the Court file, there was never a
15  waiver of preliminary hearing on it and it never
16  went to a grand jury.
17      Based on those facts, that is what the
18  problem is, and I believe that the State is
19  required to do one or the other.
20      MS. PARSONS:  Your Honor, my records
21  reflect that the defendant was indicted on
22  October 17th of '03. The case was dismissed, but
23  then, in fact, the defendant was reindicted on
24  the same charges on December 3rd of '04. He was
25  then arraigned on that indictment December 13th,

1  afforded a preliminary hearing and so we would
2  object to that.
3      THE COURT:  Well, the Court finds that
4  there is no basis for this motion and it's
5  overruled.
6      THE DEFENDANT:  Excuse me, Your Honor.
7      THE COURT:  Yes, sir?
8      THE DEFENDANT:  I was going to ask you
9  about my prior motions that I've sent.
10      THE COURT:  I'm coming up with some
11  more here that you've filed.
12      THE DEFENDANT:  No, I'm talking about
13  prior to even going to trial. These are new
14  motions that I've given you.
15      THE COURT:  All right. I've ruled on
16  all of your motions that you've presented to this
17  court.
18      THE DEFENDANT:  Okay. Well, I was
19  wondering why some of those were overruled,
20  because I asked for pictures and all of that.
21      THE COURT:  I've made my ruling on
22  that, sir. That's history. I'm not going to
23  revisit it.
24      THE DEFENDANT:  Okay.
25      THE COURT:  Be seated.

1  '04, in Division 6, and then it stayed over there
2  with Judge Mesle when she took over in Division
3  7. I do have a file-stamped copy of the
4  indictment and true bill signed by the foreman in
5  December of '04 -- or '05. So that is not what
6  happened.
7      Then after the defendant was indicted,
8  I became lead attorney. I then filed an
9  information in lieu of indictment charging the
10  defendant as a prior offender, which I'm entitled
11  to do to charge him as a prior and persistent
12  offender.
13      I'm handing the Court the indictment
14  filed December 3rd of 2004, signed by the
15  foreperson.
16      MR. TONEY:  May I see that, Your Honor?
17      THE COURT:  What do you say about that,
18  Mr. Toney? I've always understood that we were
19  proceeding originally on an indictment that was
20  later amended by information in lieu of the
21  indictment.
22      MR. TONEY:  I'm not aware of that
23  document, Your Honor, but my understanding was
24  that they filed an information in lieu of
25  indictment, and, again, my client was not

1      THE DEFENDANT:  (Complies.)
2      THE COURT:  I have a motion here to
3  reveal the deal, and apparently he is suggesting
4  that the prosecution had some kind of a deal with
5  Wendy Lockett and Lorianne Morrow.
6      Was there any such deal?
7      MS. PARSONS:  No, sir. He filed the
8  same motion prior to trial, and there's been no
9  deal with either of those two women. There still
10  isn't a deal. As a matter of fact, Wendy Lockett
11  is in custody now on something else. The State
12  filed a response to discovery detailing their
13  prior convictions, and Mr. Toney had the
14  opportunity to depose both of them, and I'm
15  telling you as an officer of this court there was
16  never a deal with either of those two.
17      THE COURT:  All I can gather is that
18  you're just suspicious that there may have been a
19  deal, but you have no information or facts that
20  indicate that there was a deal, right?
21      THE DEFENDANT:  I'm going off of my
22  innocence, knowing that I never did this and
23  knowing that there has to be a deal made for
24  Wendy Lockett to get up there and make such an
25  accusation when I know I didn't do it. Why would

In order for merit to be given to the inference of appellants Newly Discovered Evidence it is necessary to explain how it came into existence. The Newly Discovered Evidence is a affidavit from Junius Morrow, the son of the States Eyewitness Lorianne Morrow. At the Crossroad Correctional Center where appellant is currently residing, contact was made with Lorianne Morrows two nephews by learning that their last name was Morrow also. Appellant talked with the oldest nephew and explain to him about his actual innocence and how the State used his aunt to testify falsly against appellant for a conviction. After the nephew acknowledge that the physical evidence clearly refuted her testimony, he offered to help. In the course of conversations he had with her, she made different statements, one day saying "that boy knows what he did", another day saying "give me time to think about it and call me back", and then when he called back she'd go back to saying she knows what she saw. During one of their conversations she mention that her son (Junius Morrow) would be out of jail soon, so I suggested to the nephew that maybe things could go better if he talked to Junius about my situation and that he should be closer to his mother. The nephew called his aunt (Lorianne) one day and Junius was there, so they talked, the nephew asked Junius if he remembered the incident (shooting) back in October of 2003 because he knew that was Junius neighborhood. Junius response was yeah, and that one of the older guys from the area did the crime. The nephew asked him if he knew Tra (appellant) and Junius said, no. Appellant then got on the phone with Junius and explained the situation and about his actual innocence and how the State used his mother. At first Junius was in disbelief, but he said he would talk to her about

it and gave appellant his cell phone number, telling him to call back later. About a week later appellant called Junius and he told appellant that his father even knew appellant was not the real culprit of the crime. He stated that when he spoke with his mother, she denied testifying against appellant, then he asked appellant was he sure he wasn't mistaken and when was this suppose to have happened, when appellant told Junius when it occurred Junius said she was out of town so it couldn't have been her. Appellant told him that is was her and that her nephew and her have talked about the case over the phone. Junius said to send him some paper work to prove it because she saying she never did it.

Once Junius received the paper work and realized that she did testify, he told appellant, now that he had proof he would talk to his mother again, he mentioned that his sister was close to his mother also and maybe both of them could get their mother to tell the truth. Once his mother knew that he knew that she lied to him about not ever testifying, she confess that she did testify and said she was a eyewitness to the murder. As time went on he said they had more mother and son conversations as their relationship grew stronger and bond became closer. Then one day when appellant called Junius he told him that his mother decided she was ready to tell the truth, appellant told Junius that he appreciated all his help and that he would talk to his lawyer and do what was advised, but in the meantime it would be helpful if she would write a affidavit. Appellant told the nephew the good news and thanked him for all his help also. A week or so later the nephew decided to call his aunt to comend her on doing what was right, when they talked she was in a bad mood and basically said that appellant was guilty, they