126

1  A    There is no doubt in my mind, he shot Larry.
2         MS. PARSONS:  All right.  I don't have
3  any further questions.  Mr. Toney does.
4         THE WITNESS:  Okay.
5         MR. TONEY:  May it please the Court.
6              CROSS-EXAMINATION
7  BY MR. TONEY:
8  Q    Ms. Morrow?
9  A    Yes.
10 Q    You took an oath, correct?
11 A    Yes, I did.
12 Q    And you took an oath to tell the truth, right?
13 A    Right.
14 Q    Okay.  So that means that you're not going to lie,
15       right?
16 A    No, I'm not going to lie.
17 Q    Okay.  And you've taken an oath to tell the truth
18       at least two other times in connection with this
19       case, correct?
20 A    Yes.
21 Q    And each time, you swore not to lie, right?
22 A    Yes.
23 Q    All right.  Let's go back to October the 6th of
24       2003.  Why were you in the area of 29th and Olive?
25 A    I was leaving my girlfriend's house, going over

127

1        to a friend of mine's house.
2  Q    Have you sold drugs over in that area?
3  A    Have I sold drugs?  No.  I've purchased drugs.
4  Q    You've purchased, but you've never sold?
5  A    No.
6  Q    Okay.  So when you would buy drugs for somebody
7        else and give them to somebody else for money, you
8        didn't consider that selling?
9  A    Maybe.
10 Q    Maybe.  So it would be maybe you sell drugs?
11 A    Maybe I sold drugs.
12 Q    Did you get money?
13 A    Yes, I got money.
14 Q    Okay.  Sometimes, did you get up to $150?
15 A    Yes, I sure did.
16 Q    And that was for delivery of drugs to somebody?
17 A    Purchasing them and taking them back to them,
18       yes.
19 Q    So that would be selling them?
20 A    Right.
21 Q    So you've sold drugs?
22 A    Yes.
23 Q    All right.  So when you just told me you didn't
24       sell drugs, you were lying, right?
25 A    If you call it selling drugs, sir, if that's what

128

1        you want to call it.
2  Q    Well, you just told me you were going to tell the
3        truth, ma'am.
4  A    And I told the truth.
5  Q    Okay.  So you've sold drugs?  Is that a "yes" or a
6        "no"?
7  A    Yes.
8  Q    All right.  So when you said you didn't sell
9        drugs, you were lying?
10 A    If I purchase drugs from somebody else and take
11       them back to them, it's still the same thing as
12       selling them to them.
13 Q    All right.  Let's move on.  Now, you said that you
14       would deliver PCP sometimes?
15 A    Yes.
16 Q    Okay.  And you would get money for that, right?
17 A    Yes.
18 Q    Okay.  So you sold PCP, correct?
19 A    Yes.
20 Q    Okay.  And you said sometimes you sell crack, or
21       you deliver it to them?
22 A    Yes.
23 Q    Okay.  And you would sell marijuana?
24 A    Yes.
25 Q    Okay.  So you would just sell any type of drugs

129

1        that people would give you money for, correct?
2  A    If they request for me to go buy it for them,
3        yes, I will go get it for them.
4  Q    All right.  Do you use drugs yourself?
5  A    I smoke marijuana.
6  Q    Okay.  Have you ever smoked crack cocaine?
7  A    No, I haven't.
8  Q    Have you ever smoked PCP?
9  A    No.
10 Q    Okay.  Had you smoked marijuana on the day of this
11       incident?
12 A    No.
13 Q    You had nothing at all?
14 A    Nothing at all.
15 Q    Okay.  Now, did you get crack cocaine from Kiki?
16 A    I purchased cocaine from him also.
17 Q    Okay.  Did you get crack cocaine from anyone else?
18 A    No, just him and Tre.
19 Q    Okay.  Now, were you selling these drugs in the
20       area of 29th and Olive?
21 A    No.  I would go pick them up and take them back
22       to the people that purchased the drugs.
23 Q    So you would pick them up from 29th and Olive?
24 A    Right.
25 Q    All right.  And you say you were standing on the

1   there was blood and various medical things and
2   some clothing?
3 A   Right.
4 Q   Did you find anything else that you considered of
5   evidentiary value there?
6 A   No. The only items that were collected was a
7   coat and two gloves.
8 Q   Did you find any shell casings, or spent bullets,
9   or anything of that nature?
10 A   No.
11 Q   Did you collect all of that evidence that you just
12   described, with the exception of the blood, I'm
13   sure?
14 A   Well, the blood was with the clothing. The
15   clothing was collected, yes.
16 Q   And was there blood anywhere else, other than the
17   clothing itself?
18 A   There was a small pool of blood in the parking
19   lot, yes.
20 Q   All right. After you finished collecting that
21   evidence, I want to move down 29th towards Wabash.
22   Can you tell me if you found anything in the area
23   of 29th and Wabash?
24 A   Yes. In that area, a total of 12 shell casings
25   were collected.

1 Q   And do you recall where you collected those from?
2 A   Well, they were from the porch of 2846, from the
3   yard, and then also along the curb and the street
4   there, 29th Street.
5 Q   Okay. On that evening, were those the only crime
6   scenes that you worked?
7 A   Yes.
8 Q   Were you later called back out to the area of 29th
9   and Prospect to 29th and Olive on this case?
10 A   The following day.
11 Q   And what was the purpose of your going out on that
12   day?
13 A   The homicide detectives were serving a search
14   warrant at 2404 East 29th.
15 Q   And when a search warrant is served, what are your
16   duties?
17 A   Again, I respond to the scene. After the scene
18   has been cleared by our tactical teams, I respond
19   to the scene and collect any related evidence
20   that the detectives request.
21 Q   So when they go and they do the search warrant,
22   are you going in with the detectives and the tac
23   team, or do you wait until after they've already
24   gone in?
25 A   As the tac team goes in, they clear the

1   residence, and then the detective goes in, and
2   then I follow.
3 Q   So are you going in in essentially the same time
4   as the detective?
5 A   No, not at all.
6 Q   All right. So when he's finished with whatever
7   he's looking for, then you go in and collect any
8   evidence?
9 A   If they find anything, yes.
10 Q   All right. Can you tell us what building you were
11   searching that day?
12 A   There were three similar buildings. There was a
13   center building, which was 2404 East 29th,
14   Apartment West.
15 Q   The search warrant was for that particular area?
16 A   Correct.
17 Q   And you went into 2404. Did you say what
18   apartment number it was?
19 A   West, which was on the first floor.
20 Q   Okay.
21           THE COURT:  I'm sorry?
22           THE WITNESS:  West, first floor.
23 Q   (By Mr. Twenter)  Did you only search and collect
24   evidence from the apartment on the first floor to
25   the west that day?

1 A   No, also 1-East, which was directly east of the
2   apartment, same building.
3 Q   And so you also collected evidence from the
4   apartment on the east side of the building,
5   correct?
6 A   Yes.
7 Q   And this was the middle of the three similar
8   buildings?
9 A   Yes.
10 Q   I want to start with Apartment 1 on the first
11   floor to the west.
12 A   Okay.
13 Q   Can you tell me what you collected from that
14   apartment?
15 A   There were two ID cards, an apparent crack pipe,
16   and various ammunition, and some court papers.
17 Q   And do you recall exactly what types of ammunition
18   were found in there?
19 A   I would have to check my reports. There were
20   various kinds.
21 Q   Would that help refresh your recollection?
22 A   Yes.
23 Q   All right. Go ahead and check.
24 A   Five Luger 9-millimeter; one 380 auto; one PMC
25   223 Remington; one live shotgun shell,

1    the cartridge casings.
2  Q  I'm going to show you what's been marked, first,
3    as State's Exhibit Number 58 and ask you if you
4    recognize that as one of the weapons that was
5    submitted to you.
6  A  Yes, I do.
7  Q  And what type of weapon is that?
8  A  It is a 7.62 x 39 millimeter Norinco SKS rifle.
9  Q  All right. And we're going to call that State's
10   Number 58, because that's what it's been
11   introduced as.
12 A  Okay.
13 Q  I'm also going to show you what's been marked as
14   State's Exhibit Number 35 and ask you if you
15   recognize that weapon.
16 A  Yes, I do.
17 Q  Is that also one of the weapons that was submitted
18   to you for testing in this case?
19 A  Yes, it is.
20 Q  What type of weapon is that?
21 A  It also is a 7.62 x 39 millimeter Norinco, but
22   the model is a MAK-90.
23 Q  Okay. And we're going to call that State's 32
24   just for differentiating between the two, if
25   that's all right with you.

1  A  Yes.
2         THE COURT: Thirty-two, you say?
3         MR. TWENTER: Thirty-five. I
4    apologize, Your Honor, 35. I have poor
5    handwriting.
6  Q  (By Mr. Twenter) Now, you test-fired both of
7    those weapons, you said?
8  A  Yes, I did.
9  Q  And did you then compare the test-fired casings to
10   the casings that had been submitted to you from
11   the crime scene technicians?
12 A  Yes, I did.
13 Q  And can you tell us if the casings from the crime
14   scene matched either of those weapons?
15 A  Yes, they did.
16 Q  And which one did they match?
17 A  It matched the Norinco MAK-90, Exhibit Number 35.
18 Q  Okay. I have a couple of other questions just
19   generally about weapons when they are fired. When
20   you shoot a semiautomatic or an automatic, the
21   casing comes out and the bullet goes out the front
22   of the gun, obviously?
23 A  Yes.
24 Q  If that bullet hits something solid, what are the
25   different things that can happen with it?

1  A  That bullet can become embedded or, if it hits a
2    harder surface, that bullet could fragment, break
3    apart.
4  Q  If it hits at an angle, is it possible it could
5    ricochet as well?
6  A  Yes.
7  Q  And would you expect any of those things to happen
8    if it was to come in contact with, let's say, a
9    concrete parking lot?
10 A  Yes, I would expect that.
11 Q  So you couldn't tell us if it would embed in it,
12   if it would fragment, or if it would ricochet?
13 A  It could do any of those things, depending on the
14   surface that it came in contact with.
15        MR. TWENTER: All right. That's all
16   the State has of this witness, Your Honor.
17            CROSS-EXAMINATION
18 BY MR. TONEY:
19 Q  Good morning, Ms. May.
20 A  Good morning.
21 Q  You indicated that you tested Number 58, which is
22   the long black -- well, we'll just describe it for
23   the record. It's the long black gun, Number 58?
24 A  Yes.
25 Q  All right. And do you recall how many times you

1    fired it?
2  A  I can check my notes.
3  Q  Please, do.
4  A  I test-fired that particular firearm three times.
5  Q  And you checked to see which way the shells
6    ejected, is that correct?
7  A  No, I did not.
8  Q  You didn't?
9  A  No.
10 Q  But you did recover the shell casings to check for
11   tool marks on them, didn't you?
12 A  Yes.
13 Q  All right. Now, let me show you Number 58 and ask
14   you, if this were fired, which direction would you
15   expect the casings to eject?
16 A  As I stated earlier, the cartridge casings could
17   eject in different directions, depending on the
18   angle of the firearm, the way the firearm is
19   actually being held. It could eject from the
20   sides, it could eject from the rear of the
21   firearm, and it could eject forward of the
22   firearm.
23 Q  But if it were fired, say, eight or nine times,
24   would you expect to be able to find the shell
25   casings somewhere close to where it was fired?

1 A That's a possibility, but as I said earlier it
2 all depends on what that cartridge case came in
3 contact with as it was exiting the firearm.
4 Q All right. Let me see that gun again.
5 A (Complies.)
6 Q The way that this gun is made, is the ejection
7 port to the right or to the left?
8 A It could be either, because when that bolt
9 actually comes back there is an open ejection
10 port. So it has a possibility of going either
11 way.
12 Q Let me show you State's Exhibit Number 35 and ask
13 you, does that have the same mechanism as Exhibit
14 Number 58?
15 A And you mean by "mechanism"?
16 Q The ejection.
17 A It is slightly different, yes.
18 Q Would you tell the Court how this one differs from
19 the other?
20 A This ejection port has a closed area. So when
21 the bolt is actually open, this part of it is
22 actually shielded or covered.
23 Q Right. And on that one, you would expect it to
24 eject which way?
25 A I would expect it to eject to the right, or to

1 thing?
2 A Pretty much the same. It could embed in that
3 asphalt and it could fragment.
4 Q Would it be more likely to embed in an asphalt
5 surface than it would be to embed in a concrete
6 surface?
7 A Again, it all depends on how close it was to the
8 actual asphalt or to the concrete, what the angle
9 of the bullet was when it was discharged; it
10 depends on how it actually hit that surface.
11 Q All right. Now, were you brought to examine
12 bullet fragments or just the shell casings?
13 A I believe just shell casings.
14 Q Okay. Do you recall how many shell casings were
15 brought to you?
16 A Thirteen.
17 Q And you determined that all 13 of them came from
18 Number 35?
19 A Yes, sir.
20 Q And none of them came from Number 58?
21 A That's correct.
22 MR. TONEY: All right. No other
23 questions, Your Honor.
24 MR. TWENTER: The State has nothing
25 further of this witness, Your Honor.

1 the forward, or to the rearward.
2 Q But not over it like the other one?
3 A Again, it's a possibility. It all depends on how
4 the individual was actually holding the firearm,
5 what position the firearm was in when it was
6 being fired, and what that cartridge case came in
7 contact with.
8 Q Okay. Now, are you right- or left-handed?
9 A I am right-handed.
10 Q Would you hold that gun in the way that a person
11 who is left-handed would hold it?
12 A (Complies.)
13 Q Now, if that gun were shot by a left-handed
14 person, would you expect the cartridges to go in
15 the same direction?
16 A I would expect that.
17 Q Okay. Thank you. The prosecutor asked you about
18 if a gun is shot -- a high-velocity gun is shot
19 from a close range, say, into a parking lot -- he
20 used concrete. You said you would expect it to
21 either embed, or ricochet, or fragment, is that
22 correct?
23 A Those are possibilities, yes.
24 Q Assume for a moment it's a softer surface than
25 concrete, like asphalt. Would you expect the same

1 THE COURT: That's all. You may step
2 down.
3 (Witness excused.)
4 MS. PARSONS: Your Honor, the State
5 rests.

PLAINTIFF RESTS

6 THE COURT: Very well.
7 Yes, sir?
8
9 MR. TONEY: I have one witness here at
10 this time. I didn't anticipate them being
11 finished at 10:30, so I told everyone to come at
12 1:30. I've had people trying to call to get
13 these people here, but right now I'm looking at
14 being able to put on one witness now and coming
15 back at 1:30, because that's the time I told
16 everybody else to show up, and I'm really having
17 trouble trying to reach them right now. That's
18 the position that I'm in.
19 THE COURT: Do you have a motion at
20 this time?
21 MR. TONEY: Yes, but I wanted to do
22 that first.
23 THE COURT: I understand.
24 MR. TONEY: Okay. Your Honor, at this
25 time, the State rests and the defense would make

1 MR. TONEY: We did. We left messages;
2 we left phone numbers, business cards, the whole
3 bit.
4 THE COURT: Right up here to this
5 witness enclosure, please, and remain standing a
6 moment.
7 THE WITNESS: (Complies.)
8 MARVA GRAY,
9 having first been duly sworn, testified as follows:
10 DIRECT EXAMINATION
11 BY MR. TONEY:
12 Q Would you state your name for the record, please.
13 A Marva Gray.
14 THE COURT: I'm sorry, I didn't
15 understand you.
16 THE WITNESS: Marva Gray.
17 THE COURT: Marva Gray?
18 THE WITNESS: (Nods head
19 affirmatively.)
20 Q (By Mr. Toney) Ms. Gray, would you spell your
21 first name and your last name for the record?
22 A M-A-R-V-A, G-R-A-Y.
23 Q And, Ms. Gray, where are you employed?
24 A Fish Town.
25 Q And that's the Fish Town Restaurant at 2831

1 Q Would that be down 29th Street?
2 A And Wabash.
3 Q Toward Wabash?
4 A (Nods head affirmatively.)
5 Q Is that a "yes"?
6 A Uh-huh.
7 Q Okay. I need you to say "yes" or "no," because
8 the court reporter is trying to make a record, and
9 if you say "uh-huh" or "uh-uh," they can't get
10 that. All right?
11 A Okay.
12 Q Now, I want to show you what's been marked as
13 State's Exhibit Number 6 and ask you if you can --
14 if you recognize that area.
15 A Yes.
16 Q And what is that?
17 A The Fish Town building.
18 Q That's where you work at, correct?
19 A Yeah.
20 Q Now, you say you were working as the cashier that
21 evening?
22 A (Nods head affirmatively.)
23 Q Is that a "yes"?
24 A Yes.
25 Q And the cash register, would that be facing to the

1 Prospect?
2 A Yeah.
3 Q And were you employed there on October the 6th of
4 2003?
5 A Yeah.
6 Q And were you working there on that night around
7 9:00 p.m.?
8 A Yes.
9 Q And what is your position at that establishment?
10 A Cashier and cook.
11 Q Okay. And on that night, were you working as a
12 cashier?
13 A Yeah.
14 Q Did you hear any noises that were unusual that
15 night?
16 A Yeah.
17 Q Did you hear what you thought were gunshots?
18 A Yes.
19 Q Would you tell the Court when you first heard the
20 gunshots?
21 A When I first heard them, I started to go to the
22 door but then I went back inside.
23 Q Okay. And where did those gunshots appear to be
24 coming from?
25 A Down the street from Fish Town.

1 north, toward 27th Street?
2 A Yes.
3 Q And there's a window right there, correct?
4 A Yes.
5 Q And then there are two windows that face to the
6 west, toward Prospect, correct?
7 A Yes.
8 Q Now, when you're standing at the cash register,
9 can you see out of the windows that face toward
10 Prospect?
11 A No.
12 Q But you can see out of the windows that face
13 toward 27th Street, correct?
14 A Yes.
15 Q Now, at any time that evening, did you hear
16 gunshots in your parking lot?
17 A It wasn't in the parking lot.
18 Q Okay. And from the cashier's -- well, where
19 you're standing to out in the parking lot, that's
20 about 25 feet, correct?
21 A Yes.
22 Q Okay. And if someone would have been standing in
23 that parking lot shooting, you would have heard
24 it, correct?
25 A Yes.

1  Q  But you did not hear that, is that correct?
2  A  Yes.
3  Q  Okay. That night, did you discover that a person
4     had been shot and was laying in the parking lot?
5  A  Yes.
6  Q  Okay. Tell the Court how you came to know that
7     that person had been shot and was laying in the
8     parking lot.
9  A  I went to tell this lady her food was ready and
10    the lady had already came in, and then when the
11    lady came in -- I went back around the counter
12    and then when the lady came and got her food, she
13    got ready to walk out and she grabbed her chest
14    and was like, "There's a man in the parking lot."
15 Q  Okay. So he wasn't there before she came in?
16 A  Uh-uh.
17 Q  And not there when you went out to get her?
18 A  No.
19 Q  And about how much time was that, a couple of
20    seconds, a couple of minutes?
21 A  A couple of minutes.
22 Q  Okay. And then when you went back out, that's
23    when he was laying out there?
24 A  Yeah.
25 Q  Okay. And in that period of time, you hadn't

1     heard any gunshots in your parking lot, right?
2  A  No.
3  Q  Okay. Now, I want to show you what's been marked
4     as State's Exhibit Number 8 and ask you if you
5     recognize that.
6  A  (Nods head affirmatively.)
7  Q  Is that a "yes"?
8  A  Yes.
9  Q  Okay. And I know this is traumatic and painful,
10    but is that the location where the body was when
11    you went out there?
12 A  Yes.
13 Q  Okay. And that body is like right outside of the
14    door of the Fish Town, correct?
15 A  Yes.
16 Q  I don't want to just keep going over this -- well,
17    here, I'll remove that picture because I know you
18    don't want to look at it.
19       That was a traumatic evening for you,
20    wasn't it?
21 A  I had just lost my son, that's why.
22 Q  Okay. And then you go out and there is a dead
23    body right in front of the place where you're
24    working at. So you would remember that night,
25    correct?

1  A  Yes.
2  Q  And you are sure beyond any doubt that there was
3     no gunshots fired in that parking lot that
4     evening, is that correct?
5  A  Yes.
6        MR. TONEY: I don't have any other
7     questions, Your Honor.
8        THE COURT: You may examine.
9        MS. PARSONS: Thank you.
10            CROSS-EXAMINATION
11 BY MS. PARSONS:
12 Q  Ms. Gray, you were working at the Fish Town and
13    you said you were the cashier and also the cook,
14    is that correct?
15 A  Yes.
16 Q  And so as a part of your duties, you take orders
17    from customers that walk in the store, right?
18 A  Yes.
19 Q  And customers that go through the drive-through?
20 A  We don't have a drive-through.
21 Q  Okay. And so you're taking orders and then you're
22    also maybe sometimes at the same time cooking the
23    food?
24 A  Yes.
25 Q  Doing a couple of things at once?

1  A  Yes.
2  Q  And so on this night, there was nothing unusual;
3     you were taking orders and you were cooking the
4     food?
5  A  Yes.
6  Q  And then you had heard gunshots, right?
7  A  Yes.
8  Q  And you actually heard two sets of gunshots?
9  A  Yes.
10 Q  The first set, you told Mr. Toney and you also
11    told the police that you heard it towards the west
12    down 29th, is that true?
13 A  Yes, yes.
14 Q  And then you had said earlier that there was a
15    delay of about eight minutes and then there was a
16    second set?
17 A  Yes.
18       MR. TONEY: I'm going to object, Your
19    Honor. She didn't say anything like that. I
20    object.
21       MS. PARSONS: It's cross-examination.
22       THE COURT: It's overruled.
23 Q  (By Ms. Parsons) So about eight minutes elapsed
24    and then you hear the second set?
25 A  Yes.

1 Q    You hear the first set, and there are people in
2      the store -- or a person in the store?
3 A    They was in their car.
4 Q    In their car. And you're working, is that true?
5 A    Yes.
6 Q    So you hear the shots and there are things going
7      on; you're working, right?
8 A    Yes.
9 Q    Then the second set of shots, correct?
10 A   Yes.
11 Q   And then that's when you saw the lady who had her
12     hand to her chest?
13 A   Yes.
14          THE COURT: Had what? I'm sorry.
15          MS. PARSONS: Her hand on her chest.
16          THE COURT: All right.
17 Q   (By Ms. Parsons) I guess she was gasping, like
18     she was shocked?
19 A   Yes.
20 Q   And then you went to her, correct?
21 A   Yes.
22 Q   You wanted to find out what was going on with her?
23 A   Yes.
24 Q   All of this is kind of happening at once, correct?
25 A   Yes.

1 Q    She's okay, right, the woman?
2 A    Yes.
3 Q    And then that's when you look outside and you see
4      the body?
5 A    Yes.
6 Q    The other customer that you had been waiting on,
7      did he or she drive through the parking lot?
8 A    No. They were sitting there waiting on their
9      order.
10 Q   Was there a car in the parking lot?
11 A   Yes. It was facing toward Fish Town.
12 Q   Did that car drive away after the shooting?
13 A   Yes.
14 Q   But before anybody got there, like the police or
15     fire or anything like that?
16 A   Yes.
17 Q   Did you call 911?
18 A   Yes.
19 Q   And then the police came?
20 A   Yes.
21 Q   Did the fire department come, like a fire engine?
22 A   No.
23 Q   Did an ambulance come?
24 A   Yes.
25 Q   Did they drive into the parking lot?

1 A    Yes.
2 Q    And then you stayed and gave information to the
3      police, right?
4 A    Yes.
5 Q    And then you went downtown and gave a statement?
6 A    Yes.
7 Q    And you didn't see anybody shooting, right?
8 A    Right.
9 Q    You're just doing your job?
10 A   Right.
11 Q   And the only other involvement you had in this
12     case is when the lawyers started talking to you
13     and then you came here?
14 A   Yes.
15          MS. PARSONS: I don't have any further
16     questions. Thank you.
17          THE COURT: Any redirect?
18          MR. TONEY: Yes.
19          REDIRECT EXAMINATION
20 BY MR. TONEY:
21 Q   Ms. Gray, I want to just make something clear.
22     The customer that had come in to order their food
23     and was parked outside, when you first went out to
24     their car or when they first came in, there was no
25     dead body laying in the parking lot, was there?

1 A    No.
2 Q    Okay. And then you prepared whatever for them and
3      then you came back to see what they were doing or
4      to bring it out to the car to them?
5 A    I was going to tell her her food was ready, but
6      she had already came in.
7 Q    But she had come in. And when she came in, that's
8      when she told you that there was --
9 A    No. There was another gunshot and I handed her
10     her food, and she turned around to walk out and
11     she said there was somebody laying in the parking
12     lot.
13 Q   Okay. But that gunshot didn't come from that
14     parking lot?
15 A   No.
16 Q   All right. So to the best of your knowledge, you
17     were right there at Fish Town that night and
18     nobody was standing in that parking lot shooting?
19 A   No.
20          MS. PARSONS: Objection, Your Honor.
21     She doesn't know that. She couldn't see it. I
22     object to the form of the question.
23          THE COURT: Overruled.
24 Q   (By Mr. Toney) You can answer. Do you want me to
25     do the question again?

1 A    There wasn't nobody in the parking lot shooting.
2           MR. TONEY:  All right.  Thank you.
3                    RECROSS-EXAMINATION
4 BY MS. PARSONS:
5 Q    Ma'am, you couldn't see even if there was, could
6      you?
7 A    No, but I could hear the sounds and it came from
8      by the church.
9 Q    Fair enough, but you couldn't see if someone shot?
10 A    No.
11          MS. PARSONS:  All right.  Thank you.
12                    REDIRECT EXAMINATION
13 BY MR. TONEY:
14 Q    Ms. Gray, you've heard gunshots before, is that
15      correct?
16 A    (Nods head affirmatively.)
17 Q    Is that a "yes"?
18 A    Yes.
19 Q    Okay.  And if a gun is right ten feet from the
20      door of your business, you would be able to know
21      that, wouldn't you?
22 A    Yes.
23 Q    But that didn't happen, did it?
24 A    No.
25          MR. TONEY:  Thank you.

1          THE COURT:  Anything further?
2          MS. PARSONS:  No, sir.
3          THE COURT:  That's all.  You may step
4      down.  Thank you, and watch your step.
5                    (Witness excused.)
6          MR. TONEY:  Your Honor, I would next
7      call crime scene technician Van Ryn.
8               GREGORY VAN RYN,
9 having first been duly sworn, testified as follows:
10               FURTHER DIRECT EXAMINATION
11 BY MR. TONEY:
12 Q    Good afternoon, Officer.
13 A    Hello.
14 Q    I had contacted you this morning about going back
15      out to the crime scene at the Fish Town at 2831
16      Prospect, correct?
17 A    Correct.
18 Q    And as fate would have it, we met up there today
19      at about 12:30, is that correct?
20 A    Correct.
21 Q    And at my request, did you do a measurement of the
22      distance from where the body was located to where
23      the end of the church was, the church that's
24      located across the street?  Is that correct?
25 A    Correct.

1 Q    Now, I want to refer you to State's Exhibit
2      Number 3.  In Exhibit Number 3, you see at 28th
3      and Prospect the outline of a building, is that
4      correct?
5 A    That's 2844 Prospect.
6 Q    And that would be that AME church that's there on
7      the corner?
8 A    Correct.
9 Q    Okay.  And on this exhibit, you see where there
10      are some initials, "WL"?  Do you see those
11      initials?
12 A    Yes.
13 Q    All right.  Now, did I ask you to measure from
14      that approximate spot where the church was over to
15      where you located the body?
16 A    Correct.
17 Q    Okay.  And did you and other crime scene
18      technicians make that measurement today?
19 A    Yes.
20 Q    Would you please tell the Court what that
21      measurement was?
22 A    One hundred and eighty-nine feet.
23 Q    And did you all measure it more than once to make
24      sure that that was accurate?
25 A    Yes.

1 Q    And 189 feet -- three feet equals one yard -- that
2      would be 60 yards, wouldn't it?
3 A    I'm not that good at math.
4 Q    Okay.  Well, if I told you six times three is 18,
5      that would be 180?
6 A    Okay.
7 Q    So that is 60 yards?  Are you a football fan?
8 A    Not really.
9 Q    Okay.  Do you know how long a football field is?
10 A    I believe it's 100 yards.
11 Q    Okay.  So 50 yards would be to at least halfway,
12      and then another 10 yards past that, correct?
13 A    Correct.
14 Q    Okay.  Now, on the night that you went out when
15      the shooting first occurred, that was October the
16      6th, correct?
17 A    Correct.
18 Q    Okay.  And I want to show you what's been marked
19      as State's Exhibit Number 6, and you've probably
20      already looked at that picture but I want to ask
21      you -- it was dark that evening, wasn't it, when
22      you went out there?
23 A    It was nighttime, yes.
24 Q    And I see that the picture is illuminated.  Do you
25      all use flashes on your cameras to take those

1          Did you serve the subpoena personally?

2          MR. TONEY: Yes, I did, Your Honor, I

3 served her personally with the subpoena.

4          THE COURT: Very well. I'm issuing the

5 attachment for the witness.

6          MR. TONEY: Okay.

7          THE COURT: And as soon as we get this

8 processed, I understand that both counsel for the

9 State and counsel for the defendant have

10 requested that the Court go to the scene for a

11 personal view of the area?

12          MR. TONEY: That is correct, Your

13 Honor.

14          MS. PARSONS: Yes, sir.

15          THE COURT: We'll make arrangements to

16 do that today, and then I would propose that we

17 continue the matter until, say, 2:00 tomorrow.

18          MS. PARSONS: Okay.

19          THE COURT: We'll see what the

20 situation is then, whether she's been brought in

21 on the writ or not, and if she has, then we can

22 proceed, assuming that I am through with the

23 other matter that I have scheduled for tomorrow

24 morning. At least, we can just see what happens

25 and proceed if we can.

1          MR. TONEY: Okay.

2          THE COURT: So at this time, we'll

3 adjourn on this case until tomorrow at 2:00 p.m.

4          MS. PARSONS: Okay.

5          MR. TONEY: Thank you.

6          (Whereupon, the Court adjourned until

7 10:00 a.m., Monday, November 14th, 2005, at which

8 time the following proceedings were had:)

9          THE COURT: All right. Counsel, this

10 is the case of State versus Keith Carnes, and it

11 was continued until this date for further

12 evidence, namely, Vernetta Bell. She apparently

13 had to be brought in through body attachment and

14 I understand she's here now.

15          Are you Vernetta Bell?

16          THE WITNESS: Uh-huh.

17          THE COURT: Will you please stand a

18 moment and be sworn.

19          THE WITNESS: (Complies.)

20          MR. TONEY: May I proceed, Your Honor?

21          THE COURT: Yes, sir.

22          VERNETTA BELL,

23 having first been duly sworn, testified as follows:

24          DIRECT EXAMINATION

25 BY MR. TONEY:

1 Q  Good morning, Ms. Bell.

2 A  Good morning.

3 Q  Would you state your name for the record.

4 A  Vernetta Marie Bell.

5 Q  And, Ms. Bell, what is your date of birth?

6 A  September 22nd, 1958.

7 Q  Where do you live?

8 A  3224 Quincy.

9 Q  Is that in Kansas City, Missouri?

10 A  Yes, it is.

11 Q  And how long have you lived in Kansas City?

12 A  Oh, all my life.

13 Q  I want to call your attention to October the 6th

14    of 2003. Were you living in Kansas City at that

15    time?

16 A  Yes.

17 Q  Were you in the area of 29th Street between

18    Prospect and Olive on that day?

19 A  Yes, I was.

20 Q  All right. How frequently did you go to that

21    area?

22 A  Off and on, I'll say -- what, like maybe once or

23    twice every week.

24 Q  Okay. And let's just cut through some of this.

25    What was your purpose for going to that area?

1 A  Well, most of the time I went down there -- I had

2    family down there, plus, I did the dealings that

3    I did down there.

4 Q  Okay. Did you go down there to buy drugs at some

5    time?

6 A  Yes.

7 Q  Okay. Did you go down there to sell drugs at some

8    time?

9 A  Yes.

10 Q  Okay. During the time that you were frequenting

11    that area in October of 2003, did you ever have an

12    occasion to meet a person by the name of Larry

13    White?

14 A  Yes, I did.

15 Q  Okay. Will you tell the Court how you knew Larry

16    White?

17 A  Well, I knew Larry some years ago because he

18    stayed -- he went with a niece of mine and he

19    stayed in the same complex over on The Boulevard,

20    named Lena.

21 Q  So he dated a niece of yours?

22 A  Uh-huh.

23 Q  Is that a "yes"?

24 A  Yes.

25 Q  So you've known Larry White for a while?

# "Ground Two"

## "Sufficiency of the"

## Evidence

REQUEST
EVIDENTIARY Hearing

# Ground Two

## Sufficiency of the Evidence

The only evidence that links appellant Keith L. Carnes to the murder of Larry White is the states eyewitness testimony from Lorianne Morrow and Wendy Lockett, so submitting supporting facts establishing the insufficiency of that alleged evidence/testimony is a necessary argument that's being raised, because the evidence in support of appellants state conviction cannot be fairly characterized as sufficient proof to have led a rational trier of fact to find guilt beyond a reasonable doubt of the existence of every element of the offense. U.S.C.A. Const. Amend. 14

With regards to the particular essential elements involving the shooting death of Larry White on the parking lot of the Fishtown resturant, as testified to by the alleged eyewitnesses.

Lorianne Morrow version of the event is that appellant is by himself on the parking lot when he turned the victims body over, after he collapsed, stood right over him and shot the victim 5 to 6 more times from point-blank range with a Ak-47 assault rifle (Trial 3, pgs. 132, 145-147).

Wendy Lockett version is that appellant is with someone else on the parking lot and that appellant stood right over the victim and not back aways and shot the victim "one time" in the head after he'd collapsed. Lockett testified that she never saw victim get turned over nor see or hear 5 to 6 more shots and that she knows what a rifle looks like and that the victim was shot one time in the head with a pistol (Trial 3, pgs. 227-228 and 231-233).

The states medical examiner Dr. Gill testimony elaborating on the damage that would be anticipated from a high-velocity projectile at a close range of 4 to 5 feet away, particularly refering to the head wound, which lacked the radiating tears you would see at the entrance wound produced by kenetic energy from greater amounts of gun powder that under goes a combustion that brings forth a great deal of gas which would cause temporary cavitation, a massive defect, and increased damage to the tissues at the entrance wound (Trial 3, pgs. 335-336 line 1-3). Dr. Gill testified in (Trial 2) that they looked at the victims clothing very carefully and that that's a very important part of their examination because the clothing can absorb the soot, stippling and so forth, but they found none (Trial 2, pgs 26-27). Dr. Gill labled all the wounds as distant shots fired from more than 3 feet away (Trial 3, pg. 318) and testified, that to a reasonable degree of medical certainty, based on the evidence, that the head and body wounds are not consistent with the victim being stood over and shot (Trial 3, pgs. 332, 339, 340)

The physical evidence proves that the shooter is in the yard of 2846 Wabash area where "12 spent shell casing" were retrieved by police (Trial 3, pgs. 83-85).

Alleged eyewitness Locianne Morrow testified in (trial 3) that she witness appellant shooting from the yard of 2846 Wabash and that only "3 shots" occurred (Trial 3, pgs. 137-138) Morrow testified in (trial 2) that she never saw appellant in the yard of 2846 Wabash (Trial 2, pgs. 149-152). In Morrows

(deposition) she states that she never saw appellant in the yard of 2846 Wabash holding or firing a gun (Deposition pg. 2, line 10). Morrow states in her original police statement when questioned by Det. Williamson; Q. "Did you actually see the shots at FishTown", or did you hear them? Morrows response, A. "I heard them".

Alleged eyewitness Wendy Lockett testified that she initially heard 2 shots when the shooting kicked off and only one shot when she got up to the church, from looking across the street to FishTown (Trial 3, pg. 199, Line 13-25). A calculated evaluation on the window of time for the escape route Lockett testified to taking, where she said took her right next to 2846 Wabash, (where the shooter would have been firing the 12 spent shell casings) but she never mentions anything and claims that she kept running east crossing Wabash headed toward the church on Prospect (Trial 3, pg. 223). Lockett testified that she doesn't know where anybody went once the shooting started and that no one was with her when she got up to the church (Trial 3, pg. 199, Line 1-9), but in (Trial 2) Lockett testified that her and Felica Jones run together from Olive, through backyards then to Wabash headed all the way to the church on Prospect (Trial 3, pgs. 219-220). Lockett testified that she was not using crack cocaine on that particular day of the shooting (Trial 3, pg. 185, Line 11-14) but in (Trial 2) Lockett testifies to smoking a eighth of an ounce (8 ball) on the day of the shooting (Trial 3, pgs. 207-208).

Officer Shawn Campbell (First Responding officer) secured the crime scene at Fishtown and then was directed to 2846 Wabash, because statements from witnesses said that the shots came from that general direction (Trial 3, pg 47), he also looked around for shell casings at fishtown and found none or any apparent holes in the asphalt from gun shots were detected (Trial 3, pg. 52 line 14-25).

CST Gregory Van Ryn testified that Detectives received information from witnesses that shots were heard in the 2846 Wabash area, so he was directed to base his investigation there (where a total of 12 spent shell casing were collected), and at Fishtown where he found nothing of evidentiary value (shell casing, spent bullet or anything of that nature), the only evidence he collected from the Fishtown parking lot were the victims clothes (Trial 3, pgs. 65-66).

Detective Bleam, the assigned case detective testified that he went west down the street to the apartment complex on 29th and Olive looking for evidence, but found none and that other detectives in his squad were working with him as well (Trial 3, pg. 258).

Officer Kathryn May of the fire arms section testified that the states Exhibit 35 (Mac 90 assault rifle that was collected in the 29th and Olive apartment complex) matched all the shell casing from the crime scene (Trial 3, pg. 347 line 13-17) and that none matched number 58 (SKS rifle that was collected at appellants residence located at 4224 E. 58th st) (Trial 3, pg. 352 line 20-21).

Marva Gray (Fishtown Cashier) testified that no shooting took place in their parking lot and that she heard shooting towards the west down 29th st. Testified that she's heard gunshots before and although see didn't see any shots she could hear them

and that those shots came from by the church and if gunshots were fired from 10 feet from the door of her business (location of victims body) she would know-but that didnt happen and that there wasn't nobody in the parking lot shooting (Trial 3, pgs. 374-386).

Vernetta Bell testified that she was friends with the victim Larry White and that he was standing on the corner of 29th and Wabash as she was headed down the hill towards 29th and Wabash. She states that she didn't see Morrow or Lockett as she crossed over Wabash when the shooting started, she then ran west in the direction of 29th and Olive towards the apartment buildings as the shooting continued from behind her. She testified that appellant was standing in the doorway of the middle apartment building, that he didn't have a gun, was not shooting at anybody and was peeking up there like everybody else was. Said she was arrested on the day of this incident around midnight but wasn't questioned by law enforcement about the case. Ms. Bell testified that nobody told her to lie or anything and she started not to get involved but when she found out appellant was facing life for something she knew he couldn't have done because she was standing with appellant when this happened and knows that she was with the victim and that appellant was nowhere around them. Stated that she knew appellant was in front of the apartments while the shooting is going on, so coming forward to testify was something she felt she was supposed to do (Trial 3, pgs. 404-425).

The States medical Examiner Dr. Gill labled all of the wounds as "distant shots" that went through and through, one to the head, two to the chest and one graze wound (Trial 3, pg. 306, 318 line 3-13). The facts explained from the testimony of Dr. Gill about the abrasions analyzed on Mr. Whites left eyebrow, nose and lip are called blunt force injuries (Trial 2, pgs. 19, line 22; 20, line 1-4) indicating that it could've been caused by falling, and being consistent with Mr. White getting shot while running, then hitting the ground (Trial 3, pgs. 342-343).

   Wherefore appellant request that this court order his immediate release on the ground of sufficiency of the evidence from the facts submitted, proving actual innocence, and because the essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficent proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L. Ed. 2d 368. Pp. 2786-2788.

"What Does The Evidence Really Say"?

Respectfully Submitted

Keith L. Carnes

*Keith Carnes*

3-20-12

VINCENT NEGUS
Notary Public - Notary Seal
STATE OF MISSOURI
DeKalb County
My Commission Expires: 11-18-2013
Commission # 09696623



Trial ~~One~~
Two      Dr. Gill

# Transcript of the Testimony of

**Date:** April 20, 2005
**Volume:**

Case. STATE OF MISSOURI v. KEITH L. CARNES

Printed On: 7/26/2005

Patricia A. Manners
Phone: 816.881.3711
Fax:
Email: patmanners@comcast.net
Internet:

(20)

Case 4:12-cv-00416-BP   Document 1-4   Filed 03/30/12   Page 17 of 48

1    Beyond six inches, you don't get the soot.  Soot

2    wipes away.  It's something that's just a coating on

3    the outside.

4        Along with this is traveling particles of the

5    gunpowder.  It occurs in ball, flake, cylinder, and

6    some variations on that, and these little particles

7    are on fire, but they haven't completely burnt up

8    and turned into gas or soot and they're traveling

9    with, but just slightly behind the bullet, and ours

10   at two and a half to three feet, these will impact

11   the skin around the entrance wound and produce what

12   we call stippling.

13       It is like little firebrands and they make

14   little burn spots which look like little red dots.

15   The further out you get, the wider the spread of

16   these dots and the less dense the pattern of the

17   dots, so we get kind of a rough idea of how far out

18   from the muzzle the gunshot wound is.  Beyond two

19   and a half to three feet, then we don't get any of

20   these clues as to what the distance is, and so we

21   refer to this as a distant wound.

22       Now the one thing that you need to consider in

23   this, and it's very important, is the clothing, and

24   the clothing was looked at very carefully here.  The

25   clothing can absorb the soot, this stippling and so

Case 4:12-cv-00416-BP   Document 1-4   Filed 03/30/12   Page 18 of 48

1    forth, and so you don't see anything underneath.

2    But we looked at the clothing and that's a very

3    important part of our examination, and we don't see

4    any evidence of these materials deposited on the

5    clothing surrounding the entrance wounds.

6    Q.  So does that lead you to the conclusion that these

7        shots came from a distance?

8    A.  That is correct.

9    Q.  Now is there anything that would indicate that

10       someone stood over this man with a gun and shot him?

11       Right over him two or three feet, right over and

12       shot him, anything to indicate that?

13   A.  It seems inconsistent unless he was extremely tall.

14   No.  I'm only 5 08" or 5 09"

15   Q.  Now showing you what's been marked as State's

16       Exhibit No. 35, in our conversation about this case

17       we talked about what would happen if a person was

18       shot from a very close range with that type of gun,

19       correct?

20   A.  Yes.

21   Q.  What would you expect to find if the person was shot

22       with someone standing right over them with that kind

23       of gun?

24   A.  Well, in close proximity and particularly in a

25       contact or near contact or partial contact wound,



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

STATE OF MISSOURI,  )

           Respondent,  )

           vs.  )  Appeal No. WD 67426

KEITH L. CARNES,  )

           Appellant.  )

**C O P Y**


## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
### SIXTEENTH JUDICIAL CIRCUIT
Honorable Gene R. Martin, Senior Judge

STATE OF MISSOURI,  )

           Plaintiff,  )

           vs.  )  Case No. 16CR03006321

KEITH L. CARNES,  )

           Defendant.  )


## TRANSCRIPT ON APPEAL
### VOLUME I OF I
Pages 1 thru 572


**FOR THE PLAINTIFF:**

  Ms. Dawn M. Parsons and
  Mr. Brady X. Twenter
  Asst. Prosecuting Attorneys
  Floor 7M
  Jackson County Courthouse
  415 East 12th Street
  Kansas City, Missouri 64106

**FOR THE DEFENDANT:**

  Mr. Willis L. Toney
  Attorney at Law
  1100 Main Street
  Suite 1600
  Kansas City, Missouri 64105

(14)

*JIM BOUCK, CCR, CSR, PSSC, CVR-CM-RVR*
*Official Reporter, Circuit Court of Jackson County, Missouri*

Case 4:12-cv-00416-BP   Document 1-4   Filed 03/30/12   Page 20 of 48

```
 1      correct?
 2  A   Only if it's closer than two and a half to
 3      three feet.
 4  Q   If it is closer than two and a half to three feet?
 5  A   Yes.
 6  Q   Okay. Now, let's reverse the body and have them
 7      on their back; instead of in the prone position,
 8      they're on their back.
 9  A   All right.
10  Q   All right. Would you expect to see the type of
11      trajectory that you found here if the person is
12      laying on their back and the person is being shot
13      from a close angle -- close range?
14  A   Well, again, if the head is turned to the side --
15      and I'll indicate here that I'm turning now to
16      the left side so that this exposes the right side
17      of the head. If there is a person lying on their
18      back, they could from a certain angle -- I guess
19      it would be back here. Depending on how far it
20      was turned, you could get this kind of an angle.
21  Q   Okay. Now, you and I talked about that earlier
22      and you indicated that in order to get a shot like
23      that the shooter would almost have to be crouched
24      down to shoot, instead of standing over?
25  A   Yes. Because of the forward component of the
```

```
 1      transcript, page 27, line 9.
 2          MS. PARSONS:  We don't have it.
 3          MR. TONEY:  You don't have it?
 4          MS. PARSONS:  Just go ahead, we'll
 5      figure it out.
 6          MR. TONEY:  Okay.
 7  Q   (By Mr. Toney) "QUESTION: Now, is there anything
 8      that would indicate that someone stood over this
 9      man with a gun and shot him, right over him, two
10      or three feet, right over him and shot him,
11      anything to indicate that?" What is your answer?
12          MR. TWENTER:  Your Honor, objection. I
13      don't believe this is proper impeachment. The
14      question Mr. Toney asked him is not the question
15      he is being asked in that transcript.
16          THE COURT:  Overruled.
17          THE WITNESS:  Well, the only thing I
18      see here --
19  Q   (By Mr. Toney) I would like for you first to
20      tell the Court for the record what your answer
21      was.
22  A   The answer is, "It seems inconsistent, unless he
23      was extremely tall. No."
24  Q   And you said, "No," correct?
25  A   Right. I may not have been thinking clearly, but
```



```
 1      trajectory, it would seem like that would be the
 2      case.
 3  Q   Right. Just so the Court is clear, if they're
 4      laying on their back, from a close shot, they
 5      would have to be -- what you told me earlier is
 6      that they would have to be crouched down sort of
 7      like this to be able to shoot and get that type of
 8      trajectory?
 9  A   Well, again, I suppose the issue is how far would
10      their head have been turned. If they were
11      tucking their head or something like that --
12      unfortunately, the human head has got a lot of
13      mobility, but I was thinking of it, you know,
14      sort of in a very simple way, like this
15      (Indicating).
16  Q   All right. Now, Doctor, do you remember telling
17      me that based on the trajectory, the way the
18      bullet traveled, the trajectory of the bullet's
19      path, and the lack of finding indications of
20      stippling or soot, that it was inconsistent with
21      the person being shot while laying on the ground?
22  A   Well, it would be -- if I said that, I'm sorry.
23      I mean, it's possible, obviously, from what I've
24      just said.
25  Q   I want to call your attention to the trial
```

```
 1      I think the point is, I don't think there's any
 2      evidence one way or the other. I think it's kind
 3      of an open question. There is no evidence that
 4      the person was standing over them, but it's
 5      possible.
 6  Q   And that's what I'm trying to get at.
 7  A   Yeah, I agree.
 8  Q   To a reasonable scientific certainty, there is no
 9      evidence here that the person was standing over
10      him. That's what you've told me before. Is that
11      what you're saying now?
12  A   Yeah. You -- not you personally, but it would be
13      asking too much of the physical evidence to
14      make -- this is more supposition. This is
15      something that goes beyond the purview of what we
16      can find out from the autopsy.
17  Q   All right. Now, we talked about what you would
18      expect to see with a high-velocity rifle shot. Do
19      you remember us having that conversation?
20  A   Yes.
21  Q   All right. Would you explain to the Court what
22      you would expect to see from a high-velocity shot
23      to the cranium as from, say, a pistol? What would
24      you expect to see, the difference there?
25  A   Well, again, the issue of the amount of energy,
```

334

1   so-called kinetic energy, energy in motion, if
2   you'll remember your high school physics, is much
3   greater. The equation is 1/2MV$^2$ equals -- energy
4   equals 1/2MV$^2$, the mass times the velocity
5   squared. So every time that you double the
6   velocity, you quadruple the amount of energy
7   imparted. What the significance of this is, is
8   that this temporary cavitation gets greater and
9   greater and it will shred and explode things.
10  There are demonstrations where they shoot it into
11  pineapples or grapefruit. Well, at any rate, I
12  think I alluded to that on the direct
13  examination, and that's the sort of thing that we
14  look for in combination with the exit wounds,
15  which are characteristically much larger.
16          Now, if we're talking about a contact
17  wound or a close wound, then the entrance wound
18  also takes on, at least some of the time,
19  characteristics that are different or distinct in
20  a high velocity, but at a distance, if there is
21  no intermediate target to destabilize the
22  projectile, the entrance wounds can be remarkably
23  rather benign and, if anything, look less
24  impressive than they do with handguns, because
25  the projectiles, in reality, are hardly much

335

1   larger than a .22 or a .25 caliber.
2   Q  Now, Dr. Gill, let's stay on that same track here.
3      With a high-velocity projectile -- if you have a
4      contact wound, with a high-velocity projectile,
5      what would you expect to see in terms of what
6      would happen inside of the cranium, if you have a
7      contact wound?
8   A  Because of the velocities derived from a greater
9      amount of gunpowder, as the gunpowder undergoes
10     combustion it produces a great deal of gas. The
11     gas is injected into the skull so you get these
12     kind of radiating tears and massive defect on a
13     contact wound at the entrance as well as the
14     exit, and sometimes you have just a complete
15     destruction and huge cranial defect. So that's
16     what you see.
17  Q  Now, if you're, say, a short distance -- instead
18     of the contact wound, now, we're going to move to
19     the intermediate. Okay?
20  A  Uh-huh.
21  Q  We'll say three to four to five feet away. Would
22     you expect to see mass destruction inside of the
23     cranium if he's shot with a high-velocity rifle
24     from that close range?
25  A  You'll see the temporary cavitation and the

336

1   increased damage to the tissues that I described,
2   yes, because that doesn't rely on just the gases,
3   but the velocity of the projectile.
4   Q  And if you go back a distance, if you go back,
5      say, 50 to 100 to 200 feet, same high-velocity
6      rifle, what do you expect to see then?
7   A  Well, I don't think that anybody has ever said
8      that we can, you know, make too much of a
9      statement about this, but obviously as you get
10     further and further away there is going to be
11     some decrease in the amount of damage. I mean,
12     you can't just go out to infinity because there
13     is a certain amount of drag in the atmosphere
14     here. If we were in outer space or something,
15     that wouldn't be the case, but I really don't
16     think that forensic pathologists are in a
17     position to make any kind of statement whether
18     this was, you know, 100 or 1000 yards away or
19     anything. I just don't know anything in the
20     literature that comments on that.
21  Q  What I'm asking you is -- I'll just cut to the
22     chase here. The issue here is whether or not
23     you're able to say, "Hey, this guy was shot from
24     somebody standing three to four feet over him," or
25     whether it appears to be that it may have been

337

1   from a greater distance away. That's the issue
2   here. Are you able to determine that?
3   A  The answer is, no, conservatively we really
4      can't.
5   Q  Okay. But you can determine that it wasn't a
6      contact wound and it wasn't within that three-foot
7      range where you get the soot and stippling,
8      correct?
9   A  Correct.
10  Q  Now, I want to move on to the other wounds here.
11     That would be what you've marked as wound number
12     two and wound number three, right?
13  A  Uh-huh.
14  Q  Did those wounds appear to come from the back, for
15     example, someone running away from you, or did
16     they appear like the person shot from in front of
17     you?
18  A  Oh, I think that they are probably, technically
19     speaking, neither. They are really from the
20     side, from the right side. I mean, again, you
21     have all of these possible movements. One
22     scenario would be just a slight turn of the body
23     of the victim so that these things are
24     basically -- I mean, it's sort of like, you know,
25     the next step up from a graze, because they seem

120





**338**

1     to just tunnel underneath the skin and remarkably
2     don't do that much damage.
3 Q You testified that wound number two was from back
4     to front, right to left, and upwards?
5 A Yes.
6 Q Okay. So back to front would be this way?
7 A Yes.
8 Q And exited this way?
9 A Yes.
10 Q If the person is standing in front of you shooting
11     you, wouldn't you expect it to be the opposite?
12 A Yes.
13 Q Okay. So would it be fair to say that it appeared
14     that the person, the victim here -- these wounds
15     would not have come if he were facing his shooter?
16 A That's correct.
17 Q Okay. And that would be both of those wounds,
18     number two and wound number three, correct?
19 A Correct.
20 Q And also the graze wound?
21 A Yes.
22 Q All right. Now, if a person is laying on the
23     ground and faceup, would you expect to find wound
24     number two or three if they were shot while they
25     were laying on the ground faceup?

**339**

1 A Those would be very awkward. I mean, I suppose
2     it's physically -- well, with a long-barrelled
3     weapon, it would be very, very awkward, because,
4     I mean, you know, it appears that these are two
5     and a half to three feet behind, and it's around
6     on the side here and it's going forward.
7 Q So those wounds would be inconsistent with --
8 A A person laying faceup. That's what we're
9     talking about?
10 Q Right.
11 A Okay. Good.
12 Q So, Dr. Gill, based upon your experience and
13     within a reasonable degree of medical certainty,
14     would you conclude that wounds numbers two and
15     three and the graze wound did not come from shots
16     from someone standing directly over the body?
17 A Directly over the body?
18 Q Yes.
19 A Yes.
20 Q Okay. Now, you indicated to the prosecutor that
21     the shot to the head was the shot that resulted in
22     this person's death, is that correct?
23 A Correct.
24 Q The other two shots would not be life-threatening,
25     in and of themselves?

**340**

1 A Correct.
2 Q Okay. And the graze wound would not have been
3     life-threatening, is that correct?
4 A Correct.
5 Q Do you have any medical evidence that would
6     support the statement that someone stood over the
7     victim and shot him in the head? Is there any
8     medical evidence to support that?
9 A Nothing in the report that, you know, supports,
10     in other words suggests, that was how things
11     occurred, no.
12         MR. TONEY: Okay. Thank you.
13         MR. TWENTER: I just have a few
14     questions on redirect, Your Honor.
15         THE COURT: Very well.
16         REDIRECT EXAMINATION
17 BY MR. TWENTER:
18 Q You and Mr. Toney were just discussing shots two
19     and three and the graze wound?
20 A Yes.
21 Q On this diagram where you have diagramed out the
22     trajectory, it appears that you're saying the
23     graze wound was going down from the front?
24 A Yes.
25 Q Were you mistaken when you told Mr. Toney the

**341**

1     graze wound came from the back then?
2 A It doesn't go from the back.
3 Q Does it kind of come from above?
4 A Yeah. So it actually could occur from somebody
5     standing probably at the head and shooting
6     downwards, so that it would pass downwards and
7     from right to left, grazing the left side of the
8     thorax, yes.
9 Q Could it also come, I don't know, from somebody
10     30 feet away, above me, shooting going down then?
11 A I guess so. I mean, that would be a shallow
12     angle, but I guess so.
13 Q It's possible that happened?
14 A It's possible.
15 Q All right. Also, Mr. Toney asked you if you could
16     say within a reasonable -- I'm sorry, let me start
17     that question all over. Mr. Toney asked you if
18     there was any medical evidence that somebody stood
19     over this person and shot them in the head, and
20     you said no, correct?
21 A But what I meant by that is that there is nothing
22     that says that's explicitly -- we've already gone
23     over this, that if a person's head was turned in
24     a certain fashion --
25 Q You can't say for certain one way or the other,

8  Q.  When Tre started chasing him through the alley, which way did they run?
   A.  They were going north up the alley then east towards Prospect.

9  Q.  When they started running east towards Prospect, what happened next?
   A.  Larry hollered out "I'm gonna die. I'm gonna die." Then he collapsed right there at fish town.

10  Q.  Was anybody with Tre while Larry was being chased?
    A.  Yes. His name is Kiki.

11  Q.  Was Kiki carrying anything?
    A.  He had a gun but I couldn't see his as good as Tre's.

12  Q.  What kind of gun did Kiki have?
    A.  His was small. It wasn't as big as the one Tre had.

13  Q.  Did Kiki fire any shots?
    A.  No.

14  Q.  What happened when Larry collapsed at fish town?
    A.  Tre rolled him over then shot him some more, probably five more times.

*Seen*

*Sei ... he ... that means she ...*

15  Q.  Did you see these shots or did you see them?
    A.  I heard them, seen the fire from the bullets.

*She never should have been able to take the stand and testify*

16  Q.  Did you actually see the shots at fish town or did you hear them?
    A.  I heard them.

17  Q.  What was Tre wearing that night?
    A.  He was dressed in all black with a hooded sweatshirt and black pants.

123

**MEMO TO FILE:**
**STATE VS. KEITH CARNES**

### WITNESS FOR STATE: Lorianne Morrow

Interview of Lorrianne Morrow - taken 10/26/04 in Jackson County Prosecutor's office - also present Amy McGowan assistant prosecuting attorney

Ms. Morrow stated the following:

1. She resides in Kansas City, MO but does not want to give her address or telephone number. Middle age black female with dredlocks - very thin and nervous

2. On October 2003 she was visiting the area of 29th Wabash looking for a friend of hers. She was frequently in the area.

3. Arrived between 8 - 8:30PM - it was dark outside and she was walking east bound on 29th Street between Olive and Wabash. Even though dark she claims to be able to see real well.

4. Saw Tre on balcony of first building. Says he was yelling at victim [Larry] from the balcony stating he needed to stop selling drugs on his turf
     a. says Tre did not live there - claims it was not Tre's turf
     b. Tre was wearing black hood sweat shirt

5. Says after yelling - Tre ran outside and began shooting at the victim and chasing victim east bound on 29th Street toward Prospect Ave. Says Tre and Kiki started chasing him - both had guns but only Tre was firing gun [claims Tre's gun was black AK-47 with clip]

6. Several people were outside observing this incident
     a. Kiki (chasing victim) ( Kiki had a gun in his hand)
     b. Wendy Lockett
     c. Lisa
     d. Star (white female)   -last name unknown
     e. Sherry (white female) -last name unknown
     f. Red (black male)    -last name unknown




7. She was continuing to walk toward Prospect as the events took place - says Tre never saw her - but she saw Tre and he had a patch over his eye

8. Claims Tre ran off the balcony - then out the front door - north down the alley then east behind the house, then east up 29th Street toward Prospect

   a. Claims she was standing on the corner of 29th and Wabash by the volleyball court while this was taking place

   b. lost sight of Tre for a moment when he went behind the house - but could still hear shots [no bullets found in street on 29th]

   c. claims she went up 29th Street and hid in the shadows by the church [church is on corner of 29th and Prospect] where Tre could not see her. From there she watched the execution of victim in Fish Town parking lot

   d. claims she watched Tre run up on victim as victim lay dying in parking lot of Fish Town, roll victim's body over and shoot victim 5-6 times while the victim laid on the ground.

[no bullets found in parking lot - no frontal wounds on victim]

9. After shooting claims she walked north on Prospect to 28th Street then east on 28th Street to her friend's house

10. Never saw Tre standing on porch of 2846 Wabash holding or firing a gun

11. Says Tre walked back to buildings and was laughing [How did she see or hear this if she was on Prospect going north toward 28th Street?]

12. Says he smokes pot on the regular and has purchased pot from Reggie Thomas. Says she was drug free on this night.

13. Claims she was alone when she observed these events - did not relay the information to the police for a number of days

14. Claims victim was standing on corner of Olive when Tre comes out with guns - victim then runs east - this is a problem - if Tre is coming out of first building then victim would be running right at shooter instead of away from shooter [illogical] if victim starts to run east bound

15. Claims Tre went behind house and up alley - however 29th Street is straight - fence

was not damaged. Running around house and down alley would not be quickest way to reach victim.

16. Says she is not now employed and is not currently on probation or parole and does not have any criminal cases pending

NOTE: Physical and forensic evidence is contrary to her version of events. Negative point is that she ID's Tre and does not back down from her ID. Not believable that she followed shooter up 29th Street. Most people would run the other way.

# Trial Two
# Transcript
## Of
# Lorianne Morrow

21  A.  Yes, sir, he did.

22  Q.  How many times?

23  A.  I heard about five more shots.

24  Q.  Five more shots.  In that parking lot five times,

25      that's your testimony?


                    Division 70, Sixteenth Judicial Circuit

                                                    37

☐


1   A.  Yes.

2   Q.  Okay, so there should have been, according to you--

3       He's shooting close range, right?

4   A.  Yes.

5   Q.  With that AK-47?

6   A.  Yes, he did.

7   Q.  In that parking lot?

8   A.  Yes, he did.

9   Q.  At least five times?

10  A.  Yes, sir.

11  Q.  Okay.  Do you remember talking to the police and

12      telling them that you saw Ke-Ke with a gun?

13  A.  Yes.

14  Q.  And what kind of gun did Ke-Ke have?

15  A.  Ke-Ke had a small gun.

16  Q.  A small gun.  Did you ever see Ke-Ke fire that gun?

17  A.  No.  He did not fire.

18  Q.  And you never saw Ke-Ke run down the street, right?

19  A.  No, sir.  It wasn't him that shot him.  It was Tre.

20  Q.  All right, and did you see, did you ever see--ever

21      see--Mr. Carnes standing in this, the front yard?

22  A.  Did I ever see him standing in the front yard?

                        Page 36

041905 Lorianne Morrow.txt

23   Q.  Right.

24   A.  I don't remember.

25   Q.  So that would be no, you didn't see him standing in

                              Division 70, Sixteenth Judicial Circuit

                                                        38

1        the front yard?

2    A.  That would be no.

3    Q.  Okay.  And, in fact, that front yard has a fence

4        around it, doesn't it?

5    A.  Yes, it has a fence around it.

6    Q.  You didn't see Mr. Carnes jump that fence, did you?

7    A.  Jump the fence?  Why would he jump the fence when

8        he could come down the stairs?

9    Q.  Okay.  So you never saw him in the yard of 28462

10       Is that correct?

11   A.  2846?

12              (The witness shook her head.)

13   Q.  All right.  So, ma'am, I just want to make sure I

14       understand what you're saying.  I don't want to be

15       confused here.  Okay?  You're standing on this

16       corner.  Just follow me here.  You're standing on

17       this corner.  Okay?  And you say that Keith comes

18       off this porch to confront Larry with the gun,

19       correct?

20   A.  Correct.

21   Q.  And you're saying Larry runs toward him while Keith

22       has that gun in his hand, correct?

23   A.  Yes.

                              Page 37



IN THE MISSOURI COURT OF APPEALS
WESTERN DISTRICT

STATE OF MISSOURI,　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　Respondent,　　)
　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　)　　Appeal No. WD 67426
　　　　　　　　　　　　　　　)
KEITH L. CARNES,　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　Appellant.　　　)

**COPY**

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
SIXTEENTH JUDICIAL CIRCUIT
Honorable Gene R. Martin, Senior Judge

STATE OF MISSOURI,　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　)　　Case No. 16CR03006321
　　　　　　　　　　　　　　　)
KEITH L. CARNES,　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　)

TRANSCRIPT ON APPEAL
VOLUME I OF I
Pages 1 thru 572

FOR THE PLAINTIFF:

Ms. Dawn M. Parsons and
Mr. Brady X. Twenter
Asst. Prosecuting Attorneys
Floor 7M
Jackson County Courthouse
415 East 12th Street
Kansas City, Missouri 64106

FOR THE DEFENDANT:

Mr. Willis L. Toney
Attorney at Law
1100 Main Street
Suite 1600
Kansas City, Missouri 64105

(14)

JIM BOUCK, CCR, CSR, PSSC, CVR-CM-RVR

Official Reporter, Circuit Court, Jackson County, Missouri

## 46

1 dispatched out there?

2 A Yes.

3 MR. TWENTER: Your Honor, the State

4 would move to admit State's Exhibit Number 4 into

5 evidence.

6 MR. TONEY: No objection.

7 THE COURT: Number 4 is admitted.

8 (Whereupon, State's Exhibit Number 4

9 was received in evidence.)

10 Q (By Mr. Twenter) Now, on both maps at the area of

11 what is marked on State's Exhibit Number 3 as 2831

12 Prospect, there is what I can only describe as a

13 small caricature there?

14 A Yes.

15 Q Can you tell me what that represents?

16 A That was where the victim was lying when I came

17 up to the scene, or approximately where the

18 victim was lying.

19 Q And this area that's marked 2831 on State's

20 Exhibit Number 3, can you tell me what that

21 business is?

22 A That's Fish Town.

23 Q So the area around that would be the parking lot

24 where you found him?

25 A Correct.

## 47

1 Q Now, when you say you secured the crime scene, was

2 it just the Fish Town parking lot that you

3 secured, or did you go anywhere else?

4 A At first, it was just the Fish Town, and then I

5 had some officers do what we call an area

6 canvass. They go out around the neighborhood and

7 start asking questions to see if there are any

8 more witnesses or anything. We were also

9 directed to 2846 Wabash.

10 Q And is that also indicated on State's Exhibit

11 Number 3 with the address of the building?

12 A Yes, it is.

13 Q And why were you directed to 2846 Wabash?

14 A There were some shell casings found in the yard

15 of that address.

16 Q And when you got that information, is that

17 something you would inform the crime scene

18 technicians when they arrived?

19 A I would inform the homicide unit, yes, and then

20 they would, in turn, investigate to make sure

21 that that's a part of the crime scene we're

22 dealing with at that time. From the statements

23 of the witnesses and stuff at that time, they

24 said the shots had come from that general

25 direction.

## 48

1 Q Your job is not to collect any evidence or collect

2 any shell casings, is it?

3 A No, it's not.

4 Q You just identify the witnesses, where any

5 potential evidence may be, and secure the area?

6 A Correct.

7 Q Did you also at some point during the

8 investigation of this crime have an opportunity to

9 measure the distance from the parking lot at 2831

10 Prospect to the corner -- essentially, the

11 intersection of 29th and Olive Street?

12 A I actually measured the distance from the yard at

13 2846 Wabash to 2831 Prospect, using a

14 roll-a-tape.

15 Q And what is a roll-a-tape?

16 A It's a device that measures distances in feet.

17 It's got a little wheel on it.

18 Q Essentially, you just roll it along the ground and

19 it measures out how far you're walking?

20 A Correct.

21 Q Can you tell us what the distance was?

22 A It was approximately 681 feet.

23 Q Now, after you secured the scene and you talked to

24 some witnesses and you measured the distance, did

25 you have any further involvement with this case?

## 49

1 A No, I did not.

2 MR. TWENTER: The State has no further

3 questions of this witness, Your Honor.

4 THE COURT: Mr. Toney, you may

5 cross-examine.

6 MR. TONEY: May it please the Court.

7 CROSS-EXAMINATION

8 BY MR. TONEY:

9 Q Officer Campbell, you were working for east patrol

10 in October of 2003, correct?

11 A Yes, sir.

12 Q And you say you were dispatched to 29th and

13 Prospect. Do you know about what time you were

14 dispatched there?

15 A I believe it was about 8:00 that night.

16 Q Do you have your report on this?

17 A No, sir, I do not.

18 Q But you believe it was -- well, I want to show you

19 a report and ask you if you would look at it to

20 refresh your recollection.

21 A It was 8:50 at night.

22 Q Okay. You were dispatched to that location. Do

23 you know whether it was from a 911 call, or do you

24 know how you were dispatched there?

25 A No. The dispatcher just puts it out and we

**50**

1  respond.
2  Q  And do you know where you were at prior to going
3  to 29th and Prospect?
4  A  I was south, I know that. I remember coming
5  north on Prospect into the parking lot.
6  Q  About how long did it take you?
7  A  It was a matter of minutes.
8  Q  Do you think you were further south on Prospect
9  than, say, 39th Street?
10  A  I don't recall.
11  Q  Okay. But you got to 29th and Prospect in a
12  matter of minutes?
13  A  (Nods head affirmatively.)
14  Q  Is that a "yes"?
15  A  Yes.
16  Q  And when you got there, did you observe anyone
17  standing up in the parking lot?
18  A  No, I did not.
19  Q  Okay. Did you observe anyone fleeing from the
20  parking lot?
21  A  No, I did not.
22  Q  Okay. When you first got there, what was the
23  first thing that you observed?
24  A  I observed the victim lying in the parking lot.
25  Q  I want to show you what's been marked as

**51**

1  Defendant's Exhibit 101.
2  MR. TWENTER: Your Honor, the State is
3  going to object at this point. Counsel has never
4  seen what he is showing the witness.
5  THE COURT: Well, he's got to identify
6  it first.
7  MR. TWENTER: Okay.
8  MR. TONEY: I'm going to show it to
9  you. Give me a second here.
10  Q  (By Mr. Toney) I want to show you Defendant's
11  Exhibit 101 and ask you if you can identify that
12  picture.
13  A  Yes, sir, I can.
14  Q  And would you tell the Court what that is a
15  picture of?
16  A  It's a picture of Fish Town, at 2831 Prospect.
17  MR. TWENTER: The State has no
18  objection.
19  THE COURT: Are you offering it?
20  MR. TONEY: Yes, Your Honor. I move
21  for the admission of Defendant's Exhibit 101.
22  THE COURT: Exhibit 101 is admitted.
23  (Whereupon, Defendant's Exhibit
24  Number 101 was received in evidence.)
25  Q  (By Mr. Toney) Officer, I'm going to hand you

**52**

1  this pen and I want you to mark with an X
2  approximately where in that parking lot you saw
3  the body laying.
4  A  Okay.
5  Q  Put your initials beside it, please.
6  A  (Complies.)
7  Q  Thank you. And when you got there, was the
8  victim's body faceup or facedown?
9  A  I believe it was faceup.
10  Q  So he would have been laying on his back?
11  A  Yes, sir.
12  Q  And did you move the body when you got there?
13  A  No, sir, I did not.
14  Q  Did you look around to see if you saw any shell
15  casings?
16  A  I did look around, yes, sir.
17  Q  Okay. Did you observe any shell casings in that
18  parking lot?
19  A  No, sir, I did not.
20  Q  Did you look around to see if there were any holes
21  in the asphalt, as if a shot had been made into
22  the asphalt?
23  A  No. Unless it stood right out, I wouldn't have
24  noticed whether there had been any holes or
25  anything.

**53**

1  Q  Okay. Did you observe any footprints in the
2  blood?
3  A  No. I would have noted that. So I would say,
4  no, I did not.
5  Q  Okay. And you said one of your jobs is to make
6  sure that there is no contamination of the crime
7  scene, correct?
8  A  As much as possible, yes, sir.
9  Q  Okay. So you would make sure that no one walked
10  around and touched anything or picked up anything
11  before the crime scene people could get there?
12  A  That would be correct, but on this case the
13  victim was transported by the MAST unit. So they
14  would have been around the body and touching him
15  and doing the various things that they do.
16  Q  So was he alive when you got there?
17  A  I didn't check for a pulse or anything. At that
18  point, I saw that he was shot and I saw blood
19  coming from him. I called MAST in. Usually, if
20  there is a good indication that he is deceased,
21  for example, he's missing a limb or a body part,
22  something like that, I would wave MAST off at
23  that point. At this time, it is not my job to
24  decide whether he is alive or dead. So I go
25  ahead and let MAST do what they need to do.

1      THE COURT: Well, I see those, but I
2  haven't seen these photos here.
3      MR. TONEY: (Complies.)
4      MR. TWENTER: Your Honor, if we could
5  have a moment, we're going to use the PowerPoint
6  with the next witness.
7      THE COURT: Just have a seat a moment.
8      THE WITNESS: (Complies.)
9      THE COURT: Mr. Toney, looking at
10 Exhibit 102, I had the impression this was a
11 photo looking west. Is that right?
12     MR. TONEY: That is correct, Judge.
13 It is now corrected.
14     MR. TWENTER: The State has no
15 objection to the correction, Your Honor.
16     THE COURT: Would you stand up, sir?
17     THE WITNESS: (Complies.)
18     <u>GREGORY VAN RYN,</u>
19 having first been duly sworn, testified as follows:
20     <u>DIRECT EXAMINATION</u>
21 BY MR. TWENTER:
22 Q  Could you state your name for the record, please.
23 A  Gregory Van Ryn.
24     THE COURT: Spell your last name for
25 me.

1  A  It is called PMs, which we start at 3:30 p.m.
2  Q  And go until?
3  A  Normally, 11:30.
4  Q  Unless you're in the middle of doing something, I
5     assume?
6  A  Correct.
7  Q  Were you dispatched on the night of October 6th to
8     the area of 29th and Prospect?
9  A  Yes.
10 Q  And what was the purpose of your dispatch there?
11 A  Originally, it was in regards to a shooting,
12    which later turned out to be a homicide.
13 Q  And when you arrive on the scene, what are your
14    duties?
15 A  Again, to document the scene. That's our first
16    priority, photographing.
17 Q  And after you photograph any potential evidence,
18    what do you do?
19 A  When we get to the scene, we do a walk-through,
20    photograph the evidence, and then collect the
21    evidence.
22 Q  And on this particular night when you arrived, do
23    you recall what the first thing you noted was?
24 A  At the?
25 Q  At the scene of the Fish Town, let's start out

1      THE WITNESS: V-A-N-capital-R-Y-N.
2  Q  (By Mr. Twenter) Mr. Van Ryn, where are you
3     employed?
4  A  Kansas City, Missouri, Police Department, crime
5     scene unit.
6  Q  And what are your duties with the crime scene
7     unit?
8  A  We respond to crime scenes; collect any related
9     evidence; document the scene through photographs,
10    reports, and diagrams.
11 Q  And do you do any investigating and solving of the
12    crimes like they do on TV?
13 A  That is really a detective's job on our
14    department.
15 Q  Okay. Your job is to go out and collect the
16    evidence and take it to the property room or to
17    the lab, whichever would be appropriate, correct?
18 A  And document the scene, yes.
19 Q  Okay. Were you working for the Kansas City Police
20    Department in October of 2003?
21 A  Yes, I was.
22 Q  Were you working, specifically, the night of
23    October 6th?
24 A  Yes, I was.
25 Q  What shift were you working that day?

1     there, at 29th and Prospect.
2  A  Yes. It was in the parking lot, some blood,
3     clothing, and medical-related trash.
4  Q  When you arrived on the scene, was there still a
5     body there?
6  A  No.
7  Q  Did you see fire, ambulance, and that sort of
8     thing?
9  A  I believe they had already left by the time I had
10    gotten there.
11 Q  All right. After you saw the area at Fish Town,
12    did you go anywhere else that night?
13 A  Yes, the area of 29th and Wabash.
14 Q  Now, how did you decide these were the areas you
15    would look at for the collection of evidence, or
16    photographs and that sort of thing?
17 A  We received that information from detectives.
18    The detectives were talking to witnesses saying
19    that they had heard shots from that area.
20 Q  So you're basing your investigation and your
21    collection at the scene on where the detectives
22    are telling you to look, correct?
23 A  Correct.
24 Q  All right. I want to start with the parking lot
25    and we'll go over what you found there. You said

1     there was blood and various medical things and
2     some clothing?
3  A   Right.
4  Q   Did you find anything else that you considered of
5     evidentiary value there?
6  A   No. The only items that were collected was a
7     coat and two gloves.
8  Q   Did you find any shell casings, or spent bullets,
9     or anything of that nature?
10  A   No.
11  Q   Did you collect all of that evidence that you just
12     described, with the exception of the blood, I'm
13     sure?
14  A   Well, the blood was with the clothing. The
15     clothing was collected, yes.
16  Q   And was there blood anywhere else, other than the
17     clothing itself?
18  A   There was a small pool of blood in the parking
19     lot, yes.
20  Q   All right. After you finished collecting that
21     evidence, I want to move down 29th towards Wabash.
22     Can you tell me if you found anything in the area
23     of 29th and Wabash?
24  A   Yes. In that area, a total of 12 shell casings
25     were collected.

1  Q   And do you recall where you collected those from?
2  A   Well, they were from the porch of 2846, from the
3     yard, and then also along the curb and the street
4     there, 29th Street.
5  Q   Okay. On that evening, were those the only crime
6     scenes that you worked?
7  A   Yes.
8  Q   Were you later called back out to the area of 29th
9     and Prospect to 29th and Olive on this case?
10  A   The following day.
11  Q   And what was the purpose of your going out on that
12     day?
13  A   The homicide detectives were serving a search
14     warrant at 2404 East 29th.
15  Q   And when a search warrant is served, what are your
16     duties?
17  A   Again, I respond to the scene. After the scene
18     has been cleared by our tactical teams, I respond
19     to the scene and collect any related evidence
20     that the detectives request.
21  Q   So when they go and they do the search warrant,
22     are you going in with the detectives and the tac
23     team, or do you wait until after they've already
24     gone in?
25  A   As the tac team goes in, they clear the

1     residence, and then the detective goes in, and
2     then I follow.
3  Q   So are you going in at essentially the same time
4     as the detective?
5  A   No, not at all.
6  Q   All right. So when he's finished with whatever
7     he's looking for, then you go in and collect any
8     evidence?
9  A   If they find anything, yes.
10  Q   All right. Can you tell us what building you were
11     searching that day?
12  A   There were three similar buildings. There was a
13     center building, which was 2404 East 29th,
14     Apartment West.
15  Q   The search warrant was for that particular area?
16  A   Correct.
17  Q   And you went into 2404. Did you say what
18     apartment number it was?
19  A   West, which was on the first floor.
20  Q   Okay.
21           THE COURT: I'm sorry?
22           THE WITNESS: West, first floor.
23  Q   (By Mr. Twenter) Did you only search and collect
24     evidence from the apartment on the first floor to
25     the west that day?

1  A   No, also 1-East, which was directly east of the
2     apartment, same building.
3  Q   And so you also collected evidence from the
4     apartment on the east side of the building,
5     correct?
6  A   Yes.
7  Q   And this was the middle of the three similar
8     buildings?
9  A   Yes.
10  Q   I want to start with Apartment 1 on the first
11     floor to the west.
12  A   Okay.
13  Q   Can you tell me what you collected from that
14     apartment?
15  A   There were two ID cards, an apparent crack pipe,
16     and various ammunition, and some court papers.
17  Q   And do you recall exactly what types of ammunition
18     were found in there?
19  A   I would have to check my reports. There were
20     various kinds.
21  Q   Would that help refresh your recollection?
22  A   Yes.
23  Q   All right. Go ahead and check.
24  A   Five Luger 9-millimeter; one 380 auto; one PMC
25     223 Remington; one live shotgun shell,

1   the cartridge casings.
2 Q  I'm going to show you what's been marked, first,
3   as State's Exhibit Number 58 and ask you if you
4   recognize that as one of the weapons that was
5   submitted to you.
6 A  Yes, I do.
7 Q  And what type of weapon is that?
8 A  It is a 7.62 x 39 millimeter Norinco SKS rifle.
9 Q  All right. And we're going to call that State's
10   Number 58, because that's what it's been
11   introduced as.
12 A  Okay.
13 Q  I'm also going to show you what's been marked as
14   State's Exhibit Number 35 and ask you if you
15   recognize that weapon.
16 A  Yes, I do.
17 Q  Is that also one of the weapons that was submitted
18   to you for testing in this case?
19 A  Yes, it is.
20 Q  What type of weapon is that?
21 A  It also is a 7.62 x 39 millimeter Norinco, but
22   the model is a MAK-90.
23 Q  Okay. And we're going to call that State's 32
24   just for differentiating between the two, if
25   that's all right with you.

1 A  Yes.
2   THE COURT: Thirty-two, you say?
3   MR. TWENTER: Thirty-five. I
4   apologize, Your Honor, 35. I have poor
5   handwriting.
6 Q  (By Mr. Twenter) Now, you test-fired both of
7   those weapons, you said?
8 A  Yes, I did.
9 Q  And did you then compare the test-fired casings to
10   the casings that had been submitted to you from
11   the crime scene technicians?
12 A  Yes, I did.
13 Q  And can you tell us if the casings from the crime
14   scene matched either of those weapons?
15 A  Yes, they did.
16 Q  And which one did they match?
17 A  It matched the Norinco MAK-90, Exhibit Number 35.
18 Q  Okay. I have a couple of other questions just
19   generally about weapons when they are fired. When
20   you shoot a semiautomatic or an automatic, the
21   casing comes out and the bullet goes out the front
22   of the gun, obviously?
23 A  Yes.
24 Q  If that bullet hits something solid, what are the
25   different things that can happen with it?

1 A  That bullet can become embedded or, if it hits a
2   harder surface, that bullet could fragment, break
3   apart.
4 Q  If it hits at an angle, is it possible it could
5   ricochet as well?
6 A  Yes.
7 Q  And would you expect any of those things to happen
8   if it was to come in contact with, let's say, a
9   concrete parking lot?
10 A  Yes, I would expect that.
11 Q  So you couldn't tell us if it would embed in it,
12   if it would fragment, or if it would ricochet?
13 A  It could do any of those things, depending on the
14   surface that it came in contact with.
15   MR. TWENTER: All right. That's all
16   the State has of this witness, Your Honor.
17   CROSS-EXAMINATION
18 BY MR. TONEY:
19 Q  Good morning, Ms. May.
20 A  Good morning.
21 Q  You indicated that you tested Number 58, which is
22   the long black -- well, we'll just describe it for
23   the record. It's the long black gun, Number 58?
24 A  Yes.
25 Q  All right. And do you recall how many times you

1   fired it?
2 A  I can check my notes.
3 Q  Please, do.
4 A  I test-fired that particular firearm three times.
5 Q  And you checked to see which way the shells
6   ejected, is that correct?
7 A  No, I did not.
8 Q  You didn't?
9 A  No.
10 Q  But you did recover the shell casings to check for
11   tool marks on them, didn't you?
12 A  Yes.
13 Q  All right. Now, let me show you Number 58 and ask
14   you, if this were fired, which direction would you
15   expect the casings to eject?
16 A  As I stated earlier, the cartridge casings could
17   eject in different directions, depending on the
18   angle of the firearm, the way the firearm is
19   actually being held. It could eject from the
20   sides, it could eject from the rear of the
21   firearm, and it could eject forward of the
22   firearm.
23 Q  But if it were fired, say, eight or nine times,
24   would you expect to be able to find the shell
25   casings somewhere close to where it was fired?

1 A That's a possibility, but as I said earlier it
2 all depends on what that cartridge case came in
3 contact with as it was exiting the firearm.
4 Q All right. Let me see that gun again.
5 A (Complies.)
6 Q The way that this gun is made, is the ejection
7 port to the right or to the left?
8 A It could be either, because when that bolt
9 actually comes back there is an open ejection
10 port. So it has a possibility of going either
11 way.
12 Q Let me show you State's Exhibit Number 35 and ask
13 you, does that have the same mechanism as Exhibit
14 Number 58?
15 A And you mean by "mechanism"?
16 Q The ejection.
17 A It is slightly different, yes.
18 Q Would you tell the Court how this one differs from
19 the other?
20 A This ejection port has a closed area. So when
21 the bolt is actually open, this part of it is
22 actually shielded or covered.
23 Q Right. And on that one, you would expect it to
24 eject which way?
25 A I would expect it to eject to the right, or to

1 the forward, or to the rearward.
2 Q But not over it like the other one?
3 A Again, it's a possibility. It all depends on how
4 the individual was actually holding the firearm,
5 what position the firearm was in when it was
6 being fired, and what that cartridge case came in
7 contact with.
8 Q Okay. Now, are you right- or left-handed?
9 A I am right-handed.
10 Q Would you hold that gun in the way that a person
11 who is left-handed would hold it?
12 A (Complies.)
13 Q Now, if that gun were shot by a left-handed
14 person, would you expect the cartridges to go in
15 the same direction?
16 A I would expect that.
17 Q Okay. Thank you. The prosecutor asked you about
18 if a gun is shot -- a high-velocity gun is shot
19 from a close range, say, into a parking lot -- he
20 used concrete. You said you would expect it to
21 either embed, or ricochet, or fragment, is that
22 correct?
23 A Those are possibilities, yes.
24 Q Assume for a moment it's a softer surface than
25 concrete, like asphalt. Would you expect the same

1 thing?
2 A Pretty much the same. It could embed in that
3 asphalt and it could fragment.
4 Q Would it be more likely to embed in an asphalt
5 surface than it would be to embed in a concrete
6 surface?
7 A Again, it all depends on how close it was to the
8 actual asphalt or to the concrete, what the angle
9 of the bullet was when it was discharged; it
10 depends on how it actually hit that surface.
11 Q All right. Now, were you brought to examine
12 bullet fragments or just the shell casings?
13 A I believe just shell casings.
14 Q Okay. Do you recall how many shell casings were
15 brought to you?
16 A Thirteen.
17 Q And you determined that all 13 of them came from
18 Number 35?
19 A Yes, sir.
20 Q And none of them came from Number 58?
21 A That's correct.
22 MR. TONEY: All right. No other
23 questions, Your Honor.
24 MR. TWENTER: The State has nothing
25 further of this witness, Your Honor.

1 THE COURT: That's all. You may step
2 down.
3 (Witness excused.)
4 MS. PARSONS: Your Honor, the State
5 rests.
6 PLAINTIFF RESTS
7 THE COURT: Very well.
8 Yes, sir?
9 MR. TONEY: I have one witness here at
10 this time. I didn't anticipate them being
11 finished at 10:30, so I told everyone to come at
12 1:30. I've had people trying to call to get
13 these people here, but right now I'm looking at
14 being able to put on one witness now and coming
15 back at 1:30, because that's the time I told
16 everybody else to show up, and I'm really having
17 trouble trying to reach them right now. That's
18 the position that I'm in.
19 THE COURT: Do you have a motion at
20 this time?
21 MR. TONEY: Yes, but I wanted to do
22 that first.
23 THE COURT: I understand.
24 MR. TONEY: Okay. Your Honor, at this
25 time, the State rests and the defense would make

1    MR. TONEY: We did. We left messages;
2 we left phone numbers, business cards, the whole
3 bit.
4    THE COURT: Right up here to this
5 witness enclosure, please, and remain standing a
6 moment.
7    THE WITNESS: (Complies.)
8    MARVA GRAY,
9 having first been duly sworn, testified as follows:
10    DIRECT EXAMINATION
11 BY MR. TONEY:
12 Q  Would you state your name for the record, please.
13 A  Marva Gray.
14    THE COURT: I'm sorry, I didn't
15 understand you.
16    THE WITNESS: Marva Gray.
17    THE COURT: Marva Gray?
18    THE WITNESS: (Nods head
19 affirmatively.)
20 Q  (By Mr. Toney) Ms. Gray, would you spell your
21 first name and your last name for the record?
22 A  M-A-R-V-A, G-R-A-Y.
23 Q  And, Ms. Gray, where are you employed?
24 A  Fish Town.
25 Q  And that's the Fish Town Restaurant at 2831

1 Prospect?
2 A  Yeah.
3 Q  And were you employed there on October the 6th of
4 2003?
5 A  Yeah.
6 Q  And were you working there on that night around
7 9:00 p.m.?
8 A  Yes.
9 Q  And what is your position at that establishment?
10 A  Cashier and cook.
11 Q  Okay. And on that night, were you working as a
12 cashier?
13 A  Yeah.
14 Q  Did you hear any noises that were unusual that
15 night?
16 A  Yeah.
17 Q  Did you hear what you thought were gunshots?
18 A  Yes.
19 Q  Would you tell the Court when you first heard the
20 gunshots?
21 A  When I first heard them, I started to go to the
22 door but then I went back inside.
23 Q  Okay. And where did those gunshots appear to be
24 coming from?
25 A  Down the street from Fish Town.

1 Q  Would that be down 29th Street?
2 A  And Wabash.
3 Q  Toward Wabash?
4 A  (Nods head affirmatively.)
5 Q  Is that a "yes"?
6 A  Uh-huh.
7 Q  Okay. I need you to say "yes" or "no," because
8    the court reporter is trying to make a record, and
9    if you say "uh-huh" or "uh-uh," they can't get
10    that. All right?
11 A  Okay.
12 Q  Now, I want to show you what's been marked as
13    State's Exhibit Number 6 and ask you if you can --
14    if you recognize that area.
15 A  Yes.
16 Q  And what is that?
17 A  The Fish Town building.
18 Q  That's where you work at, correct?
19 A  Yeah.
20 Q  Now, you say you were working as the cashier that
21    evening?
22 A  (Nods head affirmatively.)
23 Q  Is that a "yes"?
24 A  Yes.
25 Q  And the cash register, would that be facing to the

1    north, toward 27th Street?
2 A  Yes.
3 Q  And there's a window right there, correct?
4 A  Yes.
5 Q  And then there are two windows that face to the
6    west, toward Prospect, correct?
7 A  Yes.
8 Q  Now, when you're standing at the cash register,
9    can you see out of the windows that face toward
10    Prospect?
11 A  No.
12 Q  But you can see out of the windows that face
13    toward 27th Street, correct?
14 A  Yes.
15 Q  Now, at any time that evening, did you hear
16    gunshots in your parking lot?
17 A  It wasn't in the parking lot.
18 Q  Okay. And from the cashier's -- well, where
19    you're standing to out in the parking lot, that's
20    about 25 feet, correct?
21 A  Yes.
22 Q  Okay. And if someone would have been standing in
23    that parking lot shooting, you would have heard
24    it, correct?
25 A  Yes.

378

1  Q  But you did not hear that, is that correct?
2  A  Yes.
3  Q  Okay. That night, did you discover that a person
4     had been shot and was laying in the parking lot?
5  A  Yes.
6  Q  Okay. Tell the Court how you came to know that
7     that person had been shot and was laying in the
8     parking lot.
9  A  I went to tell this lady her food was ready and
10    the lady had already came in, and then when the
11    lady came in -- I went back around the counter
12    and then when the lady came and got her food, she
13    got ready to walk out and she grabbed her chest
14    and was like, "There's a man in the parking lot."
15 Q  Okay. So he wasn't there before she came in?
16 A  Uh-uh.
17 Q  And not there when you went out to get her?
18 A  No.
19 Q  And about how much time was that, a couple of
20    seconds, a couple of minutes?
21 A  A couple of minutes.
22 Q  Okay. And then when you went back out, that's
23    when he was laying out there?
24 A  Yeah.
25 Q  Okay. And in that period of time, you hadn't

379

1     heard any gunshots in your parking lot, right?
2  A  No.
3  Q  Okay. Now, I want to show you what's been marked
4     as State's Exhibit Number 8 and ask you if you
5     recognize that.
6  A  (Nods head affirmatively.)
7  Q  Is that a "yes"?
8  A  Yes.
9  Q  Okay. And I know this is traumatic and painful,
10    but is that the location where the body was when
11    you went out there?
12 A  Yes.
13 Q  Okay. And that body is like right outside of the
14    door of the Fish Town, correct?
15 A  Yes.
16 Q  I don't want to just keep going over this -- well,
17    here, I'll remove that picture because I know you
18    don't want to look at it.
19       That was a traumatic evening for you,
20    wasn't it?
21 A  I had just lost my son, that's why.
22 Q  Okay. And then you go out and there is a dead
23    body right in front of the place where you're
24    working at. So you would remember that night,
25    correct?

380

1  A  Yes.
2  Q  And you are sure beyond any doubt that there was
3     no gunshots fired in that parking lot that
4     evening, is that correct?
5  A  Yes.
6        MR. TONEY:  I don't have any other
7     questions, Your Honor.
8        THE COURT:  You may examine.
9        MS. PARSONS:  Thank you.
10             CROSS-EXAMINATION
11 BY MS. PARSONS:
12 Q  Ms. Gray, you were working at the Fish Town and
13    you said you were the cashier and also the cook,
14    is that correct?
15 A  Yes.
16 Q  And so as a part of your duties, you take orders
17    from customers that walk in the store, right?
18 A  Yes.
19 Q  And customers that go through the drive-through?
20 A  We don't have a drive-through.
21 Q  Okay. And so you're taking orders and then you're
22    also maybe sometimes at the same time cooking the
23    food?
24 A  Yes.
25 Q  Doing a couple of things at once?

381

1  A  Yes.
2  Q  And so on this night, there was nothing unusual;
3     you were taking orders and you were cooking the
4     food?
5  A  Yes.
6  Q  And then you had heard gunshots, right?
7  A  Yes.
8  Q  And you actually heard two sets of gunshots?
9  A  Yes.
10 Q  The first set, you told Mr. Toney and you also
11    told the police that you heard it towards the west
12    down 29th, is that true?
13 A  Yes, yes.
14 Q  And then you had said earlier that there was a
15    delay of about eight minutes and then there was a
16    second set?
17 A  Yes.
18       MR. TONEY:  I'm going to object, Your
19    Honor. She didn't say anything like that. I
20    object.
21       MS. PARSONS:  It's cross-examination.
22       THE COURT:  It's overruled.
23 Q  (By Ms. Parsons)  So about eight minutes elapsed
24    and then you hear the second set?
25 A  Yes.

1  Q  You hear the first set, and there are people in
2     the store -- or a person in the store?
3  A  They was in their car.
4  Q  In their car. And you're working, is that true?
5  A  Yes.
6  Q  So you hear the shots and there are things going
7     on; you're working, right?
8  A  Yes.
9  Q  Then the second set of shots, correct?
10 A  Yes.
11 Q  And then that's when you saw the lady who had her
12    hand to her chest?
13 A  Yes.
14       THE COURT:  Had what? I'm sorry.
15       MS. PARSONS:  Her hand on her chest.
16       THE COURT:  All right.
17 Q  (By Ms. Parsons)  I guess she was gasping, like
18    she was shocked?
19 A  Yes.
20 Q  And then you went to her, correct?
21 A  Yes.
22 Q  You wanted to find out what was going on with her?
23 A  Yes.
24 Q  All of this is kind of happening at once, correct?
25 A  Yes.

1  Q  She's okay, right, the woman?
2  A  Yes.
3  Q  And then that's when you look outside and you see
4     the body?
5  A  Yes.
6  Q  The other customer that you had been waiting on,
7     did he or she drive through the parking lot?
8  A  No. They were sitting there waiting on their
9     order.
10 Q  Was there a car in the parking lot?
11 A  Yes. It was facing toward Fish Town.
12 Q  Did that car drive away after the shooting?
13 A  Yes.
14 Q  But before anybody got there, like the police or
15    fire or anything like that?
16 A  Yes.
17 Q  Did you call 911?
18 A  Yes.
19 Q  And then the police came?
20 A  Yes.
21 Q  Did the fire department come, like a fire engine?
22 A  No.
23 Q  Did an ambulance come?
24 A  Yes.
25 Q  Did they drive into the parking lot?

1  A  Yes.
2  Q  And then you stayed and gave information to the
3     police, right?
4  A  Yes.
5  Q  And then you went downtown and gave a statement?
6  A  Yes.
7  Q  And you didn't see anybody shooting, right?
8  A  Right.
9  Q  You're just doing your job?
10 A  Right.
11 Q  And the only other involvement you had in this
12    case is when the lawyers started talking to you
13    and then you came here?
14 A  Yes.
15       MS. PARSONS:  I don't have any further
16    questions. Thank you.
17       THE COURT:  Any redirect?
18       MR. TONEY:  Yes.
19       REDIRECT EXAMINATION
20 BY MR. TONEY:
21 Q  Ms. Gray, I want to just make something clear.
22    The customer that had come in to order their food
23    and was parked outside, when you first went out to
24    their car or when they first came in, there was no
25    dead body laying in the parking lot, was there?

1  A  No.
2  Q  Okay. And then you prepared whatever for them and
3     then you came back to see what they were doing or
4     to bring it out to the car to them?
5  A  I was going to tell her her food was ready, but
6     she had already came in.
7  Q  But she had come in. And when she came in, that's
8     when she told you that there was --
9  A  No. There was another gunshot and I handed her
10    her food, and she turned around to walk out and
11    she said there was somebody laying in the parking
12    lot.
13 Q  Okay. But that gunshot didn't come from that
14    parking lot?
15 A  No.
16 Q  All right. So to the best of your knowledge, you
17    were right there at Fish Town that night and
18    nobody was standing in that parking lot shooting?
19 A  No.
20       MS. PARSONS:  Objection, Your Honor.
21    She doesn't know that. She couldn't see it. I
22    object to the form of the question.
23       THE COURT:  Overruled.
24 Q  (By Mr. Toney) You can answer. Do you want me to
25    do the question again?

## 386

1  A   There wasn't nobody in the parking lot shooting.
2         MR. TONEY:  All right.  Thank you.
3            RECROSS-EXAMINATION
4  BY MS. PARSONS:
5  Q   Ma'am, you couldn't see even if there was, could
6       you?
7  A   No, but I could hear the sounds and it came from
8       by the church.
9  Q   Fair enough, but you couldn't see if someone shot?
10 A   No.
11        MS. PARSONS:  All right.  Thank you.
12           REDIRECT EXAMINATION
13 BY MR. TONEY:
14 Q   Ms. Gray, you've heard gunshots before, is that
15      correct?
16 A   (Nods head affirmatively.)
17 Q   Is that a "yes"?
18 A   Yes.
19 Q   Okay.  And if a gun is right ten feet from the
20      door of your business, you would be able to know
21      that, wouldn't you?
22 A   Yes.
23 Q   But that didn't happen, did it?
24 A   No.
25        MR. TONEY:  Thank you.

## 387

1         THE COURT:  Anything further?
2         MS. PARSONS:  No, sir.
3         THE COURT:  That's all.  You may step
4    down.  Thank you, and watch your step.
5                  (Witness excused.)
6         MR. TONEY:  Your Honor, I would next
7    call crime scene technician Van Ryn.
8           GREGORY VAN RYN,
9  having first been duly sworn, testified as follows:
10        FURTHER DIRECT EXAMINATION
11 BY MR. TONEY:
12 Q   Good afternoon, Officer.
13 A   Hello.
14 Q   I had contacted you this morning about going back
15      out to the crime scene at the Fish Town at 2831
16      Prospect, correct?
17 A   Correct.
18 Q   And as fate would have it, we met up there today
19      at about 12:30, is that correct?
20 A   Correct.
21 Q   And at my request, did you do a measurement of the
22      distance from where the body was located to where
23      the end of the church was, the church that's
24      located across the street?  Is that correct?
25 A   Correct.

## 388

1  Q   Now, I want to refer you to State's Exhibit
2       Number 3.  In Exhibit Number 3, you see at 28th
3       and Prospect the outline of a building, is that
4       correct?
5  A   That's 2844 Prospect.
6  Q   And that would be that AME church that's there on
7       the corner?
8  A   Correct.
9  Q   Okay.  And on this exhibit, you see where there
10      are some initials, "WL"?  Do you see those
11      initials?
12 A   Yes.
13 Q   All right.  Now, did I ask you to measure from
14      that approximate spot where the church was over to
15      where you located the body?
16 A   Correct.
17 Q   Okay.  And did you and other crime scene
18      technicians make that measurement today?
19 A   Yes.
20 Q   Would you please tell the Court what that
21      measurement was?
22 A   One hundred and eighty-nine feet.
23 Q   And did you all measure it more than once to make
24      sure that that was accurate?
25 A   Yes.

## 389

1  Q   And 189 feet -- three feet equals one yard -- that
2       would be 60 yards, wouldn't it?
3  A   I'm not that good at math.
4  Q   Okay.  Well, if I told you six times three is 18,
5       that would be 180?
6  A   Okay.
7  Q   So that is 60 yards?  Are you a football fan?
8  A   Not really.
9  Q   Okay.  Do you know how long a football field is?
10 A   I believe it's 100 yards.
11 Q   Okay.  So 50 yards would be to at least halfway,
12      and then another 10 yards past that, correct?
13 A   Correct.
14 Q   Okay.  Now, on the night that you went out when
15      the shooting first occurred, that was October the
16      6th, correct?
17 A   Correct.
18 Q   Okay.  And I want to show you what's been marked
19      as State's Exhibit Number 6, and you've probably
20      already looked at that picture but I want to ask
21      you -- it was dark that evening, wasn't it, when
22      you went out there?
23 A   It was nighttime, yes.
24 Q   And I see that the picture is illuminated.  Do you
25      all use flashes on your cameras to take those

**402**

1    Did you serve the subpoena personally?
2    MR. TONEY: Yes, I did, Your Honor, I
3 served her personally with the subpoena.
4    THE COURT: Very well. I'm issuing the
5 attachment for the witness.
6    MR. TONEY: Okay.
7    THE COURT: And as soon as we get this
8 processed, I understand that both counsel for the
9 State and counsel for the defendant have
10 requested that the Court go to the scene for a
11 personal view of the area?
12    MR. TONEY: That is correct, Your
13 Honor.
14    MS. PARSONS: Yes, sir.
15    THE COURT: We'll make arrangements to
16 do that today, and then I would propose that we
17 continue the matter until, say, 2:00 tomorrow.
18    MS. PARSONS: Okay.
19    THE COURT: We'll see what the
20 situation is then, whether she's been brought in
21 on the writ or not, and if she has, then we can
22 proceed, assuming that I am through with the
23 other matter that I have scheduled for tomorrow
24 morning. At least, we can just see what happens
25 and proceed if we can.

**403**

1    MR. TONEY: Okay.
2    THE COURT: So at this time, we'll
3 adjourn on this case until tomorrow at 2:00 p.m.
4    MS. PARSONS: Okay.
5    MR. TONEY: Thank you.
6    (Whereupon, the Court adjourned until
7 10:00 a.m., Monday, November 14th, 2005, at which
8 time the following proceedings were had:)
9    THE COURT: All right. Counsel, this
10 is the case of State versus Keith Carnes, and it
11 was continued until this date for further
12 evidence, namely, Vernetta Bell. She apparently
13 had to be brought in through body attachment and
14 I understand she's here now.
15    Are you Vernetta Bell?
16    THE WITNESS: Uh-huh.
17    THE COURT: Will you please stand a
18 moment and be sworn.
19    THE WITNESS: (Complies.)
20    MR. TONEY: May I proceed, Your Honor?
21    THE COURT: Yes, sir.
22    VERNETTA BELL,
23 having first been duly sworn, testified as follows:
24    DIRECT EXAMINATION
25 BY MR. TONEY:

**404**

1 Q  Good morning, Ms. Bell.
2 A  Good morning.
3 Q  Would you state your name for the record.
4 A  Vernetta Marie Bell.
5 Q  And, Ms. Bell, what is your date of birth?
6 A  September 22nd, 1958.
7 Q  Where do you live?
8 A  3224 Quincy.
9 Q  Is that in Kansas City, Missouri?
10 A  Yes, it is.
11 Q  And how long have you lived in Kansas City?
12 A  Oh, all my life.
13 Q  I want to call your attention to October the 6th
14    of 2003. Were you living in Kansas City at that
15    time?
16 A  Yes.
17 Q  Were you in the area of 29th Street between
18    Prospect and Olive on that day?
19 A  Yes, I was.
20 Q  All right. How frequently did you go to that
21    area?
22 A  Off and on, I'll say -- what, like maybe once or
23    twice every week.
24 Q  Okay. And let's just cut through some of this.
25    What was your purpose for going to that area?

**405**

1 A  Well, most of the time I went down there -- I had
2    family down there, plus, I did the dealings that
3    I did down there.
4 Q  Okay. Did you go down there to buy drugs at some
5    time?
6 A  Yes.
7 Q  Okay. Did you go down there to sell drugs at some
8    time?
9 A  Yes.
10 Q  Okay. During the time that you were frequenting
11    that area in October of 2003, did you ever have an
12    occasion to meet a person by the name of Larry
13    White?
14 A  Yes, I did.
15 Q  Okay. Will you tell the Court how you knew Larry
16    White?
17 A  Well, I knew Larry some years ago because he
18    stayed -- he went with a niece of mine and he
19    stayed in the same complex over on The Boulevard,
20    named Lena.
21 Q  So he dated a niece of yours?
22 A  Uh-huh.
23 Q  Is that a "yes"?
24 A  Yes.
25 Q  So you've known Larry White for a while?

1  A  Yeah.
2  Q  Did you know the defendant in this case, Keith
3     Carnes?
4  A  Yeah, but not like I knew Larry.
5  Q  And on the street, Mr. Carnes had another name
6     besides Keith. What was his name?
7  A  Tre.
8  Q  And how long had you known Tre?
9  A  A few months.
10 Q  All right. And did you have a relationship with
11    Tre?
12 A  Not really.
13 Q  Okay. Did you have a relationship with Larry
14    White?
15 A  Yes.
16 Q  Would you tell the Court what your relationship
17    with Larry White was?
18 A  Well, we were like -- well, Larry called me
19    Auntie. You know, I was more closer to Larry
20    than any of them around there. When Larry showed
21    up in the hood, I stayed with Larry all day long,
22    you know, kind of watched his back or whatever.
23 Q  Okay. So you and Larry had not only a friendship,
24    but a relationship that dated some period of time,
25    is that correct?

1  A  Yeah.
2  Q  All right. Now, on the evening of October the
3     6th, were you present when the shooting started?
4  A  Yes.
5  Q  Okay. Would you tell the Court where you were
6     located when the shooting first started?
7  A  I had just walked away from him.
8  Q  From who?
9  A  From Larry.
10 Q  Okay. And Larry was standing on 29th Street
11    between Wabash and Prospect, is that correct?
12 A  Yes.
13 Q  And you had just walked away from Larry?
14 A  Yeah.
15 Q  And Larry was standing there on the corner. Was
16    Larry standing on the corner dealing drugs?
17 A  Yeah.
18 Q  Okay. And when you saw Larry, he was talking to
19    some people in a car, is that correct?
20 A  No. It was two guys I had never seen. They were
21    standing on the sidewalk talking to him.
22 Q  Okay. And did you see Wendy Lockett standing
23    there?
24 A  No.
25 Q  Okay. Did you see Lorianne Morrow?

1  A  No.
2  Q  Okay. So Larry was standing there and the
3     shooting started, and then what did you do?
4  A  I was headed down the hill towards Wabash. By
5     the time I had crossed over to Wabash, that's
6     when the shooting started, you know, and me and
7     this guy, Shorty -- he caught himself trying to
8     protect me, and we were just trying to run, you
9     know, to keep from getting hit.
10 Q  Okay. Now, were you running west on 29th Street
11    toward Olive?
12 A  Yeah.
13 Q  And running toward the apartment buildings?
14 A  Yeah.
15 Q  All right. Now, when you got by the apartment
16    buildings, the shooting was behind you, is that
17    correct?
18 A  Right.
19 Q  And who did you see when you got to the apartment
20    buildings?
21 A  Tre. He hollered, "Auntie, come up here," you
22    know, because that's what most of them in the
23    neighborhood called me.
24 Q  Where was Tre standing?
25 A  He was standing in between the apartment

1     buildings.
2        MR. TONEY:  Okay. Bear with me for
3     just a moment, please.
4  Q  (By Mr. Toney) I want to show you what's been
5     marked as Defendant's Exhibit Number 106, and I
6     would like for you to stand up a minute.
7  A  (Complies.)
8  Q  Now, these are the apartment buildings on 29th
9     Street, is that correct?
10 A  Uh-huh.
11 Q  Is that a "yes"?
12 A  Yes.
13 Q  All right. Now, there is building number one,
14    number two, and number three is on the corner?
15 A  Uh-huh.
16 Q  Where was Mr. Carnes when you saw him?
17 A  Over here.
18 Q  So he was in building number two, the middle
19    building?
20 A  Yeah.
21 Q  And was he standing in the doorway or on the
22    porch?
23 A  No, he was in the doorway.
24 Q  All right. So he was standing in the doorway of
25    the middle apartment building?

**410**

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | You can have a seat. Thank you. |
| 3 | A | (Complies.) |
| 4 | Q | And do you recall if there was anybody else |
| 5 | | standing there with him? |
| 6 | A | No, not right off. |
| 7 | Q | Okay. And when you saw him, would you tell the |
| 8 | | Court what he asked you to do? |
| 9 | A | He said, "Auntie, get up here out of the way." |
| 10 | Q | And did you go up that way? |
| 11 | A | Yeah, I got up there. |
| 12 | Q | Okay. And did he have a gun with him? |
| 13 | A | Uh-uh. |
| 14 | Q | Was he shooting at anybody? |
| 15 | A | No. He was up there peeking like everybody else |
| 16 | | was. |
| 17 | Q | And what did you do after the shooting stopped? |
| 18 | A | Sat down in the hallway for a few minutes to try |
| 19 | | to get myself together, because certain ones had |
| 20 | | came down there and told me who it was. |
| 21 | | THE COURT:  Who came down? |
| 22 | | THE WITNESS:  Certain people had came |
| 23 | | down and let me know, had told me who it was, |
| 24 | | that it was the one that I had been with. So I |
| 25 | | sat down there in the hallway for a few minutes. |

**411**

| | | |
|---|---|---|
| 1 | Q | (By Mr. Toney) And until that time, you didn't |
| 2 | | know that Larry White had gotten shot? |
| 3 | A | I didn't know it was him, no. |
| 4 | Q | And where was Mr. Carnes at during that time? |
| 5 | A | He went back in the apartment. |
| 6 | Q | Okay. After that, did you leave the apartment |
| 7 | | complex? I shouldn't call it a complex. Did you |
| 8 | | leave the apartment building? |
| 9 | A | Yeah. |
| 10 | Q | All right. Did you go back toward the area of |
| 11 | | 29th and Prospect? |
| 12 | A | Yeah, I went back up through there, and I was |
| 13 | | walking around and stuff trying to see if anybody |
| 14 | | could tell me something or what had happened, and |
| 15 | | the police picked me up and took me to jail. |
| 16 | Q | Okay. So the police stopped you on 29th and |
| 17 | | Prospect that night? |
| 18 | A | Uh-huh. |
| 19 | Q | Did they start to question you? |
| 20 | A | No. They just ran me and I had other warrants, |
| 21 | | so they took me to jail. |
| 22 | Q | And that was that night? |
| 23 | A | Yeah. |
| 24 | Q | Okay. And did any of the police officers ever ask |
| 25 | | you if you had seen the shooting or anything? |

**412**

| | | |
|---|---|---|
| 1 | A | Uh-uh. |
| 2 | Q | Is that a "no"? |
| 3 | A | No, nobody has ever asked me nothing. |
| 4 | Q | Okay. Now, have you ever been convicted of a |
| 5 | | felony? |
| 6 | A | Have I ever been? |
| 7 | Q | Convicted of a felony. |
| 8 | A | Well, yeah, possession. |
| 9 | Q | And that was in 1999? |
| 10 | A | Uh-huh. |
| 11 | Q | Is that a "yes"? |
| 12 | A | Yes. |
| 13 | Q | Okay. And you served six months in the county |
| 14 | | jail for that? |
| 15 | A | Uh-huh. |
| 16 | Q | Is that a "yes"? |
| 17 | A | Yes. |
| 18 | Q | All right. Do you know of any other times that |
| 19 | | you've been convicted of a felony? |
| 20 | A | No. |
| 21 | Q | Just that one time? |
| 22 | A | Yeah. |
| 23 | Q | Now, Ms. Bell, how did you come to the attention |
| 24 | | of my office to find you as a witness, do you |
| 25 | | remember that? |

**413**

| | | |
|---|---|---|
| 1 | A | Tennille, his girlfriend. |
| 2 | Q | Had contacted you, and then Tennille Benton |
| 3 | | contacted my office and told us that you might |
| 4 | | know something about this? |
| 5 | A | Right. |
| 6 | Q | All right. Has anybody in my office made you any |
| 7 | | promises to get you to testify? |
| 8 | A | No. |
| 9 | Q | Have we paid you any money? |
| 10 | A | No. |
| 11 | Q | Have we done anything to benefit you in any way to |
| 12 | | get you to testify? |
| 13 | A | You should have asked me that question. No. |
| 14 | Q | I should have asked you that question before you |
| 15 | | got locked up. All right. But other than to |
| 16 | | issue you a subpoena to testify, we have not |
| 17 | | promised or given you anything to come forward, is |
| 18 | | that correct? |
| 19 | A | No. |
| 20 | Q | And is what you're telling the Court today the |
| 21 | | truth? |
| 22 | A | Yes, it is. |
| 23 | Q | All right. And you were present that evening and |
| 24 | | you did not see Mr. Carnes with a gun, is that |
| 25 | | correct? |

1  A   No.
2  Q   Okay. And, in fact, when the shooting started,
3      you ran toward Mr. Carnes and he shielded you, is
4      that correct?
5  A   Right. When the shooting was going on, he was
6      standing in between the buildings ducking
7      himself, trying to see what was going on.
8          MR. TONEY:  All right. I don't have
9      any other questions of this witness, Your Honor.
10         THE COURT:  You may examine.
11         MS. PARSONS:  Thank you.
12         CROSS-EXAMINATION
13 BY MS. PARSONS:
14 Q   Ms. Bell, you have a conviction for possession of
15     a controlled substance, right?
16 A   Uh-huh.
17 Q   You had sold drugs in the past?
18 A   Uh-huh.
19 Q   Is that a "yes"?
20 A   Yes.
21 Q   And you also helped arrange serves for people, is
22     that true?
23 A   Yes.
24 Q   And you would help arrange serves for Larry White?
25 A   Yes.

1  Q   And that means you would facilitate a drug deal;
2      you would have customers come to him?
3  A   Yeah.
4  Q   You're kind of like the middleman?
5  A   Yeah.
6  Q   And you would also facilitate serves for Tre as
7      well?
8  A   Yeah.
9  Q   So you too are a drug dealer?
10 A   Well, if that's what you want to call it.
11 Q   Okay. And on October 6th of 2003, you got to the
12     area of 29th and Olive, Wabash, Prospect sometime
13     in the afternoon?
14 A   Uh-huh.
15 Q   You need to say "yes" or "no."
16 A   Yes.
17 Q   Because he's trying to pick it up.
18 A   Oh, yes. Okay.
19 Q   And when you got there, Larry White was there?
20 A   No, he wasn't there when I got there.
21 Q   He showed up sometime later?
22 A   Yeah. I was already down there when he showed
23     up.
24 Q   And when you were there, there were people hanging
25     around the street, right?

1  A   Yeah.
2  Q   In the afternoon?
3  A   Yes.
4  Q   And into the evening?
5  A   Yes.
6  Q   And then Larry showed up, is that right?
7  A   Yes.
8  Q   And he started conducting business?
9  A   Yes.
10 Q   And you were helping him?
11 A   Yes.
12 Q   And there were people driving up?
13 A   Yes.
14 Q   Walking up?
15 A   Yes.
16 Q   And people in the apartments walking up there?
17 A   Well, from the apartments, no. The people that
18     were coming were coming from the other direction
19     or whatever. There wasn't really nobody from the
20     apartments coming up there by Larry.
21 Q   But there were people going to the apartments?
22 A   Yeah.
23 Q   And that area at that time, in September and
24     October of 2003, was a hot area for drugs?
25 A   Yes.

1  Q   And you frequented that area, right?
2  A   Yes.
3  Q   During that time?
4  A   Uh-huh.
5  Q   And during that time around the shooting, the
6      defendant, Tre, was also in that area?
7  A   Yes.
8  Q   And he actually sold drugs from that area too?
9  A   Yes.
10 Q   He sold from the apartment buildings?
11 A   Right.
12 Q   And sometimes you would buy drugs from him, right?
13 A   Yes.
14 Q   And sometimes from Larry?
15 A   Well, Larry wasn't down there like that. Larry
16     hadn't been in that neighborhood. That was
17     Larry's first time being down there since I had
18     been down there, in a minute, since I had last
19     seen him in the old complex.
20 Q   Okay.
21 A   So Larry was not frequently down there. Larry
22     wasn't from down there.
23 Q   Okay. But Tre had been there awhile?
24 A   Yes.
25 Q   And you had said "in a minute," and you don't mean

| | | |
|---|---|---|
| 1 | | 60 seconds? |
| 2 | A | Right. |
| 3 | Q | Okay. Some people would just hang out there, |
| 4 | | right? |
| 5 | A | Yes. |
| 6 | Q | Some people would buy their crack and smoke it |
| 7 | | right there? |
| 8 | A | Yes. |
| 9 | Q | And on October 6th of 2003 in the afternoon and |
| 10 | | into the early evening hours, it was no different; |
| 11 | | people would buy drugs, smoke drugs? |
| 12 | A | Yeah, you're right. |
| 13 | Q | People coming in and out, right? |
| 14 | A | Yes. |
| 15 | Q | And you had been helping Larry in the hopes that |
| 16 | | he would either give you drugs or money? |
| 17 | A | Yes. |
| 18 | Q | You really weren't sure, maybe a little bit of |
| 19 | | both? |
| 20 | A | Uh-huh. |
| 21 | Q | And on that afternoon and into the evening, you |
| 22 | | saw the defendant, correct, Tre? |
| 23 | A | Yeah. |
| 24 | Q | And he was in the apartment? |
| 25 | A | What do you mean? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So he's there and he's wearing his patch. He had |
| 3 | | been there for a few weeks, couple weeks, three |
| 4 | | weeks? |
| 5 | A | Who? |
| 6 | Q | Tre. |
| 7 | A | No, he had been there longer than a few weeks. |
| 8 | Q | Okay. So you had seen him there many times |
| 9 | | selling drugs? |
| 10 | A | Yes. |
| 11 | Q | So, now, we move to October 6th of 2003. After |
| 12 | | the shooting, you said that you were arrested, |
| 13 | | right? |
| 14 | A | Yes. |
| 15 | Q | And you were arrested on a warrant? |
| 16 | A | Yes. |
| 17 | Q | And you were arrested up at 29th and Prospect |
| 18 | | around midnight? |
| 19 | A | Yes. |
| 20 | Q | And they took you to the city jail? |
| 21 | A | Yes. |
| 22 | Q | On that warrant, for that particular crime? |
| 23 | A | Yes. |
| 24 | Q | And then from that time that you were arrested, |
| 25 | | October 6th of 2003, into the evening hours of |

419                                                                          421

| | | |
|---|---|---|
| 1 | Q | Tre was in the apartment, in this middle apartment |
| 2 | | here, on that afternoon/evening? |
| 3 | A | Yeah, but I didn't see Tre until that night when |
| 4 | | all of the stuff happened. |
| 5 | Q | Okay. And when you saw Tre, he had his patch on? |
| 6 | A | Right. |
| 7 | Q | And he was wearing a black hoodie? |
| 8 | A | Not as I know of. |
| 9 | Q | And no other people out there had a patch, right? |
| 10 | A | No. |
| 11 | Q | No other drug dealers that you knew of had a |
| 12 | | patch? |
| 13 | A | No. |
| 14 | Q | No other drug dealers that frequented that |
| 15 | | particular area at that time had a patch? |
| 16 | A | No. |
| 17 | Q | Okay. And you know Tre well enough for him to |
| 18 | | call you Auntie, right? |
| 19 | A | Yes. |
| 20 | Q | And that's what Larry called you? |
| 21 | A | Yes. |
| 22 | Q | And the people that know you call you Auntie? |
| 23 | A | Yes. |
| 24 | Q | That you kind of have a familiar relationship |
| 25 | | with? |

| | | |
|---|---|---|
| 1 | | October 7th of 2003, you didn't talk to anybody in |
| 2 | | law enforcement about this case? |
| 3 | A | No. |
| 4 | Q | You didn't come forward, actually, until August of |
| 5 | | 2005, to the motion for new trial, right? |
| 6 | A | Yes. |
| 7 | Q | So you came forward after the defendant had been |
| 8 | | convicted the first time around? |
| 9 | A | Yes. |
| 10 | Q | So you come to court that day. I believe it was |
| 11 | | August -- |
| 12 | A | No. Excuse me. No, I didn't come forward then. |
| 13 | | They had located me before the last trial, but |
| 14 | | somehow, the way their communication has been |
| 15 | | with me, they did not get me here where I could |
| 16 | | have testified for that trial. |
| 17 | Q | Okay. But you came forward after he was |
| 18 | | convicted, right? |
| 19 | A | Yes. |
| 20 | Q | Now, your brother has been in the jail with Tre, |
| 21 | | hasn't he? |
| 22 | A | Yes. |
| 23 | Q | Your brother, Terry Young? |
| 24 | A | Uh-huh. |
| 25 | Q | Is that a "yes"? |

1 A Yes.

2 Q They are in the same module?

3 A Yes.

4 Q Their cells are, I think, next door to each other,
5 aren't they?

6 A I don't know all of that.

7 Q And actually Tre, the defendant, contacted you on
8 a three-way call through his girlfriend?

9 A Yes.

10 Q And, actually, you came to Tre's attention through
11 your brother, Terry Young?

12 A Yes.

13 Q And that's how this all started --

14 A Uh-huh.

15 Q (Continuing) -- and how you came to light, and
16 then they ultimately brought you to Mr. Toney?

17 A Yes.

18 Q Mr. Toney didn't do anything?

19 A No.

20 Q Right. He had asked you if he had threatened you
21 or paid you, and that's not the case here?

22 A No.

23 Q Okay. So your brother is in jail with Tre; you
24 get on a three-way with Tre, Tennille, and you;
25 and you come to court in August of 2005? Do you

1 remember that?

2 A Yes.

3 Q And Mr. Toney asked you to go over to the police
4 department to tell the police what you knew?

5 A Yes.

6 Q And you went over there that day?

7 A Yes.

8 Q And two detectives brought you into a room?

9 A Yes.

10 Q And then you left?

11 A Right. I was supposed to have had another
12 appointment.

13 Q And then you didn't tell them anything on that
14 day, right?

15 A Yes, I did. I gave them a statement.

16 Q You did not give them a signed statement, you
17 left?

18 A No, I gave them a statement.

19 Q You left that day?

20 A I gave them a statement.

21 Q You left that day?

22 A They were supposed to do a video after the
23 written statement and they set me up an
24 appointment. I went back for the appointment.
25 They told me that they would set me up another

1 appointment because they were too busy with other
2 murder cases.

3 Q That's true.

4 A Okay.

5 Q And then you didn't keep your third appointment?

6 A They never set me one.

7 Q And then, ultimately, you never gave a statement
8 to the police?

9 A Do what?

10 Q You never gave a statement to the police?

11 A I give a statement to them the first day I went
12 over there, a written statement. They wrote down
13 what I said.

14 Q And they had a little chalkboard and a whiteboard,
15 and showed you what was going on, right, and then
16 you left?

17 A No, they did not do the chalkboard and all of
18 that.

19 Q Okay. But the point is, Ms. Bell, the way you
20 came into contact in this whole case was through
21 the defendant, through your brother, and they
22 contacted you and you came forward after the
23 conviction?

24 A Right.

25 　　　　MS. PARSONS: I have nothing further.

1 　　　　THE COURT: Any redirect?

2 　　　　MR. TONEY: Yes.

3 　　　　REDIRECT EXAMINATION

4 BY MR. TONEY:

5 Q Ms. Bell, Terry Young is your brother, correct?

6 A Yes.

7 Q Okay. Did Terry Young tell you to lie for
8 Mr. Carnes?

9 A No, nobody told me to lie or anything. See, I
10 started not to get involved because I did have a
11 warrant. See what I'm saying?

12 Q Okay.

13 A And, like, when I found out that they had gave
14 this man life -- were going to give him life for
15 something I knew he didn't do, I felt like this
16 is something I'm supposed to do. I know this man
17 was standing by me when this happened, see what
18 I'm saying, and I know I was with Larry and this
19 man was nowhere around us. So, you know, I just
20 couldn't go and I'm knowing that this man is
21 right here while the shooting is going on and he
22 couldn't have did this.

23 　　　　MR. TONEY: I don't have any other
24 questions.

25 　　　　MS. PARSONS: Nothing further, Your