

146

Trial
Two
Dr. Gill

# Transcript of the Testimony of

**Date:** April 20, 2005
**Volume:**

**Case:** STATE OF MISSOURI v. KEITH L. CARNES

Printed On: 7/26/2005

Patricia A. Manners
Phone: 816.881.3711
Fax:
Email: patmanners@comcast.net
Internet:

(20)

 THE COURT: What's the relevancy of these?

MR. TWENTER: They show the graze wound on one side and the entry and exit wound of another.

THE COURT: On one condition: that you explain the autopsy occurred.

Overruled.

MR. TWENTER: Thank you, Your Honor.

(The proceedings returned to open court.)

THE COURT: State's Exhibits No. 71 through 75 will be admitted into evidence.

(State's Exhibit Nos. 71 through 75 were admitted into evidence.)

MR. TWENTER: Your Honor, permission to publish to the jury.

THE COURT: You may.

MR. TWENTER: Permission for the witness to step down, Your Honor.

THE COURT: He may.

Q. (By Mr. Twenter) I'm going to start with State's Exhibit No. 71, and can you describe to the jury what we're seeing in this picture here?

A. There is a fresh abrasion. Abrasions can be dated by the color. This is bright red. It means it's very fresh. It's just above the left eyebrow on the forehead and you can see an abrasion here on the

upper lip and then you can see there's a little laceration of the upper lip just to the left of the midline. These are what are called blunt force injuries.

Q. We'll move on to State's Exhibit No. 72. Can you describe what we're seeing here?

A. This is the entrance wound for a gunshot wound. One, you can see that it has a rounded contour and a very small, discrete entrance wound.

Q. I'm going to show you what's been marked as State's Exhibit No. 73.

A. And this is the exit wound on the left side of the forehead. This is the right side. This is the left side kind of looking downward. It's up into the hairline here and you can see that it has these kind of radiating tears and it's a rather large, gaping wound.

Q. State's Exhibit No. 74, and I'm going to have you explain a couple things on this before you get to the gunshot wound, there's some large slices to the body. Was that the condition the body would have arrived at the hospital after the wounds or is that medical intervention that came after the gunshot wounds?

A. These are medical intervention. They did what is

-4f9b-b11d-14342504d806

whether someone was standing over them and shooting them or not, can you?

A Correct. I mean, it's an issue of what position they are inand this goes beyond what the autopsy can tell you.

MR. TWENTER: Okay. That's all I have. Thanks.

THE COURT: Any recross?

MR. TONEY: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. TONEY:

Q Do you know where these abrasions came from?

THE COURT: I'm sorry?

MR. TONEY: Abrasions, abrasions.

MR. TWENTER: Objection, Your Honor. That's outside the scope of redirect.

THE COURT: I understand. I'll allow a bit of latitude here, if it doesn't go too far.

Q (By Mr. Toney) Do you know where the abrasions came from?

A Well, again, I can tell you that they are over bony prominences. Just to review them, there is one above the left eyebrow somewhat medially, and it's not sharply defined; the nose; and then there is a little laceration on the lip. All of



that could be caused by, like, falling or somebody running into something kind of flat.

Q So if the person were running away, got shot while they were running away, and fell and hit the ground, you might find those abrasions, correct?

A It's consistent, yes.

Q It's consistent with that?

A Yes.

MR. TONEY: I don't think I have anything else, Your Honor.

MR. TWENTER: The State has nothing further of this witness, Your Honor.

THE COURT: That's all, Doctor. You may step down.

(Witness excused.)

THE COURT: Before you call your next witness, let's take a short break.

(Whereupon, a recess was taken.)

THE COURT: Proceed.

MR. TWENTER: Your Honor, the State would call Kathryn May.

KATHRYN MAY,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TWENTER:



Q Would you state your name for the Court, please.

A My name is Kathryn May.

Q Ms. May, where are you employed?

A I'm employed with the Kansas City, Missouri, police crime lab, in the firearms section.

MS. PARSONS: And I believe Mr. Toney has agreed to stipulate to the witness' qualifications as an expert in ballistics.

MR. TONEY: Yes, I have, Your Honor.

THE COURT: Very well.

Q (By Mr. Twenter) All right. Ms. May, I'm going to jump ahead here a little from what you're used to. Can you tell us what the difference is between a revolver and a semiautomatic weapon?

A Well, a revolver could be a semiautomatic. It would be easier to describe, maybe, the difference between a semiautomatic and an automatic.

Q Well, I'm looking for -- I'll just ask the question flat-out. Is a semiautomatic weapon or an automatic weapon going to eject casings out of it?

A Yes. A revolver would not, though.

Q Yes, that's what I wanted to clear up.

A Uh-huh.



Q And when casings come out of the semiautomatic and the automatic weapons, how do they discharge out of there?

A When a semiautomatic weapon is fired, the cartridge cases will eject from the ejection port. The direction could vary. It could vary from side to side; the cartridge cases could eject from the back or the rear of the firearm, or to the front of the firearm.

Q And several different shots standing basically in the same location and ejecting cartridges, are those all going to end up in the same place necessarily?

A Pretty much in the same place unless it hits something, another object, on the way down. It could bounce or roll.

Q Okay. I'm going to direct your attention to October of 2004, when you became involved in the investigation of this case. Do you recall having some shell casings arrive in the lab, and some weapons?

A Yes.

Q And what did those come to you to do?

A To test-fire the weapons and try to determine if any of the weapons submitted were used to fire

"Ground Three"

EXCLUDE

the

EYEWITNESS

TESTIMONY

of

WENDY Lockett

and

Lorianne Morrow

Request
Evidentiary Hearing
"Ground Three"

For the reasons, as those will be stated below, it is necessary to begin by revisiting clearly establish principles of law. The United States Supreme Court has stated that it is establish that a conviction obtain through the use of false evidence, known to be such by the representatives of the state, must fall under the Fourteenth Amendment... the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears. Later on the Court states; the principle that the state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony [goes only to the credibility of the witness]. Napue v. Illinois 360 U.S. 264, 269; 79 S.Ct. 1173, 1177 (1959) See also: Donati v. Gualdoni 216 S.W. 2d 519, 521 (mo 1948) "no verdict and resultant judgment, in any case, could be said to be just from the result of false testimony".

The Missouri Supreme Court has followed the teaching of Napue: "The starting point in any analysis of relief based on perjury is the general rule that a conviction which results from the deliberate or conscious use by a prosecutor of perjured testimony, violates Due Process and must be vacated". State v. Mims 674 S.W. 2d 536, 538 (MO. banc 1984). Again citing Napue, the Missouri Supreme Court noted that "the state also has a duty to correct testimony of its witnesses that it knows to be false", Hutchison v State 59 S.W. 3d 494, 496 (MO. banc 2001).

Particularly to the principles above, is the prior testimonies in the case at bar, of the States Key-Eyewitnesses Lorianne Morrow and Wendy Lockett, for they testified to have witness [appellant] perpetrating the shooting death of Larry White (See: Trial 3, pgs. 104-159, and 183-238)

In this aspect of the case the trustworthiness of such identification is not only relevant, but a material matter as to which Missouri Law is clear, for the purpose of [admissibility]. The lynchpin for admissibility of witness identification is reliability, not suggestiveness, See: State v. Weaver 912 S.W. 2d 499, 520 (mo. banc 1995).

In determining reliability of a witness identification the courts consider:

1. The opportunity of the witness to view the subject
2. The witness degree of attention
3. The accuracy of any prior description given by the witness
4. The level of certainty demonstrated by the witness in making the identification
5. The interval between the event and the identification procedure

See: State v. Littleton 649 S.W. 2d 255, 257 (mo. banc 1983)

Factors must be found for the courts consideration to support that [necessary] finding that, the identification of defendant as the perpetrator by Morrow and Lockett are reliable and trustworthy. In addition, although identification testimony is usually admissible because the courts rely upon the good sense and judgement of the trier of facts for determining trustworthiness of identification, but for this court to conclude that the shooting of Mr. White took place, with respect to the death of Mr. White, in the Fishtown parking lot: a analysis of the physical evidence, in its totality, would contradict that finding... and the testimony of Morrow and Lockett so as to make it inadmissible for trial.

The Identification of Defendant and the circumstances (facts) as to the death of Mr. White as testified by Morrow and Lockett

1. opportunity of Morrow and Lockett to view defendant:

Lorianne Morrow testified that she witness defendant chase Mr. White

from 29th and Olive headed East, then cut through the alley between Olive and Wabash shooting at White as he continue running East towards Prospect until White collasped in the parking lot of Fish Town Resturant located at 2831 Prospect. Morrow testified that she witness defendant put the weapon down to turn Whites body over and then stand right over him and shoot with a AK-47 assault rifle 5 or 6 more times from point-blank range and testified that she's positive about that (Trial 3 pgs. 132, 145-147).

Everything Morrow claims to have viewed at FishTown was not seen in the reports or heard through the testimony of the States medical Examiner Dr. Gill regarding the damage that would be anticipated from a high-velocity projectile at close-range, particularly the head wound, which lacked the radiating tears you would see at the entrance wound produced by Kenetic Energy from greater amounts of gun powder that undegoes a combustion that brings forth a great deal of gas which would cause temporary cavitation, a massive defect and increased damage to the tissues at the entrance wound (Trial 3, pgs. 335-336 Line 1-3). Dr. Gill labled all the wounds as distant shots fired from more than 3 feet away, because no signs of soot or stipplings were detected on the victim or his clothes. Dr. Gill testified that they looked at the clothing very carefully that that's a very important part of their examination because the clothing can absorb the soot and stippling and so forth, but they found none (Trial 2, pgs. 26-27). Dr. Gill testified, that to a reasonable degree of medical certainty, based on the evidence, that the head and body wound are not consistent with the victim being stood over and shot (Trial 3, pgs. 332, 339-340).

Appellant independant forensic consultant Gary Rini analysis also revealed the same conclusion concerning the damage that one

would expect to see if someone stood over the victim shooting, he further added that the angle of the wound path trajectory was not consistent with the testimony of Morrow or Lockett. Mr. Rini stated that the fact that no shells were discovered around the victim and no signs of asphalt were disturb or missing around or under the the victim, and from the blood splatter evidence that he did analyze, all this as a whole with the rest of the information that he received regarding this crime displayed nothing that directly linked appellant to the shooting (SEE: Deposition of Gary Rini).

Lockett and Morrow both claimed to have viewed appellant shoot Mr. White in the parking lot of FishTown resturant, but both of them have illogical, inconsistent, destructive contradicted versions that dont corroborate or collaborate with the phyical evidence of the case. Morrows version is that appellant was by himself on the parking lot when he turned the victim over and shot him 5 to 6 more times with a AK-47 (Trial 3, 132, 145-147). Locketts version is that appellant is with someone else on the parking lot when appellant shot Mr. White one time in the head after he'd collapsed, she testified that she never saw victim get turned over or hear 5 to 6 more shots. Lockett testified that she knows what a rifle looks like and that the victim was shot one time in the head with a pistol in the parking lot of FishTown (Trial 3, pgs. 227-228 Line 1-15 and 231-233).

The facts explained through the testimony of the States medical examiner Dr. Gill about the abrasions analyzed on Mr. Whites left eyebrow, nose and lip are labled as blunt force injuries (Trial 2, pg. 20) indicating that it could have been caused from falling, and being consistent with Mr. White getting shot while running, and then hitting the ground (Trial 3, pgs. 342-343). These facts prove

White was face-down and not face-up, further Establishing the falsity of the states theory and the testimony of W. Lockett because the Exit wound would be the Entrance wound if appellant "stood right up on White and not back away as she testified (Trial 3 pg. 228). Police report from Marva Gray (FishTown cashier) and Leslie Cole confirm White was face-down after the shooting.

The physical Evidence proves that the shooter is in the yard of 2846 Wabash where "12 spent shell casing" were retrieved by police. Morrow testified that she witness appellant shooting "3" shots from that yard (Trial 3, pgs. 147-149). But she testified in (Trial 2 pgs. 36-37) that she never saw appellant in the yard of 2846 Wabash. Morrow states in her deposition that she never saw appellant in the yard of 2846 Wabash holding or firing a gun (Deposition pg. 2, Line 10). Morrow states in her original police statement when questioned by Det. Williamson, "Q. Did you actually see the shots at FishTown, or did you hear them"? Morrow responds A. "I heard them".

Wendy Lockett testifies that she only heard 2 shots in the beginning and they came from porch area of the apartment (2404 E. 29th) building on 29th and Olive and that the only other shot she heard was the single shot at FishTown (Trial 3 pgs. 199 Line 13-25 and 235 Line 5-13). The Escape route Lockett testified to taking took her right next to 2846 Wabash where the shooter is but she mention nothing and claims that she kept running East crossing over Wabash headed towards the church on Propect (Trial 3, pg. 223). The 12 spent shell casing prove that Morrow and Lockett testimonies are not trustworthy or reliable.

In Sum, with respect to [all the inconsistencies and contradictions as to the testimony of Lockett and Morrow that were submitted as Exhibit 8 at appellants Evidentiary hearing.

The physical evidence in this case clearly establishes that no evidence exists to tie the appellant to the murder of Mr. White, and the identification of appellant in that respect is totally underminded by the physical facts as being an impossibility. The number one concideration for finding the required [trustworthiness] of an identification by a witness's account is [opportunity for the witness to view the subject], because after all, such admissibility is completely based on [reliability]. Weaver Supra. As noted above in the case at bar, with respect to the testimony of Morrow and Lockett, such reliability is absent. Their testimony as to the circumstances surrounding the murder of Mr. White, and particularly the identity of appellant as the person responsible for it, is decisively refuted, contradicted, and clearly exposed as false by the physical evidence, plus its hearsay and inadmissible. Further, this is a clear indication that a Napue issue is present in this case which directly effect the identification of appellant as stated above.

A complete and through review of the record reflect the fact that neither Morrow nor Lockett observed appellant, or any body else for that matter, perpetrating the killing of Mr. White in the parking lot of FishTown, an as such the "4" remaining conditions of the criteria for the introduction of eyewitnesses account need not be addressed here, where, there has not been any opportunity to observe/view what happened at Fish Town.

Appellant states, the line between innocence and guilt is "beyond a reasonable doubt" and although a prosecutor must strike hard blows, his or her responsibility is to see that justice is served, and not obtain a conviction at any cost. See: Reasonover v. Washington 60 F. Supp. 2d 948

Appellant ask that this court take Judicial Notice of the record and all pertinent material pertaining to "State v. Carnes", SEE: Knorp v. Thompson 352 Mo. 44, 175 S.W. 2d 889, 894 (Mo. 1943); Thompson v. Scott, 19 S.W. 2d 1063 (1929); Grassmuck v. Autorama... 659 S.W. 2d 264 (Mo. App. 1983) all in reference to the court taking of Judicial Notice of its files "when justice so requires".

Actual Innocence has been express by appellant in numerous ways throughout his incarceration within the courts record.

[signature] 3-20-12

VINCENT NEGUS
Notary Public - Notary Seal
STATE OF MISSOURI
DeKalb County
My Commission Expires: 11-18-2013
Commission # 09898623

Respectfully Submitted

Keith Carnes



IN THE MISSOURI COURT OF APPEALS
WESTERN DISTRICT

STATE OF MISSOURI, )
Respondent, )
vs. ) Appeal No. WD67426
KEITH L. CARNES, )
Appellant. )

COPY

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
SIXTEENTH JUDICIAL CIRCUIT
Honorable Gene R. Martin, Senior Judge

STATE OF MISSOURI, )
Plaintiff, )
vs. ) Case No. 16CR03006321
KEITH L. CARNES, )
Defendant. )

TRANSCRIPT ON APPEAL
VOLUME I OF I
Pages 1 thru 572

FOR THE PLAINTIFF:

Ms. Dawn M. Parsons and
Mr. Brady X. Twenter
Asst. Prosecuting Attorneys
Floor 7M
Jackson County Courthouse
415 East 12th Street
Kansas City, Missouri 64106

FOR THE DEFENDANT:

Mr. Willis L. Toney
Attorney at Law
1100 Main Street
Suite 1600
Kansas City, Missouri 64105

(14)

JIM BOUCK, CCR, CSR, PSSC, CVR-CM-RVR
Official Reporter, Circuit Court of Jackson County, Missouri

correct?
A Only if it's closer than two and a half to three feet.
Q If it is closer than two and a half to three feet?
A Yes.
Q Okay. Now, let's reverse the body and have them on their back; instead of in the prone position, they're on their back.
A All right.
Q All right. Would you expect to see the type of trajectory that you found here if the person is laying on their back and the person is being shot from a close angle -- close range?
A Well, again, if the head is turned to the side -- and I'll indicate here that I'm turning now to the left side so that this exposes the right side of the head. If there is a person lying on their back, they could from a certain angle -- I guess it would be back here. Depending on how far it was turned, you could get this kind of an angle.
Q Okay. Now, you and I talked about that earlier and you indicated that in order to get a shot like that the shooter would almost have to be crouched down to shoot, instead of standing over?
A Yes. Because of the forward component of the

trajectory, it would seem like that would be the case.
Q Right. Just so the Court is clear, if they're laying on their back, from a close shot, they would have to be -- what you told me earlier is that they would have to be crouched down sort of like this to be able to shoot and get that type of trajectory?
A Well, again, I suppose the issue is how far would their head have been turned. If they were tucking their head or something like that -- unfortunately, the human head has got a lot of mobility, but I was thinking of it, you know, sort of in a very simple way, like this (Indicating).
Q All right. Now, Doctor, do you remember telling me that based on the trajectory, the way the bullet traveled, the trajectory of the bullet's path, and the lack of finding indications of stippling or soot, that it was inconsistent with the person being shot while laying on the ground?
A Well, it would be -- if I said that, I'm sorry. I mean, it's possible, obviously, from what I've just said.
Q I want to call your attention to the trial

transcript, page 27, line 9.

MS. PARSONS: We don't have it.

MR. TONEY: You don't have it?

MS. PARSONS: Just go ahead, we'll figure it out.

MR. TONEY: Okay.

Q (By Mr. Toney) "QUESTION: Now, is there anything that would indicate that someone stood over this man with a gun and shot him, right over him, two or three feet, right over him and shot him, anything to indicate that?" What is your answer?

MR. TWENTER: Your Honor, objection. I don't believe this is proper impeachment. The question Mr. Toney asked him is not the question he is being asked in that transcript.

THE COURT: Overruled.

THE WITNESS: Well, the only thing I see here --

Q (By Mr. Toney) I would like for you first to tell the Court for the record what your answer was.
A The answer is, "It seems inconsistent, unless he was extremely tall. No."
Q And you said, "No," correct?
A Right. I may not have been thinking clearly, but

I think the point is, I don't think there's any evidence one way or the other. I think it's kind of an open question. There is no evidence that the person was standing over them, but it's possible.
Q And that's what I'm trying to get at.
A Yeah, I agree.
Q To a reasonable scientific certainty, there is no evidence here that the person was standing over him. That's what you've told me before. Is that what you're saying now?
A Yeah. You -- not you personally, but it would be asking too much of the physical evidence to make -- this is more supposition. This is something that goes beyond the purview of what we can find out from the autopsy.
Q All right. Now, we talked about what you would expect to see with a high-velocity rifle shot. Do you remember us having that conversation?
A Yes.
Q All right. Would you explain to the Court what you would expect to see from a high-velocity shot to the cranium as from, say, a pistol? What would you expect to see, the difference there?
A Well, again, the issue of the amount of energy,



Trial "3" Dr. Gill

160

so-called kinetic energy, energy in motion, if you'll remember your high school physics, is much greater. The equation is $1/2MV^2$ equals -- energy equals $1/2MV^2$, the mass times the velocity squared. So every time that you double the velocity, you quadruple the amount of energy imparted. What the significance of this is, is that this temporary cavitation gets greater and greater and it will shred and explode things. There are demonstrations where they shoot it into pineapples or grapefruit. Well, at any rate, I think I alluded to that on the direct examination, and that's the sort of thing that we look for in combination with the exit wounds, which are characteristically much larger.

Now, if we're talking about a contact wound or a close wound, then the entrance wound also takes on, at least some of the time, characteristics that are different or distinct in a high velocity, but at a distance, if there is no intermediate target to destabilize the projectile, the entrance wounds can be remarkably rather benign and, if anything, look less impressive than they do with handguns, because the projectiles, in reality, are hardly much

larger than a .22 or a .25 caliber.

Q Now, Dr. Gill, let's stay on that same track here. With a high-velocity projectile -- if you have a contact wound, with a high-velocity projectile, what would you expect to see in terms of what would happen inside of the cranium, if you have a contact wound?

A Because of the velocities derived from a greater amount of gunpowder, as the gunpowder undergoes combustion it produces a great deal of gas. The gas is injected into the skull so you get these kind of radiating tears and massive defect on a contact wound at the entrance as well as the exit, and sometimes you have just a complete destruction and huge cranial defect. So that's what you see.

Q Now, if you're, say, a short distance -- instead of the contact wound, now, we're going to move to the intermediate. Okay?

A Uh-huh.

Q We'll say three to four to five feet away. Would you expect to see mass destruction inside of the cranium if he's shot with a high-velocity rifle from that close range?

A You'll see the temporary cavitation and the

increased damage to the tissues that I described, yes, because that doesn't rely on just the gases, but the velocity of the projectile.

Q And if you go back a distance, if you go back, say, 50 to 100 to 200 feet, same high-velocity rifle, what do you expect to see then?

A Well, I don't think that anybody has ever said that we can, you know, make too much of a statement about this, but obviously as you get further and further away there is going to be some decrease in the amount of damage. I mean, you can't just go out to infinity because there is a certain amount of drag in the atmosphere here. If we were in outer space or something, that wouldn't be the case, but I really don't think that forensic pathologists are in a position to make any kind of statement whether this was, you know, 100 or 1000 yards away or anything. I just don't know anything in the literature that comments on that.

Q What I'm asking you is -- I'll just cut to the chase here. The issue here is whether or not you're able to say, "Hey, this guy was shot from somebody standing three to four feet over him," or whether it appears to be that it may have been

from a greater distance away. That's the issue here. Are you able to determine that?

A The answer is, no, conservatively we really can't.

Q Okay. But you can determine that it wasn't a contact wound and it wasn't within that three-foot range where you get the soot and stippling, correct?

A Correct.

Q Now, I want to move on to the other wounds here. That would be what you've marked as wound number two and wound number three, right?

A Uh-huh.

Q Did those wounds appear to come from the back, for example, someone running away from you, or did they appear like the person shot from in front of you?

A Oh, I think that they are probably, technically speaking, neither. They are really from the side, from the right side. I mean, again, you have all of these possible movements. One scenario would be just a slight turn of the body of the victim so that these things are basically -- I mean, it's sort of like, you know, the next step up from a graze, because they seem

Trial "3" Dr. Gill

161

to just tunnel underneath the skin and remarkably don't do that much damage.

Q You testified that wound number two was from back to front, right to left, and upwards?

A Yes.

Q Okay. So back to front would be this way?

A Yes.

Q And exited this way?

A Yes.

Q If the person is standing in front of you shooting you, wouldn't you expect it to be the opposite?

A Yes.

Q Okay. So would it be fair to say that it appeared that the person, the victim here -- these wounds would not have come if he were facing his shooter?

A That's correct.

Q Okay. And that would be both of those wounds, number two and wound number three, correct?

A Correct.

Q And also the graze wound?

A Yes.

Q All right. Now, if a person is laying on the ground and faceup, would you expect to find wound number two or three if they were shot while they were laying on the ground faceup?

A Those would be very awkward. I mean, I suppose it's physically -- well, with a long-barrelled weapon, it would be very, very awkward, because, I mean, you know, it appears that these are two and a half to three feet behind, and it's around on the side here and it's going forward.

Q So those wounds would be inconsistent with --

A A person laying faceup. That's what we're talking about?

Q Right.

A Okay. Good.

Q So, Dr. Gill, based upon your experience and within a reasonable degree of medical certainty, would you conclude that wounds numbers two and three and the graze wound did not come from shots from someone standing directly over the body?

A Directly over the body?

Q Yes.

A Yes.

Q Okay. Now, you indicated to the prosecutor that the shot to the head was the shot that resulted in this person's death, is that correct?

A Correct.

Q The other two shots would not be life-threatening, in and of themselves?

A Correct.

Q Okay. And the graze wound would not have been life-threatening, is that correct?

A Correct.

Q Do you have any medical evidence that would support the statement that someone stood over the victim and shot him in the head? Is there any medical evidence to support that?

A Nothing in the report that, you know, supports, in other words suggests, that was how things occurred, no.

MR. TONEY: Okay. Thank you.

MR. TWENTER: I just have a few questions on redirect, Your Honor.

THE COURT: Very well.

REDIRECT EXAMINATION

BY MR. TWENTER:

Q You and Mr. Toney were just discussing shots two and three and the graze wound?

A Yes.

Q On this diagram where you have diagramed out the trajectory, it appears that you're saying the graze wound was going down from the front?

A Yes.

Q Were you mistaken when you told Mr. Toney the

graze wound came from the back then?

A It doesn't go from the back.

Q Does it kind of come from above?

A Yeah. So it actually could occur from somebody standing probably at the head and shooting downwards, so that it would pass downwards and from right to left, grazing the left side of the thorax, yes.

Q Could it also come, I don't know, from somebody 30 feet away, above me, shooting going down then?

A I guess so. I mean, that would be a shallow angle, but I guess so.

Q It's possible that happened?

A It's possible.

Q All right. Also, Mr. Toney asked you if you could say within a reasonable -- I'm sorry, let me start that question all over. Mr. Toney asked you if there was any medical evidence that somebody stood over this person and shot them in the head, and you said no, correct?

A But what I meant by that is that there is nothing that says that's explicitly -- we've already gone over this, that if a person's head was turned in a certain fashion --

Q You can't say for certain one way or the other,



whether someone was standing over them and shooting them or not, can you?

A Correct. I mean, it's an issue of what position they are inand this goes beyond what the autopsy can tell you.

MR. TWENTER: Okay. That's all I have. Thanks.

THE COURT: Any recross?

MR. TONEY: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. TONEY:

Q Do you know where these abrasions came from?

THE COURT: I'm sorry?

MR. TONEY: Abrasions, abrasions.

MR. TWENTER: Objection, Your Honor. That's outside the scope of redirect.

THE COURT: I understand. I'll allow a bit of latitude here, if it doesn't go too far.

Q (By Mr. Toney) Do you know where the abrasions came from?

A Well, again, I can tell you that they are over bony prominences. Just to review them, there is one above the left eyebrow somewhat medially, and it's not sharply defined; the nose; and then there is a little laceration on the lip. All of

that could be caused by, like, falling or somebody running into something kind of flat.

Q So if the person were running away, got shot while they were running away, and fell and hit the ground, you might find those abrasions, correct?

A It's consistent, yes.

Q It's consistent with that?

A Yes.

MR. TONEY: I don't think I have anything else, Your Honor.

MR. TWENTER: The State has nothing further of this witness, Your Honor.

THE COURT: That's all, Doctor. You may step down.

(Witness excused.)

THE COURT: Before you call your next witness, let's take a short break.

(Whereupon, a recess was taken.)

THE COURT: Proceed.

MR. TWENTER: Your Honor, the State would call Kathryn May.

KATHRYN MAY,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TWENTER:

Q Would you state your name for the Court, please.

A My name is Kathryn May.

Q Ms. May, where are you employed?

A I'm employed with the Kansas City, Missouri, police crime lab, in the firearms section.

MS. PARSONS: And I believe Mr. Toney has agreed to stipulate to the witness' qualifications as an expert in ballistics.

MR. TONEY: Yes, I have, Your Honor.

THE COURT: Very well.

Q (By Mr. Twenter) All right. Ms. May, I'm going to jump ahead here a little from what you're used to. Can you tell us what the difference is between a revolver and a semiautomatic weapon?

A Well, a revolver could be a semiautomatic. It would be easier to describe, maybe, the difference between a semiautomatic and an automatic.

Q Well, I'm looking for -- I'll just ask the question flat-out. Is a semiautomatic weapon or an automatic weapon going to eject casings out of it?

A Yes. A revolver would not, though.

Q Yes, that's what I wanted to clear up.

A Uh-huh.

Q And when casings come out of the semiautomatic and the automatic weapons, how do they discharge out of there?

A When a semiautomatic weapon is fired, the cartridge cases will eject from the ejection port. The direction could vary. It could vary from side to side; the cartridge cases could eject from the back or the rear of the firearm, or to the front of the firearm.

Q And several different shots standing basically in the same location and ejecting cartridges, are those all going to end up in the same place necessarily?

A Pretty much in the same place unless it hits something, another object, on the way down. It could bounce or roll.

Q Okay. I'm going to direct your attention to October of 2004, when you became involved in the investigation of this case. Do you recall having some shell casings arrive in the lab, and some weapons?

A Yes.

Q And what did those come to you to do?

A To test-fire the weapons and try to determine if any of the weapons submitted were used to fire





and that's when I heard another gunfire and that's when the lady turned around and grabbed her chest. The lady gasped and I said, "What happened?" Then I ran around there and then I locked the door and told the lady's man to come inside and the lady's man was pointing and telling us to look over there. Then I told that man to come in and I locked the door and then I told the lady to go and the lady and her man left. I was already on the phone with 911 and I told them a man just got shot and then I called my boss.

Q. At any point and time did you see anybody standing outside with a gun?
A. No, there wasn't anybody out there and there was no cars going up and down the street.

Q. How much time had elapsed from the time you heard the first gunshots and the time you heard the second set of gunshots?
A. Probably about 8 minutes.

Q. What kind of car was the lady and the man in that were picking up their order when the shooting happened?
A. A small burgundy car.

Q. Did you recognize the lady or the man?
A. No.

Q. Did another customer arrive after the shooting occurred to pick up some food?
A. Yes, but I don't know what he was driving because I went behind the counter.

Q. Did you get a good look at the victim?
A. No because his face was down in the ground.

Q. Did you ever touch the victim in any way?
A. No.

TMS/mg

Form 277 P.D. (2-79) M.D.G.

KANSAS CITY, MISSOURI POLICE DEPARTMENT
INVESTIGATIVE REPORT [ CASE DOCUMENT ]

SUPP Case # 03095392

| Title of Investigation | | Subject of Report | |
|---|---|---|---|
| HOMICIDE<br><br>V: LARRY E. WHITE, B/M, 04-17-79<br><br>OCC: 10-06-03, 2050 HOURS, 2831 PROSPECT | | INTERVIEW<br><br>LESLIE S. COLE, B/F, 06-23-67<br>2607 AGNES KANSAS CITY, MO. 64127<br>(816) 921-8798 | |
| Report By: Det. Avery Williamson 4725<br>DET. AVERY WILLIAMSON #4723 | Assignment:<br>HOMICIDE UNIT | Date:<br>10-08-03 | Page 1 of 1 Pages |

On 10-07-03 at approximately 0045 hours I responded to 1125 Locust, Police Headquarters, in regard to the above captioned incident.

Upon arrival I made contact with the listed subject in interview room #1. The listed subject stated on 10-06-03 at approximately 2030 hours she was walking home from a friend's house at Linwood and Garfield. The listed subject stated she was walking East on 30th Street between Olive and Wabash when she heard a series of about six to eleven gunshots. The listed subject stated the gunshots were very loud and she stated they sounded very close to her location. The listed subject stated she observed two people dressed in dark clothing run East through the intersection of 29th and Wabash. The listed subject stated she could not tell if they were carrying anything. The listed subject continued to walk towards Prospect and she stated she was near the intersection of 30th and Prospect when she heard one more gunshot. The listed subject stated there were approximately forty-five seconds between the first series of gunshots and the last gunshot. The listed subject stated she began to walk North on Prospect and she observed a young black kid leaving the fish restaurant at 2831 Prospect with food. The listed subject stated the young black kid got into the passenger side of an unknown type gold vehicle and left. The listed subject stated she continued to walk North on Prospect and she observed the victim lying in the parking lot at 2831 Prospect. The listed subject observed the "victim lying face down" and a crowd of about ten people standing by the victim. The listed subject stated she observed an unknown black female remove the victim's hood from the victim's face to tell if the victim was breathing. The listed subject stated police arrived and the people in the parking lot left.

Supervisor Sgt. T Niemeier 4253

Form 107 P.D. (10-80)

File Page #______

Lorianne Morrow L.M., Wendy Lockett W.L., Felica Jones F.J. 166

Exhibit "8" that was submitted by appellants Evidentiary Hearing

1. L.M. Tr. 1, pg. 24, L. 18-25, pg. 25, L. 1-7, notified police through victim's family, after talking to victim's family (COERCION) by Uncle Tim and Ronald White/10-7-03 Ronald White stated in a police report that he heard Arnold G. Carr speaking freely while he purchased crack, about "Blasting his nephew all the way to Prospect and then capped his ass." Stated that Mr. Carr didn't know Mr. White was related to the victim. Police investigated Mr. White's statement and found it to be false after investigating Mr. Carr alibi, police statement, which proved that Mr. Carr had no involvement in crime. This shows that the family of victim will pin this case on anyone known to associate with the apartment building on 29th & Olive. After L.M. gives police statement, police drop her off at Ronald White's residence, 3009 Montgall.
2. L.M. Police statement, pg. 2, 10/12/03 6 day after crime

   Q. "What happened when Larry collapsed at Fish Town?"

   A. "Tre rolled him over, then shot him some more, probably 5 more times.

   Q. "Did you see these shots, or did you see them?"

   A. "I heard them, seen the fire from the bullets."

   Q. "Did you actually see the shot at fishtown, or did you hear them?"

   A. "I heard them."(Malicious Prosecution for knowingly using false testimony)
3. Wendy Lockett gave police statement 8 days after crime 10/14/03 to detective.
4. W.L. Tr. 1, pg, 17, L. 16-25, pg. 18., L. 1-17, Pg. 19, L. 12-16, testifies that she came in contact with the police "about 2 days later" which would be pertinent to P/O Huth #4755 "report form narrative" dated 1 day after crime 10/7/03 that he took from a confidential informant, document states that informant is a "she". Informant gives statement about what see observed, but gives no names of suspects. Requesting court to disclose informant "Wendy Lockett" to show that the statement given to P/O Huth is not consistent with -W.L- trial testimony. (I have to lead P/O Huth and P/O Begley with questions that will disclose W.L.) W.L. testifies to coming in contact with police the same day of the crime as she states that she's still in the parking lot after witnessing this crime Tr. 1, pg. 17, L. 16, Tr. 1, pg. 18, L. 8-14 "Like I said, I was standing on the lot, police came out of nowhere and tell me they had a flag on me in the computer. Homicide wanted me".(Which makes no sense, which the prosecutor recognizes and tries to correct, but this correction does not erase the illogical testimony. Also in this testimony W.L. refers to going back to the house after incident, "29th Park" (Tr. 1, pg. 8, L. 14-15) On Tr. 2, pg. 196, L. 1-14, Tr. 2, pg. 234, L. 6-9 testified that after incident she ran north on Prospect all the way to her sister's house in Chouteau on Independence Avenue).
5. L.M. Tr. 2, Pg. 120, L. 22-25, pg. 121, L. 1-25 testifies that her and victim are standing together by grate on "S.W. corner" as victim and defendant argue back and forth.
6. L.M. Tr. 2, pg. 131, L. 3-4 "W.L. wasn't standing next to victim, L. 25, L.M. testifies she's standing right next to victim.



167

7. W.L. Tr. 2, pg. 191, L. 4-6, states that victim didn't say anything back to defendant.
8. W.L. Depo. pg. 37-38, 42-43, states standing beside victim on the "northeast" of 29th and Olive, talking and selling drugs, when defendant fires 2 shots from porch of apartmen building.
9. LM Tr. 2, pg. 134, L. 10-18, testifies that she's positive that no shots were fired from the porch of apartment building.
10. L.M. Tr. 2, pg. 123, L. 7-10, testifies that defendant Y KiKi (Gary Kitchen) running chasing behind victim.
11. L.M. Tr. 1, pg. 23, L. 5-10, testifies that KiKi (Gary Kitchen) didn't come off porch of apt. building.
12. L.M. Depo. pg. 2, L. 10, states she never saw defendant stand on porch of 2846 Walbash holding or firing a gun.
13. L.M. Depo. pg. 2, Line 8, states that she is on the corner of 29th and Walbash by the volleyball court watching as defendant ran off balcony of apartments and chase victim north down alleyway (if this were true, she would have said that she saw shooter in the yard of the corner house(2846 Walbash) shooting, where the 12 spent shell casings were retrieved by police.)
14. L.M. Tr. 2, pg. 137, L. 6-24, testified that only 3 shots occurred. Victim ran through the alleyway, and those 3 shots were fired by defendant from porch of 2846 Walbash, however this testimony does not collaborate with the physical evidence, which are the 12 spent shell casings found in that front yard of (2846).
15. L.M. Tr. 1, pg. 9, L. 4-11, pg. 10, L. 11-14, "saw shots" fired when victim cut through the alleyway as defendant chased him.
16. L.M. Tr. 1, pg. 34, L. 5-10, lost sight as they ran up alleyway, and only heard shots.
17. L.M. Tr. 1, pg. 36, L. 20-25, pg. 37, L. 1-25, never saw defendant in yard of 2846 Walbash.
18. L.M. Tr. 2, pg. 148-152, the breakdown of her perjury testimony "stating that she saw defendant shot from porch of 2846 Walbash. Again states 3 shots fired from porch, evidence of this lie are the 12 spent shell casings in that yard. Explanation for her perjured testimony is, "I've been taking so much medication(Darvocet and Prednisone) it makes me confused."
19. LM Tr. 2, pg. 155, L. 5-25, Gets questioned about how she knew that shells were found on the porch of 2846 Walbash, if nobody told her. Pg. 156-157, L. 1-10, reveals that she doesn't even know if bullets eject from revolvers. (COERCION by the victim's family, that she knew this information about shells on the porch of 2846 Walbash from the 1st trial).
20. L.M. Tr. 2, pg. 127-128(Perjury) "said she's never sold drugs, just purchases drugs for

other people." After being questioned about her drug activity transpires, she admits to selling drugs (crack-cocaine, PCP, marijuana, etc.) pg. 128, L. 5-9,

Q. Okay. So you've sold drugs? Is that a "yes" or a "no"?
A. "Yes".

21. W.L. police statement pg. 2, states Debo (Damon Rhodes "police suspect") was there. Police document from Det. Bleam shows that D. Rhodes was at work on camera cleaning at Bank of America at the time of incident.
22. W.L. police statement, pg. 1, states that Felica Jones is with her when incident occurred
23. W.L. Tr. 1, pg. 15-16, testifies that her and F.J. run together from corner of 29th and Olive, go behind the apartment building through the access of the fence of apartment buildings, cross the alleyway next to the buildings, past the house(2846 Walbash) and they end up together by the church on Prospect, the problem here is that once you go through the first 6 ft. fence of apt. building there's a second 6 ft. fence that goes entirely around the 3rd building. There is no access to the back of the 3rd building because of this 6 ft. fence. Depo, pg. 48, L. 1-4 "Didn't climb over any fences"
24. W.L. Depo. 44, L. 7-25 **Defendant Exhibit 110** states that she goes past the fence of the apartment buildings to where a house is and goes between the house and fence (COERCION from the prosecutor, because of the 2nd 6 ft. fence that goes around entire 3rd building).
25. W.L. Tr. 2, pg. 221, L. 15-24, places herself again running through the back of the apartment buildings and testifies that the 2nd 6 ft. fence -is- down, all the fence's are down.
26. WL Tr. 2, pg. 219-220, (perjury) testifies Felica Jones wasn't with her running, testifies that she was "mistaken" and that she was running by herself.
27. W.L. Tr. 1, pg. 12, L. 7-10, Tr. 1, pg. 22, L. 15-20, testified to smoking a 8-ball of crack cocaine the same day crime occurred.
28. W.L. Tr. 2, pg. 185, L. 11-14, "The day of the shooting, I wasn't using. (Crack/cocaine)
29. **Felica Jones** Tr. 2, pg. 165, L. 5-6, do you remember a shooting? No., Line 14-17 do you remember talking to police about a shooting? No, I do not remember. pg. 167, Line 16-19, "I have no memory about making a statement to the police. (constantly gets questioned about the police statement, and F.J. continuously responds "That's what it says.") Tr. 2, pg. 170, L. 23, This is not happening, because I cannot read. Tr. 2, pg. 172, L. 17-20, "Do you remember anything about what happened on 10/6/2003?" "No, ma'am. No ma'am." Tr. 2, pg. 175-176-177, L. 1-21, testified she had been doing drugs before police picked her up, she'd been up 30 days straight smoking crack with hardly any sleep at all. Diagnosed with bipolar disorder, has paranoid schizophrenia where she has multiple personality disorder, depression and mood swings, hears voices most of the time and smokes crack to drown out the voices. Tr. 2, pg. 179, L. 24-25, Would you have been running behind houses

with W.L.? Tr. 2, pg. 180, L.15-17, There is no way in hell that I would hang out anywhere with W.L. Tr. 2, pg. 181, L. 1-5, Your testimony today is that you didn't see, or you don't remember seeing Mr. Carnes shoot anybody, do you?" Sir, again, as I've said 17,000 times today, no, I don't remember."

30. **L.M.** Tr. 2, pg. 141-143, L. 1-17, (Illogical testimony) from L.M. that refutes W.L. testimony regarding the route victim was chased after leaving the area of 29th and Walbash L.M. states that victim ran straight up 29th st. and she's positive that victim was never in the church parking lot.

31. **W.L.** Tr. 2, pg. 225, L. 10-25, pg. 226, L. 1-13, testifies that she's already in the church parking lot and she sees victim run through the parking lot at a slant. (This means that she got there before the victim. No geometrical logic).

32. **L.M.** Tr. 2, pg. 145-147, L. 1-12, testifies to standing beside the church and witnessing defendant by himself on fishtown parking lot, turn victim over after he collapsed and shot victim 5 or 6 more times from point-blank range. "I'm positive about that!"

33. **W.L.** Tr. 2, pg. 227-228, L. 1-15, testifies to standing beside church and witnessing defendant and someone else run up on victim after he collapsed, testifies that defendant "stands right over victim" and shot victim one time, never observing victim getting rolled over or hear 5 shots.

34. **L.M.** Tr. 2, pg. 134, L. 2-10, testifies that defendant shot at victim with a AK-47, pg. 146, states that defendant had a big gun in his hand when he rolled victim over then shot victim 5 or 6 more times.

35. **W.L.** Tr. 2, pg. 231, Line 21-25, testifies that defendant didn't have a rifle, pg. 232, L. 1-25, "It wasn't a long gun" like state's exhibit #58, which was then shown to her. Tr. 2, pg. 233, L. 1-9, "No, it wasn't. No, it wasn't." Testifies that she knows what a pistol looks like and that the gun that was shot "one time" in the Fishtown parking lot was similar to a pistol.

* * * *

"Ground Four"

Ineffectiveness Assistance
of
Trial Counsel
for
Failing to Investigate,
Consult, retain and
Call a Independent
Forensic Expert to
Testify at Trial

Supporting Facts

When trial counsel was questioned about this error at the evidentiary hearing he admitted that appellant was persistent in his request for a independant forensic expert to testify at trial (Exhibit (A) PCR, Tr. 75), plus appellant also fied a pro'se motion prior to trial requesting the assistance of a forensic reconstructionist, after counsel told appellant that there was no such thing (Exhibit (B) motion). Counsel also explains at the hearing that the reason he didn't was because the Fishtown resturant (2831 Prospect) crime scene had been contaminated and testified that the expert (Mr. Rini, M.F.S., D.A.B.F.E.) "would have only been able to" testify to the crime scene at Fishtown where the victim (Larry White) was found and not the other crime scene at 2846 Wabash were the 12 spent shell casing were retrieved in the yard (Exhibit (C) PCR, Tr. 69-71 and 76-78). Although counsel said this to justify his negligence, trial 2 transcript establishes on the record that before the 2nd trial began counsel confess to the court, "to make the record clear, that he explain to appellant that there was no such thing in this type of case as a reconstructionist of the crime scene (Exhibit (D) Trial 3, pgs. 13-14). If counsel had consulted with and obtain the experts analysis prior to trial, one would assume the "obvious"- in that the expert "would have been able and prepared to" view all the crime scenes and if necessary give his professional interpretation of how the events transpired between 28th and Wabash area and Fishtown. Counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained the facts upon which such a decision could be made. U.S.C.A. Const. Amend. 6. The record clearly establishes that counsel lacked the information to make an informed judgment because of inadequacies in his investigation; therefore any argument as to trial strategy is inappropriate. Clay v. State 954 S.W. 2d 344, 349 (Mo. app. 1997)

Once counsel discovers that appellants family retain the services of a forensic reconstructionist, **his** excuse to there's no such thing as a forensic reconstructionist changed, in a in-chambers conference with the judge, to having to locate a expert and come up with the funds (Exhibit (E) Trial 3, pg. 497); which was not the case or the truth because appellants family had already located the expert and acquired the necessary funds from money paid back by counsel for services not completed during appellants first trial (Exhibit (F) cashier's check). Instead of counsel giving misleading illegal advice, that there's no such thing....., a reasonably competent attorney under similar circumstances would have requested assistance from the court and a continuance before trial in order to obtain a expert, which is precisely what the trial judge told counsel during the sentencing phase (Exhibit (G) Trial 3, pg. 515). In criminal cases a trial court may in its discretion, authorize the appointment of experts to assist indigent defendants, SEE: State v. Chapman, 365 S.W. 2d 551, 552 (mo. 1963) also State v. Young, 701 S.W. 2d 429, 433 (mo. 1985). An expert may also be appointed to assist a defendant who has hired private counsel but cannot afford expert assistance, SEE: State v. Huchting, 927 S.W. 2d 411, 419-20 (mo. app. 1996).

The analysis of the respondent for the State of Missouri stated that the motion court did not clearly err in denying relief when appellants counsel didn't call a reconstructionist expert to testify at trial, because any testimony he could have offered would have been cumulative. The law states "it is not enough for movant to show that the errors had some conceivable effect on the outcome of the proceeding," Strickland: at 693, 104 S.Ct. at 2067. However, a movant is not required to show that the error "more likely than not altered the outcome of the case," Id. at 693, 104 S.Ct at 2068.

The Strickland test falls somewhere between these two extremes, and the issue becomes what effect the evidence would have had if it had been before the jury/judge. Trimble v. State, 693 S.W. 2d 267, 274 (Mo. App. 1985)

Appellant was found guilty in his "1st trial", although the states medical examiner Dr. Gill testified that no medical evidence supported statements that appellant stood over the victim and shot him as he layed on the ground (Exhibit (H) Trial 2, pgs. 27-29). [Eyewitness #1 "Lorianne Morrow" testified that appellant stood over victim after he'd collapsed and shot him 5 or 6 more times after he turned the victim over, from point-blank range with a big gun (testified appellant shot with a AK-47 Trial 3, pg. 132) (Exhibit (I) Trial 3, pgs. 145-147)]. [Eyewitness #2 "Wendy Lockett" testified that appellant stood right over victim and not back aways and shot him with a pistol one time in the head after he'd collapsed (Exhibit (J) Trial 3, pgs. 227-233]. However, in "trial 3" Dr. Gill testified that the evidence was consistent with the victim being shot while laying on the ground, [A. Well, it would be - if I said that I'm sorry. I mean, it's possible, obviously, from what I've just said. - I may not have been "thinking" clearly, but I "think" the point is, I dont "think" there's any evidence one way or the other. I "think" it's kind of an open question. There is no evidence that the person was standing over him, but its possible (Exhibit (K) Trial 3, pgs. 331-333]. These statements from Dr. Gill, in trial 2 are and were outcome determinative and invaded the province of the trier of law, plus its refuted by the physical evidence.

The testimony that would have been offered by appellants independant forensic consultant Gary A. Rini is [A. Well, the question was whether or not again the shooter was standing over the decedent and shot the decedent while the decedent was on the ground, and what I determined was that based on the evidence that was looked at, there was no evidence

which would support that conclusion. That was based on the angle of the bullets, the appearance of the wounds, particularly the head wound and the location of the head wound and the absence of any cartridge cases or bullets on or about the body or on the ground surrounding the body or any documentation of any bullet fragments or concrete or asphalt material that might have been dislodged as a result of a bullet passing through the body. You can't have a shooting with a semi-automatic weapon without those types of evidence present. If you have a shoulder weapon or a long rifle, I can't imagine someone holding it up four feet above the ground to fire into it. A distance wound is basically four feet and you would expect to see at that point some soot or tattooing and none of that was present either. I didn't see any evidence that linked Mr. Carnes to the shooting at all. Q. Okay. So if you had been called to testify at the trial, would your testimony have been the same. A. Yes. (Exhibit (L) Deposition of Mr. Rini, pgs. 15-21) <u>Original deposition was filed with brief, labled "Petioner's Exhibit #1 appellant is sending the depo. with the brief and the respondents brief also to this court for review.</u>

Appellant is in disagreement with the states analysis that the expert testimony of Mr. Rini would have been cumulative, in fact his testimony would have not only supported appellants assertion that no shooting took place in the Fishtown resturant parking lot while the victim was laying on the ground, it also would have asserted the facts to drive the point home. Counsel's failure to investigate the propriety of obtaining expert witnesses to testify to the distance from which the shot was fired was unreasonable and fell below the customary skill and diligence of a reasonably competent attorney. Appellants entire defense rested upon the fact that the shooting was not fired from a close distance. Again, counsel cannot make a strategic decision against pursuing a line of investigation

when he or she has not yet obtained the facts upon which such a decision could be made. Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991)(applying Strickland test in habeas corpus proceeding). "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty" Id. at 1304, n.5 (quoting Eldridge v. Atkins, 665 F.2d 228, 232 (8th Cir. 1981)). Trial counsel could not foresee what a independant expert could have offered regarding expert testimony or other forensic techniques that could've produced exculpatory evidence, so any debate about his effectiveness, after trial, should not be considered by this court.

To show ineffective assistance by failing to locate and present expert witnesses, appellant has the burden to show such experts existed at the time of trial, that they could have been located through reasonable investigation, and the testimony would have benefitted the defense, State v. Johnson, 968 S.W. 2d 686, 696-97 (Mo. banc 1998); State v. Davis, 814 S.W. 2d 593, 603-04 (Mo. banc 1991). The testimony adduced, if believed would have supported appellants assertion that no shooting took place in the Fish Town parking lot, thus negating the first-degree murder charge. Likewise, if counsel would have made even a perfunctory investigation, he would have uncovered expert at the time of trial. As noted above, counsels performance was constitutionally deficient as defined under the first prong of the Strickland test.

The second prong of the Strickland analysis focuses on the prejudice to appellant. Appellant must show in the absence of his attorneys unprofessional errors, that there is a reasonable probability that the result of his trial would have been different. Strickland, supra at 2069. The judge obviously will take into consideration the additional evidence of guilt adduced at trial in making his conclusions. The issue is the effect that the expert testimony would have had

on the judge if it had been presented at trial with regard to guilt of first-degree murder. The proposition that a verdict with "overwhelming record support" is less likely to have been affected by counsels errors than one with weak support. Strickland at 696, 104 S.Ct. at 2069. In appellants direct appeal to the W.D., MO., Court of Appeals, his conviction was affirmed wherein it was determined the case against appellant had ample evidence. State v. Carnes (WD 67426). This was found to be so even without the testimony from Dr. Gill (M.E.)

"Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect" Strickland at 695-96, 104 S.Ct at 2069, 104 S.Ct. 2052. Without the evidence that counsels errors failed to produce, the judge was left with but one inference to draw: Appellant was guilty of knowingly killing the victim. Had the expert testimony adduced at the evidentiary hearing been before the trial judge, it may have "altered the entire evidentiary picture". Id. at 696, 104 S.Ct. at 2069; See also State v. Butler, 951 S.W. 2d 600, 610 (Mo. banc 1997) (finding that "without the evidence presented before the motion court, the jury/judge... had no reason to question the inferences that the state drew from its circumstantial case"). State v. Barton, 936 S.W. 2d 781, 787 (Mo. banc 1996) (finding while the jury/judge certainly might have rejected this [Evidence] and found the facts consistent with Bartons guilt, they were not compelled to do so). Moore v. State, 827 S.W. 2d 213, 215 (Mo. banc 1992) (finding "though the [Evidence] may not have changed the result, that very real probability cannot be ignored"). See: Cravens v. State, 50 S.W. 3d 290 (Mo. App. S.D. 2001)

If the judge in appellants case had the expert testimony of Mr. Rini before him, the inferences drawn from the evidence certainly may have changed. Significantly, the judge may have believe appellants claim entirely and disbelieved the states eyewitnesses. But for trial counsels ineffectiveness, there is a reasonable probability that the outcome of the proceeding would have been different.

Trial counsel was ineffective for failing to investigate and present evidence to counter misleading and prejudicial inferences the prosecutor used to infer guilt. The state used a myriad of stacked inferences to attempt to bolster a weak case for guilt. None of these inferences by themselves were enough to make a submissible case. Nonetheless counsel still had a duty to refute the negative inferences with evidence that was readily available.

Appellant has maintain to express in the court record his "actual Innocence" from the begining of his incarceration, and his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated as well as Article 1, Sec. 2, 10, 18(a) and 21 of the Missouri Constitution.

[signature] 3-20-12

Respectfully Submitted
[signature]

VINCENT NEGUS
Notary Public - Notary Seal
STATE OF MISSOURI
DeKalb County
My Commission Expires: 11-18-2013
Commission # 09898623