# INDEX OF EXHIBITS

Exhibits                                                                    page

(A) PCR, Tr. pg. 75 of trial counsel                                         10

(B) Evidentiary hearing motion                                              11

(C) PCR, Tr. pgs. 69-71 of trial counsel and 76-78                         12, 1

(D) Trial Two, pgs. 13-14 of trial counsel                                 15, 16

(E) Trial Two, pg. 497 of trial counsel                                    17

(F) Cashier's check from trial counsel                                     18

(G) Trial Two, pg. 515 of Trial Judge                                      19

(H) Trial One, pgs. 27-29 of Dr. Gill (Medical Examiner)                  21, 22,

(I) Trial Two, pgs. 145-147 of Lorianne Morrow (Eyewitness)              25, 26

(J) Trial Two, pgs. 228-233 of Wendy Lockett (Eyewitness)                28, 29

(K) Trial Two, pgs. 331-333 of Dr. Gill                                     31

(L) Deposition, pgs. 15-21 of Gary A. Rini (Forensic Expert)              33, 3

178

IN THE MISSOURI COURT OF APPEALS
WESTERN DISTRICT

KEITH CARNES,                          )
            Appellant,                 )
    vs.                                )  WD No. 72916
                                       )
STATE OF MISSOURI,                     )
            Respondent.                )

    IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
        SIXTEENTH JUDICIAL CIRCUIT, DIVISION 5
            Honorable W. Stephen Nixon, Judge

KEITH CARNES,                          )
            Movant,                    )
    vs.                                )  Case No. 0816-CV04757
                                       )
STATE OF MISSOURI,                     )
            Respondent.                )

            RECORD ON APPEAL - TRANSCRIPT
                    APPEARANCES


For Movant/Appellant:

MS. SUSAN HOGAN
MISSOURI STATE PUBLIC DEFENDER
920 Main Street, Ste. 500
Kansas City, Missouri 64105

For Respondent/Respondent:

MS. DAWN PARSONS
PROSECUTING ATTORNEY'S OFFICE
415 E. 12th Street
Kansas City, Missouri 64106




        Gayle M. Wambolt, Certified Court Reporter
          Official Court Reporter, Division 5
              Sixteenth Judicial Circuit
                Jackson County, Missouri

                        1

Trial Counsels

PCR Testimony

(10)

**Page 72**

1  A  It wasn't me.
2  Q  Okay. Now, did you have -- did you ultimately
3     receive a report that had been authored by
4     Mr. Rini?
5  A  Yes, I received a report from Mr. Rini. It came
6     after the initial sentencing --
7  Q  Okay.
8  A  -- hearing.
9  Q  And do you recall what the contents of that
10     report were, just a short summary?
11  A  Yeah. I mean, I've got the actual report, but
12     the -- with me, but what it said was that based
13     on the pictures that he had looked at, based on
14     his review of the autopsy report, it was his
15     opinion that the witnesses' statements were
16     inconsistent with the physical evidence.
17  Q  Okay. Was that essentially what your defense had
18     been at the second trial or at least part of what
19     your defense had been at the second trial?
20  A  Right. But there's a problem with that because
21     Mr. Rini had never actually come out to Kansas
22     City to observe the actual crime scene, and he
23     was basing it just on pictures that had been sent
24     to him. I discussed this with him a couple of
25     times about how if he did testify, it would only
72

**Page 73**

1     that I didn't know whether they would sustain the
2     objection for it just being an opinion.
3  Q  Okay. Let me ask you -- but you've previously
4     testified, though, that your defense was partly
5     that the physical evidence at Fish Town was
6     inconsistent with the crime taking place as the
7     witnesses --
8  A  Correct.
9  Q  Okay. Now, these witnesses who were in this
10     area, do you recall any testimony as to what
11     activities they were engaging in while they were
12     in that area?
13  A  Well, they were either doing drugs or selling
14     drugs.
15  Q  Okay. And that would be both Lorianne Morrow and
16     Wendy Lockett?
17  A  Correct.
18  Q  Okay. Did you have the benefit of any report
19     from Mr. Rini at the time you took the case for
20     the second trial?
21  A  No. I told you I didn't hear from Mr. Rini until
22     after the trial was concluded.
23  Q  Okay. So he never testified?
24  A  No, ma'am.
73


EX. A

**Page 74**

1  Q  Okay.
2  A  He wasn't available to testify.
3  Q  Okay. And was there any -- as far as the
4     evidence that you presented and the defense,
5     would it be fair to say that you tried to
6     establish the lack of any physical evidence at
7     the scene through cross-examination of some of
8     the state's witnesses?
9  A  Yes, ma'am.
10  Q  Okay. And also through the testimony of the --
11     cross-examining the medical examiner?
12  A  Yes, ma'am. Spent a lot of time with the medical
13     examiner.
14  Q  That was partly to say that it would be really
15     difficult for somebody to shoot somebody who was
16     laying on the ground and come up with the
17     injuries that resulted in this case?
18  A  Yes, ma'am.
19  Q  Okay. And was there any expert testimony
20     presented at the trial about whether the shooting
21     could have taken place or not taken place in the
22     way that the state's witnesses said?
23  A  No, ma'am. There were no experts called.
24  Q  Okay. Let's see here. Now, when you were
25     discussing the case with Mr. Carnes, did -- can
74

**Page 75**

1     you kind of give us a -- I don't know exactly how
2     to put it.
3     But on a scale of 1 to 10, how consistent or
4     inconsistent was he in your discussions with him
5     about wanting to call a crime scene or forensic
6     reconstructionist?
7  A  Are you talking about the first trial or the
8     second trial, ma'am?
9  Q  The second time around.  Note's
10  A  The second time around Mr. Carnes and I had
11     discussions about it. In fact, Mr. Carnes would
12     talk to me about it on a regular basis when I
13     would talk to him, and we actually discussed the
14     benefits of it and the fact that I didn't think
15     that we could find somebody who could accurately
16     reconstruct that crime scene because of the
17     contamination of the scene and the timeframe in
18     which we were trying to go back and do that.
19  Q  Okay. And you're talking about, as far as the
20     contamination, the fact that the ambulance
21     personnel had arrived?
22  A  Correct. We got -- you got ambulance personnel
23     there. You've got tire marks through the blood.
24     You've got the fact that it wasn't cordoned off.
25     You have other people having access to it.
75



(10)

IN The Circuit Court of Jackson County, STATE of Missouri

EX. B

State of Missouri
   Plaintiff

   V

KEITH L. Carnes
   Defendant

CASE no. CR03-06321

# Motion for an Evidentiary "HEARING"

Come now, KEITH L. CARNES, defendant Prose with the right to retain counsel Pursuant to Missouri Rule 23.04, moves this court for a "Motion for a Evidentiary Hearing" pursuant to State v. Crouch 353 S.W. 2d 597 and Crim. Rule 12(d) and Crim. Rule 16

   In support of this "Motion" defendant states:

1) That the assistant prosecutor in this case is knowingly using false testimony to procure defendants conviction; that the testimony of allege eyewitnesses Lorianne Morrow and Wendy L. Lockett is false and contrary to the scientific evidence and crime scene facts. Defendant is prejudiced by state's knowing use of false testimony. SEE C.F. State v. Davison, 46 F. 3d 68

1 of 3 pages

(11)

2) The vague description depicting the crime scene details that will eventually exonorate, me, need to be fully develope, before trial, to see if material facts exist for the trier of facts for findings of guilty beyond reasonable doubts:

a) Defendant request the assistance of an independent forensic Pathologist and crime scence reconstructionist to rebut the bias and controverted testimony of Dr. Thomas Gill, whom is an advocate for the state and not a partial fact finder; his credibility as a competent forensic doctor is doubtful, as he has a history of rehearsing and omitting facts in favor of prosecutors.

b) The assistant prosecutors on this case Amy McGowan and Dawn Parson are withholding exculpatory evidence that need to be discovered," the depicting sketch diagram" taken by KC pd. crime scene unit "CST" Lutman serial # 10775, witnesses prior criminal history and complete notes & reports catolog in police files related to this case, crime scene color pictures, x-rays taken from the victim body, the results of neutron activation analysis done on victims clothes, Luminel test, portion of any existing transcripts of Grand Jury proceedings which relate to the offenses with which defendant is charged containing testimony of those person whom the state used or intends to call as witnesses at a hearing or trial.

Case 4:12-cv-00416-BP   Document 1-6   Filed 03/30/12   Page 6 of 38

3) Afer my first trial got dismissed 11/16/04
the assitant prosecutor filed an "Information
in Lieu" where as 99% of the witnesses
listed there were never deposed and their
testimony is unknown or their involvement
in this case if any; how can defendant in this
case put up a meaningful adversarial
challenge to the states case if he's ambush
by new set of witnesses and testimonies
that defendant doesn't know exist prior to
those or these proceedings.

## Conclusion

In the past defendants attempt to file motions
in his own behalf, Pro se, have been rejected or
ignored by this court. The courts have absolutely
refused to entertain or consider them what so ever.
It is the defendants right to present a defense
and have a hands on approach in the preparation
of his defense. There is no reasonable strategy from
downplaying, omitting or bypassing the importance
of the issues herein that will ultimately end in
a just result.

## Prayer

Wherefore, for the foregoing reasons plaintiff prays
this court to grant defendant/petitioner with a
"Evidentiary Hearing" within a reasonable time before
trial so these issues can be fully adjudicated.

(11)

3 of 3 pages

I KEITH L. CARNES, defendant in this case swear under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. Pursuant to 28 USC §1746

Respectfully Submitted

Keith L. Carnes

MERLE F. HORNING
Jackson County
My Commission Expires
February 21, 2006

10/25/05

(17)

```
 1              IN THE MISSOURI COURT OF APPEALS
                      WESTERN DISTRICT
 2
    KEITH CARNES,                    )
 3              Appellant,           )
                vs.                  )  WD No. 72916
 4                                   )
    STATE OF MISSOURI,               )
 5              Respondent.          )

 6     IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
           SIXTEENTH JUDICIAL CIRCUIT, DIVISION 5
 7            Honorable W. Stephen Nixon, Judge

 8  KEITH CARNES,                    )
                Movant,              )
 9              vs.                  )  Case No. 0816-CV04757
                                     )
10  STATE OF MISSOURI,               )
                Respondent.          )
11
                 RECORD ON APPEAL - TRANSCRIPT
12                      APPEARANCES

13

14  For Movant/Appellant:

15  MS. SUSAN HOGAN
    MISSOURI STATE PUBLIC DEFENDER
16  920 Main Street, Ste. 500
    Kansas City, Missouri 64105
17
    For Respondent/Respondent:
18
    MS. DAWN PARSONS
19  PROSECUTING ATTORNEY'S OFFICE
    415 E. 12th Street
20  Kansas City, Missouri 64106

21

22

23        Gayle M. Wambolt, Certified Court Reporter
              Official Court Reporter, Division 5
24              Sixteenth Judicial Circuit
                Jackson County, Missouri
25
                          1
```

Case 4:12-cv-00416-BP   Document 1-6   Filed 03/30/12   Page 9 of 38



Trial Councel
PCR Testimony

(12)

**Page 68**

1      not conclusively say the range ~~from~~ ~~which~~ ~~the~~
2      shot had been fired. In normal cases where I've
3      represented people or prosecuted them for
4      murders, you look to see at close-range shootings
5      what's called stippling. You look for that.
6      But in this case there was no stippling. If
7      the court wants me to explain what stippling is,
8      I will.
9      But it's the -- when a bullet comes out of
10      the gun, there's the wadding that comes out of
11      the projectile. If you shoot at close range, you
12      will normally have that soot and wadding lodged
13      into the flesh of the person who is shot. That
14      was not present here.
15 Q   Okay. So there wasn't any indication, then, that
16      that was actually a short-range or a close-range
17      gunshot?
18 A   Well, that wasn't present. But you can have a
19      shooting at close range and not have stippling.
20 Q   Right.
21 A   I mean, that -- but most times you will find
22      stippling.
23 Q   And in this case there wasn't any stippling or
24      soot?
25 A   No, correct, there was not.

**Page 69**

1      going to turn your attention to our first issue,
2      which is ineffective -- we're alleging
3      ineffective assistance of counsel for not
4      consulting with and retaining a qualified
5      forensic reconstructionist and having them
6      testify at trial.
7      Did you ever have any discussion with
8      Mr. Carnes about the possibility of hiring
9      somebody as a forensic reconstructionist or a
10      crime scene reconstructionist?
11 A   Not at the first trial, but at the second trial,
12      yes, ma'am.
13 Q   Okay. And did -- so I'm assuming -- well, let me
14      just ask you, who brought up the subject?
15 A   Mr. Carnes.
16 Q   Mr. Carnes. And what exactly -- how did that
17      come about? How did it come about that he asked
18      you about that?
19 A   He -- in the jail he had been reading. Some
20      people had talked to him about it and indicated
21      to him that there may be the possibility of
22      finding somebody who could reconstruct the crime
23      scene.
24 Q   Okay. And did you -- what conversations did you

*(handwritten, right margin: 188)*
*(handwritten: Claim)*



*(handwritten: Lie opinion vs. fact)*

**Page 70**

1      have with him about that?
2 A   I explained to Mr. Carnes that based on what had
3      happened at that scene, the fact that the scene
4      had been contaminated, the fact that no one had
5      come out and actually observed and cordoned off
6      that crime scene at the time, that it would be
7      difficult to find somebody who could reconstruct
8      that crime scene.
9 Q   Okay. And at some point did you have contact
10      with Mr. Gary Rini?
11 A   Yes. Mr. Carnes' family hired Mr. Rini.
12 Q   Okay. And who is Mr. Rini?
13 A   Hold on just a minute. I have his CV.
14      Mr. Rini was a forensic science consultant
15      out of Cleveland, Ohio.
16 Q   Okay. And when -- how is it that you came to
17      have contact with Mr. Rini?
18 A   He called me on the phone as a result of
19      Mr. Carnes' family telling him to call me.
20 Q   Okay. And at that time when he called you, had
21      anybody retained him to work on this case?
22 A   I don't know, ma'am. I didn't retain him.
23 Q   Okay. You didn't retain him yourself?
24 A   No, I didn't.
25 Q   Okay. And when in the course of the case was it

**Page 71**

1      that you had this initial contact with Mr. Rini?
2 A   I initially talked to Mr. Rini before the second
3      trial. No, that may be wrong. Hold on just a
4      minute, ma'am.
5      No, I did not talk to Mr. Rini until after
6      the second trial. The second trial was, I
7      believe, in November of '05. I didn't receive
8      any contact from Mr. Rini until, like, January of
9      '06, and then I contacted -- he contacted me
10      again in February of '06. So I didn't know about
11      him until after the trial was over with.
12 Q   Okay. And do you know when it was that
13      Mr. Carnes' family retained Mr. Rini?
14 A   Again, ma'am, I had no personal knowledge of that
15      because they did that without consulting me.
16 Q   Okay. So you're not the person who retained him,
17      it was all Mr. Carnes and his family?
18 A   Correct.
19 Q   And do you know who actually paid his fees?
20 A   It would be hearsay. I got a letter from a lady
21      named Tanille Benton, who was Mr. Carnes'
22      girlfriend at the time, and she indicated to me
23      that she had paid him. But I don't know for a
24      fact.
25 Q   Okay. But it wasn't you?

EX. C

(12)

But you're only focusing, ma'am, on the one part of the crime scene because the crime scene actually was in two to three different locations. The first shot occurred -- supposedly occurred either on the corner of 29th and Wabash or 29th and Olive. So there's a crime scene there.

There's also the fact that on the corner of 29th and Wabash, there was a house with a fence there, and there were shell casings found there on the porch and in the yard area of that house. There was shell casings found there. Okay.

And there was a witness, the lady who lived in that house, who came to court to testify that she heard shooting from -- in her yard and she actually called the police to point out to them where certain shell casings were located in her front yard and on her porch. That would have been consistent with the testimony of both Ms. Morrow and Ms. Lockett that the first shots had occurred on that corner area.

So you got two different crime scenes. Mr. Rini was only testifying about the scene at the Fish Town. He had no testimony about the original crime scene down at the house. So, you know, a matter of trial strategy I decided, well,

76

---

to testify about part of it anyway.

Q  Okay. And let me just ask you about that then.
     Did the fact that there were those shell casings found in the lady's front yard at 29th and Wabash, did that somehow play into your defense that the testimony of Wendy Lockett and Lorianne Morrow was inconsistent with the physical evidence?

A  Well, yes and no, because the physical evidence was that this guy had -- I mean, the facts that were presented was that Mr. White had been shot at on the corner of 29th and Wabash, that he was hit there, and then took off running and was shot at again.

     Those shell casings there would indicate, yes, that shooting -- someone was shooting at him there. Lorianne Morrow was stating that she wasn't standing right there, and Wendy Lockett was supposedly standing up the street. So neither one of them would have been able to testify that Mr. Carnes was the person shooting right there at the corner.

     So we went with that, that they couldn't place him there. As the -- Mr. White goes

77

---



---

through the field and runs up toward the Fish Town, that's when Lorianne Morrow and Wendy Lockett both say that they observed Mr. Carnes either chasing after him or running after him and shooting.

So what we're trying to establish was, no, that didn't happen because there was a -- as I told you earlier, there was a witness that we called who indicated that she was standing on the corner of 29th and Wabash when the shooting took place and that she knew Mr. Carnes and that he was not the person who was doing the shooting at that corner.

Q  Okay. All right. I'm going to move on to another topic, which has to do with not calling a Margo Thomas to testify for the defense. Do you recall in reviewing the discovery, that there was a police report pertaining to a Margo Thomas?

A  Right. And -- yes, yes. The answer is yes.

Q  Do you recall what she told the police essentially?

A  Hold on just a minute and I'll tell you.
     Margo Thomas was stating that she saw a man carrying a long-barrel, assault rifle with a pistol-type grip. The male walked north toward

78

---

the alleyway and that she observed the person shooting at the alleged victim, that she saw a medium to heavyset, short, black man jump a fence at the house on the corner of 29th and Wabash and begin shooting. She was not able to say whether the man she saw jumping the fence earlier was Mr. Carnes.

Q  Okay. So did Mr. Carnes express to you any concern or desire to call Margo Thomas to testify at his trial?

A  Well, we talked about calling Margo, but there's -- there were a couple of problems.
     Number one, Margo was hard to locate.
     But, number two, if Margo testified consistent with what she put in her police statement, then that would validate the fact that the shooting took -- well, the initial shooting took place right there in front of that house on 29th and Wabash because she said she saw somebody jump the fence of that yard, and that's the same yard where those shells were found. So I'm -- calling Margo would defeat the purpose.

Q  Okay. And did you try to locate Margo Thomas before either one of the trials?

A  I tried to locate Margo. In fact, I knew Margo

79

---

(13)

190

STATE OF MISSOURI,                    )
                                      )
            Respondent,               )
                                      )        
      vs.                             )        Appeal No. WD 67426
                                      )
KEITH L. CARNES,                      )
                                      )
            Appellant.                )

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
SIXTEENTH JUDICIAL CIRCUIT
Honorable Gene R. Martin, Senior Judge

STATE OF MISSOURI,            )
                              )
            Plaintiff,        )
                              )        Case No. 16CR03006321
      vs.                     )
                              )
KEITH L. CARNES,              )
                              )
            Defendant.        )

TRANSCRIPT ON APPEAL
VOLUME I OF I
Pages 1 thru 572

FOR THE PLAINTIFF:                    FOR THE DEFENDANT:

   Ms. Dawn M. Parsons and               Mr. Willis L. Toney
   Mr. Brady X. Twenter                  Attorney at Law
   Asst. Prosecuting Attorneys           1100 Main Street
   Floor 7M                              Suite 1600
   Jackson County Courthouse             Kansas City, Missouri 64105
   415 East 12th Street
   Kansas City, Missouri 64106
                        (14)

JIM BOUCK, CCR, CSR, PSSC, CVR-CM-RVR
Official Reporter, Circuit Court of Jackson County, Missouri

1 that the prosecutors will get the officers that I
2 requested -- the additional police officers I
3 -- requested.
4 　　　　MS. PARSONS: I didn't say that I would
5 do that. Generally the way it works when the
6 defendant would like police to testify, they
7 serve subpoenas to the police department and then
8 they come. I'm not going to run around and try
9 to get eight more witnesses on line for a trial
10 today. I can give him Lisa Morris's phone
11 number. Mr. Toney knows how to get ahold of
12 police officers, he knows how to subpoena them.
13 We will try our best, but I've got the burden and
14 I've got my own witnesses. I'm not going to run
15 around for the defendant and get his police
16 witnesses.
17 　　　　MR. TONEY: I didn't ask the State to
18 run around and get the witnesses, Your Honor. If
19 they're not going to do that, we know how to go
20 through it. We'll go through the police
21 department and we'll serve them with subpoenas.
22 When we tried to contact them to ask if the
23 officers were going to be here, the response I
24 got was, "Ask the prosecutor." So we'll do it
25 the other way.

1 the State tells me that they can't find them, we
2 can go through their chain of command to make
3 sure that they appear.
4 　　　　THE COURT: How many are you talking
5 about, numberwise?
6 　　　　MS. PARSONS: Seven.
7 　　　　MR. TONEY: Seven.
8 　　　　THE COURT: Okay. Well, with that, are
9 you ready to proceed?
10 　　　　MR. TONEY: The defense is ready, Your
11 Honor.
12 　　　　THE COURT: Is the State ready?
13 　　　　MS. PARSONS: We are ready. I filed an
14 amended information, and I need to prove him up
15 again.
16 　　　　THE COURT: Oh, yes. I want to make a
17 record on that.
18 　　　　Mr. Toney, the State filed a motion for
19 leave to file a second amended information on
20 August 19 of this year and attached a copy of the
21 proposed second amended information. As I
22 understand, basically, the only real change there
23 is that they've added the language that he was
24 acting in concert with others, and that's the
25 only thing.

1 　　　　THE COURT: Well, as I indicated
2 earlier here, I'm not going to be able to be here
3 tomorrow morning and we'll have to resume this
4 trial tomorrow afternoon. So that will give you
5 the morning to do what you need to do in order to
6 get those individuals here for your part of the
7 case.
8 　　　　MR. TONEY: Correct.
9 　　　　THE COURT: And that may be workable.
10 　　　　THE DEFENDANT: Excuse me, Your Honor.
11 I was under the impression that I would be able
12 to -- because I filed a lot of my own motions. I
13 sent them to the courts, sent them to the
14 lawyers, sent them to the prosecutor. I sent a
15 motion asking for the subpoenas almost two months
16 ago, so it's not like this is a surprise. I've
17 already requested these motions, and they are
18 certified and notarized. I thought I was doing
19 everything the way it was supposed to be done.
20 I've filed a lot of motions, over 15, and I've
21 never had a hearing on one of them. So these are
22 things that could help me and my defense. So I
23 would just like to --
24 　　　　MR. TONEY: Your Honor, I mean, I know
25 how to get those additional police officers. If

1 　　　　MR. TONEY: I've reviewed that and I
2 believe that they filed that as a result of the
3 evidence that came in at the last trial. So I
4 believe that there will be evidence that there
5 was another individual at the scene by the name
6 of Gary Kitchen, and I believe that's why they
7 filed that. As far as we're concerned, it
8 doesn't change their burden of proof, so it
9 doesn't affect us in any way.
10 　　　　THE COURT: Right. And as I understand
11 it, you've had notice of this since last August,
12 at any rate?
13 　　　　MR. TONEY: Correct.
14 　　　　THE COURT: So I've signed an order
15 granting leave to file that, and it's been filed
16 as of today. So I just wanted you to be aware of
17 that change and that we're trying it on the
18 second amended information.
19 　　　　THE DEFENDANT: Your Honor, I would
20 like to know, if possible -- I've been reading a
21 lot, trying to figure out as much as I can
22 towards this issue, but am I allowed to ask for a
23 reconstructionist of the crime scene?
24 　　　　THE COURT: You'll have to deal with
25 that with your attorney, as to what he wants to

(15)




EXHIBIT
(b)

1  present in the way of evidence in your defense.
2  I'm not here to --
3      THE DEFENDANT:  Well, this is something
4  that we both know that I want, and I figured that
5  if I asked you that you have the final say-so on
6  a reconstructionist of the crime scene.
7      THE COURT:  We'll deal with that when
8  it's offered, because I don't know what you've
9  got or anything else.  It's a matter of evidence
10  and I can't prejudge it at this time.
11      MR. TONEY:  Your Honor, I want to make
12  the record clear.  I've explained to Mr. Carnes
13  that there is no such thing in this type of case
14  as a reconstructionist of the crime scene.  There
15  are crime scene technicians who will testify as
16  to what they found when they went out, as to
17  where they found different items.  Those people
18  are going to be called as witnesses -- I assume
19  that they will be -- by the State.  If not, we'll
20  call them for the defense.  I have tried to
21  explain to him that you can't reconstruct a
22  murder scene in the fashion where you have
23  someone come out and say, "Well, this happened at
24  this time and this happened at that time,"
25  because that's just not something that we can do.

1  We can have the people who were out there and
2  investigated it come and testify as to what they
3  found, and we intend to do that.
4      THE COURT:  All right.  That said, are
5  we ready to proceed?
6      MS. PARSONS:  Yes.  I would like to
7  proceed, first, with proving the defendant up.
8  I'll just go ahead and do that.
9      On or about June 22nd, 1998, the
10  defendant pleaded guilty to the felony of robbery
11  in the first degree in Case Number CR97-08010 in
12  Division 14 of the Circuit Court of Jackson
13  County.  He is a prior offender under Section
14  558.016.  I tender to the Court State's Exhibit
15  2, which is a multiple-page document showing the
16  defendant Keith Carnes.  There was an Alford plea
17  in Division 14, and then ultimately the probation
18  wound up in Division 6.  So I tender to the Court
19  State's Exhibit Number 2, although it is just a
20  bench trial and I'm not even sure what the actual
21  effect would be.
22      MR. TONEY:  Your Honor, we have seen
23  that document.  My understanding of proving him
24  as a prior offender was to take sentencing away
25  from the jury.  There is no jury, so there is no

1  sentencing to take away from the jury.
2      MS. PARSONS:  As I was doing that, the
3  lightbulb went on and I just went into my normal
4  routine, and there you have it.
5      THE COURT:  All right.  I'll take it
6  under advisement.  I want to look it over.  There
7  is really no urgency in making a ruling on that
8  right now.  I usually make detailed findings on
9  it.  So I will do that, since you have tendered
10  Exhibit Number 2 in connection with your charge
11  that he is a prior offender.
12      MS. PARSONS:  I have another question.
13  At the last trial -- I don't know if you did, but
14  we had several motions in limine.  Now, I
15  understand that with a bench trial you can
16  separate the wheat from the chaff, so I don't
17  know if we want to go through all of the motions
18  in limine or just take them up as they come
19  along.
20      THE COURT:  I would prefer that we take
21  them up as they come along.  Are these your
22  motions or his motions, or both of your motions?
23      MS. PARSONS:  Well, I know that he has
24  one issue and we have three issues, but just the
25  nature of a bench trial is such that you're going

1  to hear it anyway.  So I'm not going to bring
2  them up now.  I'm going to bring them up as they
3  come in, unless you would like to do it
4  differently.
5      MR. TONEY:  That's the way I intended
6  to do it.
7      THE COURT:  Very well.
8      THE DEFENDANT:  Excuse me one more time
9  before I finish.  I would like to know, is it
10  possible before this even goes any further that
11  we could have an evidentiary trial to see if
12  there is enough to even take it to trial?
13      THE COURT:  No, no.
14      MR. TONEY:  Your Honor, I tried to
15  explain to Mr. Carnes that when the State indicts
16  you do not get a preliminary hearing.  What he is
17  asking for would be a preliminary hearing.
18  Because they went for an indictment, you don't
19  get a preliminary hearing.  I've explained that
20  to him.  I want the record to be clear that I
21  have done my job as his lawyer and explained to
22  him that an indictment eliminates your getting a
23  preliminary hearing, and so you don't get one in
24  this situation.
25      THE COURT:  Basically, the grand jury

(16)

MOTION TO CONTINUE SENTENCING

The hearing was had on Friday, February 10th, 2006, before the Honorable GENE R. MARTIN, Senior Judge, sitting in Division 70 of the Circuit Court of Jackson County, Missouri, at Kansas City, and the proceedings hereinafter set forth were had and entered of record.

The Plaintiff was represented by Ms. Dawn Parsons and Mr. Brady Twenter, Assistant Prosecuting Attorneys, Floor 7M, Jackson County Courthouse, 415 East 12th Street, Kansas City, Missouri 64106.

The Defendant was present in person and represented by Mr. Willis Toney, Attorney at Law, 1100 Main Street, Suite 1600, Kansas City, Missouri 64105.

The following proceedings were had:

THE COURT: The case before the Court this afternoon is numbered 16CR03006321-02. It is entitled State of Missouri versus Keith L. Carnes.

The record should reflect that the State is appearing by assistant prosecuting

by the defendant's attorney requesting additional time, suggesting a 30-day time period. In addition to the motion filed by counsel for the defendant, on February 9, the defendant filed a pro se motion for time extension/sentencing, is the way it is denominated, and, in addition, on February 7 of this year, he filed a pro se motion to review fact-finding, review exculpatory evidence, suppress findings of guilt.

On that same date, February 7 of 2006, he filed, pro se, a supplement to motion to suppress finding of guilt, together with various attachments referred to in that document.

The Court also has before it what purports to be a letter from the defendant to the presiding judge of this court, J.D. Williamson, which is dated December 22 of 2005, and it's addressed to whom it may concern. It also has some documents attached to it.

So I guess the first matter to be taken up at this time is the motions for continuance of this post-trial hearing on defendant's motion for new trial.

Mr. Toney, are you prepared to explain to the Court the need and request for this

EX. E

attorneys Dawn Parsons and Brady X. Twenter, and defendant is here in person and represented by his attorney, Mr. Willis Toney.

This matter was previously before the Court on November 7th of 2005 for trial, at which time the defendant waived trial by jury and the case proceeded as a bench trial before this judge. The evidence was presented on several different days and ultimately concluded on November the 14th of 2005.

The Court then took the matter under advisement and, on November the 22nd, made its finding that the defendant was guilty of the charge of murder in the first degree.

At that time, the Court granted the defendant 10 additional days in which to file post-trial motions and ordered a presentence report. The Court then continued the matter to Friday, January 10th of 2006, at 1:30 p.m., for further proceedings.

At that time, the defendant filed a motion for continuance, which was granted, and the matter was continued until this date for further proceedings.

The Court now has another motion filed

continuance at this time?

MR. TONEY: Yes, sir. May it please the Court?

THE COURT: Yes, sir.

MR. TONEY: Your Honor, on January the 10th, this matter was originally set for sentencing. We had an in-chambers conference and I expressed to the Court that my client wanted to retain a forensic expert to analyze the crime scene and to do crime scene reconstruction. I also explained to the Court at that time that the problem had been locating a person who was willing to do that and coming up with the necessary funds to retain that person to do that, and that we were making all diligent efforts to get that done.

Right after that hearing, contact was made with a Mr. Gary A. Rini, R-I-N-I, who is out of Cleveland, Ohio, to do this reconstruction and to be able to testify and present evidence at the defendant's motion for new trial hearing.

My client's family has, to the best of my knowledge, paid a retainer to this Mr. Rini to do the investigation. I personally spoke with Mr. Rini two or three days ago and we went over

(17)



MR. TONEY: Yes.

THE COURT: And also to compensate him for his --

MR. TONEY: Time to travel, expenses?

THE COURT: (Continuing) -- time and travel and expenses while he comes here to testify, or is this witness going to be asking for more money at that time?

MR. TONEY: My understanding was -- he sent me a copy of the contract and it indicated that he needed a certain amount, and that amount included preparing the report and testifying and everything. It was like, "This is how much I need. Flat amount, this is what I need."

THE COURT: Well, you know, I have a great deal of reluctance in continuing the matter and continuing the matter over and over again after the trial has already been concluded and the evidence was presented, and unless there is something in this expert's findings and testimony that reveals newly discovered evidence that was not discoverable, it's going to be pretty difficult for him to convince me that you and your client and he are doing anything more than reopening the case to present additional



515

evidence --

MR. TONEY: I understand that, Your Honor.

THE COURT: (Continuing) -- which could have been and should have been presented at that time, and if it was not available at that time, then the request for continuance should have been made before trial started in order to get this evidence, which was not done, for whatever reason, until after the trial was over with and you got a bad result and now the defendant, the family, and so forth wants to basically reopen the case.

MR. TONEY: Your Honor, I'm not trying to reopen the case, and I would never stand in front of the Court and ask for a frivolous continuance. You know that's not my nature. I wouldn't do that. I honestly believe that this is in the best interest of my client and I do not see where 30 days is going to hurt anybody, and we would know when we walk out today that there will be no other times if we don't have this in. Also, I know if he doesn't give me anything that presents newly discovered evidence I wouldn't be able to call him anyway, or I could call him but

it wouldn't change anything.

THE COURT: How do we know he would be available 30 days from now? He might say, "Oh, I've already got a commitment in New York or San Francisco."

MR. TONEY: Because I specifically told him that I would probably not be allowed more than 30 days and asked him if he would be available 30 days from now, and he told me he would be, and I knew that 30 days from now was actually March the 10th. So I asked if he would be available and he told me he would be available.

THE COURT: Ms. Parsons, I know you're objecting to this continuance, vigorously in opposition to it.

MS. PARSONS: I am. Actually, a crime scene expert is going to give you an opinion. That's not newly discovered evidence. That's just somebody else's opinion.

THE COURT: I understand.

MS. PARSONS: So, yes, I do oppose it.

THE COURT: Well, I'm going to grant it. I want to give this individual every opportunity I can to present whatever he has for

517

the Court's consideration, but there are certain rules that we must be guided by and I'm really going to be looking for any newly discovered evidence that was not discoverable during the course of the trial.

So, anyway, the matter will be continued at defendant's request until March 10 at 1:30.

THE DEFENDANT: Thank you, Your Honor.

MR. TONEY: Thank you.

THE COURT: That's all.

(Whereupon, the matter having been concluded, the Court adjourned.)

- - - - - -

SENTENCING

The hearing was had on Friday, March 10th, 2006, before the Honorable GENE R. MARTIN, Senior Judge, sitting in Division 70 of the Circuit Court of Jackson County, Missouri, at Kansas City, and the proceedings hereinafter set forth were had and entered of record.

The Plaintiff was represented by Ms. Dawn Parsons and Mr. Brady Twenter, Assistant Prosecuting Attorneys, Floor 7M, Jackson County Courthouse, 415 East 12th Street, Kansas City,

(19)



Trial
TWO   Dr. Gill


196

...script of the **Testimony of**

**Date:** April 20, 2005
**Volume:**

Case: STATE OF MISSOURI v. KEITH L. CARNES

Printed On: 7/26/2005

Patricia A. Manners
Phone: 816.881.3711
Fax:
Email: patmanners@comcast.net
Internet:

(20)



1    forth, and so you don't see anything underneath.

2  → But we looked at the clothing and that's a very

3    important part of our examination, and we don't see

4    any evidence of these materials deposited on the

5    clothing surrounding the entrance wounds.

6  Q.  So does that lead you to the conclusion that these

7      shots came from a distance?

8  A.  That is correct.

9  Q.  Now is there anything that would indicate that

10     someone stood over this man with a gun and shot him?

11     Right over him two or three feet, right over and

12     shot him, anything to indicate that?

13  A.  It seems inconsistent unless he was extremely tall.

14     No.   I'm only 5 08" or 5 09"

15  Q.  Now showing you what's been marked as State's

16     Exhibit No. 35, in our conversation about this case

17     we talked about what would happen if a person was

18     shot from a very close range with that type of gun,

19     correct?

20  A.  Yes.

21  Q.  What would you expect to find if the person was shot

22     with someone standing right over them with that kind

23     of gun?

24  A.  Well, in close proximity and particularly in a

25     contact or near contact or partial contact wound,

1    there's an _additional_ wound particularly like on the

2    head where you have a curved surface.  You'll get

3    radiating tears at the entrance wound because of the

4    gas effect.  In other words, a lot of gas is

5    injected into the entrance wound when the muzzle

6    isn't very far away from the surface of the skin.

7    Again, we don't see anything like that in these

8    wounds, so we don't see any of that feature, either,

9    in this case.

10   Q.   So based upon your experience and within a

11        reasonable degree of medical certainty, would you

12        conclude that this person was not shot from someone

13        standing right over him?

14   A.   Well, like I say, unless they can get two and a half

15        to three feet away, with a weapon that size, with

16        that long barrel and everything, no.

17   Q.   Also you said there were three shots that entered

18        the body and one that grazed, correct?

19   A.   Yes.

20   Q.   And two of those shots came from the back, correct,

21        when the person was shot in a backward direction?

22   A.   That's correct.

23   Q.   Again not consistent with someone laying on the

24        ground and someone standing over him shooting,

25        correct?

EX H

1   A.  Yeah, I guess.

2   Q.  Okay.  Now, the shot to the head which you say was

3       the cause of death here--

4   A.  Yes.

5   Q.  --do you have any medical evidence that would

6       support the statement that someone stood over him

7       and shot him in the head?  Is there any medical

8       evidence to support that?

9   A.  None.

10   Q.  Thank you.

11           MR. TONEY:  I have no other questions,

12       Your Honor.

13           MR. TWENTER:  State just has one question.

14                REDIRECT EXAMINATION

15   BY MR. TWENTER:

16   Q.  Doctor, when you say it was a distant shot, that

17       means farther than two and a half to three feet

18       away?

19   A.  Yes.

20   Q.  Not necessarily 20 feet away?

21   A.  Yeah.  I have no way of knowing beyond that.  As I

22       say, there's no indication, so we just really can't.

23   Q.  So it could be said there is some medical evidence

24       to support that somebody two and a half feet away

25       could have fired the shot?

03fe70a2-26b4-4f9b-b11d-14342504d806





# Trial "3" Testimony
## of
# Lorianne Morrow

(24)

1 Q All right. So you're saying this guy not only ran
2   towards the people shooting at him, but he runs
3   around a house and back in the same direction? Is
4   that what you're saying?
5 A Right. He could have been high, I don't know.
6 Q He could have been high. Okay. And you did say
7   he was out there selling drugs, right?
8 A Right.
9 Q And did you know him to be a drug user?
10 A I know him to smoke PCP.
11 Q Okay. So you think he could have been high?
12 A Yeah.
13 Q Okay. So then you say you see Kiki and Mr. Carnes
14   running after this guy?
15 A Yes.
16 Q And then he goes up 29th Street, is that right?
17 A Yes.
18 Q All right. Where do you go?
19 A By the church.
20 Q You go up this way. Did you go through the lot?
21 A The parking lot of the church.
22 Q Well, how did you get to the parking lot of the
23   church? You're starting down here. Did you go up
24   29th Street to get to the parking lot up here or
25   do you go up Wabash?

---

1 A I go up 29th Street to get to the parking lot.
2 Q So you go straight up 29th Street?
3 A Right, and cut over.
4 Q All right. So where is Larry?
5 A Where is Larry? At this time, at the Fish Town.
6 Q So Larry always was on 29th Street, is that
7   correct? Is that correct, ma'am?
8 A Is that correct? Yes.
9 Q So he ran straight up 29th Street? I want to make
10   sure that I'm right on this.
11 A After he came through the alley, straight up
12   29th.
13 Q Straight up 29th Street. So he never was in this
14   lot over here?
15 A No.
16 Q Okay. You're positive about that?
17 A Yes.
18 Q All right. So after Larry got off 29th Street,
19   you say he gets in the Fish Town parking lot?
20 A Right.
21 Q When he gets to the Fish Town parking lot, who is
22   behind him?
23 A Keith is.
24 Q Okay. Where is Kiki?
25 A He's not there. He never did follow them all the

---

1   way up there.
2 Q All right. So when he gets to that parking lot,
3   what happens?
4 A He starts shooting him some more. He turned the
5   boy over.
6 Q Does he fall?
7 A Did Larry fall? Yeah.
8 Q And where are you at?
9 A You can see it. You have to be in that area to
10   know what's going on.
11 Q Here's the church.
12 A Right.
13 Q So you're over here by the church?
14 A Right.
15 Q Okay. So you go up 29th Street, cut behind this
16   building, and go into the parking lot?
17 A Right.
18 Q And you're saying Larry goes straight, correct?
19 A Right.
20 Q All right. And we know that his body is found
21   right here.
22 A Right.
23 Q So you're standing back over here?
24 A Right.
25 Q And you're saying you're looking from beside the



---

1   church across here?
2 A Yes.
3 Q All right. Now, as Larry runs up there, did he
4   fall down?
5 A He falls down.
6 Q All right. And you're saying that at that point
7   Mr. Carnes goes over --
8 A Yes.
9 Q Does he bend over, bend over him?
10 A He rolls him over.
11 Q How does he roll him over, ma'am?
12 A He bent over.
13 Q He bent over. Okay. And where is his gun when he
14   does this?
15 A I couldn't see the gun anymore in his hand, but
16   he rolled him over.
17 Q How did he roll him over, ma'am? I mean, there's
18   got to be a way to roll him over. Stand up and
19   show me how he rolled him over.
20 A He rolled him over. I didn't see his gun no
21   more. He rolled him over like this (Indicating),
22   turned around and shot him some more. I know
23   what I saw.
24 Q So he rolled him over -- put the gun down so he
25   could roll him over? Is that what he's doing?

EX. I



1  A  He had a big gun in his hand, sir.
2  Q  Okay. But, ma'am, to roll over this guy's body,
3     he's got to do something. So does he put the gun
4     down?
5  A  Yes.
6  Q  He puts the gun down?
7  A  I didn't see the gun in his hand no more.
8  Q  So he puts the gun down, rolls him over, and then
9     does he pick the gun back up?
10 A  And shoots him some more.
11 Q  You saw this?
12 A  Yes.
13 Q  Okay. Now, ma'am, do you remember testifying at
14    this court hearing before? Do you remember coming
15    here?
16 A  I said he shot him some more.
17 Q  Now, when he turned him over, how many times did
18    you say he shot him?
19 A  Maybe about five, six more times.
20 Q  Five or six more times?
21 A  Right.
22 Q  All right. From point-blank range?
23 A  Yes.
24 Q  Okay. So he puts the gun down, rolls the body
25    over, picks the gun back up, and shoots him five



1     yard?
2  A  Yes.
3  Q  You did? Remember, ma'am, you promised to tell
4     the truth.
5  A  Wait a minute. Repeat that again, please,
6     because you're saying so many different things.
7  Q  All right. Well, I don't want to confuse you; I
8     just want to get the truth. 2846 Wabash, the
9     house on the corner --
10 A  That's that green house.
11 Q  Right. Did you see him in that yard?
12 A  I seen him around that way.
13 Q  Now, wait a minute, you just said a few minutes
14    ago you saw him --
15 A  On the porch.
16 Q  You saw him on the porch?
17 A  The shell casings and all of this stuff was on
18    the porch.
19 Q  Who told you the shell casings were on the porch?
20 A  Didn't nobody tell me anything. I was there.
21 Q  How do you know the shell casings were on the
22    porch, ma'am?
23 A  I seen him shoot from the porch.
24 Q  Who told you the shell casings were on the porch,
25    ma'am?

1     times?
2  A  Right, which was senseless.
3  Q  Okay. So if he shot him that close five times --
4     that's what you're saying, five times?
5  A  He shot him five more times. There was five more
6     shots fired.
7  Q  Five more shots fired from right up over him,
8     correct?
9  A  Yes.
10 Q  You're positive about that?
11        Yes, ma'am? Are you or not?
12 A  I'm positive about that.
13 Q  Okay. And after he reaches down, turns him over,
14    and shoots him five times, what does he do then?
15 A  He took off.
16 Q  What did you do?
17 A  I took off, too. If someone sees somebody kill
18    somebody, do you think they're going to try to
19    hurt them too? Come on, now.
20 Q  Did you ever see Mr. Carnes in the yard at 2846?
21 A  Have I ever seen him there before?
22 Q  That night, did you see him in that yard?
23 A  I seen him on the balcony porch.
24 Q  No, not the building here. At 2846 Wabash is a
25    house on the corner. Did you see him in that

1  A  I seen him shoot from the porch. I know what I
2     seen. A man is dead, it's not a game anymore.
3        MR. TONEY: Your Honor, I would like to
4     refer to the trial transcript from the first
5     trial, page 39.
6        Have you got that, Ms. Parsons, page
7     39?
8        Do you have it now?
9        MS. PARSONS: Uh-huh.
10 Q  (By Mr. Toney) Ms. Morrow, do you remember being
11    asked the question, "You didn't see Mr. Carnes
12    jump that fence, did you?" Do you remember being
13    asked a question like that?
14 A  I don't remember.
15 Q  Can you read and write the English language?
16 A  Can I read and write English? Yes, I can.
17 Q  Okay. I want to show you a certified copy of your
18    testimony from the first trial that we had, and
19    the question that was asked to you was, "Okay.
20    And, in fact, that front yard has a fence around
21    it, doesn't it?"
22        What is your answer, line 5?
23 A  "Yes."
24 Q  Read the whole line, please.
25 A  "Yes, it has a fence around it."





Trial "3" Testimony
of

WENDY LOCKETT



| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | And is he running through the lot? |
| 3 | A | Yeah, he come through the lot. |
| 4 | Q | Okay. Through the church parking lot? |
| 5 | A | Yes. |
| 6 | Q | The same direction that you had been going? |
| 7 | A | Not the same direction. |
| 8 | Q | Which way is he coming from? |
| 9 | A | I don't know exactly which direction he was |
| 10 | | coming from, but I know he had to be coming from |
| 11 | | downward, because I'm at a slant. I'm going |
| 12 | | through it at a slant and he's coming kind of |
| 13 | | like in a little dip and straight. |
| 14 | Q | All right. And when you see him, is anybody |
| 15 | | chasing him? |
| 16 | A | At that point, no, at least I didn't see nobody. |
| 17 | Q | And then you said you saw him stumble into the |
| 18 | | Fish Town parking lot? |
| 19 | A | Yeah. He was not running at that point. He was |
| 20 | | more so, like, stumbling. |
| 21 | Q | Did you see anybody behind him? |
| 22 | A | At that point, no. |
| 23 | Q | And when you say you saw him fall on the ground, |
| 24 | | then do you see anybody? |
| 25 | A | That's when I see two figures. Who they were, I |

| | | |
|---|---|---|
| 1 | | don't know. |
| 2 | Q | At that point, you can't tell us who they were? |
| 3 | A | No, sir. |
| 4 | Q | Just two figures. Were these figures in black? |
| 5 | | Were they dressed in black? |
| 6 | A | Dark clothing. |
| 7 | Q | Dark clothes. You can't tell us whether they were |
| 8 | | black clothes, just dark clothes? |
| 9 | A | Yeah. I would say the hooded outfit was black. |
| 10 | | I would say that for sure. |
| 11 | Q | And then you said you saw Mr. White hit the |
| 12 | | ground? |
| 13 | A | Yes. |
| 14 | Q | And then you saw the two people go over to him, is |
| 15 | | that correct? |
| 16 | A | Yes. |
| 17 | Q | Did you observe anybody place a gun down on the |
| 18 | | ground? |
| 19 | A | No, sir. |
| 20 | Q | Did you observe anyone take an assault rifle and |
| 21 | | place it down on the ground? |
| 22 | A | No, sir. |
| 23 | Q | Okay. Did you observe anyone reach down and roll |
| 24 | | Mr. White over? |
| 25 | A | No, sir. |

$(28)$

| | | |
|---|---|---|
| 1 | Q | Okay. And you indicated that you saw a figure |
| 2 | | fire a shot, is that correct? |
| 3 | A | Correct. |
| 4 | Q | One shot? |
| 5 | A | One. |
| 6 | Q | Okay. You did not hear five shots go off? |
| 7 | A | No, sir. |
| 8 | Q | Just one shot? |
| 9 | A | Just one. |
| 10 | Q | And you indicated that that shot was from, what, |
| 11 | | standing right over him or back a ways? Which one |
| 12 | | was it? |
| 13 | A | Standing up on him. |
| 14 | Q | And one shot? |
| 15 | A | Uh-huh. |
| 16 | Q | You indicated that at that point you couldn't tell |
| 17 | | who was doing the shooting, correct? |
| 18 | A | No, I couldn't. |
| 19 | Q | And that you couldn't determine who was doing that |
| 20 | | shooting until the person turned around, is that |
| 21 | | correct? |
| 22 | A | Exactly. |
| 23 | Q | Now, I want to show you what's been marked as |
| 24 | | State's Exhibit Number 3. This depicts the area |
| 25 | | that we're talking about, is that correct? |

EX. J

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | All right. Now, this is the church parking lot |
| 3 | | here, is that correct? |
| 4 | A | Correct. |
| 5 | Q | Would you tell the Court where you were standing |
| 6 | | at when you say you observed -- |
| 7 | A | When I observed, right there (Indicating). |
| 8 | Q | You were standing at the end back here? |
| 9 | A | This area, yes. |
| 10 | Q | Okay. Could you take this pen and put your |
| 11 | | initials, if you can reach it -- I'll have to move |
| 12 | | it for you. Put your initials on the church |
| 13 | | parking lot -- |
| 14 | A | Where I was standing? |
| 15 | Q | (Continuing) -- where you were standing. |
| 16 | A | (Complies.) |
| 17 | Q | So that would be on the side of the church? |
| 18 | A | It's not on the side. It's catty-corner to the |
| 19 | | church. |
| 20 | Q | In the back of the church, is that right? |
| 21 | A | Catty-corner to the church, not in back of it, |
| 22 | | not on the side of it. I'm still in the open, |
| 23 | | actually. |
| 24 | Q | Is it dark back there? |
| 25 | A | Yes and no. |

| | | |
|---|---|---|
| 1 | Q | Is there a light there? |
| 2 | A | Yes. |
| 3 | Q | Were you standing in the light? |
| 4 | A | Half and half. |
| 5 | Q | Did you see another person standing back there |
| 6 | | with you? |
| 7 | A | No, sir. There was no other person back there. |
| 8 | Q | There was no other person standing back there? |
| 9 | A | Not that I saw. |
| 10 | Q | Okay. And you're indicating that you're standing |
| 11 | | here and you're looking across this way -- |
| 12 | A | Yes. |
| 13 | Q | (Continuing) -- across Prospect over to here, and |
| 14 | | that's when you see the person turn around? |
| 15 | A | Yes. |
| 16 | Q | Okay. And can you see their face clearly? |
| 17 | A | Yes. |
| 18 | Q | Okay. And you indicated that what you saw was a |
| 19 | | patch and that's what made you believe that it was |
| 20 | | the defendant, correct? |
| 21 | A | Yes. |
| 22 | Q | And that's what you're basing your identification |
| 23 | | on, seeing the patch? |
| 24 | A | Yes. |
| 25 | Q | And you're seeing that patch from clear across -- |

| | | |
|---|---|---|
| 1 | Q | Okay. So it wasn't a long gun? |
| 2 | A | No, it wasn't a long gun. |
| 3 | Q | It wasn't a gun like this (Indicating)? |
| 4 | A | No, sir. |
| 5 | | MR. TWENTER: Could we get for the |
| 6 | | record what that is? |
| 7 | | MR. TONEY: I'm sorry, this would be |
| 8 | | State's Exhibit Number 58. |
| 9 | Q | (By Mr. Toney) It wasn't a long gun like State's |
| 10 | | Exhibit 58? |
| 11 | A | No, sir. |
| 12 | | THE COURT: I might add that 58 has |
| 13 | | never been identified. It's not in evidence. I |
| 14 | | don't know where it came from and I have no idea |
| 15 | | what you're talking about. |
| 16 | | MR. TONEY: I understand, Your Honor. |
| 17 | | THE WITNESS: Excuse me? |
| 18 | | MR. TONEY: I was responding to the |
| 19 | | Judge's question. |
| 20 | Q | (By Mr. Toney) Now, I just showed you State's |
| 21 | | Exhibit Number 58, which is a long rifle-type |
| 22 | | gun. Did you look at that gun? |
| 23 | A | Yes, I looked at it. |
| 24 | Q | And the gun that you say you saw wasn't like that, |
| 25 | | is that correct? |



EX. J

231

| | | |
|---|---|---|
| 1 | A | It's not a far distance at all. The distance was |
| 2 | | very close, actually. |
| 3 | Q | And it's nighttime? |
| 4 | A | Yes, that's correct, and there is a light right |
| 5 | | up under the defendant as well. Right up under |
| 6 | | Larry where he fell down at. There is a bright |
| 7 | | light. That parking lot is brightly lit, period. |
| 8 | Q | Okay. Now, I want to call your attention to -- |
| 9 | | you're indicating that you didn't see anybody |
| 10 | | chasing Larry through a lot, correct? |
| 11 | A | Correct. |
| 12 | Q | Okay. And that there was only one shot fired? |
| 13 | A | Yes. |
| 14 | Q | And there were two people out there? |
| 15 | A | Yes. |
| 16 | Q | Okay. Did you see the gun? |
| 17 | A | I seen the flash of a gun. I can't say that I |
| 18 | | actually saw a gun. I seen what appeared -- |
| 19 | Q | To be a gun? |
| 20 | A | (Continuing) -- to be a gun. |
| 21 | Q | Okay. And you can't tell me whether it was a |
| 22 | | rifle, or a pistol, or anything like that, right? |
| 23 | A | I can tell you it wasn't a rifle. |
| 24 | Q | It wasn't a rifle? |
| 25 | A | No, it wasn't a rifle. |

233

| | | |
|---|---|---|
| 1 | A | No, it wasn't. No, it wasn't. |
| 2 | Q | Okay. Do you know what a pistol looks like? |
| 3 | A | Yes. |
| 4 | Q | Okay. Was it a gun similar to a pistol? |
| 5 | A | It was similar to a pistol. |
| 6 | Q | Similar to a pistol. All right. And the person, |
| 7 | | you said, fired this gun that was similar to a |
| 8 | | pistol one time, is that correct? |
| 9 | A | Correct. |
| 10 | Q | Do you know who the other person was standing up |
| 11 | | in that parking lot? |
| 12 | A | No, sir. |
| 13 | Q | Do you know whether that person had a gun? |
| 14 | A | No, sir, I don't know. |
| 15 | Q | Now, when you're standing in the church parking |
| 16 | | lot, are you crouched down or are you standing up? |
| 17 | A | Standing up. |
| 18 | Q | Okay. And you said you look over and you see one |
| 19 | | shot being fired, correct? |
| 20 | A | Correct. |
| 21 | Q | All right. And then you take off running? |
| 22 | A | After the shot was fired and the person turned |
| 23 | | and I identified who I identified in my mind that |
| 24 | | person was, yes, I took off running. |
| 25 | Q | Okay. So you didn't look at that person for any |

(29)



Trial "3" Testimony
of
Dr. Gill (Medical Examine)

(30)

correct?

2 A Only if it's closer than two and a half to
3 three feet.
4 Q If it is closer than two and a half to three feet?
5 A Yes.
6 Q Okay. Now, let's reverse the body and have them
7 on their back; instead of in the prone position,
8 they're on their back.
9 A All right.
10 Q All right. Would you expect to see the type of
11 trajectory that you found here if the person is
12 laying on their back and the person is being shot
13 from a close angle -- close range?
14 A Well, again, if the head is turned to the side --
15 and I'll indicate that I'm turning now to
16 the left side so that this exposes the right side
17 of the head. If there is a person lying on their
18 back, they could from a certain angle -- I guess
19 it would be back here. Depending on how far it
20 was turned, you could get this kind of an angle.
21 Q Okay. Now, you and I talked about that earlier
22 and you indicated that in order to get a shot like
23 that the shooter would almost have to be crouched
24 down to shoot, instead of standing over?
25 A Yes. Because of the forward component of the

1 trajectory, it would seem like that would be the
2 case.
3 Q Right. Just so the Court is clear, if they're
4 laying on their back, from a close shot, they
5 would have to be -- what you told me earlier is
6 that they would have to be crouched down sort of
7 like this to be able to shoot and get that type of
8 trajectory?
9 A Well, again, I suppose the issue is how far would
10 their head have been turned. If they were
11 tucking their head or something like that --
12 unfortunately, the human head has got a lot of
13 mobility, but I was thinking of it, you know,
14 sort of in a very simple way, like this
15 (Indicating).
16 Q All right. Now, Doctor, do you remember telling
17 me that based on the trajectory, the way the
18 bullet traveled, the trajectory of the bullet's
19 path, and the lack of finding indications of
20 stippling or soot, that it was inconsistent with
21 the person being shot while laying on the ground?
22 A Well, it would be -- if I said that, I'm sorry.
23 I mean, it's possible, obviously, from what I've
24 just said.
25 Q I want to call your attention to the trial

1 transcript, page 27, line 9.
2 MS. PARSONS: We don't have it.
3 MR. TONEY: You don't have it?
4 MS. PARSONS: Just go ahead, we'll
5 figure it out.
6 MR. TONEY: Okay.
7 Q (By Mr. Toney) "QUESTION: Now, is there anything
8 that would indicate that someone stood over this
9 man with a gun and shot him, right over him, two
10 or three feet, right over him and shot him,
11 anything to indicate that?" What is your answer?
12 MR. TWENTER: Your Honor, objection. I
13 don't believe this is proper impeachment. The
14 question Mr. Toney asked him is not the question
15 he is being asked in that transcript.
16 THE COURT: Overruled.
17 THE WITNESS: Well, the only thing I
18 see here --
19 Q (By Mr. Toney) I would like for you first to
20 tell the Court for the record what your answer
21 was.
22 A The answer is, "It seems inconsistent, unless he
23 was extremely tall. No."
24 Q And you said, "No," correct?
25 A Right. I may not have been thinking clearly, but

1 I think the point is, I don't think there's any
2 evidence one way or the other. I think it's kind
3 of an open question. There is no evidence that
4 the person was standing over them, but it's
5 possible.
6 Q And that's what I'm trying to get at.
7 A Yeah, I agree.
8 Q To a reasonable scientific certainty, there is no
9 evidence here that the person was standing over
10 him. That's what you've told me before. Is that
11 what you're saying now?
12 A Yeah. You -- not you personally, but it would be
13 asking too much of the physical evidence to
14 make -- this is more supposition. This is
15 something that goes beyond the purview of what we
16 can find out from the autopsy.
17 Q All right. Now, we talked about what you would
18 expect to see with a high-velocity rifle shot. Do
19 you remember us having that conversation?
20 A Yes.
21 Q All right. Would you explain to the Court what
22 you would expect to see from a high-velocity shot
23 to the cranium as from, say, a pistol? What would
24 you expect to see, the difference there?
25 A Well, again, the issue of the amount of energy,

EX. K



# Limit doctor's work, prosecutor insists

**By BENITA Y. WILLIAMS**
The Kansas City Star

Jackson County Prosecutor Mike Sanders, said he wants deputy medical examiner Thomas Gill excluded from performing homicide autopsies because past incidents could jeopardize Gill's credibility.

"I respectfully request that your office make every effort to avoid the necessity of Dr. Gill's testimony in court and preclude him from making findings and issuing reports on any future autopsies per-



Sanders

formed by your office," Sanders said in a letter Tuesday to Jackson County Medical Examiner Thomas Young.

On Wednesday, Young said he had no plans to limit Gill's duties, that he was confident of Gill's abilities and that he did not think the doctor's past

*See EXAMINER, B-3*

---

# EXAMINER: Limit doctor's work, prosecutor say

**Continued from B-1**

would jeopardize prosecutions.

"If I bring into question Mr. Gill's credibility, I undermine my whole operation, not just in Jackson County but in all of western Missouri," said Young, whose office also performs autopsies for Clay, Platte and Cass counties. "I'm not going to run away, because there is nothing to run away from."

During an interview Wednesday, Sanders said the issues surrounding Gill include a driving while intoxicated charge in the 1990s, Gill's dismissal from the Indianapolis coroner's office and the suspension of Gill's Indiana medical license.

In 2001, the Sonoma County, Calif., district attorney dismissed a murder case amid questions about Gill, then the county's medical examiner, rehearsing testimony with a speech therapist. However, Gill said, the state attorney general later said he had not testified falsely.

Gill also defended himself on Wednesday, saying, "I don't think

## First glance

■ Jackson County Prosecutor Mike Sanders asks that deputy medical examiner Thomas Gill be barred from homicide autopsies.

there is any need to worry."

He defended rehearsing his Sonoma County testimony, but said he would not do so again. He also alleged the dismissal was caused in part by a "botched" investigation.

Gill acknowledged he was charged with drunken driving on Aug. 14, 1994, but said he entered treatment and for six years underwent job performance monitoring. He said he has been sober almost 10 years.

He said his license was suspended in the spring of 1995 when a counselor's miscommunication allowed him to take a position in California without permission from Indiana. Gill said the matter was resolved, and his Indiana license was restored in June 1995. The license

has since lapsed, he said.

Gill said he submitted letters of recommendation and was investigated before receiving his Missouri medical license in January 2003. Gill said he also retains his California medical license.

Young said he knew about Gill's past when he hired him on Nov. 1, 2002.

"That's ancient history," he said.

On Wednesday, Young said he was angry with Sanders for waiting months to raise issues about Gill and for discussing them with the press without first coming to Young.

Sanders' letter "is not a serious attempt at trying to deal with the problem," Young said. "This is media aggrandizement, and it's not appreciated. ... He puts me in a position where he embarrasses me publicly, and I resent it."

Sanders, who became prosecutor on Nov. 12, 2002, said he thought that Gill was allowed to testify only in cases where he was reviewing the work of others or where the

cause of death was not at
Sanders said he recently le
Young planned to lift those r
tions.

Young said Gill had neve
restricted.

Clay County Prosecuto
Norris said he too asked Yo
restrict Gill after recently le
about the man's background

"I preferred that he not w
anything from Clay County,"
said.

Young said he met with
and agreed to give depositio
porting Gill's credibility or
testify about Clay County au
when necessary.

Platte County Prosecuto
Zahnd declined to co
Wednesday, saying he had
reviewed the information
Gill. The Cass County pro
could not be reached for con

*To reach Benita Y. Williams,*
*son County government repo*
*call (816) 234-4789 or send e*
*to bwilliams@kcstar.com.*



Gary Rini                    Keith Carnes vs. St. of Mo.                    8/25/2009

Page 1

```
 1        IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
 2
 3   KEITH L. CARNES,                    )
                                         )
 4                    Movant,            )
              vs.                        )   No. 0816-CV04757
 5                                       )
                                         )
 6   STATE OF MISSOURI,                  )
                                         )
 7                    Respondent.        )
 8
 9
10        DEPOSITION OF GARY A. RINI, M.F.S., D.A.B.F.E.,
11   produced, sworn and examined via telephone on Tuesday,
     August 25, 2009, from the Office of the State Public
12   Defender, Suite 500, 920 Main Street, Kansas City,
     Missouri, before
13
14              SHARON L. CRAWFORD, CCR, RPR,
15   a Certified Court Reporter in and for the states of
     Missouri and Kansas.
16            Taken on behalf of the Movant.
17                         APPEARANCES
18   FOR THE MOVANT:
          Ms. Susan L. Hogan,
19        Office of State Public Defender
          Post-Conviction Relief Division
20        920 Main Street, Suite 500
          Kansas City, Missouri  64105
21
22   FOR THE RESPONDENT:
          Ms. Dawn M. Parsons,
23        Assistant Jackson County Prosecutor
          Jackson County Courthouse, 7-M
24        415 East 12th Street
          Kansas City, Missouri  64105
25
```

COPY

Case 4:12-cv-00416-BP   Document 1-6   Filed 03/30/12   Page 33 of 38

EX. L

1  collected at the scene was consistent with someone
2  standing over the decedent and shooting them while
3  standing over them while the decedent was on the
4  ground?
5      Q.  So I guess what I hear you saying is the purpose
6  that you were originally retained for was just to look at
7  the blood stain patterns?
8      A.  That's correct.
9      Q.  And since that was not a viable -- would you say
10 a viable thing to look at or --
11     A.  It was not possible to do a blood stain pattern
12 reconstruction because the stain patterns had been
13 covered and essentially contaminated by whoever put the
14 blue absorbent chux over them and basically the stains
15 were never documented prior to doing that or at least I
16 wasn't presented with any photos of the documentation
17 prior to them being placed on the stains. So I couldn't
18 do what I was asked to do based on the material that I
19 was given.
20     Q.  So essentially since that kind of pathway was
21 kind of impeded, you decided to take a different path to
22 look at what happened at the crime scene?
23     A.  Yes, and I also think that was another question
24 that was posed in the, you know -- you know, my
25 recollection of it is that the police alleged that the

1  shooter was standing over the victim and shot the victim
2  while the victim was on the ground.  Does the evidence
3  contained in the report support that conclusion.  So I
4  had to look at the material and make a determination to
5  that point.
6      Q.  Okay.  And were you able to reach a conclusion
7  based on that examination or that review?
8      A.  Yes.
9      Q.  Okay, so you were.  And what conclusion did you
10 reach based upon the review of the other evidence in the
11 case?
12     A.  Well, the question was whether or not again the
13 shooter was standing over the decedent and shot the
14 decedent while the decedent was on the ground, and what I
15 determined was that based on the evidence that was looked
16 at, there was no evidence which would support that
17 conclusion.  And that was based on the angles of the
18 bullets as described in the autopsy report, the
19 appearance of the wounds, particularly the head wound and
20 the location of the head wound and the absence of any
21 cartridge case or bullets on or about the body or on the
22 ground surrounding the body or any documentation of any
23 bullet fragments or concrete or asphalt material that
24 might have been dislodged as a result of a bullet passing
25 through the body.  In essence, there was no evidence

1  present that you would expect to see had a weapon been
2  fired downward into the ground or into the body of this
3  individual.
4      Q.  Okay.  And did you examine the police reports as
5  to whether there were any shell casings also found on the
6  parking lot where the decedent's body was found?
7      A.  Yes, I did.
8      Q.  And what kind of evidence did you find as far as
9  that was concerned?
10     A.  There were no shell casings.
11     Q.  Okay.  And did that support your conclusion then
12 that the shooting couldn't have taken place there?
13     A.  Yes.
14     Q.  Okay.  And am I stating your conclusion
15 properly, that your conclusion was that nobody -- that
16 the decedent was not actually shot while he was lying on
17 the parking lot?
18     A.  I'm saying that there's no evidence to support
19 that at all.
20     Q.  I'm sorry, yeah, that the evidence does not
21 support the finding that he was shot on the parking
22 lot?
23     A.  The conclusion was that someone -- the
24 allegation was and the conclusion by the police as
25 reflected in their report was that someone was standing

1  over the decedent and shooting the decedent on the
2  ground.  I looked at it, looked at the wounds, the
3  appearance of the wounds, the bullet path through the
4  body, and of course you're looking for ejected cartridge
5  cases and bullets, and none of those items were present,
6  which, you know, you can't have a shooting with a
7  semi-automatic weapon without those types of evidence
8  present.
9      Q.  Okay.  And I was going to ask you about that.
10 Do you remember what kind of weapon the police reports
11 indicated might have been involved?
12     A.  It was -- my recollection was it was a
13 semi-automatic rifle or a handgun.  The one witness said
14 it was a long gun or a rifle or a semi-automatic handgun.
15 She wasn't quite sure which one it was.  But my
16 recollection is it was black and it was a long gun.
17     Q.  And do you recall whether there was any weapon
18 identified as the weapon used to inflict the wounds to
19 the decedent?
20     A.  No, I never was able to determine that they were
21 able to make that determination.
22     Q.  Okay.  And what do you recall as to the distance
23 at which the wounds were inflicted on the decedent?
24     A.  My recollection from the autopsy report, that
25 the pathologist stated that they were distance wounds.

SHARON L. CRAWFORD, CCR, RPR
(816) 697-2576
(33)



Keith Carnes vs. St. of Mo.

**Page 18**

1  Q. Okay. And would that have been consistent with
2  having been generated by gunfire close to the decedent?
3  A. No.
4  Q. Okay. So if the person had been standing
5  directly over the decedent, would you have expected it to
6  be a distance wound?
7  A. Well, a distance wound is one that's basically
8  classified as exceeding 48 inches or beyond, so that's
9  four feet. And you would also expect to see at that
10  point some soot or tattooing and none of that was present
11  either. But if you have a shoulder weapon or a long
12  rifle, I can't imagine someone holding it up four feet
13  above the ground to fire into it. But nevertheless,
14  whether it was a rifle, shoulder weapon or a handgun, the
15  fact that there were no bullets or bullet fragments or
16  shell cases around, in my estimation based on the
17  evidence I reviewed precludes the possibility of someone
18  standing over him and shooting him.
19  Q. All right. And were you able to find whether
20  there was any physical evidence that would directly link
21  Mr. Carnes to shooting the decedent while he was laying
22  in the parking lot?
23  A. Well, I didn't see any evidence that linked
24  Mr. Carnes to the shooting at all.
25  Q. And what did you base that on?

**Page 19**

1  A. The review of the materials that I was given.
2  Q. All right. And I just -- we have your report
3  here as Movant's Exhibit No. 2, and it's dated June 25,
4  2006. Is that the report that you actually generated in
5  response to this request by Ms. -- I forget her name
6  already -- by Ms. Benson and Mr. Toney?
7  A. Yes, this was -- yeah, it was June 25th, 2006,
8  and that was delivered to Mr. Toney or sent and mailed to
9  Mr. Toney.
10  MS. HOGAN: And we'll go ahead and admit
11  that as Movant's Exhibit 2 I guess for purposes of the
12  deposition.
13  Q. (By Ms. Hogan) Now, you said you mailed that
14  report to Mr. Toney?
15  A. I'm pretty sure I mailed that. It could have
16  been faxed but I'm almost positive I mailed it.
17  Q. Did you also send a copy to Mr. Carnes?
18  A. I sent it to I think Ms. Benson for him.
19  Q. Okay. Do you not -- were you ever asked to do
20  this review before Mr. Carnes went to trial?
21  A. The request for my assistance came between the
22  first and the second trial.
23  Q. Okay. All right. When did you conduct your
24  actual analysis in relationship to the second trial?
25  A. Well, it would have been, as we mentioned

**Page 20**

1  previously, sometime between -- by my recollection
2  sometime between December of 2005 and June of 2006.
3  Q. Okay. So do you have any knowledge as to
4  whether the case, whether you were retained before a
5  trial was actually had on behalf of Mr. Carnes?
6  A. Well, I know that I was -- I was asked if I
7  would be available to travel to Kansas City to testify,
8  and I had made myself available, and I want to say it was
9  a September date but I can't be sure. But they were,
10  they being Ms. Benson and a friend of Mr. Carnes and I
11  have forgotten his name, were both trying to get Mr.
12  Toney to speak to me and to get me to testify, and I was
13  having trouble making contact with Mr. Toney. He
14  wouldn't return my phone calls or e-mails. He finally
15  did call me and then we had a discussion about the case
16  and what Ms. Benson and others' expectations were of me,
17  and I told Mr. Toney the kind of things I could do and
18  that I was available for testimony, and then he said,
19  okay, I'll send you the stuff, and he eventually sent it
20  to me. But I just had a sense that his trial strategy in
21  my opinion wasn't, didn't include my testimony and I was
22  never called.
23  Q. Okay. And that's the big question. Before
24  giving this deposition today, were you ever called to
25  testify on behalf of Mr. Carnes?

**Page 21**

1  A. No.
2  Q. And so you didn't testify at his trial for first
3  degree murder then?
4  A. No.
5  Q. Would you have been willing to testify at that
6  trial if you had been retained in time to testify at that
7  trial?
8  A. As a matter of fact I was retained in time for
9  the second trial. Is that what you're talking about?
10  Q. Well, were you ever asked to testify at the
11  second trial?
12  A. By Ms. Benson and Mr. Carnes, yes.
13  Q. Okay. But not by counsel?
14  A. No.
15  Q. Okay. Let me catch up my notes real quick here.
16  And if Mr. Toney had asked you to testify on behalf of
17  Mr. Carnes, would you have made yourself available?
18  A. Yes, I had blocked it out, I was ready to go.
19  Q. And would your opinion have been any different
20  if you had been asked to review the evidence and the
21  reports at sometime earlier than the trial?
22  A. No.
23  Q. Okay. So if you had been called to testify at
24  the trial, would your opinion have been the same as it is
25  today?

6 (Pages 18 to 21)

SHARON L. CRAWFORD, CCR, RPR
(816) 697-2576
(34)


Client
COPY
213

### WD 72916
## IN THE MISSOURI COURT OF APPEALS
### WESTERN DISTRICT

---

## KEITH L. CARNES

### Appellant,

vs.

## STATE OF MISSOURI,

### Respondent

Appeal from the Circuit Court of Jackson County, Missouri
16th Judicial Circuit, Division 5
The Honorable S. Stephen Nixon, Judge

## EXHIBIT ON APPEAL

Petitioner's Exhibit #1 – Original Deposition of Gary A. Rini

SUSAN L. HOGAN, #33194
Appellate Defender
Office of the Public Defender
920 Main Street, Suite 500
Kansas City, Missouri 64105
Tel.: 816/889-7699
Fax: 816/889-2001
Susan.Hogan@mspd.mo.gov

Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed to Shaun Mackelprang, Chief Counsel, Office of the Attorney General, P.O. Box 899, Jefferson City, Missouri 65102 on the 1st day of June, 2011.

Susan L. Hogan

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

KEITH L. CARNES,                    )
                                    )      **ORIGINAL**
              Movant,               )
                                    )
      vs.                           )   No. 0816-CV04757
                                    )
STATE OF MISSOURI,                  )
                                    )
              Respondent.           )


      DEPOSITION OF GARY A. RINI, M.F.S., D.A.B.F.E.,

produced, sworn and examined via telephone on Tuesday,
August 25, 2009, from the Office of the State Public
Defender, Suite 500, 920 Main Street, Kansas City,
Missouri, before

            SHARON L. CRAWFORD, CCR, RPR,

a Certified Court Reporter in and for the states of
Missouri and Kansas.
      Taken on behalf of the Movant.


                    APPEARANCES

FOR THE MOVANT:
      Ms. Susan L. Hogan,
      Office of State Public Defender
      Post-Conviction Relief Division
      920 Main Street, Suite 500
      Kansas City, Missouri  64105


FOR THE RESPONDENT:
      Ms. Dawn M. Parsons,
      Assistant Jackson County Prosecutor
      Jackson County Courthouse, 7-M
      415 East 12th Street
      Kansas City, Missouri  64105

PETITIONER'S
EXHIBIT

PENGAD-Bayonne, N.J.

9/4/09