1

2                              I N D E X

3

     WITNESS:   GARY A. RINI, M.F.S., D.A.B.F.E.
4

     Examination by Ms. Hogan . . . . . . . . . . . . . 3
5    Examination by Ms. Parsons . . . . . . . . . . . . 22
     Examination by Ms. Hogan . . . . . . . . . . . . . 34
6

7

8    STIPULATIONS:

     The signature of the witness is waived.  The deposition
9    may be used as if signed.

10

11   EXHIBITS MARKED:

12   No. 1 - Curriculum Vitae . . . . . . . . . . . . . . 4
     No. 2 - June 25, 2006 Letter to Willis Toney . . . 19
13

14   (The exhibits are attached hereto.)

15

16

17

18

19

20

21

22

23

24

25

Case 4:12-cv-00416-BP   Document 1-7   Filed 03/30/12   Page 1 of 26

1          GARY A. RINI, M.F.S., D.A.B.F.E.,

2     a witness, having been produced via telephone, sworn, and

3     examined on behalf of the Movant, testified as follows

4     on:

5     EXAMINATION BY MS. HOGAN:

6          Q.  Could you please state your name?

7          A.  My name is Gary A. Rini, last named spelled

8     R-i-n-i.

9          Q.  And do you understand we're taking your

10    deposition rather than having you come all the way to

11    Missouri to testify?

12         A.  Yes.

13         Q.  This is for an evidentiary hearing on behalf of

14    Keith Carnes?

15         A.  Yes.

16         Q.  Okay, great.  Can you tell us how you're

17    employed?

18         A.  I am an independent forensic science

19    consultant.

20         Q.  Okay.  And what kind of work do you do, what

21    does that entail?

22         A.  I provide a critical case review and analysis of

23    cases, particularly of criminal cases involving

24    homicides.  I also do blood stain pattern analysis, crime

25    scene reconstruction and shooting incident reconstruction

1    cases for both prosecutors and defense attorneys.

2        Q.  Let's see, we have a copy of your CV here, and

3    is that -- I would represent to you this is the CV that

4    you e-mailed to me back in December of 2008?

5        A.  Yes.

6        Q.  Is that still a current CV?

7        A.  Yes.

8                MS. HOGAN:  I'm going to just move to

9    admit that.

10                MS. PARSONS: I don't object to whatever,

11    Movant's Exhibit No. 1.

12                MS. HOGAN:  Movant's Exhibit No. 1, yeah.

13        Q.  (By Ms. Hogan)  I just want to ask you a few

14    questions.  When you talk about crime scene

15    reconstruction, what does that mean?

16        A.  Well, as a matter of course during a

17    reconstruction, reconstruction process, you take

18    available information and you basically have a problem

19    stated to you or you identify the problem, and then you

20    go ahead and you review the material and collect the data

21    that you need to make your evaluation.  And from all that

22    data and information that you obtain you form a

23    hypothesis.  And then with that hypothesis you go ahead

24    and test the hypothesis based on all the information you

25    have to see if your hypothesis is valid.  And then based

1    on the results of that testing, then you form your

2    conclusions.

3        Q.  Okay.  And how long have you worked in -- you

4    indicated that you worked in the field of crime scene

5    reconstruction.  How long have you worked in that

6    field?

7        A.  Well, actually I started my law enforcement

8    career in December of 1975.  My very first case was

9    January 2nd, 1976, and that involved a shooting and

10   reconstruction, so I guess you can say from January 2nd,

11   1976.

12       Q.  What kind of training do you have in police

13   work?

14       A.  Well, I have been -- I have graduated from three

15   different police academies, the Ohio State Highway Patrol

16   Academy, the Lakewood Department of Public Safety in

17   Lakewood, Colorado Police Academy and the Denver Police

18   Academy.

19       Specific to crime scene investigation I have taken

20   many courses that are enumerated in my CV, but courses

21   that involved medical/legal death investigation I took

22   from St. Louis University School of Medicine and the

23   University of New Mexico School of Medicine, the Armed

24   Forces Institute of Pathology in Washington, DC, Western

25   Reserve University School of Legal-Medicine Center in

1    homicide investigation, a variety of courses in blood

2    stain pattern analysis, crime scene reconstruction and

3    associated types of forensic investigation courses.

4        Q.   Okay.  And included in your educational

5    background, and I know we have your CV here but just to

6    make the record clear, did you attend any colleges and

7    universities as part of that?

8        A.   I have an undergraduate degree from Cleveland

9    State University in psychology and criminal justice, a

10   minor in criminal justice, and I have my Master's degree

11   in forensic science from the George Washington University

12   in Washington, DC.

13       Q.   Okay.  And then have you actually worked with

14   police departments?

15       A.   Yes, I have.  I began my career, as I mentioned

16   before, in December of 1975.  I worked with the North

17   Olmsted, Ohio Police Department.  That is spelled

18   O-l-m-s-t-e-d.  Then I worked for the Lakewood Police

19   Department, which was in Colorado, the Denver Police

20   Department and the --

21       And I should take a step back and say at North

22   Olmsted I was working as a patrol officer, a crime scene

23   investigator, a training officer, a swat team member, and

24   several other things.

25       And as a Lakewood police agent, I was a police agent

1    my recollection.

2        Q.  Okay.  Did you know those three witnesses knew

3    the Defendant Keith Carnes personally, did you get that

4    from your information?

5        A.  I think -- the information that I get from

6    reading what I did read was that they were familiar with

7    him or had seen him around the area.  I wouldn't

8    characterize it as knowing him personally as a friend or

9    anything, but my recollection is that he was one of the

10   members of that area.

11       Q.  Okay.  You had talked to us about the -- you

12   attempted to look at the blood stain pattern at the

13   scene?

14       A.  Right.

15       Q.  And based on your review of the photos, you

16   determined that it had been corrupted by what I refer to

17   as ambulance trash but it's the chux and everything; is

18   that your conclusion?

19       A.  Yes.

20       Q.  And did you know that the parking lot where this

21   occurred was a business parking lot?

22       A.  Yes.

23       Q.  And did you know that the business had been open

24   at the time?

25       A.  At the time of the event, yes.

1        Q.   Did you know it was a drive-through business?

2        A.   I didn't know it was a drive through.

3        Q.   Yeah, it's a drive-through fish market.  At the

4 time it was called Fish Town.  Did you know if there had

5 been any cars in the drive through or in the parking lot

6 when this occurred?

7        A.   No, I did not.

8        Q.   Did you know if -- were you aware if the

9 ambulance or fire trucks came up through, into the

10 parking lot into the crime scene?

11        A.   No, not specifically, no.

12        Q.   In your experience do ambulances and

13 firefighters driving through and walking through scenes

14 contaminate a scene?

15        A.   The bad ones do.

16        Q.   Okay.  And if the police hadn't gotten there or

17 the firemen hadn't gotten there and there were cars

18 driving through, could that possibly kick out shells and

19 move evidence around?

20        A.   Certainly if a car would have driven over any

21 cartridge cases, it would have dislocated them from their

22 original position but one would expect them to be in or

23 about the area.  I wouldn't say that they would remove

24 them by merely driving through it, but certainly if it

25 ran over it, it probably would have smashed it and kept

1    it in place.  But I imagine it is a possibility that it

2    could be kicked aside from its original location.

3         Q.  Okay.  And you had said that you based your

4    hypothesis on available information?

5         A.  Right.

6         Q.  But your hypothesis is only as good as your

7    available information, right?

8         A.  Yes.

9         Q.  So if some ambulance workers or fire workers or

10   even people who didn't even realize a crime had occurred

11   traipsed through the scene, that's going to affect the

12   information that you get?

13        A.  Well, yes and no.  Having been involved in this

14   since '75 and being in situations like you're talking

15   about where instances occur where there's a lot of people

16   and traffic, I also realize that that possibility that we

17   did discuss, that it could have been kicked aside or

18   whatever, you would then have to accept the fact that

19   every piece of evidence from the four shots were -- that

20   the cartridge cases were all removed, the bullets were

21   all removed, any pieces of concrete or asphalt that were,

22   that would have been chinked or nicked from the surface

23   by virtue of a bullet flying into it, that would have

24   been removed, the chinks themselves would have been

25   covered over.  All that stuff was taken into

1  consideration. And in my experience, yes, it is true
2  that people walk through it, but it's generally off to
3  the side or someplace else. And by the time the police
4  come in there and they control the scene and cordon off
5  the scene, then they'll go through, if they do it right,
6  will do a systematic search of the scene and locate those
7  pieces of evidence somewhere. The only thing would be is
8  if someone would actually take the time to pick up the
9  bullets and the cartridge cases, if you would want to
10  believe that happened. But still you would still have to
11  think in terms of the four shots that perforated the body
12  at the scene and there's no chunks of concrete or asphalt
13  removed, and then you have to consider the angles of the
14  bullets, which didn't correspond with someone standing
15  over him.

16      So you look at all that stuff. And, you know, some
17  of the stuff is obvious, which is the physical evidence,
18  and then the conditional evidence, which would be the
19  condition of the evidence had someone kicked it or moved
20  it aside. So that stuff is taken into consideration.

21      Q.  Does your opinion assume that all four shots
22  occurred in the parking lot?

23      A.  No.

24      Q.  Okay. So you are aware that there was evidence
25  that the victim was shot running through a field and up

1      the street?

2           A.  My information was that he was shot at while he

3      was running.

4           Q.  Right.

5           A.  And whether or not he was hit at those times I

6      don't know.  Could he have been, yes.  Was there absolute

7      proof that I saw, no.

8           Q.  And you knew that there were shell casings,

9      762's found around where it all started, which is 2846

10     Wabash?

11          A.  I don't recall the address, but I do recall that

12     12 casings were found in and around the house and another

13     one by the curb on Prospect.

14          Q.  So if the State's witnesses had said that the

15     Defendant was shooting a long rifle around that area,

16     then the physical evidence that would support that would

17     be the ejected shell casings?

18          A.  Yes, they could, you know, absent any other

19     explanation for those shell casings.  I didn't see any

20     report from the laboratory that connected those shell

21     casings to any particular weapon, so with that caveat I

22     would say that there was testimony that someone was

23     shooting, that there were cartridge cases in the area.

24     They could have very well been connected with that

25     incident.

1     Q.   Okay.  And you had said on your direct testimony

2     that there was no evidence to support that the Defendant

3     was shooting; do you remember that?

4     A.   That the Defendant was shooting?

5     Q.   Yes.

6     A.   Yeah, I didn't have any specific -- standing

7     over him shooting in the parking lot, yeah.

8     Q.   Would you agree with me that eye witness

9     testimony is, in fact, evidence?

10    A.   Well, let me take a step back.  I would say that

11    there is no evidence of anyone standing over the decedent

12    in a parking lot shooting.

13    Q.   But you agree with me that eye witness testimony

14    is evidence?

15    A.   In general, yes, with the caveat that there's a

16    lot of unreliability.

17    Q.   All right.  But you would agree with me that eye

18    witness testimony is evidence?

19    A.   Yes.

20    Q.   So when you had said that there's no evidence to

21    support that, were you taking into consideration eye

22    witness testimony?

23    A.   I believe I said physical evidence, but if I

24    didn't let me say that because there's no physical

25    evidence.  Because that's really what I was addressing

247

```
 1    was the physical evidence with someone standing over the

 2    body.

 3         Q.  Right.  I figured that but that's not what you

 4    said, which is why I wanted to clarify that.

 5         A.  Yeah, it's physical evidence.

 6         Q.  Just let me look through my notes.  Were you

 7    aware that Mr. Toney argued all these theories at both

 8    the jury trial and the bench trial, that there was no

 9    physical evidence, that the physical evidence doesn't

10    support the eye witness testimony?  Did you know that

11    that was part of his trial strategy or did you know that

12    he argued that?

13         A.  No, I did not.

14         Q.  And is that essentially what you're saying is

15    based on what the three witnesses said there's no

16    physical evidence to support their -- what they say they

17    saw in the parking lot?

18         A.  That's correct.

19         Q.  And you had also said earlier that the police

20    had made a conclusion about what had happened?

21         A.  Well, let me clarify.

22         Q.  Okay.

23         A.  What I was saying was the information was that

24    the decedent was shot by someone standing over him.

25    Whoever made that conclusion, and I'm basing that on the
```

1    eye witness testimony that someone was standing over him,

2    whoever came up with that conclusion, there's no physical

3    evidence that supports that statement that I saw or had

4    presented to me.  I saw nothing in the record that would

5    support it, as I mentioned previously.

6        Q.  That's what I wanted to clarify, a few things,

7    because there was no police conclusion.

8        A.  No, it would have been -- well, they had to

9    arrive at a conclusion somehow but they would have gotten

10   that information from their eyewitnesses.

11       Q.  Okay.  So your best recollection of when you

12   first contacted a member of the Defendant's family or

13   team was in December of 2005?

14       A.  That's my best recollection.

15           MS. PARSONS:  That's all I have.

16           MS. HOGAN: I just have like one question

17   here.  Can you hear me okay, Mr. Rini?

18           THE WITNESS:  Yes.

19   EXAMINATION BY MS. HOGAN:

20       Q.  Let's see -- Okay, when you indicated that you

21   were talking about the trial strategy that Mr. Toney was

22   employing, you indicated that there was some financial

23   issues?

24       A.  Yes.

25       Q.  Do you recall what those financial issues

1    were?

2         That Mr. Toney had told me that they had, and I

3    may be wrong in the amount, that he was given $15,000 for

4    the trial, and I think it was the first trial, and my

5    recollection is that he was a little put back by Ms.

6    Benson's demands and directions and how he should go

7    about his trial because by the time he was at the second

8    trial he had exhausted the funds that they had given, and

9    he was basically working pro bono and he was a little

10   disappointed that they didn't understand that you can't

11   have all these experts and everything when you have no

12   money to pay them.  As he mentioned, he said I,

13   Mr. Toney, am working now for nothing.

14        Q.  Okay.  Who actually paid you for your initial

15   evaluation?

16        A.  Ms. Benson and a friend of Mr. Carnes.

17        Q.  Okay.  Were they indicating that they were

18   willing to pay you for purposes of the trial?

19        A.  Yeah, the friend was, and his name was Richard

20   and I can't remember his last name.  A very nice guy, but

21   a childhood friend.  And he said, I'll take care of you

22   if you come out, et cetera.

23        Q.  So from your perspective did it appear that

24   there was any indication that you weren't going to get

25   paid if you were --

1      A.  I don't even think it was an issue because I

2    think at that point I said that if they paid my expenses

3    and it was just a day to go out and testify, I wouldn't

4    charge them.  That's my recollection, because I was so

5    impressed with the fact that this friend of his would

6    come up with this money and pay, you know, to help his

7    friend out.  I was touched by the gesture and I said, I

8    can't take anymore money from you.  I don't even think

9    the money was an issue for me.  I just told them as long

10   as they paid my expenses I would be happy to go out

11   there.

12             MS. HOGAN:  Okay.  I don't think I have

13   any further questions for you.  I don't know if Ms.

14   Parsons does.

15             MS. PARSONS: No.

16             MS. HOGAN:  Thank you, Mr. Rini.

17             (Signature waived)

18

19

20

21

22

23

24

25

```
 1

 2                    C E R T I F I C A T E

 3

 4    STATE OF MISSOURI    )
      COUNTY OF JACKSON    )
 5

 6         I, SHARON L. CRAWFORD, CCR, RPR, Certified Court
      Reporter in and for the states of Missouri and Kansas, do
      hereby certify that the witness, GARY A. RINI, was duly
 7    sworn by me prior to the taking of testimony as to the
      truth of the matters attested to and contained therein,
 8    that the testimony of said witness was taken by me in
      machine shorthand and was thereafter reduced to
 9    typewritten form by me or under my direction and
      supervision, that the foregoing transcript is a true and
10    accurate record of the testimony given to the best of my
      understanding and ability.
11
           I FURTHER CERTIFY that I am neither counsel for,
12    related to, nor employed by any of the parties to the
      action in which this proceeding was taken; and, further,
13    that I am not a relative or employee of any attorney or
      counsel employed by the parties hereto, nor financially
14    interested, or otherwise, in the outcome of this action.

15         Dated:  August 28, 2009

16

17              Sharon L Crawford
                SHARON L. CRAWFORD, CCR, RPR
18              MO CCR #164, KS CCR #498

19

20

21

22

23

24

25
```

**Gary A. Rini, M.F.S., D.A.B.F.E.**
An Independent
Forensic Science Consultant



GR

5801 Postal Road (Airport)
Post Office Box 81098
Cleveland, Ohio 44181-0098

Telephone: 440.979.5271
Facsimile: 440.979.5272
E-mail:garini@earthlink.net

# Curriculum Vitae

## PROFESSIONAL EMPLOYMENT

| | |
|---|---|
| 1995 - Present | *Forensic Science Educator, Trainer and Consultant* (International) |
| 1994 - 1995 | *Police Division Commander* (Woodridge Police Department, Illinois) |
| 1991 - 1994 | *Forensic Services Manager* (Naperville Police Department, Illinois) |
| 1988 - 1991 | *Police Sergeant* (Denver Police Department, Colorado) |
| 1984 - 1988 | *Crime Laboratory Detective* (Denver Police Department, Colorado) |
| 1983 - 1984 | *Police Officer* (Denver Police Department, Colorado) |
| 1981 - 1983 | *Police Agent/ Crime Scene Investigator* (Lakewood Police Department, Colorado) |
| 1975 - 1979 | *Police Officer/Crime Scene Investigator* (North Olmsted Police Department, Ohio) |
| 1972 - 1979 | *Emergency Room Medical Corpsman* (United States Air Force/Ohio Air National Guard) |

## EDUCATION

*The George Washington University* - Master of Forensic Science (1981)
*DePaul University* - Master's Certificate in Administrative Foundations in Public Service (1993)
*Northwestern University Center for Public Safety* - Graduate of the School of Police Staff and Command (1993)
*Roosevelt University* - Graduate Coursework in Public Administration (1994)
*Western Illinois University* - Graduate Coursework in Law Enforcement Administration (1994 -1995)
*Cleveland State University* - Bachelor of Arts in Psychology and Criminal Justice (1979)
*Kent State University* - Undergraduate Coursework in Arts and Sciences (1969-1972)

## FORENSIC SCIENCE GRADUATE COURSEWORK

| | | |
|---|---|---|
| Biological Aspects of Forensic Science | Forensic Anthropology | Forensic Medicine |
| Physical Aspects of Forensic Science | Personal Identification | Forensic Pathology |
| Questioned Document Examination | Forensic Photography | Criminal Law |
| Firearm and Toolmark Examination | Forensic Psychiatry | Criminal Law - Evidence |

## PROFESSIONAL AND FORENSIC ORGANIZATIONS

American Academy of Forensic Sciences (AAFS)
Association for Crime Scene Reconstruction (ACSR)
American College of Forensic Examiners (ACFE) - Diplomate
International Association of Bloodstain Pattern Analysts (IABPA)
International Association for Identification (IAI) - Life Active Member
Rocky Mountain Division of the International Association for Identification (RMDIAI) - Life Active Member
Homicide Research Working Group (HRWG)
International Association for Property and Evidence (IAPE)
The Commission on Forensic Education (Commissioner)

## LAW ENFORCEMENT TRAINING ACADEMIES ATTENDED

*Denver (CO) Police Department Training Academy* - Commencement Speaker (1983)
*Lakewood (CO) Police Agent Academy* - Commencement Speaker, Leadership Award (1981)
*Ohio Police Officer Training Academy* - Class Leader (1976)

EXHIBIT

Rini #1
25-04SC

253

## LAW ENFORCEMENT AND FORENSIC ACTIVITIES

- *Visiting Professor of Forensic Science* - Francisco Marroquin University School of Law (2004 - Present)
- *Forensic Science Educator, Trainer and Consultant* (1995 - Present)
- *Member* - National Institute of Justice Technical Working Group on Crime Scene Investigation (1999 - 2001)
- *Diplomate* - American Board of Forensic Examiners (1998 - Present)
- *Director* - Criminal Investigation Training Institute (Metropolitan Community College 1999 - 2001)
- *College Instructor* - Department of Criminal Justice (Iowa Western Community College, IA 1996 - 1999)
- *College Instructor* - Department of Criminal Justice (Metropolitan Community College, NE 2001)
- *Regional Director of Training (Nebraska)* - American Society of Law Enforcement Trainers (1999 - 2001)
- *Board of Directors* - Nebraska Division of the International Association for Identification (1999 - 2001)
- *Forensic Science Training Consultant* - Powerphone, Inc. (Madison, Connecticut 1998 - 2000)
- *Program Developer* - Peavey Institute for Police Science (Lenexa, Kansas 1996-1997)
- *Volunteer Group Leader* - Douglas County (NE) Juvenile Diversion Program (1997)
- *Coordinator* - Felony Investigation Assistance Team (DuPage County, IL 1995)
- *Member* - Police Executive Research Forum (1992 - 1995)
- *Member* - International Association of Chiefs of Police (1994 - 1995)
- *Member* - Illinois Chiefs of Police Association (1994 - 1995)
- *Member* - DuPage County (IL) Senior Police Manager's Association (1994 - 1995)
- *Member* - Problem Housing Task Force (Woodridge, IL 1994 - 1995)
- *Member* - West Suburban (Chicago) Chiefs of Police Association (1992 - 1994)
- *Member* - Lake County (IL) Major Case Task Force (1993 - 1995)
- *Member* - Science and Practice Committee for Bloodstain Pattern Analysis (IAI 1993 - 1994)
- *Member* - American Society of Crime Laboratory Directors (1991 - 1994)
- *Chairman* - Education and Training Conference for the Illinois IAI (1993 - 1994)
- *Chairman* - American Cancer Society's Jail and Bail Committee (Naperville, IL 1994)
- *Founder and Executive Vice-President* - Citizens Appreciate Police (Naperville, IL 1994)
- *Regional Vice-President* - International Association of Bloodstain Pattern Analysts (1988 - 1989)
- *Chairman* - Education and Training Conference for the IABPA (1988 - 1989)
- *Chairman of the Board* - Rocky Mountain Division of the International Association for Identification (1987)
- *President* - Rocky Mountain Division of the International Association for Identification (1986 - 1987)
- *Vice-President* - Rocky Mountain Division of the International Association for Identification (1985 - 1986)
- *Board of Directors* - Rocky Mountain Division of the International Association for Identification (1983 -1985)
- *Member* - Denver Police Department Peer Support Unit (1986 - 1990)
- *Member* - Human Relations Council Member (Ohio Air National Guard 1976 - 1979)
- *Member* - North Olmsted Police Department S.W.A.T. Team (1976 - 1979)
- *Member* - Westshore Enforcement Bureau S.W.A.T. Team (1976 - 1979)
- *Chairman* - Grievance and Negotiation Committee (North Olmsted Police Department - 1979)

## FORENSIC EXPERT WITNESS QUALIFICATIONS

- Death Scene Investigation
- Crime Scene Investigation and Crime Scene Reconstruction
- Bloodstain Pattern Analysis and Luminol Processing
- Forensic Serology and Blood Alcohol Analysis
- Forensic Investigation and Examination

## FORENSIC SCIENCE LECTURES TO UNIVERSITIES AND PROFESSIONAL AUDIENCES

- Luminol Processing
- Forensic Science
- Bloodstain Pattern Analysis
- Significance of Bloodstain Evidence in Criminal Investigations
- Crime Scene Investigation
- Crime Scene Issues for First Responders
- Death Scene Investigation
- Fingerprints
- Crime Laboratory Management

*Gary A. Rini, M.F.S., D.A.B.F.E. (Curriculum Vitae)*     2

Case 4:12-cv-00416-BP   Document 1-7   Filed 03/30/12   Page 18 of 26


254

## FORENSIC SCIENCE LECTURES (CONT'D)

- Managing Forensic Investigations
- Forensic Investigation
- Bloodborne Pathogens
- Forensic Investigation Training Programs
- Forensic Science College Lecture Series (Iowa Western Community College)
- Forensic Evidence for Nursing and Health Professionals
- Check Forgery and Handwriting Examination
- Crime Scene Issues in Homicide Cases: A Primer for the Criminal Trial Lawyer (CLE Class)

## FORENSIC SCIENCE COLLEGE COURSES DEVELOPED AND TAUGHT

- Crime and Science: An Introduction to Forensic Investigation
- Criminalistics
- Medicolegal Death Investigation
- Bloodstain Evidence
- Fingerprint Technology
- Crime Scene Search and Physical Evidence Management
- Forensic Evidence: An Introduction to Scientific Crime Detection

## FORENSIC SCIENCE TRAINING PROGRAMS PLANNED, ORGANIZED AND PRESENTED

- Aircraft Crash Investigation (1985)
- Bloodstain Evidence (1986)
- Basic Crime Scene Investigation (1987)
- Institute on the Physical Significance of Bloodstain Evidence (1987)
- Demonstrative Evidence (1987)
- Practical Bloodstain Pattern Evidence (1987)
- Advanced Forensic Investigation (1988)
- Advanced Forensic Investigation (1992)
- Footwear Impression Evidence (1992)
- Basic Forensic Investigation Course (1993)
- Latent Print Photography Course (1994)
- Advanced Forensic Investigation (1994)
- Medicolegal Death Investigation (1997 a + b)
- Crime Scene Issues for First Responders (1997)
- Interviews and Interrogations (1997)
- Medicolegal Death Investigation (1998)
- Equivocal Death Investigation (1999 a + b)
- Death Scene Investigation (1999 a + b)
- Death Scene Investigation (2000 a + b + c + d + e + f)
- Crime Scene Issues in Homicide Investigations (2005 -2006 a + b + c + d)

## LEADERSHIP, MANAGEMENT AND ADMINISTRATIVE TRAINING

- *Law Enforcement Management* - Western Illinois University Graduate School (1995)
- *Public Service Management* - DePaul University Graduate School (1992)
- *Human Resource Management* - Roosevelt University Graduate School (1994)
- *Accounting and Finance for Non-Financial Managers* - DePaul University Graduate School (1993)
- *Fundraising and Grantwriting* - DePaul University Graduate School (1993)
- *Civil Liability for Police Officers* - Western Illinois University Graduate School (1995)
- *Police Executive Research Forum (PERF) Regional Meeting* - Evanston, IL (1994)
- *Police Executive Research Forum (PERF) Regional Meeting* - Chicago, IL (1993)
- *Police Executive Research Forum (PERF) Regional Meeting* - Naperville, IL (1992)
- *Management Training Forum* - Naperville, IL (1994)
- *Management Problems of the Technical Person* - Chicago, IL (1993)
- *Liability Issues Affecting Police Executives* - Chicago, IL (1993)

Case 4:12-cv-00416-BP   Document 1-7   Filed 03/30/12   Page 19 of 26

## LEADERSHIP, MANAGEMENT AND ADMINISTRATIVE TRAINING (CONT'D)

* *Police Civil Liability Course* - Schaumburg, IL (1994)
* *Developing Policies and Procedures* - Willowbrook, IL (1994)
* *Successful Grantwriting Course* - Northwestern University Traffic Institute (1994)
* *Internal Affairs Seminar* - Northwestern University Traffic Institute (1995)
* *Police-Media Relations* - Northwestern University Traffic Institute (1995)
* *Violence in the Workplace* - Oakbrook, IL (1995)
* *Criminal Justice Grant Writing Course* - Rolling Meadows, IL (1994)
* *Budget Preparation Workshop* - Chicago, IL (1991)
* *Trainer's Institute* - University of Nebraska at Omaha (1997)
* *Instructor Development Course* - Northwestern University Traffic Institute (1991)
* *Improving Supervision through Total Quality Management* - Naperville, IL (1993)
* *Leadership Supervisory Training Seminar* - Denver, CO (1989)
* *Dealing With Difficult Employees* - Northwestern University Traffic Institute (1994)
* *Police Supervision School* - Denver, CO (1989)
* *Stress Management Seminar* - Lake Shelbyville, IL (1994)
* *Basic Counseling Skills* - Denver, CO (1985)
* *Illinois Law Enforcement Training Board 40 Hour Firearms Course* - (1994)
* *Illinois Law Enforcement Training Board 40 Hour Law Review Course* - (1994)
* *Problem-Oriented Policing* - Northwestern University Traffic Institute (1994)
* *Assistant Tactical Firearms Instructor's Course* - Denver, CO (1990)
* *Officer Survival School* - Northwestern University Traffic Institute (1984)
* *Advanced Patrol Tactics and Techniques* - London, OH (1978)
* *Crime Reduction Course* - Federal Bureau of Investigation (1977)
* *Interviews and Interrogations* - LaVista, NE (1997)
* *Waste Isolation Pilot Program* (Hazardous Materials) - Denver, CO (1991)
* *AIDS Update* - Metropolitan State University, Denver, CO (1986)
* *Bloodborne Pathogen Training Course* - Chicago, IL (1991)
* *Bloodborne Pathogen Training Course* - U.S. Department of Justice (1992)
* *Bloodborne Pathogen Training Course* - Chicago, IL (1992)
* *Bloodborne Pathogen Training Course* - Elgin, IL (1994)
* *Tuberculosis Training Course* - Elgin, IL (1994)
* *AIDS and the Law* - DePaul University Graduate College of Law (1995)

## FORENSIC SCIENCE CONTINUING EDUCATION COURSES

* *Homicide Investigation* - Case Western Reserve University Law-Medicine Center (1979)
* *Medicolegal Death Investigation* - St. Louis University Medical School (1982)
* *Medicolegal Death Investigation* - University of New Mexico Medical School (1982)
* *Advanced Homicide Investigation* - Wichita, KS (1989)
* *Advanced Homicide Investigation* - Little Rock, AR (1996)
* *Death Investigation Course* - Little Rock, AR (1998)
* *Forensic Entomology Workshop* - University of Illinois, Chicago (1993)
* *Forensic Dentistry Course* - Armed Forces Institute of Pathology, Washington, D.C. (1981)
* *Identification of Human Remains* - Denver, CO (1986)
* *Fingerprint Classification School* - F.B.I., London, OH (1982)
* *Fingerprint Classification School* - F.B.I., Buffalo Grove, IL (1992)
* *Advanced Latent Fingerprint School* - F.B.I., London, OH (1982)
* *Advanced Latent Fingerprint School* - F.B.I., Naperville, IL (1992)
* *Latent Fingerprint Development School* - Colorado Bureau of Identification (1983)
* *Crime Scene Investigation Course* - Lakewood (CO) Police Department (1981)
* *Crime Scene Investigation Course* - Sirchie Crime Labs, Raleigh, North Carolina (1982)

*Gary A. Rini, M.F.S., D.A.B.F.E. (Curriculum Vitae)*      4

## FORENSIC SCIENCE CONTINUING EDUCATION COURSES (CONT'D)

- *Crime Scene Investigation Course* - Denver Regional Council of Governments (1982)
- *Crime Scene Investigation Course* - National Law Enforcement Institute (1982)
- *Crime Scene Investigation Course* - Denver Police Department (1987)
- *Crime Scene Investigation Course* - University of Arkansas at Little Rock (1996)
- *Crime Scene Issues for the First Responder* - UALR Criminal Justice Institute (1996)
- *Crime Scene Issues for the First Responder* - Council Bluffs, Iowa (1997)
- *Emergency Crime Scene Responder* - Mineral County, Nevada (1998)
- *Crime Scene Photography Course* - Denver, CO (1982)
- *Criminalistics Seminar* - Greeley, CO (1986)
- *Forensic Evidence & Managing Forensic Investigations* - Little Rock, AR (1998)
- *Aircraft Crash Investigation* - Denver, CO (1985)
- *Sex Crimes Investigator's Course* - Greeley, CO (1982)
- *Sex Crimes Investigator's Course* - Glenwood Springs, CO (1988)
- *Forensic Serology Course* - F.B.I. Academy, Quantico, VA (1987)
- *Semen Analysis Course* - Serological Research Institute, Emeryville, CA (1987)
- *Bloodstain Evidence Course* - Denver, CO (1986)
- *Bloodstain Pattern Investigation* - University of Arkansas (1986)
- *Bloodstain Pattern Investigation* - Valencia Community College, Orlando, FL (1986)
- *Bloodstain Evidence Institute* - Corning, NY (1987)
- *Bloodstain Evidence Institute* - Denver, CO (1987)
- *Advanced Bloodstain Evidence Institute* - Corning, NY (1987)
- *Practical Bloodstain Pattern Investigation* - Douglas County, CO (1987)
- *Detection of Blood at the Crime Scene* - Denver, CO (1988)
- *Basic Bloodstain Pattern Interpretation* - Little Rock, AR (1998a)
- *Basic Bloodstain Pattern Interpretation* - Little Rock, AR (1998b)
- *Advanced Forensic Investigation Course* - Denver, CO (1988)
- *Advanced Forensic Investigation Course* - Naperville, IL (1992)
- *Advanced Forensic Investigation Course* - Naperville, IL (1994)
- *Advanced Forensic Investigation Course* - University of Arkansas at Little Rock (1996)
- *Forensic Hair and Fiber Course* - F.B.I. Academy, Quantico, VA (1989)
- *International Symposium on Forensic Hair Analysis* - F.B.I. Academy, Quantico, VA (1985)
- *International Symposium on Forensic Immunology* - F.B.I. Academy, Quantico, VA (1986)
- *International Symposium on Blood Alcohol Analysis* - F.B.I. Academy, Quantico, VA (1986)
- *American Society of Crime Laboratory Directors Annual Training* - F.B.I. Academy, Quantico, VA (1992)
- *American Society of Crime Laboratory Directors Annual Training* - F.B.I. Academy, Quantico, VA (1993)
- *Demonstrative Evidence Seminar* - Denver, CO (1987)
- *Evidence and Recovered Property Course* - Bridgeview, IL (1994)
- *Arizona Identification Council Annual Training Seminar* - Scottsdale, AZ (1995)
- *Violent Crime Investigation* - Oak Brook, IL (1996)
- *Law Forum* - Council Bluffs, IA (1996)
- *Forensic Investigation Lecture Series* - Council Bluffs, IA (1996)
- *Nebraska Division of the IAI Spring Training Conference* - Mahoney State Park, NE (1997)
- *Nebraska Division of the IAI Spring Training Conference* - Mahoney State Park, NE (2000)
- *Forensic Evidence Course* - Little Rock, AR (1998)
- *Questioned Document Training Course* - U.S. Secret Service, Glynco, GA (1999)
- *Document and Voice Examination Course* - American Institute of Applied Science (2000)
- *Questioned Document Course* - American Institute of Applied Science (2000)
- *Forgery and Questioned Document Course* - University of Houston (2000)
- *Advanced Forgery and Questioned Document Course* - University of Houston (2000)
- *International Association of Bloodstain Pattern Analysts Annual Training Conference* - Tucson, AZ (2004)

Case 4:12-cv-00416-BP   Document 1-7   Filed 03/30/12   Page 21 of 26

# FORENSIC SCIENCE PUBLICATIONS AND TRAINING MANUALS

- "Fill-Flash Photo Luminescence to Photograph Luminol Bloodstain Patterns", *Journal of Forensic Identification, (May/June 1989)*, Gary A. Rini and Fred E. Gimeno.
- "Video Documentation of the Enhancement of Luminol Tests by Means of Light Amplification" *Unpublished Report Presented to the IABPA Fall Training Conference, (1988)*, Gary A. Rini and Paul M. Selander
- "A Single Drop of Blood May Determine the Outcome of the 'Trial of the Century'", *The Daily Hound (April 1996)*
- "Evaluating the Luminol Response in Suspected Bloodstains", *The Daily Hound (June 1996)*, Lynn Peavey Co.
- *Forensic Identification Next-of-Kin Data Kit* (F.I.N.D. Kit)
- *Child F.I.N.D. Identification Planner* (Child F.I.N.D. Kit)
- *A Model Policy for Bloodborne Pathogen Risk Reduction*
- *An Overview of OSHA's Bloodborne Pathogen Standard*
- *Fingerprint Training Manual*
- *Latent Fingerprint Processing of Vehicles*
- *Luminol Processing*
- *Significance of Bloodstain Evidence in Criminal Investigations*
- *Crime Scene Search and Physical Evidence Management*
- *Basic Forensic Investigation*
- *Advanced Forensic Investigation*
- *Forensic Science Administration*
- *Managing Forensic Investigations*
- *Crime and Science: An Introduction to Forensic Investigation*
- *Crime Scene Issues for First Responders*
- *Forensic Evidence for Law Enforcement Officers*
- *Forensic Evidence for Nursing and Allied Health Professionals*
- *Basic Bloodstain Pattern Interpretation*
- *Death Scene Investigation*
- *Crime Scene Issues in Homicide Cases: A Primer for the Criminal Trial Lawyer*

## PROFESSIONAL AWARDS RECEIVED

- *Leadership Award* - Lakewood, CO Police Department (1981)
- *Award of Appreciation* - Rocky Mountain Division of the I.A.I. (1987)
- *Distinguished Service Cross* - Denver Police Department (1988)
- *Award of Appreciation* - International Association of Bloodstain Pattern Analysts (1988)
- *Officer of the Month* - Denver Optimist Club (1989)
- *Lifesaving Award* - Denver Police Department (1989)
- *Who's Who in American Law Enforcement* (1981)
- *Award of Appreciation* - Midwest Homicide Investigator's Association (1994)
- *Public Service Award* - Cook County, IL Sheriff's Police Department (1994)
- *Meritorious Service Award* - Naperville, IL Police Department (1994)
- *Award of Appreciation* - Citizens Appreciate Police (Naperville, IL) (1994)
- *Award of Appreciation* - Illinois Division of the I.A.I. (1994)
- *Award of Appreciation* - Naperville YMCA (1994)
- *Award of Appreciation* - Arizona Identification Council (1995)
- *Law Enforcement Commendation Award* - Sons of the American Revolution (Chicago, IL) (1995)
- *Diplomate Status* - American Board of Forensic Examiners (1998)
- *Over 100 Letters of Commendation for Public and Professional Service* (1972 - Present)

## EXPERT WITNESS TESTIMONY

- Testimony given in Federal , State, Military and Municipal Courts, Grand Juries and Coroner's Inquests
- Courtroom Testimony given in AL, CO, DC, FL, IA, IL, KY, MO, ND, OH, PA, SD, WI, WV and Israel
- Depositions given for cases in Colorado, Florida, Illinois, Iowa, Ohio, Oklahoma, Nebraska and Virginia

Case 4:12-cv-00416-BP   Document 1-7   Filed 03/30/12   Page 22 of 26



## Forensic Science Consultant

GARY A. RINI, MFS, DABFE

5801 POSTAL ROAD (AIRPORT)
POST OFFICE BOX 81098
CLEVELAND, OHIO 44181-0098

TELEPHONE (440) 979-5271   FACSIMILE (440) 979-5272

www.CrimeSceneExpert.com

June 25, 2006

Willis L. Toney
Attorney-at-Law
1100 Main Street, Suite 1600
Kansas City, Missouri 64105

Re: State of Missouri v. Keith L. Carnes

Dear Sir:

At your request, I performed a critical review and evaluation of the forensic evidence associated with the investigation of the above cited case. Specifically, you requested that I evaluate the bloodstain pattern evidence found at the crime scene to see if it is consistent with the statements made by the alleged eyewitnesses to this event.

### Documents Reviewed

In order to complete this task, you provided me with a CD photo disk containing 307 photographs, which included autopsy and crime scene photographs. In addition, you provided me with a copy of the autopsy report prepared by Thomas H. Gill, M.D., of the Jackson County Medical Examiner's Office, as well as copies of numerous police reports, including alleged statements made by eyewitnesses to this event.

### Focus of this Critical Case Review and Evaluation

Law enforcement investigators provided three alleged "eyewitnesses" to the shooting of the decedent whose various accounts of the circumstances surrounding the shooting of the decedent included the fact that the shooter fired at the decedent "with a long black gun or pistol", while chasing him down the street until the decedent fell in the parking lot of a restaurant. The alleged eyewitnesses then claim that the shooter, "walked up to him [decedent] and shot him [decedent] in the head." The critical review and evaluation undertaken in this matter focused on the critical events described by the alleged eyewitnesses in order to determine a correlation with the physical evidence associated with those events.

### Evidence from Medical Examiner

According to the autopsy report, the decedent suffered from four (4) gunshot wounds (three wounds to the body and one wound to the head). Three of these wounds were described by Dr. Gill as "through-and-through" (perforating) wounds. The entry wound to the head was located in the right temple and



EXHIBIT

traveled "right to left, front to back and upward." One wound was described as a "graze wound to left side of chest." Around each wound, Dr. Gill noted an "absence of soot or stippling", classifying the wounds as "distant wounds", presumably from a rifle. Dr. Gill stated that no projectiles were recovered as a result of the autopsy.

## Evidence from the Crime Scene

### The Firearms Evidence

The crime scene included locations in the area of 2846 Wabash and 2831 Prospect, where the decedent was discovered. Detective Robert D. Blehm stated that he located "spent 7.62 x 39 Wolf shell casings". Twelve (12) of these spent shell cases were found near the porch and in the area of 2846 Wabash. Detective Blehm found one (1) "spent 7.62 x 39 Wolf shell casing" in an area of the "westbound lane of 29th Street approximately forty yards west of Prospect Avenue."

- *No firearms associated with this event were recovered from the crime scene.*

- *No projectiles associated with this event were recovered from the scene.*

- *No spent cartridge casings were recovered from the parking lot scene (on or about the body.)*

### The Body

The body was removed from the scene prior to its documentation in situ. Therefore, no precise assessment of the position of the body can be made, except that it had been lying on the parking lot pavement. The condition of the body was described in detail in Dr. Gill's autopsy report. The description of the gunshot wounds are described above.

- *No projectiles associated with this event were recovered from the body.*

- *Wound paths of projectiles used to shoot decedent were not consistent with having their source from a position directly above the body.*

### The Bloodstain Pattern Evidence

The significance of bloodstain pattern evidence in violent crime investigation is well-established. It is a forensic investigative tool that is both and art and a science. The limitations for its use rests with the investigator's ability to recognize the potential value of the bloodstain evidence found at the scene, and his/her understanding of its usefulness in reconstructing the sequence of events involved in a violent, bloody criminal event.

Its theory is grounded in scientific principles which relies on the fact that blood, as a fluid, will follow certain physical laws, and as such, will form reproducible patterns under separate sets of similar circumstances. This fact of reproducibility has been established through thousands of experiments under controlled conditions. Therefore, when certain stain patterns are observed at a crime scene, we can state, with authority, that those patterns have been reproduced as a result of explainable forces and actions.

We are concerned with the static aftermath of the event, not the dynamics of fluid physics. We arrive at our findings through a thorough analysis of the size, shape and distribution patterns of the bloodstain evidence. Accordingly, those stain patterns can be evaluated from their physical appearance and from the mechanism in which the patterns were created. The stains can be categorized as three general types:

- *Passive Stains* - patterns whose physical features indicate that they were created by any significant outside source other than gravity and friction.

- *Spatter* - bloodstains that exhibit directionality, vary in size, and associated with a source of blood being subjected to external force (s), in addition to gravity and friction.

- *Altered* - bloodstain patterns whose appearance indicates the blood and/or pattern has undergone a physical and/or physiological alteration.

The bloodstain patterns produced as a consequence of an alleged "close-contact" gunshot wound to the head from a shooter standing directly over the decedent (as alleged by the eyewitnesses) would reflect a distinct type of spatter pattern not observed in the bloodstains photographically documented at the crime scene. Furthermore, the scene was altered from its original condition as a direct result of medical intervention at the scene (placing absorbent pads and clothing over the existing bloodstains) thereby contaminating the potential bloodstain pattern evidence and rendering useless for a complete and accurate interpretation.

Results of the Case Review and Evaluation of the Physical Evidence

As a result of the critical case review and evaluation of the material provide to me, the following observations were made:

- *There were no projectiles found to link them with a specific weapon.*

- *There was no weapon identified as the weapon used to inflict the wounds to the decedent.*

- *There were no cartridge cases located at the crime scene near the body that would support the theory that the shooter stood directly above the decedent and delivered the wounds described in the autopsy report.*

- *The wounds suffered by the decedent are not consistent from having been generated by gunfire from a source located directly above the decedent.*

- *The bloodstain patterns were altered, destroyed or contaminated as the result of medical intervention. The stains visible, however, can be classified as "passive" stains, including transfer stains generated by a "cleat-type" shoe sole that transferred blood from an existing bloodstain pool.*

Conclusions

As a result of a critical case review and evaluation, critical events analysis and physical evidence correlation of the physical evidence presented to me for evaluation, it is my professional opinion that:

- *The alleged eyewitnesses accounts of the events involving the shooting of the decedent are not supported by the physical evidence.*

- *The absence of critical evidence at the scene of the body (projectiles and spent cartridge cases) directly refutes their accounts.*

- *The absence of these types of evidence, as well as the autopsy results and the evaluation of existing bloodstain pattern evidence all support the conclusion that there was no physical evidence that could directly link Keith L. Carnes to this criminal event.*

Basis for Opinion

The opinions arrived at by this analyst are based on a thorough review and evaluation of the material submitted. The arrival of these conclusions is based on knowledge drawn from personal investigative experience, relevant forensic science training, forensic science education and practical research conducted by this analyst. The information provided in this evaluation is based upon reviewing, analyzing, and researching criminal cases similar to the case submitted and is consistent with the standards and practices currently employed in the analysis of this kind of crime scene event.

Sincerely,

/s/   - COPY -

Gary A. Rini, MFS, DABFE
Forensic Science Consultant