or patrol officer and I was a crime scene investigator and I was the coordinator of the crime scene investigators. There were 28 of us, and I was the liaison between the crime scene investigators and the crime lab.

In Denver I worked as a patrol officer, a crime laboratory detective, that was the forensic science section of the crime laboratory where I worked in serology and did blood stain pattern analysis and crime scene investigation and luminol processing and some other tests. I also was a patrol sergeant.

And then I went to the Naperville Police Department where I was the forensic services manager, and I was in charge of the forensic science function of the police department with presenting their or responsible for crime scene investigation and evidence of property management. And as the forensic services manager I was also assigned to assist major departments such as Chicago Police Department and the Cook County Sheriff's Police, and a variety of other northern Illinois agencies with major cases involving crime scene reconstruction and blood stain pattern analysis. And I was also a member of two multi-agency task forces. One was the Lake County Task Force, which I was the forensic -- the lead forensic investigator, and then the DuPage County Task Force which

was called the Felony Investigation Assistance Team where I served initially as the forensic investigation leader and then eventually I was in charge of the whole unit.

After Naperville Police Department I went on and I was police commander of both the administrative and operations division of the Woodridge, Illinois Police Department which included criminal investigation, crime scene investigation, property in evidence and a variety of other sections.

Q. Okay, great. Now, I want to ask you specific about crime scene investigation and crime scene reconstruction. What type of tests do you commonly perform in conducting a crime scene reconstruction or crime scene investigation?

A. Well, it varies and it's really dictated by a couple of things; one, the type of crime and then the task that I'm asked to perform. Generally what happens, I am contacted by the prosecutor and asked to do a blood stain pattern analysis or a shooting scene reconstruction to determine whether or not -- or what actually occurred and if I can arrive at a sequence of events that can be validated through the evidence present. And generally on defense cases I'm asked to review a case file and they may have a specific area of concern whether or not the determinations made by the prosecutors and investigators

1  can be validated by the evidence that they collected
2  during the course of their investigation.
3      Q.  Okay.  And have you performed that type of
4  review in other cases?
5      A.  Yes.
6      Q.  And how many cases do you think you have
7  performed that in?
8      A.  Oh, it would be in excess of a hundred easily.
9      Q.  Okay.  And in doing, in performing your review
10 of a crime scene, do you use the same tests and reviews
11 that are normally used by others in your field?
12     A.  Yes, it's standard.  Basically it's obtain the
13 information, the data, review it, form a hypothesis, and
14 then test the hypothesis with the available information
15 you have and you can form your conclusions based on those
16 determinations.
17     Q.  Okay.  And have you testified in court as an
18 expert on crime scene reconstruction?
19     A.  Yes, I have.
20     Q.  How many times have you done that do you
21 think?
22     A.  Well, this is the 116th time I provided expert
23 testimony.
24     Q.  Okay.  Let's see, are you a member of any
25 professional organizations?

1   A.  Yes, I am.

2   Q.  And are those just -- I guess, are they listed

3   in your CV?

4   A.  They are listed on my CV.

5   Q.  Okay, great.  And have you taught any classes in

6   forensic science?

7   A.  Yes.

8   Q.  Are those also listed in your CV?

9   A.  Yes, they are.

10  Q.  I just want to make sure we're kind of hitting

11  all the highlights of your expertise.  Okay.  Now, let's

12  talk about this case specifically.  Were you asked to

13  conduct a review of the evidence in the police reports in

14  a case involving Keith Carnes?

15  A.  Yes, I was.

16  Q.  Who contacted you about that?

17  A.  A Ms. Benson who was the girlfriend of Keith

18  Carnes at the time.

19  Q.  And were you ultimately retained to conduct a

20  review?

21  A.  Yes, I was.

22  Q.  And who retained you?

23  A.  Ms. Benson on behalf of Keith Carnes.

24  Q.  And did you have any contact with an attorney

25  about the case?


1  A. Yes, I did.
2  Q. Okay, and who was the attorney, do you recall?
3  A. Mr. Toney.
4  Q. Sorry, I'm taking notes, too, so if there's a
5  little delay I apologize. So Mr. Toney was the
6  attorney?
7  A. Yes.
8  Q. And did you actually communicate with Mr. Toney
9  about the case?
10 A. Yes.
11 Q. Did he provide you with any materials?
12 A. Yes, he did.
13 Q. And what materials do you recall him providing
14 you with?
15 A. He gave me a variety of police reports and the
16 autopsy report and some photos as I recall.
17 Q. Okay, all right. And then when exactly do you
18 recall conducting this review?
19 A. I can't tell you exactly. My best guess is in
20 the year 2005. That's when I think it was.
21 Q. Okay. If your report is dated June 25th of
22 2006, does that give you any, I don't know, I guess
23 context?
24 A. It could have been that I was contacted sometime
25 in 2005 by Ms. Benson, because this went on for a while,

```
 1   so I initially tried to talk her out of retaining me
 2   because I thought it was more appropriate to be retained
 3   by the attorney, and I told her to contact Mr. Toney and
 4   have him contact me if he needed me. I didn't get any
 5   response back, and then she called back and pleaded and
 6   eventually I agreed to do it. So my guess is that the
 7   initial contact occurred sometime in the end of 2005, and
 8   if I did the report in 2006, June, then that's when I
 9   would have probably done the report.
10       Q.  Okay. And you indicated you got the police
11   reports, the autopsy report and photographs from
12   Mr. Toney?
13       A.  Yes, my recollection is that he said he sent me
14   everything he had.
15       Q.  Okay. And did you conduct any tests on any
16   materials?
17       A.  No.
18       Q.  Okay. So essentially your review was based on
19   the reports that had already been generated? I'm sorry,
20   are you there?
21       A.  Yes.
22       Q.  I think I talked over your answer.
23       A.  That's correct. The work I performed was a
24   review and evaluation of the police reports and
25   evaluation of the physical evidence that was reflected in
```

```
 1   the reports and the scene comported with the
 2   determinations made by the police in their investigation
 3   of the incident.
 4        Q.  Okay.  And did you reach any conclusions?
 5        A.  Yes, I did.
 6        Q.  And that was based on your review of all those
 7   materials?
 8        A.  Yes.
 9        Q.  And what conclusions did you reach?
10        A.  Well, let me take a step back if I may.
11        Q.  Okay.
12        A.  I was asked initially to look at the blood stain
13   patterns that were located in the photos of the decedent
14   in the parking lot of the restaurant and see if I could
15   determine if the blood stains were consistent with
16   someone standing over him and shooting him while they
17   were standing over him.  What I determined from that was
18   that there had not been any photographs taken of the
19   blood stain patterns prior to the blood stains being
20   covered with blue absorbent chux, so those chux would
21   have distorted or contaminated those stains for any
22   possible evaluation.
23        So the next thing I did was to look at the
24   description of the wounds of the decedent and see whether
25   or not those wounds and the evidence that was or was not
```

```
1   collected at the scene was consistent with someone
2   standing over the decedent and shooting them while
3   standing over them while the decedent was on the
4   ground?
5        Q.  So I guess what I hear you saying is the purpose
6   that you were originally retained for was just to look at
7   the blood stain patterns?
8        A.  That's correct.
9        Q.  And since that was not a viable -- would you say
10  a viable thing to look at or --
11       A.  It was not possible to do a blood stain pattern
12  reconstruction because the stain patterns had been
13  covered and essentially contaminated by whoever put the
14  blue absorbent chux over them and basically the stains
15  were never documented prior to doing that or at least I
16  wasn't presented with any photos of the documentation
17  prior to them being placed on the stains.  So I couldn't
18  do what I was asked to do based on the material that I
19  was given.
20       Q.  So essentially since that kind of pathway was
21  kind of impeded, you decided to take a different path to
22  look at what happened at the crime scene?
23       A.  Yes, and I also think that was another question
24  that was posed in the, you know -- you know, my
25  recollection of it is that the police alleged that the
```

1  shooter was standing over the victim and shot the victim
2  while the victim was on the ground. Does the evidence
3  contained in the report support that conclusion. So I
4  had to look at the material and make a determination to
5  that point.
6      Q. Okay. And were you able to reach a conclusion
7  based on that examination or that review?
8      A. Yes.
9      Q. Okay, so you were. And what conclusion did you
10 reach based upon the review of the other evidence in the
11 case?
12     A. Well, the question was whether or not again the
13 shooter was standing over the decedent and shot the
14 decedent while the decedent was on the ground, and what I
15 determined was that based on the evidence that was looked
16 at, there was no evidence which would support that
17 conclusion. And that was based on the angles of the
18 bullets as described in the autopsy report, the
19 appearance of the wounds, particularly the head wound and
20 the location of the head wound and the absence of any
21 cartridge case or bullets on or about the body or on the
22 ground surrounding the body or any documentation of any
23 bullet fragments or concrete or asphalt material that
24 might have been dislodged as a result of a bullet passing
25 through the body. In essence, there was no evidence

present that you would expect to see had a weapon been fired downward into the ground or into the body of this individual.

Q. Okay. And did you examine the police reports as to whether there were any shell casings also found on the parking lot where the decedent's body was found?

A. Yes, I did.

Q. And what kind of evidence did you find as far as that was concerned?

A. There were no shell casings.

Q. Okay. And did that support your conclusion then that the shooting couldn't have taken place there?

A. Yes.

Q. Okay. And am I stating your conclusion properly, that your conclusion was that nobody -- that the decedent was not actually shot while he was lying on the parking lot?

A. I'm saying that there's no evidence to support that at all.

Q. I'm sorry, yeah, that the evidence does not support the finding that he was shot on the parking lot?

A. The conclusion was that someone -- the allegation was and the conclusion by the police as reflected in their report was that someone was standing

```
 1   over the decedent and shooting the decedent on the
 2   ground. I looked at it, looked at the wounds, the
 3   appearance of the wounds, the bullet path through the
 4   body, and of course you're looking for ejected cartridge
 5   cases and bullets, and none of those items were present,
 6   which, you know, you can't have a shooting with a
 7   semi-automatic weapon without those types of evidence
 8   present.
 9       Q.  Okay.  And I was going to ask you about that.
10   Do you remember what kind of weapon the police reports
11   indicated might have been involved?
12       A.  It was -- my recollection was it was a
13   semi-automatic rifle or a handgun.  The one witness said
14   it was a long gun or a rifle or a semi-automatic handgun.
15   She wasn't quite sure which one it was.  But my
16   recollection is it was black and it was a long gun.
17       Q.  And do you recall whether there was any weapon
18   identified as the weapon used to inflict the wounds to
19   the decedent?
20       A.  No, I never was able to determine that they were
21   able to make that determination.
22       Q.  Okay.  And what do you recall as to the distance
23   at which the wounds were inflicted on the decedent?
24       A.  My recollection from the autopsy report, that
25   the pathologist stated that they were distance wounds.
```

```
 1      Q.  Okay.  And would that have been consistent with
 2  having been generated by gunfire close to the decedent?
 3      A.  No.
 4      Q.  Okay.  So if the person had been standing
 5  directly over the decedent, would you have expected it to
 6  be a distance wound?
 7      A.  Well, a distance wound is one that's basically
 8  classified as exceeding 48 inches or beyond, so that's
 9  four feet.  And you would also expect to see at that
10  point some soot or tattooing and none of that was present
11  either.  But if you have a shoulder weapon or a long
12  rifle, I can't imagine someone holding it up four feet
13  above the ground to fire into it.  But nevertheless,
14  whether it was a rifle, shoulder weapon or a handgun, the
15  fact that there were no bullets or bullet fragments or
16  shell cases around, in my estimation based on the
17  evidence I reviewed precludes the possibility of someone
18  standing over him and shooting him.
19      Q.  All right.  And were you able to find whether
20  there was any physical evidence that would directly link
21  Mr. Carnes to shooting the decedent while he was laying
22  in the parking lot?
23      A.  Well, I didn't see any evidence that linked
24  Mr. Carnes to the shooting at all.
25      Q.  And what did you base that on?
```

```
 1         A.   The review of the materials that I was given.
 2         Q.   All right.  And I just -- we have your report
 3    here as Movant's Exhibit No. 2, and it's dated June 25,
 4    2006.  Is that the report that you actually generated in
 5    response to this request by Ms. -- I forget her name
 6    already -- by Ms. Benson and Mr. Toney?
 7         A.   Yes, this was -- yeah, it was June 25th, 2006,
 8    and that was delivered to Mr. Toney or sent and mailed to
 9    Mr. Toney.
10              MS. HOGAN:  And we'll go ahead and admit
11    that as Movant's Exhibit 2 I guess for purposes of the
12    deposition.
13         Q.   (By Ms. Hogan)  Now, you said you mailed that
14    report to Mr. Toney?
15         A.   I'm pretty sure I mailed that.  It could have
16    been faxed but I'm almost positive I mailed it.
17         Q.   Did you also send a copy to Mr. Carnes?
18         A.   I sent it to I think Ms. Benson for him.
19         Q.   Okay.  Do you not -- were you ever asked to do
20    this review before Mr. Carnes went to trial?
21         A.   The request for my assistance came between the
22    first and the second trial.
23         Q.   Okay.  All right.  When did you conduct your
24    actual analysis in relationship to the second trial?
25         A.   Well, it would have been, as we mentioned
```

```
 1   previously, sometime between -- by my recollection
 2   sometime between December of 2005 and June of 2006.
 3        Q.  Okay.  So do you have any knowledge as to
 4   whether the case, whether you were retained before a
 5   trial was actually had on behalf of Mr. Carnes?
 6        A.  Well, I know that I was -- I was asked if I
 7   would be available to travel to Kansas City to testify,
 8   and I had made myself available, and I want to say it was
 9   a September date but I can't be sure.  But they were,
10   they being Ms. Benson and a friend of Mr. Carnes and I
11   have forgotten his name, were both trying to get Mr.
12   Toney to speak to me and to get me to testify, and I was
13   having trouble making contact with Mr. Toney.  He
14   wouldn't return my phone calls or e-mails.  He finally
15   did call me and then we had a discussion about the case
16   and what Ms. Benson and others' expectations were of me,
17   and I told Mr. Toney the kind of things I could do and
18   that I was available for testimony, and then he said,
19   okay, I'll send you the stuff, and he eventually sent it
20   to me.  But I just had a sense that his trial strategy in
21   my opinion wasn't, didn't include my testimony and I was
22   never called.
23        Q.  Okay.  And that's the big question.  Before
24   giving this deposition today, were you ever called to
25   testify on behalf of Mr. Carnes?
```

1   A.  No.

2   Q.  And so you didn't testify at his trial for first
3   degree murder then?

4   A.  No.

5   Q.  Would you have been willing to testify at that
6   trial if you had been retained in time to testify at that
7   trial?

8   A.  As a matter of fact I was retained in time for
9   the second trial.  Is that what you're talking about?

10  Q.  Well, were you ever asked to testify at the
11  second trial?

12  A.  By Ms. Benson and Mr. Carnes, yes.

13  Q.  Okay.  But not by counsel?

14  A.  No.

15  Q.  Okay.  Let me catch up my notes real quick here.
16  And if Mr. Toney had asked you to testify on behalf of
17  Mr. Carnes, would you have made yourself available?

18  A.  Yes, I had blocked it out, I was ready to go.

19  Q.  And would your opinion have been any different
20  if you had been asked to review the evidence and the
21  reports at sometime earlier than the trial?

22  A.  No.

23  Q.  Okay.  So if you had been called to testify at
24  the trial, would your opinion have been the same as it is
25  today?

1  A. Yes.

2  Q. Would your testimony have been the same as it is
3  today?

4  A. Yes.

5  MS. HOGAN: Okay. I don't think I have
6  anything further. The prosecutor is here and she's going
7  to cross-examine you.
8  EXAMINATION BY MS. PARSONS:

9  Q. Mr. Rini, we actually spoke a couple years ago.
10  I think you and I talked about whether you were
11  testifying or not; do you remember that conversation with
12  me?

13  A. I'm sorry, you were garbled.

14  Q. I'll move the phone around. Can you hear me
15  now? Can you hear me?

16  A. Yes, I can.

17  Q. Okay. It sounded like a phone commercial. Do
18  you remember talking to me about your testimony? I think
19  I called you prior to trial or prior to the Motion For
20  New Trial?

21  A. What is your name?

22  Q. Dawn Parsons.

23  A. I do recall talking to someone, yes.

24  Q. You had told Ms. Hogan that Ms. Benson, the
25  girlfriend of the Defendant, contacted you?

1    A.  Right.
2    Q.  Do you remember the exact date?
3    A.  No, I do not.
4    Q.  Do you have any time -- do you have any idea of
5    what time of what month?
6    A.  No, no. Again, to the best of my recollection
7    it would have been somewhere around December I am
8    thinking. And the reason I say that is because of the
9    time frame between the initial contact and the generation
10   of the report and all of the machinations that occurred
11   between that where I was speaking to her, trying to get
12   ahold of Mr. Toney, speaking with Keith Carnes, speaking
13   with his friend, trying to get ahold of Mr. Toney again.
14   There was a lot of stuff that was going on prior to me
15   writing this report.
16   Q.  Okay. Do you remember when Ms. Benson contacted
17   you what the context of your conversation was or what she
18   was telling you?
19   A.  Well, she needed a crime scene expert, she
20   wanted to retain me because she wasn't happy with the
21   fact that Mr. Toney hadn't provided them with someone who
22   could look at the material and reconstruct it, and those
23   are my words, not hers. But essentially she was looking
24   for someone with my background to assist with Mr. Carnes'
25   defense.

```
 1      Q.  Did you know at the time you spoke with Ms.
 2  Benson what procedural posture the case was in?
 3      A.  No, I did not.  In fact, I do recall previously
 4  I tried to talk her out of retaining me and told her to
 5  contact the attorney, I didn't know it was Mr. Toney at
 6  the time, but to contact Mr. Toney, give him my CV,
 7  express her concerns, and have him contact me if he
 8  should need me because -- for the reason we're going over
 9  now, I think it's more appropriate that the attorney
10  contact, you know, any experts to see whether or not they
11  actually need them or want them or can afford them or
12  whatever.
13      Q.  So did you know that a jury had convicted
14  Mr. Carnes of murder in the first degree?
15      A.  I did.  Well, I did remember that he was
16  convicted.  The second trial, that was a bench trial.
17  Was that a bench trial, the second trial?
18      Q.  Correct.
19      A.  But I didn't know that right off the bat.  That
20  might have -- you know, I did learn that sometime between
21  the initial conversation and the subsequent or
22  preparation of the report.
23      Q.  So to the best of your recollection you believe
24  your contact with Ms. Benson was in December of 2005?
25      A.  That's my best recollection.
```

1   Q. When you finally got the information from
2   Mr. Toney, do you remember exactly what you got?
3   A. The paperwork, the documentation?
4   Q. Yes.
5   A. Police reports, crime scene reports,
6   photographs, autopsy report, statements, those type of
7   material. As I recall, he said I'll send you everything
8   I have.
9   Q. Do you know if you received any deposition
10  transcripts of the eye witnesses?
11  A. I think I -- I believe I did.
12  Q. Do you know if you received any trial
13  transcripts of the eye witnesses?
14  A. I'm thinking I did but I can't be sure. I do
15  remember reading extensively the three female
16  witnesses.
17  Q. And when you talked to Mr. Toney eventually, you
18  talked about you didn't think that his trial strategy
19  involved your testimony. What gave you that
20  impression?
21  A. He wasn't excited about it. He had some other
22  comments he made about Ms. Benson and the situation he
23  had and the financial support he had or didn't have at
24  the time. And I think he was pretty much committed to
25  his trial strategy and it didn't include someone like

```
 1   myself.
 2       Q.  Do you know what his trial strategy was?
 3       A.  I think -- this is my opinion based on our
 4   conversations -- is that --
 5           MS. HOGAN:  Excuse me, Mr. Rini.  Just for
 6   the record I'm going to go ahead and object to the
 7   speculation, but you can go ahead and finish answering.
 8       A.  I can't speculate, you're right, I'm sorry.
 9       Q.  (By Ms. Parsons)  But you can go ahead and
10   speculate for purposes of the deposition.  So what do you
11   think his trial strategy --
12       A.  My belief based on our conversations, the only
13   evidence or I guess evidence that the prosecution had was
14   based on three eye witnesses' testimony, and Mr. Toney
15   told me how he when he was a United States Attorney was a
16   member of the National Institute of Justice Committee
17   that established eye witness testimony procedures, and he
18   reflected on that process and we had a long discussion
19   about the value of eye witness testimony, particularly of
20   individuals who were under the influence of drugs or
21   alcohol.  And so he -- my memory is that the three
22   eyewitnesses were admitted crack cocaine users and
23   apparently were using at the time of the incident, and so
24   I think, as I recall, his strategy was to discredit those
25   three witnesses as not being reliable witnesses.  That's
```